UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
_____
                                  )
PAUL SNIADACH, Personal           )    No. 20-cv-30115
Representative of the Estate      )
of Joseph Sniadach,               )
                                  )
     On behalf of all others      )
     similarly situated,          )
                                  )
          Plaintiffs              )
                                  )
 v.                               )    COMPLAINT AND
                                  )    JURY TRIAL DEMAND
BENNETT WALSH,                    )
DAVID CLINTON,                    )
VANESSA LAUZIERE,                 )
CELESTE SURREIRA,                 )
                                  )
     and                          )
                                  )
FRANCISCO URENA,                  )
                                  )
          Defendants              )
_____ )
```

INTRODUCTION

1.   The Commonwealth of Massachusetts made a promise to
its citizen-soldiers: you take care of us in times of conflict,
and we will take care of you when you return.  Although the
Massachusetts veterans residing at the Soldiers' Home in
Holyoke, Massachusetts ("Soldiers' Home") kept their promise to
serve their country, the Commonwealth did not keep its promise
to protect and keep them safe from harm when they were unable to
care for themselves.  Instead of providing the veterans the
appropriate care to which they were entitled, the five

1

defendants in this lawsuit showed deliberate indifference to the veteran's basic needs.  As a result of the defendants' actions and inactions, 76 veterans unnecessarily died and another 84 veterans were unnecessarily infected with the deadly COVID-19 virus.  Our veterans deserved better.

2.  This is a civil rights class action, brought pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983 by the Estate of Joseph Sniadach ("Estate"), a veteran who died as a result of a COVID-19 outbreak at the Soldiers' Home.  It is also brought on behalf of all other residents of the Soldiers' Home who contracted COVID-19, including the estates of those veterans who, like Mr. Sniadach, died of COVID-19-related illness contracted while residing at the Soldiers' Home.  This case seeks to redress the needless pain, suffering, and death that these veterans endured as a result of the actions of the defendants, who were entrusted with their care, but who were denied the most basic elements of decent care, adequate treatment, and safety.

3.  Each of these five defendants acted with deliberate indifference to the risks posed by the COVID-19 pandemic, an indifference that resulted in the spread of COVID-19 throughout the Soldiers' Home.  The spread of COVID-19 at the Soldiers' Home was preventable.

4.  The facts that led to the needless deaths and

infections of veterans at the Soldiers' Home from COVID-19 are
not genuinely in dispute.  An independent investigation,
commissioned by the Governor of the Commonwealth, details the
unprofessional, unethical, and deliberately indifferent behavior
of the five individuals primarily charged with the care of the
veterans at the Soldiers' Home, the defendants in this lawsuit.
The investigation report, "The COVID-19 Outbreak at the
Soldiers' Home in Holyoke: An Independent Investigation
Conducted for the Governor of Massachusetts" ("Report"),
attached as Exhibit 1,[1]  describes a litany of "utterly baffling"
misrepresentations, misjudgments, mistakes, and blatant errors,
which by any standard amounted to a callous disregard for the
health and safety of the veterans residing in the Soldiers'
Home.

5.    Although no legal proceeding can ever restore the
lives of the 76 veterans who died unnecessarily at the Soldiers'
Home, or restore the health of the other 84 veterans who
unnecessarily contracted COVID-19, this case seeks to right
those wrongs and afford these citizen-soldiers and their
families some modicum of respect for their losses.

PARTIES

6.    The plaintiff, Paul Sniadach, is the Personal

---

[1] The Report is also available at https://www.mass.gov/doc/report-
to-governor-baker-re-holyoke-soldiers-home/download.

Representative of the Estate of Joseph Sniadach.  See Hampshire County Probate and Family Court No. HS20P0353EA.  Paul Sniadach lives in Easthampton, Massachusetts.

7.    Pursuant to Federal Rule of Civil Procedure 23, the plaintiff seeks to certify a class of similarly situated individuals and/or estates of individuals who, like the plaintiff, contracted COVID-19 while residing at the Soldiers' Home in Holyoke, Massachusetts between March 1, 2020, and June 23, 2020, and suffered as a result.

a.    Certification of a class pursuant to Rule 23(a) is appropriate because:

i. The class is so numerous that joinder of all members is impracticable.  At least "76 Soldiers' Home veterans who were COVID-19 positive died in the 11-week period between March 25, 2020 and June 12, 2020," and at least an additional 84 veterans contracted COVID-19 during that time period.  Report at 6, 113.

ii. There are common questions of law or fact, including: (1) Whether the defendants acted or failed to act in a manner that deprived residents of the Soldiers' Home of their civil rights, including their rights to safety, freedom from harm, and the full enjoyment of their lives; (2)

4

Whether the defendants substantially departed from acceptable professional standards in providing care to residents of the Soldiers' Home; (3) Whether the defendants' actions and inactions constituted deliberate indifference to the health and safety of residents of the Soldiers' Home; and (4) Whether the defendants acted in a manner that caused the death of residents of the Soldiers' Home.

iii. The claims or defenses of the named plaintiff are typical of the claims or defenses of the class, since all suffered from a common cause, the result of the common actions of the defendants.

iv. The named plaintiff will fairly and adequately protect the interests of the class, and there are no antagonistic interests with other members of the class.

b. Certification of a class pursuant to Rule 23(b)(3) is appropriate because "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

c. Appointment of undersigned counsel as class counsel is

appropriate under Rule 23(g) because counsel has more
than four decades of experience with complex
litigation and has the resources necessary to commit
to representing the class.

8.   The defendant, Bennett Walsh, is the former
Superintendent of the Soldiers' Home in Holyoke, Massachusetts.
He currently resides in Massachusetts.

9.   The defendant, Dr. David Clinton, is the former
Medical Director of the Soldiers' Home in Holyoke,
Massachusetts.  He currently resides in Massachusetts.

10.   The defendant, Vanessa Lauziere, is the former Chief
Nursing Officer of the Soldiers' Home in Holyoke, Massachusetts.
She currently resides in Massachusetts.

11.   The defendant, Celeste Surreira, is the former
Assistant Director of Nursing of the Soldiers' Home in Holyoke,
Massachusetts.  She currently resides in Massachusetts.

12.   The defendant, Francisco Urena, is the former
Massachusetts Secretary of Veterans' Affairs.  He currently
resides in Massachusetts.

JURISDICTION AND VENUE

13.   This Court has subject matter jurisdiction over this
action under 28 U.S.C. § 1331 because the claims arise under the
laws of the United States, i.e., the Fourteenth Amendment to the
United States Constitution and 42 U.S.C. § 1983.

14.   This Court has supplemental jurisdiction over any state law claims the plaintiffs might bring pursuant to 28 U.S.C. § 1367(a).

15.   This Court has personal jurisdiction over the defendants because they each reside in Massachusetts and, during the relevant time period, they each worked in Massachusetts where the incidents underlying the Complaint occurred.

16.   Venue is proper in the Western Division of this Court because all parties reside in either Hampshire County or Hampden County, except for Secretary Urena, who resides in another county within Massachusetts.

## FACTUAL BACKGROUND

### A.   Background Regarding the Soldiers' Home in Holyoke

17.   The Soldiers' Home in Holyoke was established by statute in 1946 and is governed by G.L. c. 6, §§ 17, 70, and 71.

18.   Chapter 70, § 70 creates a seven-member Board of Trustees, comprised of residents of Berkshire, Franklin, Hampden, and Hampshire counties.  Its members are appointed by the Governor of Massachusetts.

19.   Chapter 70, § 71 charges the Board of Trustees with the appointment of a Superintendent, who serves as the "administrative head of the home" and who shall, "subject to the approval of the trustees, appoint and may remove a medical director. . . ."

20.   Bennett Walsh was appointed Superintendent of the Soldiers' Home on May 29, 2016.  Mr. Walsh served as Superintendent until March 30, 2020.

21.   Chapter 70, § 71 provides that the "medical director shall have responsibility for the medical, surgical and outpatient facilities and shall make recommendations to the superintendent regarding the appointments of all physicians, nurses and other medical staff."

22.   Dr. David Clinton served as Medical Director of the Soldiers' Home during the relevant events set forth in this Complaint.

B.   State and Federal COVID-19 Guidance

23.   The SARS-COV-2 coronavirus is referred to throughout this Complaint as "COVID-19."

24.   Beginning in February 2020, the Commonwealth and the United States government began promulgating guidance directed at protecting people from COVID-19, guidance which expressly directed institutions to (a) identify patients with COVID-19, and (b) isolate patients with COVID-19 from other patients and staff.

25.   As the Report clearly established, isolating suspected cases of COVID-19 was epidemiology 101.  The Soldiers' Home received clear directives to that effect, including the following:

8

a. "[O]n March 6, 2020, Elvira Loncto (a federal VA employee) distributed COVID-19 guidance to Mr. Walsh . . . . [that] <u>advised limiting staff movements between COVID-19 contaminated and unaffected areas</u>, screening and limiting visitors, <u>assessing residents daily for symptoms, developing an isolation plan for suspected cases</u>, and <u>encouraging social distancing</u>."   Report at 60 (emphasis added).

b. "On March 12, 2020, Paul Moran (Department of Veterans' Services Chief of Staff) forwarded an email . . . to Mr. Walsh . . . . attach[ing] COVID-19 guidance for assisted-living facilities, congregate care programs, agency based in-home caregivers and workers, community day programs, and non-agency based in-home caregivers. . . . The community day program, congregate care program, and assisted living facilities guidance <u>directed isolating symptomatic individuals. The assisted-living facility guidance specified that a symptomatic resident should be moved to a single-person unit with the door closed</u>."   Report at 61 (emphasis added).

c. "On March 12, 2020, the CDC released guidance detailing 'what healthcare personnel should know about caring for patients with confirmed or possible' cases of COVID-19. <u>This March 12, 2020 guidance recommended isolating patients suspected of COVID-19, among other precautionary measures</u>. In particular the guidance recommended "<u>placing a facemask on the patient and placing them in an examination room with the door closed in an Airborne Infection Isolation Room (AIIR), if available</u>."   Report at 61 (emphasis added).

d. "The Department of Public Health issued another policy memorandum on March 16, 2020, focused on long-term care facilities. This memorandum replaced previous long-term care facility guidance issued on March 11, 2020. The memorandum: (i) restricted visitation by all visitors and non-essential health care personnel, except in certain compassionate care situations; (ii) suspended all communal dining, internal, and external group activities; (iii) recommended the use of eye protection, gowns, and gloves while caring for residents; (iv)

required facilities to perform temperature checks at entryways (individuals with temperatures over 100.3 degrees Fahrenheit were not permitted to enter the facility); and (v) <u>recommended that patients with known or suspected COVID-19 be cared for in single-person rooms with the door closed</u>." Report at 62 (emphasis added).

C.   <u>Failed Preparation at Soldiers' Home</u>

26.   The Soldiers' Home leadership team, including the defendants, Bennett Walsh (Superintendent), David Clinton (Medical Director), Vanessa Lauziere (Chief Nursing Officer), and Celeste Surreira (Assistant Director of Nursing), met in early March to discuss measures to prevent the introduction and spread of COVID-19 at the Soldiers' Home.

27.   Dr. Clinton was tasked "with monitoring CDC and Department of Public Health guidelines and providing updates to the team." Report at 74. These guidelines would and/or should have included the guidelines described in Paragraph 25 above.

28.   Despite the repeated guidance from the Commonwealth and the federal government, no isolation rooms were ever used during Mr. Walsh's tenure as Superintendent.

29.   In addition, staff at the Soldiers' Home had inadequate access to Personal Protective Equipment. Indeed, staff were discouraged from using Personal Protective Equipment. See Report at 70-71.

D.   <u>"Veteran 1"</u>

30.   As explained in detail below, the first veteran at the

Soldiers' Home diagnosed with COVID-19 (referred to in the Report as "Veteran 1") had clear symptoms that he carried the virus in February 2020, but he was not tested until March 17, 2020, and, even after receiving his positive test result on March 21, 2020, the defendants allowed Veteran 1 to continue living among other veterans and staff because, in Dr. Clinton's opinion, consideration of whether to isolate him was a "moot point" since "everyone has been exposed [to COVID-19] already." Report at 78-80.

31.   More specifically, Veteran 1, who resided in the dementia unit, "first showed symptoms consistent with COVID-19 in February, including a high-pitched cough and fever." Report at 78.  Despite these classic COVID-19 symptoms, Veteran 1 was not tested for COVID-19.  Instead, he was tested for "pneumonia, strep, and the flu" in February and early March.  Report at 78.

32.   On March 15, 2020, a veteran nursing aide reported to Ms. Surreira that Veteran 1 "was weak, feverish, and coughing more than he had been previously."  He was still not tested for COVID-19.  Report at 79.

33.   Even after Veteran 1 was finally tested for COVID-19 on March 17, 2020, inadequate precautions were taken to mitigate the potential spread of the virus from Veteran 1 to other veterans (or staff) with whom he had come in contact.  Report at 79-80.

34.  To the contrary, following Veteran 1's COVID-19 diagnosis, the defendants repeatedly made decisions that further exacerbated the spread of COVID-19 at the Soldiers' Home:

> As soon as his positive test result was received (four days after Veteran 1 was initially swabbed for COVID-19) Veteran 1's three roommates were moved to a different room. Prior to this, one of Veteran 1's roommates was "very mobile" and frequently visited other rooms. According to Ms. Lauziere, none of Veteran 1's roommates were exhibiting COVID-19 symptoms at this time.

> After testing positive, staff attempted to keep Veteran 1 in his room. The door to Veteran 1's room was supposed to remain closed, but staff largely ignored this policy and kept the door open for faster access . . . .

> When Veteran 1 tested positive, Dr. Clinton and Ms. Lauziere again discussed whether Veteran 1 should be moved to the isolation unit. Dr. Clinton advised against doing so, as in his view others in 1-North had been exposed already, and the facility would be at risk if Veteran 1 got out of his room on an unsecured unit.

> . . . .

> Staff who worked on 1-North during the weekend of March 21-22, 2020, after the test result confirmed that Veteran 1 was positive for COVID-19, continued to "float" and work in other areas of the facility, potentially spreading COVID-19. A nursing aide who primarily works on 2-North recalls being floated down to 1-North on March 26. She was tested for COVID-19 on March 27, and the result came back positive one week later. A laundry worker reports that he changed the curtains on 1-North on March 22 and then proceeded to visit each of the other units for laundry purposes during the following week. This laundry worker later tested positive for COVID-19. A registered nurse recalled that even after Veteran 1 tested positive, nursing aides would be scheduled to work two hours on 1-North and then directed to complete the balance of their shift on the third floor. The nurse asked her supervisors, including Ms. Lauziere, why staff were floated between positive and negative units given the risk of spreading COVID-

19. Ms. Lauziere responded that the Home "had to work with the number of staff they had."

Report at 81-82.

E.   Mr. Walsh falsely reported to Secretary Urena that Veteran 1 had been quarantined.

35.   Later in the evening of March 21, 2020, after Veteran 1's COVID-19 test came back positive, Mr. Walsh informed Secretary Urena of Veteran 1's diagnosis, but, in doing so, falsely stated that the Soldiers' Home had isolated Veteran 1 from others.  According to the Report:

> Mr. Walsh emailed Secretary Urena (copying Paul Moran (Department of Veterans' Services Chief of Staff), Stuart Ivimey (General Counsel for the Department of Veterans' Services), and Anthony Preston (Communications Director for the Department of Veterans' Services)), stating: "As briefed earlier in the week, (veteran with covid symptoms) we received the test results back on our veteran and the results are positive for covid-19. **We have isolated said veteran and quarantined the unit.** We're currently are [sic] testing 5 other veterans and sending out their samples this evening for testing. We'll have the full report once all the information is collected and protocol actions taken/implemented." (emphasis added) Mr. Walsh did not explain that the Soldiers' Home did not have adequate staffing to use the isolation rooms that had been set up on the third floor.

Report at 96 (emphasis in original).

36.   Later that day, "In response to questions from Mr. Moran, Mr. Walsh responded that 'the protocol is to isolate the veteran (which we did)' and 'staff has the necessary PPE at this time,'" and, following that communication, Mr. Walsh wrote directly to Secretary Urena and again falsely represented, "The

13

veteran was isolated as soon as the positive test was received." Report at 97.

F.  COVID-19 devastated veterans and staff at the Soldiers' Home.

37.  On March 27, 2020, the ill-fated decision was made to combine the Soldiers' Home's two dementia units, despite the fact that several veterans in those units had already been diagnosed with COVID-19 and were obviously at high risk of transmitting the virus to others.  According to the Report: "Unit 2-North, one of the two locked dementia units, was closed and all of its 21 veterans were moved to Unit 1-North—doubling the number of veterans in 1-North (which previously held 21 veterans).  This required that veterans be crowded into rooms and common spaces, with their beds inches apart."  Report at 87.

38.  Mr. Walsh, Dr. Clinton, Ms. Lauziere, and Ms. Surreira were each involved in the decision to combine the two dementia units.  Report at 88.

39.  During the independent investigation, Mr. Walsh admitted that "Ms. Lauziere informed him of the decision" to combine the two dementia units, "that he did not overrule the decision," and that he "was aware that 1-North and 2-North contained a 'mix of those who were tested, pending test, and not showing signs,'" but he maintained "that the ultimate decision to combine the units was 'a medical decision submitted to Dr.

14

Clinton.'"  Report at 88-89.

40.  Dr. Clinton denied responsibility for combining the
dementia units, but the Report "reject[s] as implausible Dr.
Clinton's assertion that he was not involved in the decision. At
the very least, he acknowledges that he was aware of it, and—as
the ultimate clinical authority for the Soldiers' Home—should
have involved himself."  Report at 88-89.

41.  The Report properly concluded that Ms. Lauziere's
decision to combine the two dementia units was "inconsistent
with her training, inconsistent with reasonable judgment, and
inconsistent with her duty to the veterans at the Soldiers'
Home."  Report at 89.

42.  The Report laid out in detail the devastating impact
that the combination of the two dementia units had on veterans
and staff:

> Staff describe the move as "total pandemonium," "when
> hell broke loose," and "a nightmare." They reported that
> "all of a sudden they just started moving people." One
> staff member reported thinking: "How can they do this
> because this [is] the most insane thing I ever saw in my
> entire life?" She "felt it was like moving the
> concentration camp—we are moving these unknowing
> veterans off to die. I will never get those images out
> of my mind—what we did, what was done to those veterans."

> A number of staff members reported discussions with Ms.
> Lauziere in which they questioned the decision to
> combine the two units, or tried to convince her to change
> course. One staff member reports that she "marched over"
> to Unit 1-North and asked Ms. Lauziere "what is going on
> . . . there are a lot of people here who are not showing
> symptoms and you are going to move them in with people

who are and put them right on top of each other?"

With assistance from Ms. Surreira, Ms. Lauziere "direct[ed] traffic" during the move. Housekeeping also was instructed to remove tables and chairs from the dining room on Unit 1-North so that veterans' beds could be lined up in the dining room. Ms. Surreira told housekeeping staff that if they were not going to be on the floor for more than 15 minutes, they did not need an N95 mask and could use a surgical mask instead. Some housekeeping staff refused, and ultimately received N95 masks to wear during the move.

After the consolidation, Unit 1-North was packed with 42 veterans. The veterans' beds and nightstands were directly next to each other and there were no privacy curtains between them. None of the veterans' clothing or personal items were initially moved down to Unit 1-North with them. There were insufficient outlets to plug in the beds, so some veterans could not elevate their beds. At times, [t]he names above the beds did not match the veteran who was in the bed, although the veterans wore ID bracelets and later the veterans' names were posted outside of their rooms. The dining room was made into a bedroom with nine beds in it. Veterans were sitting in common day rooms in their gowns.

One nursing aide reflected: "We always took pride in our care with honor and dignity, and I thought my god where is the respect and dignity for these men, we are leaving them sitting there in johnnies more confused because there is 40-something of them now."

Social Worker Terri Gustafson (who has worked at the Home for 21 years) reports that she saw Ms. Surreira point to a room and state: "All this room will be dead by tomorrow." Similarly, at approximately 7:00 p.m. on March 27, Social Worker Jill Orzechowski heard Ms. Lauziere—while standing outside of a room on 1-North— say "something to the effect that this room will be dead by Sunday so we will have more room here."

Ms. Orzechowski . . . . recalled raising concerns with Ms. Lauziere about the risk of COVID-19 spreading, and Ms. Lauziere responding that "it didn't matter because [the veterans] were all exposed anyway and there was not enough staff to cover both units."

16

Report at 90-91.

43.  The Report concluded:

We find substantial evidence that the conditions and
quality of care on the combined 1-North unit during the
weekend of March 28-29 were deplorable. Clinical staff
report that they tried to do the best they could under
the circumstances, but they were unprepared,
understaffed, and without sufficient resources and
guidance. Some staff members reported that they were
struggling to provide adequate care, including to keep
veterans hydrated and to provide sufficient morphine and
comfort medications to certain veterans who were dying.
Staff reported difficulties tracking which veterans had
been fed. One staff member said she observed a COVID-19
positive veteran who "had fecal matter on his socks and
was laying on another vet's bed." Staff reported that
they felt like it was "difficult" and "impossible" to
keep the veterans in 1-North isolated from one another.
Many of the veterans in the consolidated unit were "bed
hoppers," meaning that in the fog of dementia, they would
climb into various beds on the units. Some nursing aides
expressed a concern that they could not keep track of
which veterans were positive and which veterans was
negative for COVID-19.

. . . .

Social Worker Carrie Forrant provided . . . .

It was surreal . . . I don't know how the staff over in
that unit, how many of us will ever recover from those
images. You want to talk about never wanting this to
happen again.

Report at 90-91.

44.  The first confirmed COVID-19 death occurred on March
24, 2020, three days before the two dementia units were
combined.  Report at 92.

45.  The dementia units were combined on March 27, 2020.

17

46.   Veteran 1 died on March 28, 2020.   Report at 93.

47.   The rapid spread of COVID-19 and the rise in the death toll after the two units were combined was anticipated by the Soldiers' Home's leadership: "13 body bags" were delivered to the 1-North unit on Friday, March 27, 2020, "shortly before the consolidation of the two units began," and on March 28, 2020, "a tractor trailer refrigeration unit (ordered earlier in the week) arrived outside of the Soldiers' Home to store the remains of veterans who passed away, as there was not enough space in the morgue" to store the bodies of the veterans who had perished. Report at 94.

G.   Removal of Mr. Walsh as Superintendent.

48.   Mr. Walsh was placed on administrative leave on March 30, 2020.   Report at 109.

49.   As Mr. Walsh was placed on administrative leave, "a response team organized by Secretary Sudders, Acting Secretary Tsai, and Undersecretary Mick had arrived at the facility to take command of the rapidly devolving situation."   The team quickly "triage[d] patients, compile[d] essential records, institute[d] infection control measures, and sen[t] ill patients to the hospital."   Their actions significantly reduced the scope of the outbreak.   Report at 110.

50.   The National Guard assisted by "'swabbing all employees and residents,' with the plan to 're-swab negative

18

individuals every 48 hours.' The Guard's medical units (consisting of doctors and nurses) assumed an active role in patient care in place of the scores of Soldiers' Home staff members who were sick with COVID-19." Report at 110.

51.  The team that converged at the Soldiers' Home reported shocking conditions.  According to the Report:

- Ms. Liptak and her team have a "collective 90-plus years of nursing," but "none of us have ever seen anything" like this. Upon arrival, "we did not know what patients were in the Home or where they were." She and her team put in 15-hour days trying to accurately count, assess, and cohort the patients. The existing census records were "incomplete" and "disorganize[d]," at best. It was "complete mayhem." There were "not assessments being made on all patients."

  . . . .

- The 1-North unit "looked like a war zone." According to Ms. Colombo, this "hot" unit had veterans "crammed in on top of each other," some of whom "were clearly dying." There were "chairs of people lined up, some were clothed, some unclothed, some were wearing masks, some weren't."

- Ms. Colombo asked Ms. Lauziere (the Chief Nursing Officer) to explain the reasons for combining 1-North and 2-North, but "did not get an adequate response, other than it was done because of staffing . . . she appeared to know it wasn't the right thing to do, but did it anyway." It appeared to Ms. Colombo that "they pooled [veterans] together based on dementia status instead of COVID status."

- Based on a review of records from the previous week, Ms. Liptak concluded that the Soldiers' Home was badly understaffed during the previous days. Where there should have been 4 to 5 HPPD (healthcare provider hours per patient day), "they were not even at 1 HPPD."

- Ms. Liptak observed some staff with gowns but no masks; some with only masks; and some with only gloves on. Her initial assessment was that there was "no understanding of what the infection control guidelines were." When Ms. Liptak scheduled an interview with Ms. Gosselin (Infection Control nurse) to discuss the events that had transpired, Ms. Gosselin reported that Ms. Lauziere (Chief Nursing Officer) and Ms. Surreira (Assistant Director of Nursing) "did not want to have anything to do with the infection control nurse."

- Ms. Gosselin told Ms. Liptak that she "would rather be dead" than continue being at the facility; Ms. Liptak referred Ms. Gosselin to trauma and grief counseling.

Report at 111.

52.  Defendants Walsh, Clinton, Lauziere, and Surreira consistently failed to exercise minimally adequate professional judgment in the administration of the Soldiers' Home during the pandemic and in the provision of care and treatment to the veterans in the Home.

53.  The actions, inactions, judgments, and decisions of Defendants Walsh, Clinton, Lauziere, and Surreira directly created unsafe conditions of confinement for the veterans at the Soldiers' Home, deprived them of basic care, denied them minimally adequate treatment, and exposed them to harm.

54.  As a direct result of the actions and inactions of Defendants Walsh, Clinton, Lauziere, and Surreira, between March 1 and June 12, 2020, 160 veterans at the Soldiers' Home were infected with COVID-19, 76 of whom died as a result.

20

H.   <u>Secretary Urena</u>

55.   The crisis at the Soldiers' Home would have been averted had Secretary Urena not acted with deliberate indifference and substantially departed from accepted professional standards.

56.   Mr. Walsh's shortcomings as Superintendent were well known to Secretary Urena prior to the outbreak of COVID-19 at the Soldiers' Home.

57.   Before Mr. Walsh was appointed as Superintendent in May 2016, Secretary Urena was aware of the fact that Mr. Walsh had no experience in either health care or health care administration.  Report at 36-37.

58.   On account of "Mr. Walsh's lack of experience," Secretary of Health and Human Services Marylou Sudders "instructed Secretary Urena to ensure that Mr. Walsh's Deputy Superintendent . . . would have a background in longterm care." Report at 37.

59.   John Crotty was hired as Deputy Superintendent.

60.   However, as Secretary Urena was aware, Mr. Crotty resigned in June 2019.  As Secretary Urena was further aware, following Mr. Crotty's resignation, the Deputy Superintendent role was left unfilled until the response team organized by Ms. Sudders took over the administration of the Soldiers' Home on March 30, 2020.  Report at 43.

21

61.   As a result of ongoing concerns about leadership at
the Soldiers' Home, the Commonwealth's Executive Office of
Health and Human Services commissioned a study of the Soldiers'
Home by the Moakley Center for Public Management at Suffolk
University," which was conducted by Nicole Rivers.  According to
the 2019 study:

> Ms. Rivers' reports from the staff interviews are
> striking: she recounts that "staff were crying" during
> the interviews because they "need more help," that they
> "felt bullied by management," and were "overwhelmed with
> the amount of care they had to provide with limited
> resources."

Report at 49-50.  Secretary Urena was aware of this study after
it was released, but took no action.

62.   Issues persisted.  According to the Report:

> Secretary Urena noted that the high rate of staff
> turnover under Walsh's leadership was a red flag and "if
> one more employee had quit [under Mr. Walsh's
> management], there would be a more serious conversation
> that had to happen with him." Secretary Urena explained
> that no other department had staff turnover at the level
> of the Soldiers' Home in Holyoke. He emphasized that Mr.
> Walsh would get defensive if asked about the
> resignations, and the Department of Veterans' Services
> could not conduct exit interviews with the staff because
> they felt retaliation would ensue if they were to share
> their views in an exit interview.

Report at 38-39.

63.   Thus, prior to the outbreak of COVID-19 at the
Soldiers' Home, Secretary Urena was well aware of Mr. Walsh's
shortcomings as Superintendent and took inadequate steps to

protect the veterans at the Soldiers' Home and keep them safe
from harm.

64.   Secretary Urena was also keenly aware of Mr. Walsh's
shortcomings in addressing the COVID-19 crisis.

65.   Secretary Urena was present when Mr. Walsh addressed
the Soldiers' Home Board of Trustees on March 10, 2020, at which
time "Mr. Walsh's prepared presentation did not contain any
information about COVID-19."  When asked about COVID-19, Mr.
Walsh did not address "clearing space at the Soldiers' Home to
use as isolation areas for infected residents."  Report at 65-
66.

66.   On March 17, 2020, the date when Veteran 1 was tested
for COVID-19 symptoms, Mr. Walsh briefed Secretary Urena about
the "veteran with covid symptoms" (which Secretary Urena
attempted to deny during his interview with investigators).
Report at 96.

67.   On March 21, 2020, Mr. Walsh reported to Secretary
Urena that Veteran 1 had tested positive for COVID-19.  Report
at 96.

68.   On March 22, 2020, Mr. Walsh reported to Secretary
Urena that "[f]ive other veterans in the same ward who were
exhibiting symptoms have been tested," and he provided "the
names of the direct care staff that worked at the facility from

March 17 through March 21 who might have been exposed to the symptomatic veterans." Report at 97.

69. On March 22, 2020, Mr. Walsh also communicated the following information to Secretary Urena regarding Veteran 1:

> The veteran was encouraged to wear a mask, this was complicated by his dementia, he kept removing it and needed constant cues to keep on his face. **Staff tried to keep him separate from the other vets on the unit.** The staff were instructed to wear PPE when in contact with this veteran. This veteran has had respiratory symptoms on and off (+ pneumonia) and he has not left the building. His nephew was his only visitor prior to banning visitation and the board of health is following up with him. **The veteran was isolated as soon as the positive test was received.**

Report at 97 (emphasis in original).

70. On March 27, 2020, the date when Veteran 1 was tested for COVID-19 symptoms, "Mr. Walsh told Secretary Urena that the two [dementia] units were going to be consolidated during the afternoon of March 27." Secretary Urena was "<u>aware that both 1-North and 2-North contained some COVID-19 positive veterans at the time the units were combined</u>" but did not object to their consolidation. Report at 109 (emphasis added).

71. On March 27, 2020, Secretary Urena also learned that the situation at the Soldiers' Home was so bad that Mr. Walsh had requested the assistance of the National Guard. Report at 100.

72. Given this backdrop, Secretary Urena should have immediately taken affirmative steps to confirm protocols were in

place and being implemented at the Soldiers' Home, including confirming that patients with COVID-19 or exhibiting COVID-19 symptoms were being isolated.  But no such intervention occurred.  Secretary Urena received information and did nothing.

73.  On the evening of March 28, 2020, SEIU Local 888 President Brenda Rodrigues contacted Secretary Sudders directly to report the concerns of a nursing aide about the tremendous number of deaths of veterans at the Soldiers' Home.  Secretary Sudders immediately contacted Secretary Urena.  Report at 103.

74.  On March 29, 2020, "For the first time, the Department of Veterans' Services requested daily reporting of the number of pending COVID-19 cases (i.e., veterans awaiting their test results), the number of patients recovered from COVID-19, and the number of deaths associated with pending or confirmed COVID-19 cases."  Report at 126.

75.  But by that time, it was too late to avoid the crisis that would follow.

76.  The Report ultimately concluded that "the Department of Veterans' Services failed in its responsibility to oversee the Soldiers' Home," Report at 16, explaining as follows:

> Secretary Urena recommended and approved Mr. Walsh's appointment despite his lack of any healthcare administration experience. Once Mr. Walsh was in the role, Secretary Urena and his Chief of Staff soon developed concerns about his performance. They felt his communication skills were "poor" and he was "cryptic" and "not forthright in his communications." They thought

he was "in over his head" and did not spend enough time at the Home. They observed massive turnover in Mr. Walsh's staff, including clinical leadership positions. They had to hire an executive coach to work with Mr. Walsh on his anger management, and then had to extend this appointment in response to more complaints. And they were concerned that Mr. Walsh tried to control the flow of information in and out of the Home. Secretary Urena asserts that at one point, Mr. Walsh asked the Secretary of EOHHS to bar Secretary Urena from visiting the Home without giving Mr. Walsh prior notice.61 Despite all this, Secretary Urena did not take sufficient action to address Mr. Walsh's deficits, and allowed the Deputy Superintendent role to remain open for nine months—including the period of the COVID-19 outbreak.

One resource that should have been available to bring healthcare oversight experience was the Executive Director of Veterans' Homes. In 2016, the Legislature created this role within the Department of Veterans' Services with reporting and oversite responsibilities for the Soldiers' Home. The statute requires that an experienced healthcare executive hold this role. But the position—mandated by statute—was never filled, for budget reasons.

A key oversight function is to make sure the right people are in important jobs. Here—for good reason—the Department of Veterans' Services leaders did not believe Mr. Walsh was the right person for the job, but they did not take action to assure that there was competent leadership in place at the Soldiers' Home.

Report at 16-17.

I.  Joseph Sniadach, a veteran who suffered dementia, died of COVID-19 related illness on April 27, 2020.

77.  Joseph Sniadach is a veteran who served in the Army during the Korean War.

78.  Joseph was an energetic soul who easily connected with people and made friends wherever he went.  He enjoyed sports,

cigars, food, casinos, and, more than anything, socializing with family, friends, and just about anyone else he encountered.

79.   Joseph moved from New Jersey to be with his family in Hadley, Massachusetts, including his cousin Michael Sniadach, Michael's wife, Mary Jane Sniadach, and their children, Paul Sniadach and Mary Jane Sniadach.

80.   Joseph lived with Michael and Mary Jane Sniadach in Hadley for approximately one and a half years.

81.   Although Joseph was in good physical health, he suffered from dementia at times.

82.   Joseph and his family decided that he would be better served by living in an assisted living facility.

83.   In January 2020, Joseph moved into the Soldiers' Home and was placed in one of the Soldiers' Home's dementia units.

84.   Sometime after Joseph came down with COVID-19 symptoms, he was admitted to the Holyoke Medical Center in Holyoke, Massachusetts.

85.   From the time that Joseph was diagnosed with COVID-19 through the time of his death, Joseph experienced conscious pain and suffering.

86.   Joseph died on April 27, 2020.

87.   According to his death certificate, Joseph's cause of death included his COVID-19 infection.

COUNT I
FOURTEENTH AMENDMENT
TO THE UNITED STATES CONSTITUTION
42 U.S.C. § 1983

88.  The foregoing paragraphs are incorporated as if stated here.

89.  The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property without due process of law."

90.  The defendants' acts and omissions were under the color of state law.

91.  The defendants violated the rights of Joseph Sniadach, and other similarly situated veterans who resided at the Soldiers' Home, by failing to protect them from harm, provide them with a safe environment, and/or provide them with minimally adequate medical and nursing care.

92.  The defendants' actions were a substantial departure from accepted professional standards for the provision of medical and nursing care in a nursing facility.

93.  The defendants' acts and omissions were done with deliberate indifference, and constituted deliberate disregard for the health, safety, and federal rights of the veterans of the Soldiers' Home.

94.  The defendants' acts and omissions shock the conscience.

95.   Pursuant to 42 U.S.C. § 1983, the plaintiff seeks recovery to the greatest extent available under the law for the Estate of Joseph Sniadach and all others similarly situated who either died or were infected by COVID-19 at the Soldiers' Home.

WHEREFORE, the plaintiff requests that the Court:

1.   Certify a class of individuals who suffered as a result of contracting COVID-19 while residing at the Soldiers' Home between March 1 and June 23, 2020, including the estates of individuals who died as a result;

2.   Order adequate notice pursuant to Fed Rule. Civ. P. 23(c) and (d) to all member of the class;

3.   Appoint undersigned counsel as counsel for the class pursuant to Fed. R. Civ. P. 23(g);

4.   Award the plaintiff and class members damages to the fullest extent available under the law;

5.   Grant any other relief to which the plaintiff and class members might be entitled.

The plaintiff demands a trial by jury.

Respectfully submitted,

Date: July 17, 2020        */s/ Thomas Lesser*

*/s/ Michael Aleo*

_____

Thomas Lesser (BBO No. 295000)
lesser@LNN-law.com
Michael Aleo (BBO No. 672071)
aleo@LNN-law.com
Lesser, Newman, Aleo, & Nasser LLP
39 Main Street
Northampton, MA 01060
(413) 584-7331 (tel)
(413) 586-7076 (fax)