# The COVID-19 Outbreak at the
# Soldiers' Home in Holyoke

An Independent Investigation
Conducted for the Governor of Massachusetts

*June 23, 2020*

Mark W. Pearlstein
McDermott Will & Emery LLP

200 Clarendon Street, 58th Floor
Boston, Massachusetts 02116
Telephone: +1 617.535.4000
Email:   mpearlstein@mwe.com

# TABLE OF CONTENTS

I.      Introduction ...................................................................................................6

II.     Executive Summary .........................................................................................9

III.    Scope and Approach to the Investigation ....................................................18

IV.     Fact-finding ...................................................................................................22

    A.  Background: the Soldiers' Home........................................................... 22

        1.  Legal posture ................................................................................. 22

        2.  Licensing, surveys, and inspections ............................................. 24

        3.  Funding ......................................................................................... 26

        4.  Physical plant and layout ............................................................. 27

        5.  Veteran population and services ................................................... 28

        6.  Leadership and staffing................................................................. 29

        7.  General strengths and weaknesses of the Soldiers' Home, and
            comparison to the Chelsea facility .............................................. 30

    B.  Disputes concerning staffing levels and reporting structures during
        Superintendent Barabani's tenure........................................................ 33

    C.  Superintendent Walsh's tenure ............................................................ 36

        1.  Background and selection as Superintendent............................... 36

        2.  Management and leadership style................................................. 37

        3.  Interactions with the Board of Trustees ...................................... 39

        4.  Leadership team ........................................................................... 41

            i.   The Deputy Superintendent's role................................... 43

        5.  Quality of care and survey results ............................................... 45

        6.  Staffing levels............................................................................... 48

            i.    The Moakley study ......................................................... 49

            ii.   BRG analysis .................................................................. 51

            iii.  Permanent schedule ........................................................ 56

    D.  The COVID-19 outbreak ...................................................................... 57

        1.  Guidance for healthcare facilities on the emerging COVID-19
            pandemic........................................................................................ 57

        2.  COVID-19 preparations at the Soldiers' Home ........................... 63

|  |  |  |
|---|---|---|
| *i.* | 2020 flu outbreak and response | 63 |
| *ii.* | Initial COVID-19 preparations | 64 |
| *iii.* | The Board of Trustees' role during the outbreak | 65 |
| *iv.* | Additional restrictions on visitation and screening measures for staff | 67 |
| *v.* | Recreation and dining | 70 |
| *vi.* | Personal protective equipment | 71 |
| *vii.* | Other communications with staff about COVID-19 preparations | 72 |
| *viii.* | Communications with veterans' families | 73 |
| *ix.* | Communications with the state agencies prior to the first suspected case | 74 |
| *x.* | Communications with labor unions regarding COVID-19 preparations | 74 |
| *xi.* | Creation of isolation areas in preparation for COVID-19 cases | 76 |

3. The response to suspected and confirmed cases of COVID-19 at the Soldiers' Home ... 78

| *i.* | Veteran 1 shows symptoms and is tested for COVID-19 | 78 |
| *ii.* | Dr. Clinton becomes ill and leaves work | 80 |
| *iii.* | Response to Veteran 1's positive test results | 80 |
| *iv.* | Discussions with families regarding MOLST forms | 82 |
| *v.* | Continued discussions and disputes with labor unions regarding COVID-19 | 83 |
| *vi.* | Updated guidance and continued disputes regarding protective equipment and infection control | 84 |
| *vii.* | Unit 2-North is closed and consolidated with Unit 1-North | 87 |
| *viii.* | The outbreak spreads: more veterans test positive and the death toll grows | 92 |

4. Reporting out: requests for assistance and communications regarding reportable events ... 94

| *i.* | Reporting requirements related to COVID-19 | 94 |
| *ii.* | Summary of reports-out and requests for advice and assistance | 96 |

|    |    | *iii.* | State and local leaders' knowledge of the evolving crisis at the Soldiers' Home ................................................................. 108 |

|    | 5. | | Superintendent Walsh is placed on administrative leave, and an Interim Administrator takes command of the Soldiers' Home.......................... 109 |

|    |    | *i.* | Val Liptak is appointed Interim Administrator, and a response team arrives at the facility........................................ 109 |

|    |    | *ii.* | The response team's observations regarding the condition of the Soldiers' Home................................................. 111 |

|    |    | *iii.* | Additional discussions with family members regarding MOLST status............................................................................ 112 |

|    |    | *iv.* | Final death toll ............................................................................. 113 |

**V.**   **Analysis and Recommendations** .......................................................................**114**

A.   The Soldiers' Home leadership team made serious errors in responding to the COVID-19 outbreak ............................................................................................ 114

1.   Combining two locked dementia units containing veterans with a mix of COVID-19 statuses, and failing to ensure an appropriate standard of care on the newly combined unit ....................................... 114

2.   Failure to promptly isolate patients suspected of COVID-19 using the rooms set aside for isolation .................................................... 116

3.   Delays in testing additional veterans for COVID-19........................... 117

4.   Delays in closing common spaces........................................................ 118

5.   Failure to stop rotation of staff among units ...................................... 119

6.   Inconsistent policies and practices with respect to personal protective equipment ......................................................................... 120

7.   Document and recordkeeping failures ................................................. 121

B.   The Department of Veterans' Services did not take steps to address substantial and long-standing concerns regarding the leadership of the Soldiers' Home .................................................................................................. 122

C.   Although Mr. Walsh reported other information that was inaccurate and incomplete, we have not identified any material violations of the reporting requirements concerning COVID-19 test results and deaths ........................... 124

1.   Inaccurate and incomplete information ................................................ 124

2.   No material violations of reporting requirements ................................ 126

D.   The Soldiers' Home should not be exempt from the requirements for licensing and inspection that apply to other long-term care facilities in Massachusetts ............................................................................................................. 128

E.    Staffing, technology, and physical plant improvements would help protect the veterans at the Soldiers' Home ...................................................................................... 129

**VI.       Conclusion** ................................................................................................**131**

**VII.      Table of Interviews Conducted** ....................................................... **133**

**"There are a lot of heroes in that building."**
Son of a veteran at the Soldiers' Home
*Boston Globe*, March 31, 2020

# I.    INTRODUCTION

The Soldiers' Home in Holyoke is a long-term care facility operated by the Commonwealth of Massachusetts. Its residents are veterans, all of whom served this nation with honor, and in many instances were responsible for acts of heroism during wartime. The employees of the Home—some of whom are veterans themselves—are mission-driven and regard caring for the veterans as a special form of service. Prior to the COVID-19 outbreak,[i] the care provided at the Home was generally quite good, and the veterans were treated consistent with the Home's mission to provide "Care with Honor and Dignity."

This investigation focuses on the COVID-19 outbreak at the Home in the spring of 2020. During this tragedy, at least 76 veterans died with[ii] COVID-19, and an additional 84 veterans and over 80 staff tested positive.[1] Governor Baker retained us to investigate the causes of this outbreak, with a goal of preventing similar tragedies in the future. We were also asked to investigate whether the Home complied with rules for timely reporting of COVID-19 infections and deaths to the Massachusetts Department of Veterans' Services and the Executive Office of Health and Human Services ("EOHHS").

To be sure, COVID-19 has exacted an almost unimaginable toll of death and devastation throughout the United States. Long-term care facilities such as the Soldiers' Home have been hit especially hard: at least 80 long-term care facilities in Massachusetts alone had 20 or more COVID-19 deaths.[2] The residents of any congregate living facility are at a heightened risk of contracting the disease, and when those residents are elderly, the consequences of COVID-19 are substantially greater. The residents of the Soldiers' Home are indeed elderly, with an average age of 85,[3] and many suffer from serious medical

---

[i] For simplicity, we will refer to the SARS-COV-2 coronavirus and the resulting COVID-19 illness together as "COVID-19."

[ii] We say died "with" COVID-19 because the scope of our investigation did not include determining causes of death. The concept of deaths "with" COVID-19 is also consistent with EOHHS's reporting requirements for facilities such as the Soldiers' Home.

conditions.  Under ordinary circumstances, the baseline mortality rate at the Home is 10 to 12 veterans per month.  In this setting, the veterans were particularly at risk during the COVID-19 outbreak.

Standing alone, neither the existence nor even the extensive scope of the COVID-19 outbreak at the Soldiers' Home demonstrate that the Home's leaders—Superintendent Bennett Walsh and his clinical and administrative teams—failed in their mission, or that the Commonwealth's oversight of the Home was insufficient.  However, as detailed below, our analysis of the Home's preparations for and response to COVID-19 in light of existing public health recommendations has identified substantial errors and failures by the Home's leadership that likely contributed to the death toll during the outbreak.  Indeed, some of the critical decisions made by Mr. Walsh and his leadership team during the final two weeks of March 2020 were utterly baffling from an infection-control perspective, and were inconsistent with the Home's mission to treat its veterans with honor and dignity.

Our investigation also reveals failures relating to the appointment and oversight of Superintendent Walsh by the Massachusetts Department of Veterans' Services. While the Home's leadership team bears principal responsibility for the events described in this report, Mr. Walsh was not qualified to manage a long-term care facility, and his shortcomings were well known to the Department of Veterans' Services— yet the agency failed to effectively oversee the Home during his tenure despite a statutory responsibility to do so.

The most substantial error by the Home's leadership team was a decision on March 27, 2020 to move all veterans from one of the two locked dementia units (2-North) into the other locked dementia unit (1-North), where they would be crowded in with the veterans already living there.  At the time, each unit had some veterans who were COVID-19 positive, some who were suspected of having the disease, and others who were displaying no COVID-19 symptoms.  Rather than isolating those with the disease from those who were asymptomatic—a basic tenet of infection control—the consolidation of these two units resulted in more than 40 veterans crowded into a space designed to hold 25. This overcrowding was

the *opposite* of infection control; instead, it put those who were asymptomatic at even greater risk of contracting COVID-19.

Our interviews with the staff who were ordered to move veterans from 2-North into 1-North were searing.  One nurse described the move as "total pandemonium."[4]  A recreational therapist who was instructed to help with the move said that she felt like she was "walking [the veterans] to their death" and that the veterans were "terrified."[5] A social worker "felt it was like moving the concentration camp—we [were] moving these unknowing veterans off to die."[6] After the consolidation was completed, one nurse described 1-North as being "like a battlefield tent where the cots are all next to each other."[7] An experienced healthcare administrator sent in three days later to address the crisis described the unit as resembling "a war zone," with some veterans clothed, some unclothed, and some obviously in the process of dying from COVID-19.[8]   A social worker vividly described the scene:

> I was sitting with a veteran holding his hand, rubbing his chest a little bit. Across from him is a veteran moaning and actively dying. Next to me is another veteran who is alert and oriented, even though he is on a locked dementia unit. There is not a curtain to shield him from the man across from him actively dying and moaning, or a curtain to divide me and the veteran I am with at the time, from this alert, oriented veteran from making small talk with the confused little fellow. He is alert and oriented, pleasantly confused, and talking about the Swedish meatballs at lunch and comparing them with the ones his wife used to make.  I am trying to not have him concentrate on the veteran across from him who is actively dying, or the one next to him who I am holding his hand while he is dying.
>
> It was surreal . . . I don't know how the staff over in that unit, how many of us will ever recover from those images.  You want to talk about never wanting this to happen again.[9]

It appears that when COVID-19 struck the locked dementia units, the Home's leaders' focus shifted from any attempt to prevent the spread of the virus within those units to preparing for the deaths of scores of residents.  Social workers were assigned to contact family members to discuss end-of-life preferences.[10]   On the afternoon of the consolidation, 13 additional body bags were delivered to the 1-North unit.[11]  A refrigerated truck, intended to supplement the limited capacity of the Home's morgue, arrived on Saturday, March 28.[12]

While decisions made by the Home's leadership team contributed to this tragedy, and while Mr. Walsh at times conveyed inaccurate or incomplete information about the Home's response efforts, we do

not find a failure of reporting or an effort to conceal COVID-19 cases or deaths from the Department of Veterans' Services or EOHHS.   During the period through Sunday, March 29 (the day before Superintendent Walsh was placed on administrative leave) the Home substantially complied with reporting requirements established by state leaders.   Those requirements called for notifications about (i) positive COVID-19 tests and (ii) deaths of people who tested positive for COVID-19, but explicitly did not require disclosure of the deaths of people suspected of having COVID-19 but for whom a positive test result had yet to be obtained.[13] (The rules were soon updated to require the latter information).

This limitation on reporting, which was not understood by senior leaders in the executive branch, contributed to the confusion on March 29, when—on a widely reported phone call—Health and Human Services Secretary Marylou Sudders told Holyoke Mayor Alex Morse that he was wrong in claiming that eight residents had died over the weekend, and that there had been only two recent deaths. Mayor Morse was, in fact, correct: the information on which Secretary Sudders relied had been accurately reported by the Home as of that morning, but did not reflect other veterans who had passed after the Home's daily report had been submitted, or those for whom COVID-19 test results were still pending.   That evening, once the correct death toll was confirmed, Secretary Sudders organized a response team to arrive the next morning and take command of the Home.

## II.    EXECUTIVE SUMMARY

This report has three primary components.  First, in Section III (Scope and Approach), we describe how we conducted the investigation and the questions we sought to answer.  The key point: this is an independent investigation, and although Governor Baker retained us, neither he nor his team made any effort to prescribe the scope, methods, or conclusions in this report.  No one in state government has made or requested any changes or redactions to it.

In preparing this report, we conducted 111 interviews with 100 witnesses, and reviewed over 17,000 documents.  No witnesses whom we deem critical to our work refused to be interviewed.  This is

not a report based on anonymous sources: each material fact is cited to the references section on page 138, identifying the documents and interviews we relied on.

Next, in Section IV (Fact-finding) we review the legal structure, licensing, funding, leadership, oversight, and operations of the Soldiers' Home.  While our report is not a history of the Soldiers' Home, we endeavored to analyze the relevant factors and events of the past several years that may have contributed to what happened in the spring of 2020.  This section also includes a quantitative analysis of staffing levels, and a qualitative discussion of long-standing disputes between the Home and labor unions concerning staffing.  It also reviews complaints and disputes regarding Mr. Walsh's management style prior to the COVID-19 outbreak.  We then present a detailed chronology of what happened inside the Soldiers' Home during the COVID-19 outbreak, and of the Home's reports out to state leaders and other efforts to seek external assistance and advice.

Finally, in Section V (Analysis and Recommendations) we present our findings and analysis of the facts.  The following is a brief summary of our analysis and recommendations:

**A.      The Soldiers' Home leadership team made substantial errors in responding to the COVID-19 outbreak.**  Even the best preparations and most careful response cannot eliminate the threat of COVID-19.   But this does not excuse a failure to plan and execute on long-standing infection control principles and to seek outside help when it is required to keep patients safe—indeed, the extraordinary danger of COVID-19 makes these steps all the more important.  The following are the most important errors and omissions that we identified on the part of the Soldiers' Home leadership team:

- **Combining two locked dementia units containing veterans with a mix of COVID-19 statuses, and failing to ensure an appropriate standard of care on the combined unit.**

The worst decision made during the Soldiers' Home's response to COVID-19 occurred on the afternoon of Friday, March 27, 2020.  On that afternoon, a number of staff members had called in sick for the evening shift that was about to begin.  Because of the looming staff shortage, the Chief Nursing Officer, with Mr. Walsh's approval, decided that one of the Home's two locked dementia units (2-North) would be closed and consolidated with the other (1-North).[14]  One social worker recalled raising concerns

with the Chief Nursing Officer about the risk of COVID-19 spreading, and the Chief Nursing Officer responded that "it didn't matter because [the veterans] were all exposed anyway and there was not enough staff to cover both units."[15]

This decision was a catastrophe. Staff describe the move as "total pandemonium," "when hell broke loose," and "a nightmare."[16] One staff member stated that she "will never get those images out of my mind—what we did, what was done to those veterans," and "thought my god, where is the respect and dignity for these men?"[17]  Other witnesses, including a command-response leader brought in three days later to stabilize the situation, report that this "hot" unit had veterans "crammed in on top of each other," some of whom "were clearly dying."[18] There were "chairs of people lined up, some were clothed, some unclothed, some were wearing masks, some weren't."[19] A number of witness accounts suggest that veterans on the combined unit did not receive sufficient nursing care, hydration, or pain-relief medications during the weekend of March 28 and 29, 2020.[20] We also note that several days before and after the consolidation, the Chief Nursing Officer instructed social workers to call veterans' family members in an effort to persuade them to change their end-of-life healthcare preferences, such that they would not be transferred to the hospital.[21]

During our interviews, no one apart from Vanessa Lauziere (the Chief Nursing Officer) would admit to being involved in making the decision to consolidate the two units.  Medical Director Dr. David Clinton, who was present at the Home on the day of the consolidation, asserts that he "was not involved in, or consulted" in this decision, and that he disagrees with it.[22]  We find this not to be credible, and at the very least, that Dr. Clinton was aware (or should have been aware) of the move and did nothing to stop it.  The Assistant Director of Nursing and the Infection Control Nurse both report that they likewise were not consulted about the decision, and believed it was a bad idea.[23]  Superintendent Walsh indicates that he was advised of the decision in a short phone call with Ms. Lauziere, and did nothing to probe or evaluate whether this dramatic step was appropriate, or to speak with Dr. Clinton, the Infection Control Nurse, or outside public health resources to obtain their views on this dramatic step.[24]  Mr. Walsh knew

that the 1-North and 2-North units contained a mix of residents who were COVID-19 positive, who were awaiting test results, and those who were asymptomatic.[25]

Mr. Walsh and Ms. Lauziere argue that because of staffing shortages, they had no choice but to combine these units.[26]   They are incorrect.   Within hours of arriving on March 30, 2020, the Commonwealth's emergency response team assessed the acuity of the patients and quickly sent many of them to hospitals and other acute-care facilities.[27]   The same option was available to Mr. Walsh and his team.

- **Failure to promptly isolate patients suspected of COVID-19 using the rooms set aside for isolation.**

The first veteran ("Veteran 1") was tested for COVID-19 on March 17, 2020—after showing symptoms for weeks and after testing negative for other common respiratory conditions.[28]   At the time, testing guidelines authorized testing only of suspected COVID-19 cases, [29] and by any reasonable measure, Veteran 1 represented a suspected case.   But the Soldiers' Home did nothing to isolate Veteran 1 at the time of his test: he remained on the dementia unit, living in a room with three roommates, spending time in a common room, and wandering the unit.[30]   Only when his result came back positive four days later did the staff move his roommates out and make efforts (largely unsuccessful) to keep Veteran 1 in his room.[31]

Isolation of suspected and confirmed cases is required under the written COVID-19 guidelines that the Centers for Disease Control and Prevention ("CDC") and Massachusetts Department of Health promulgated earlier in March 2020.   Here, the failure to promptly isolate veterans suspected of COVID-19 is egregious because the Home had already moved other veterans to create designated negative-pressure isolation rooms, and later emptied a hospice unit for use as isolation space.   These empty rooms were never used.   It appears that Dr. Clinton concluded that because Veteran 1 had already been walking around the unit, the whole unit should be considered contaminated.   Another factor was a perception that the Home did not have enough staff to provide dedicated nurses or nursing aides to monitor veterans if they were moved to the designated isolation unit.[32]   This too is an inadequate justification.   *If* in a long-term care facility with a capacity for 248 veterans, there were a staff shortage that made it impossible to comply

with public health guidance and isolate *one* veteran, this would have been the time for Mr. Walsh and his team to sound the alarm and seek more staff.[33]  They did not do so until much later.

The failure to separate Veteran 1 from other asymptomatic residents was a mistake that was repeated over and over again between March 17 and March 30, when Mr. Walsh was relieved of duty. During that period, dozens of residents of the Soldiers' Home were tested because they were suspected of COVID-19, but in every instance they were allowed to remain in their units, posing continued infection risks to their asymptomatic neighbors. Even positive test results did not prompt meaningful changes in approach, as such residents were still allowed to remain in their units.

- **Delays in testing additional veterans for COVID-19 when they were showing symptoms.**

Several witnesses report that the Soldiers' Home leadership were reluctant to test Veteran 1, even though he was showing COVID-19 symptoms.[34]  Even after he was tested on March 17, 2020, the leadership team failed to test additional veterans on the same unit who were showing COVID-19 symptoms.  Instead, they waited until Veteran 1's test results came back positive, allowing the virus additional days to spread unchecked.[35]  There is no justification for this delay, particularly where Dr. Clinton had concluded earlier—at the time Veteran 1 was tested on March 17—that the whole unit had likely been exposed to COVID-19.

- **Delays in closing common spaces.**

The Soldiers' Home leadership team was inexcusably slow in taking steps to close communal areas to reduce the spread of COVID-19.  Veterans were permitted in common recreation rooms until at least March 16, and even then the canteen remained open to veterans living on the floor where it was located.[36] Likewise, staff members were permitted to gather in the canteen and other common rooms until late March.[37]  Veterans were permitted to congregate in indoor smoking rooms until March 28 (a senior physician with MassHealth noted that these smoking rooms should have been closed "a while ago.").[38] And even in heavily infected units such as 1-North, veterans were not restricted to their rooms and were permitted to congregate in common areas as late as March 27.[39]  One staff member saw Veteran 1 asleep

on the common area couch the evening after he was tested, and another staff member said that Veteran 1 was "still out with the other veterans and in the common area" as late as March 26.[40]

- **Failure to stop rotation of staff among units.**

The leadership of the Soldiers' Home failed to prevent the rotation or "floating" of staff members from unit to unit.  This floating presents a substantial and obvious transmission risk.

On March 29, 2020, as the crisis unfolded, Secretary Urena sent a series of text messages to Mr. Walsh asking whether he had ensured that staff in the two infected units were not being "floated" to other units.[41]  Mr. Walsh replied: "We've done that for two weeks, attempt to keep same staff on same unit."[42]  Mr. Walsh's statement to Secretary Urena was false.  For example, a registered nurse recalled that even after Veteran 1 tested positive, nursing aides would be scheduled to work two hours on 1-North and then directed to complete their shift on the third floor.[43]  Another nursing aide reports that he treated Veteran 1 during a night shift on March 16-17, and then worked a shift on the 4-East unit the next evening—where he was given a written reprimand by the Chief Nursing Officer for wearing personal protective equipment while treating another veteran (who was vomiting and had diarrhea) because his decision to wear protective equipment was "causing panic/anxiety among other staff members." [44]

A number of staff members who floated from unit to unit later tested positive for COVID-19.[45]

- **Inconsistent policies and practices with respect to personal protective equipment**.

Upon her arrival at the Soldiers' Home on March 30, 2020, the Interim Administrator observed some staff with gowns but no masks; some with only masks; and some with only gloves on.[46]  Her initial assessment was that there was "no understanding of what the infection control guidelines were."[47]

Staff members also reported inconsistent policies for the use of personal protective equipment (especially masks and gowns), and that the Soldiers' Home took steps to make it more difficult to access such equipment.  As of early March, dispensers were removed from units based on concerns about pilfering.  The Soldiers' Home's approach to the use of personal protective equipment during the COVID-19 crisis was inconsistent and unduly restrictive.  Although healthcare facilities across the nation dealt with

limited supplies of personal protective equipment during the COVID-19 crisis, the Soldiers' Home never experienced a substantial shortage.  Indeed, on March 19, 2020, the Soldiers' Home in Holyoke provided a supply of 60 extra N95 masks to the Soldiers' Home in Chelsea, to help with a shortage there.[48]

At least 80 staff members at the Soldiers' Home in Holyoke tested positive for COVID-19, likely due at least in part as the Home's failure to provide and require the use of proper protective equipment.[49]

- **Recordkeeping and documentation failures**.

When the response team arrived to take command of the Soldiers' Home on March 30, 2020, they found an organization in disarray.  Upon arrival, "we did not know what patients were in the Home or where they were."[50]  The team began work to count, assess, and cohort the patients.  The existing census records were "incorrect" and "disorganize[d]," at best.[51]  It was "complete mayhem."  There were "not assessments being made on all patients," and the physicians working at the facility were reluctant to conduct rounds and examine veterans because of the risk of COVID-19.[52]  The records concerning veterans' advanced directives (i.e., whether they wished to be hospitalized, intubated, or resuscitated) were incomplete and disorganized.   As one member of the team put it, "in my 35 years of nursing, I have never seen such a cluster . . . When we asked [them] to describe census/staffing, there was nothing."[53]  Tracking where patients are within a facility and their medical conditions is, of course, a fundamental task in healthcare administration.  Reflecting long-standing failures of leadership and organization, the Soldiers' Home failed this basic requirement.

*       *       *

These choices that Mr. Walsh made or approved show that he was unqualified to lead the Soldiers Home.  The clinical staff made the wrong clinical decisions, and Mr. Walsh failed in his duty to oversee them and ensure a robust decision-making process.

Massachusetts law requires that those in charge of long-term care facilities be licensed nursing home administrators.  This is not to say that they must be clinicians, but rather that they must have a baseline understanding of the operations of a healthcare facility, how to supervise clinical decisions and

medical care, and how to ensure that the needs of patients are met.  This is a difficult standard, and such administrators are in high demand.

The Massachusetts Department of Public Health considers the Soldiers' Home to be exempt from the requirement to have a licensed administrator, because it is a state-run facility.[54]  Indeed, Mr. Walsh lacked such a license, or any experience whatsoever in managing a healthcare facility. When he began searching for employment following the conclusion of his distinguished military career, Mr. Walsh initially sought a position as a security consultant, and even pursued such a position at the MGM Casino in Springfield, Massachusetts.[55]  He only pivoted his career search to long-term care when a state legislator suggested he apply to run the Soldiers' Home, and assured him that his lack of clinical experience would not be an impediment.[56]

Once in his role, Mr. Walsh saw his job as being the "outside man" while the Deputy Superintendent was the "inside man."[57]  Secretary Francisco Urena (head of the Department of Veterans' Services) "had conversations with [Mr. Walsh] about spending more time at the Home versus political engagements."[58]  When the Deputy Superintendent (a licensed nursing home administrator) resigned in frustration with Mr. Walsh in June 2019 and the role sat vacant until March 30, 2020, the Soldiers' Home faced a gaping leadership deficit.  Making matters worse, there was extensive turnover among Mr. Walsh's leadership team during this period, including the Chief Nursing Officer, Agency Counsel, Operations Manager, and others.

**B.**     **The Department of Veterans' Services did not take steps to address substantial and long-standing concerns regarding the leadership of the Soldiers' Home.**  We find that the Department of Veterans' Services failed in its responsibility to oversee the Soldiers' Home.  Secretary Urena recommended and approved Mr. Walsh's appointment despite his lack of any healthcare administration experience.  Once Mr. Walsh was in the role, Secretary Urena and his Chief of Staff soon developed concerns about his performance.  They felt his communication skills were "poor" and he was "cryptic" and "not forthright in his communications."[59]  They thought he was "in over his head" and did

not spend enough time at the Home.[60]  They observed massive turnover in Mr. Walsh's staff, including clinical leadership positions.  They had to hire an executive coach to work with Mr. Walsh on his anger management, and then had to extend this appointment in response to more complaints.  And they were concerned that Mr. Walsh tried to control the flow of information in and out of the Home.  Secretary Urena asserts that at one point, Mr. Walsh asked the Secretary of EOHHS to bar Secretary Urena from visiting the Home without giving Mr. Walsh prior notice.[61]  Despite all this, Secretary Urena did not take sufficient action to address Mr. Walsh's deficits, and allowed the Deputy Superintendent role to remain open for nine months—including the period of the COVID-19 outbreak.

One resource that should have been available to bring healthcare oversight experience was the Executive Director of Veterans' Homes.  In 2016, the Legislature created this role within the Department of Veterans' Services with reporting and oversite responsibilities for the Soldiers' Home.  The statute requires that an experienced healthcare executive hold this role.  But the position—mandated by statute—was never filled, for budget reasons.

A key oversight function is to make sure the right people are in important jobs.  Here—for good reason—the Department of Veterans' Services leaders did not believe Mr. Walsh was the right person for the job, but they did not take action to assure that there was competent leadership in place at the Soldiers' Home.

**C.    Although Mr. Walsh reported other information that was inaccurate and incomplete, we have not identified any material violations of the reporting requirements concerning COVID-19 test results and deaths.**  Mr. Walsh's communications with the Department of Veterans' Services and the Department of Public Health omitted important information, and at times, contained affirmatively inaccurate information.  But we find no instances where the Soldiers' Home leadership committed material violations of the reporting requirements concerning COVID-19 test results and deaths.  Indeed, much of the confusion on this issue appears to be the result of evolving reporting requirements including a policy (during the relevant time period) that only deceased veterans who were

confirmed to be COVID-19 positive (rather than those awaiting test results) were to be included in certain death tolls.[62]  Thus, when the Home reported the number of "deaths" through March 30, this total— consistent with the requirements—referred to the number of deaths of veterans who had tested positive for COVID-19 as of the time of each report.  However, it appears that leaders in EOHHS misunderstood these reports, thinking that they reflected the total death toll including veterans who were symptomatic and awaiting test results.

**D.    Finally, we suggest a number of staffing, technology, and physical plant improvements, and recommend that the Soldiers' Home should not be exempt from the requirements for licensing and inspection that apply to other long-term care facilities in Massachusetts**.  Our recommendations concerning licensing and inspections stem from a simple premise: the veterans who served our country and spend the last years of their lives at the Soldiers' Home deserve— at a *minimum*—the same standards and protections as residents at private long-term care and nursing facilities.  This is not to say that someone cannot do a good job as Superintendent without being licensed— but licensure in this profession (like other professions for which Massachusetts requires licensure) is one way to help ensure a baseline of competence.  The same is true as to the Commonwealth's licensing and inspection regime for long-term care facilities.  Again, we can think of no reason or explanation why the veterans at the Soldiers' Home should not receive the same protections as residents at private facilities.

### III.    SCOPE AND APPROACH TO THE INVESTIGATION

On April 1, 2020, Governor Baker retained Mark W. Pearlstein of McDermott Will & Emery LLP ("McDermott") to investigate the COVID-19 outbreak at the Soldiers' Home.  We have been tasked with answering three questions.

- First, what caused and contributed to the COVID-19 outbreak at the Soldiers' Home?

- Second, did the Soldiers' Home's leadership comply with applicable requirements to provide timely and accurate counts of the number of infected patients and staff, and the number of deaths associated with COVID-19?

- Third, what if anything can be done in the future to prevent or reduce the likelihood of a similar outbreak?

In addressing these questions and preparing this report, we have focused on the period of the COVID-19 outbreak during the tenure of Bennett Walsh as Superintendent of the Soldiers' Home (i.e., from early March 2020 until Mr. Walsh was placed on administrative leave on March 30, 2020). However, to understand the events of this time period, we have studied and will summarize events long before the spring of 2020, as well as the work of the emergency response team that took command of the Soldiers' Home after Mr. Walsh was placed on leave. That said, this report is not a comprehensive modern history of the Soldiers' Home. We do not purport to catalog all important events that occurred at the Home, and focus instead on the facts, people, and issues relevant to the questions Governor Baker has assigned us to answer.

It is important to emphasize the independence of our work. Although Governor Baker retained us, neither he nor his team made any effort to prescribe the scope, methods, or conclusions of this investigation. No one in state government has made or requested any changes or redactions to it.

We conducted this investigation based on interviews with witnesses and subject-matter experts (all using video- and tele-conferencing), statistical analysis regarding staffing patterns, and an extensive review of paper and electronic documents. We operated without the authority to compel testimony or the production of documents. However, we are grateful that the witnesses we contacted were overwhelmingly cooperative. Some of these interviews were extraordinarily difficult conversations: they included discussions with staff members still battling COVID-19 and grappling with the trauma they observed and experienced during the outbreak, as well as conversations with family members who had recently lost loved ones whom they had been unable to visit from the time the outbreak began.

No witnesses whom we deem critical to our work refused to be interviewed or materially limited the time that they made available to speak with us, or refused to answer any questions that we deem material to our work. We did not agree to conduct any interviews about the events of March 2020 on an anonymous basis. We have generally included the names of important actors within the body of our

report, while referring to other witnesses based on their roles or titles.  However, all sources of information are identified by name in the compendium of references and citations that appears in Section VIII of this report.

Likewise, a number of witnesses agreed to provide documents and records to aid our investigation. In particular, we are grateful to the team at the Massachusetts Executive Office of Health and Human Services ("EOHHS"), led by its General Counsel Sharon Boyle, who coordinated the collection and production of hard-copy and electronic documents and communications from the Soldiers' Home and other agencies and departments within the executive branch of state government (and did so on a highly expedited basis).  Among other things, we collected emails and text messages from a number of senior EOHHS and Soldiers' Home leaders.[iii]

EOHHS attorneys withheld 138 responsive documents based on an assertion of attorney client privilege.

In all, the McDermott team reviewed over 17,000 documents and conducted 111 interviews with 100 distinct witnesses.  We interviewed Mr. Walsh three times, each in the presence of his attorneys.  Two other witnesses (Assistant Director of Nursing Celeste Surreira and former Medical Director Dr. David Clinton) also elected to have their personal attorneys present for our interviews.  Ms. Boyle attended the interviews of a number of witnesses in her role as General Counsel of EOHHS.  Some members of the labor unions that provide staffing at the Soldiers' Home exercised their rights to have union representatives attend their interviews.

We note that the labor unions in question—SEIU Local 888 and the Massachusetts Nurses Association—cooperated with our investigation and indeed were vital in helping to identify their members

---

[iii] The custodians from whom we collected emails or text messages include: Bennett Walsh, Vanessa Lauziere, Vanessa Gosselin, Celeste Surreira, Mark Yankopoulos, Jessica Powers, Marylou Sudders, Catherine Mick, Daniel Tsai, Catherine Starr, Marianne Dill, and Francisco Urena.

who might have relevant information, and to coordinate and encourage their members to participate in our interviews.

We also relied on statistical and subject-matter expertise from consultants at Berkeley Research Group, LLC, whom we retained in support of our investigation.  Greg Russo led the statistical analysis of staffing patterns discussed in Section IV(C)(6).  Karl Bartscht—an experienced skilled-nursing home administrator and consultant—shared his expertise to give context to our observations and recommendations.

Our investigation was one of several parallel investigations reviewing the COVID-19 outbreak at the Soldiers' Home.  In addition to the McDermott team, investigators from the Office of the Attorney General of Massachusetts and the United States Attorney for the District of Massachusetts are conducting active investigations of this matter.  Likewise, other state and federal government institutions have announced their intent to investigate.  There are also public reports that the Massachusetts Office of the Inspector General is investigating Mr. Walsh and other matters related to the Soldiers' Home.[63]  However, with one exception, we conducted all of our interviews and research separately and independently from the other investigations.  The only exception was interviews with seven family members of Soldiers' Home veterans.  We conducted these interviews together with teams from the Office of the Attorney General and the United States Attorney's Office in order to avoid further traumatizing family members with requests for repeated interviews about the same painful subject-matter.  Earlier in the course of our work, we conducted interviews with a number of other family members of veterans at the Home independently from the teams conducting the other investigations.

In addition to Mr. Pearlstein, the McDermott team working on this investigation consisted of attorneys Matthew Knowles, Elizabeth Rodd, Greer Griffith, Natasha Dobrott, Jeffrey York, Adam Camiel, Dean Butkovich, and Rachel Lewis, as well as paralegal Alyse Mauro.

# IV.   FACT-FINDING

## A.   Background: the Soldiers' Home

### 1.   Legal posture

There are two state veterans' homes[iv] in Massachusetts: the Soldiers' Home in Holyoke and the Soldiers' Home in Chelsea.[v]  The legislature established the Soldiers' Home in Holyoke in Chapter 475 of the session laws of 1946, which authorized construction of a 200-bed veterans' home in which "hospital and domiciliary care shall be provided in like manner as that provided" at the Soldiers' Home in Chelsea, which has been in operation from 1882.[64]  The Soldiers' Home in Holyoke opened and began accepting veterans in 1952.[65]

Section 70 of Chapter 6 of the General Laws created a volunteer Board of Trustees to manage the Soldiers' Home:

> There shall be a board of trustees of the Soldiers' Home in Holyoke, consisting of seven persons, who shall be residents of the counties of Berkshire, Franklin, Hampden and Hampshire. Each of said counties shall be represented on said board by at least one trustee who is a resident therein. Upon the expiration of the term of office of a member, his successor shall be appointed by the governor, with the advice and consent of the council, to serve for seven years. The governor shall designate one of the members as chairman. The members shall serve without compensation, but shall receive their necessary expenses incurred in the discharge of their official duties.

Mass. Gen. Laws ch. 6, § 70.   The next section specifies the Board's powers and those of the Superintendent whom the Board is authorized to appoint:

> The board of trustees of the Soldiers' Home in Holyoke shall manage and control the Soldiers' Home in Holyoke and all property, real and personal, of the commonwealth that is occupied or used by the home. In the management and control of the home, the board of trustees shall: (i) adopt reasonable rules and regulations governing outpatient treatment at, admission to and hospitalization in the home; and (ii) appoint a superintendent. The

---

[iv] A state veterans' home is defined as "a home recognized and, to the extent required by this part, certified pursuant to this part that a State established primarily for veterans disabled by age, disease, or otherwise, who by reason of such disability are incapable of earning a living.  A State home must provide at least one program of care (i.e., domiciliary care, nursing home care, or adult day health care)." 38 C.F.R. § 51.2.

[v] The formal name of the Chelsea facility is the "Soldiers' Home in Massachusetts," and it is referred to in this way in the General Laws.  *See* Mass. Gen. Laws. ch. 6 § 41.  To avoid confusion, we will refer to the Chelsea facility as the "Soldiers' Home in Chelsea," and the Holyoke facility as the "Soldiers' Home in Holyoke" or simply the "Soldiers' Home."

> superintendent shall be the administrative head of the home. The superintendent shall, subject to the approval of the trustees, appoint and may remove a medical director, a treasurer and an assistant treasurer . . . The medical director shall have responsibility for the medical, surgical and outpatient facilities and shall make recommendations to the superintendent regarding the appointments of all physicians, nurses and other medical staff. The superintendent shall also appoint and remove such other persons as the superintendent deems necessary for the proper and efficient operation of the facilities of the home.

Mass. Gen. Laws ch. 6, § 71.  However, Section 71 (last amended in 2016) should be read in conjunction with Mass. Gen. Laws ch. 17 § 17 ("Commissions and boards serving under the governor") (last amended in 2013), which provides that:

> the superintendent [and] the board of trustees of the Soldiers' Home in Holyoke . . . shall serve under the governor, and shall be subject to such supervision as the governor deems necessary and proper.

There is no express statutory requirement that the Superintendent of the Soldiers' Home be a licensed nursing home administrator, or that the Superintendent have any health care or medical experience.

The Department of Veterans' Services, an agency within EOHHS, has supervisory and administrative responsibility for the Soldiers' Home.[66]  In 2016, the Legislature created an additional position within the Department of Veterans' Services with reporting and oversite responsibilities for the Soldiers' Home:

> (a) There shall be within the department of veterans' services an office of veterans' homes and housing. The commissioner of veterans' services shall appoint an executive director of veterans' homes and housing who shall have: (i) at least 5 years of management, healthcare experience and (ii) military or other experience working with veterans . . . The executive director may, with the approval of the commissioner of veterans' services, appoint and remove any employees necessary to carry out the duties of the office . . .

> The office shall: (i) coordinate and oversee implementation and enforcement of laws, regulations and policies relative to the veterans' homes and other housing for veterans; and (ii) investigate and make recommendations on best practices for providing housing for veterans.

> The executive director shall meet with the board of trustees of the Soldiers' Home in Massachusetts and the Soldiers' Home in Holyoke jointly at least twice per calendar year. The executive director shall have access to all property of the commonwealth under the oversight of the department of veterans services to carry out the duties of the office; provided, however, that the boards of trustees of the Soldiers' Home in Massachusetts

and the Soldiers' Home in Holyoke shall not be subject to the control of the executive director; and provided further, that the executive director shall not have control over the day-to-day operations of the Soldiers' Home in Massachusetts or the Soldiers' Home in Holyoke.

(b) Annually, not later than November 1, the office shall submit a report to the general court on the state of the soldiers' homes. The report shall include findings relative to: (i) the quality of care provided at the homes; (ii) the financial status of the homes; (iii) the uniformity of programs at the homes; (iv) the capital needs of the homes; and (v) the status of the United States Department of Veterans Affairs' accreditation, including the efforts necessary to maintain compliance and the efforts necessary to become fully compliant with the United States Department of Veterans Affairs' standards at each soldiers' home . . . .

Mass. Gen. Laws ch. 115A, § 12.

During our investigation, Francisco Urena (who serves as the Secretary of the Department of Veterans' Services) explained that the role of Executive Director of Veterans' Services was never filled, for budget reasons.[67]  Specifically, according to Secretary Urena, the position was "never funded" by the Legislature.[68] The Soldiers' Home has submitted four annual reports to the legislature pursuant to subsection (b) of § 12.[69]  None of these reports reference that the role created under § 12(a) was unfunded and unfilled.

## 2.      Licensing, surveys, and inspections

Under Massachusetts law, "no person shall establish or maintain a long-term care facility without first having obtained a license from the Department [of Public Health] or submitted an application for a license."[70]  A long-term care facility is:

Any institution, whether conducted for charity or profit, that is advertised, announced or maintained for the express or implied purpose of providing four or more individuals admitted thereto with long-term resident, nursing, convalescent or rehabilitative care; supervision and care incident to old age for ambulatory persons; or retirement home care for elderly persons. Long-term care facility shall include convalescent or nursing homes, rest homes, infirmaries maintained in towns and charitable homes for the aged.[71]

Department of Health regulations provide that "[i]n facilities providing Level I, II or III care,[vi] the administrator shall be a nursing home administrator licensed by the Board of Registration of Nursing Home Administrators."[72]  The "Administrator" is "the person charged with general administration of the facility."[73]

Licensed facilities in Massachusetts are also required to be inspected at least once a year.[74] Federal regulations provide that state veterans' homes must comply with state and local licensure laws "where licensing is required"[75] in order to receive per diem payments from the VA.[76]

However, notwithstanding these requirements, the Soldiers' Home is not licensed by EOHHS or enrolled as a provider with the Centers for Medicare and Medicaid Services ("CMS"), which means the Home is not subject to Medicare Requirements of Participation.[vii]  In determining that the Soldiers' Home and its administrator are not subject to licensing requirements, EOHHS looks[77] to Mass. Gen. Laws ch. 111 § 71, which delegates licensing authority to the Department of Public Health to issue licenses to "any person" suitable to hold a license—and notes that the statutory definition of "person" includes natural persons and corporations, but not government entities.[78]  Likewise, § 71 enumerates the facilities to which it applies—"an infirmary maintained in a town, a convalescent or nursing home, a rest home, a charitable home for the aged or an intermediate care facility for persons with an intellectual disability"—and this list does not include veterans' homes.[79]

Unlike licensed long-term care facilities in Massachusetts, the Soldiers' Home is not inspected annually by the Department of Public Health.  Instead, the Soldiers' Home is surveyed annually by the VA and every three years by The Joint Commission (formerly known as the Joint Commission on Accreditation of Healthcare Organizations), a private accrediting organization. VA surveys take approximately about three days, which is about the same amount of time as conventional state surveys. [80]

---

[vi] The Soldiers' Home has units that provides Level II and Level III care under the applicable regulations.  *See* 105 C.M.R. § 105.001.

[vii] The Soldiers' Home in Chelsea is licensed and surveyed by CMS through the Division of Health Care Facility Licensure and Certification. *See* State of the Commonwealth's Soldiers' Homes (October 2019) (GOV0083327).

Surveys conducted by The Joint Commission take approximately three to seven days, depending on the size and condition of the facility.

We asked several witnesses for their impressions of the various survey processes.  Mark Bowman, President of the National Association of State Veterans' Homes, observed that there is a difference in what each survey evaluates because there is a difference in the CMS requirements and the VA guidelines.[81] Ronald Patenaude, a former SEIU Local 888 union representative and current Massachusetts Nursing Association representative, expressed concerns about the rigor of the VA and Joint Commission surveys, noting that in his view, the VA survey is not based on "science or need," and that the Joint Commission is a private, member-funded organization.[82]

### 3.     Funding

The Soldiers' Home receives funding from the Commonwealth's annual general appropriations acts.[83]  Reimbursements received by the Soldiers' Home for care rendered, from either patients or the VA, revert to the Commonwealth to offset operating costs, with the exception of a small portion set aside for retained revenues.[84]  The table below compares the Soldiers' Home 2019 and 2020 funding[85]:

| Holyoke Soldiers' Home State Funding | Fiscal Year 2019 | Fiscal Year 2020 |
| --- | --- | --- |
| Holyoke Soldiers' Home Administration and Operations | $ 22,592,998 | $ 23,859,727 |
| Holyoke Antenna Retained Revenue | $ 5,000 | $ 5,000 |
| Pharmacy Co-Payment Retained Revenue | $ 110,000 | $ 110,000 |
| Holyoke Telephone and Television Retained Revenue | $ 50,000 | $ 50,000 |
| Holyoke 12 Bed Retained Revenue | $ 744,043 | $ 909,000 |
| License Plate Retained Revenue | $ 400,000 | $ 990,000 |
| **Total** | **$ 23,902,041** | **$ 25,424,627** |

The Soldiers' Home charges veterans $10 per day for dormitory services and $30 per day for long-term care services, including hospice and dementia care.[86]  Under the State Home Per Diem program, the VA pays recognized state veterans' homes a per-diem amount for care provided to eligible veterans.  The per-diem rates for state veterans' homes vary based on the level of care and disability rates and are

determined by the federal Secretary of Veterans' Affairs.[87]  In Fiscal Year 2020, the VA's basic per diem rates were $48.50 for veterans staying in a dormitory, and $112.36 for veterans receiving long-term care.[88]

In addition, the Soldiers' Home is eligible to receive VA funds under the Veterans' Affairs State Home Construction Grant Program, which disburses grants covering 65% of expenses for select projects for state veterans' homes.  In early 2020, the Soldiers' Home was in the process of securing a State Home Construction Grant for an electronic medical record system to replace its existing paper system.[89]

The Soldiers' Home Board of Trustees manages funds (separate from the state budget) in the form of "trustee funds."[90] Trustee funds are mainly comprised of donations from families, as well as donations from events such as motorcycle rides.[91] These funds are discretionary in nature; the Board of Trustees can deploy them as it sees fit, or on a recommendation from the Superintendent.[92] For example, when the Soldiers' Home was short on electrical hospital beds, the Board of Trustees used trustee funds to make up the gap.[93]

Unlike the Soldiers' Home in Holyoke, the Soldiers' Home in Chelsea is authorized to bill Medicare for care reimbursement as to a certain number of beds in the facility.[94]

### 4.      Physical plant and layout

The Soldiers' Home in Holyoke consists of two primary buildings: the main building that houses the long-term care facility and administrative offices, and a separate building that houses the 30-bed dormitory facility.[95]

Designed in 1948 by William Nelson Jacobs, the main building was first occupied in 1952.[96] A large "north addition" was added in 1972, further expanding the campus' footprint.[97]  The main building and north addition is 227,915 square feet, with a maximum capacity of 278 beds.[98]  There are veteran care units on four floors of the building, which are divided into five "Care Centers."  There are two specialty Care Centers.  Care Center 1 consists of two locked units (Units 1-North and 2-North) for patients with dementia or other cognitive problems who are at risk of wandering off the unit.  Care Center 2S consists of Unit 2-South, a twelve-bed hospice unit.  The remainder of the units in the long-term care facility house

27

the general veteran population. This table describes the units and average veteran census at the Soldiers' Home as of February 2020:

| Care Center: | Units: | Census (Feb. 2020 average): | Notes: |
|---|---|---|---|
| Care Center 1 | 1 North, 2 North | 44.3 | Locked dementia units |
| Care Center 2 | 2 East, 2 West | 55.5 | |
| Care Center 2S | 2 South | 7.5 | Hospice unit |
| Care Center 3 | 3 North, 3 East, 3 West | 73.9 | |
| Care Center 4 | 4 East, 4 West | 46.3 | |

The first floor of the facility includes the kitchen and main dining area as well as a chapel.[99]  The second floor has a restaurant-style canteen and patio, as well as a smoking lounge.[100]  The administrative offices for the Superintendant and other senior staff at the facility are located on the fifth floor of the building, separate from the veteran floors.[101]

Impressions of the physical state of the Soldiers Home in Holyoke are mixed. Some witnesses described a dirty and tired facility with outdated infrastructure in need of updating, with peeling wallpaper and ripped furniture.[102] Some family interviews described a "filthy," un-vacuumed facility, with staff using dirty mops to clean.[103] Some witnesses described a building with the odor of urine and feces, with unclean bathrooms.[104]  Several family members noted that the smell problems have become worse in the past few years.[105]  We do not doubt the accuracy of these observations, but many others we interviewed, including staff, depicted the facility as clean and "well-maintained" in light of being built in 1952.[106]

Generally, veteran rooms measure at least 115 square feet per resident in multiple-resident bedrooms, and have no more than four residents per room.[107] "Small" double resident bedrooms measure at least 245 square feet, and "large" double resident bedrooms measure at least 305 square feet.[108] Single resident bedrooms measure at least 150 square feet.[109] Veteran rooms in the dementia units house four veterans each, with a living room in the center of each Unit.[110] Solariums (common lounges) are located on the second, third, and fourth floors.[111]

### 5.    Veteran population and services

The Soldiers' Home provides housing, long-term care, and outpatient health care services to eligible veterans in Massachusetts.  It is one of the largest long-term care facilities in New England.[112]

Veterans are eligible to receive services at the Soldiers' Home if they were honorably discharged and (i) served 180 days of regular active-duty military service, or (ii) served 90 days on active-duty, at least one day of which was during wartime.  Veterans who received the Purple Heart or have a service-connected disability are also eligible.[113]

The Soldiers' Home's dormitory enables veterans to live independently—the facility primarily provides food and shelter.  Veterans housed in the dormitory receive psychosocial support, as well as medical care from the outpatient department at the Home.[114]

The long-term care units house and treat veterans with wide varieties of ailments who cannot live in an independent environment.[115]  Staff provide veterans in the long-term care units with nursing care, assistance with daily living, toileting care, eating assistance, transferring assistance, medication management, wound care, restorative care, and maintenance care.[116]  In addition, Soldiers' Home staff coordinate general activities such as bingo, music activities, and other games in the recreational area.[117]

The specialty hospice unit is staffed by an outside hospice service provider.  The Soldiers' Home also contracts with an outside service that provides rehabilitation services to veterans in the long-term care facility.[viii]

Between 2016 and 2019, the average yearly mortality rate of the Soldiers' Home long-term care residents, including the hospice and dementia units, was 147 veterans per year.[118]

### 6.        Leadership and staffing

Massachusetts General Laws ch. 6, § 71 provides that the Board of Trustees "shall manage and control" the Soldiers' Home and appoint a Superintendent who "shall be the administrative head of the home."  The statute authorizes the Superintendent (with approval of the Trustees) to appoint a Medical Director, Treasurer, Assistant Treasurer, and "other persons as the [S]uperintendent deems necessary and proper for the efficient operation of the facilities of the home."[119]

---

[viii] The rehabilitation services provider, Genesis Rehab Services, declined to speak with McDermott despite several requests to participate in an interview.

In recent years, the Superintendent and Trustees have established and filled a series of additional leadership positions.   In addition to the Superintendent and Medical Director, there is a Deputy Superintendent, Chief Financial Officer, Chief Operations Officer (primarily tasked with operating the physical plant and facilities department), Agency Counsel, Chief Nursing Officer (until the fall of 2019, this role was known as the Director of Nursing), Assistant Director of Nursing, Director of Human Resources, Communications Director, and Infection Control Nurse. [120]   As discussed below, not all of these roles were filled consistently, and they experienced considerable turnover in the last decade.

The next level of leadership within the Soldiers' Home is the Veteran Care Coordinators, a role akin to a unit manager—each a registered nurse with overall responsibilities for one of the five Care Centers.[121]   The majority of the veteran care is provided by the nursing staff, consisting of a mix of registered nurses, licensed practical nurses, and certified nursing assistants (i.e., nursing aides).[122]   The Soldiers' Home also employs social workers, recreational staff, housekeeping staff, a dietary staff, and a maintenance staff.[123]

### 7.   General strengths and weaknesses of the Soldiers' Home, and comparison to the Chelsea facility

The interviews we conducted revealed a remarkable and commendable theme: the front-line staff at the Soldiers' Home provide quality, compassionate, and affordable care for veterans.[124]   These are mission-driven healthcare workers.   Working in a nursing home or long-term care facility is challenging, but it is apparent that the Soldiers' Home staff take great pride in caring for the veterans and providing a nurturing environment.   Indeed, the Soldiers' Home staff are deeply devoted to the veterans, frequently referring to veterans receiving care at the facility as "our guys," or "our veterans."[125] A number expressed their grief about the deaths of veterans on their units with whom they had become close over the years. EOHHS Secretary Marylou Sudders lauded the "homey" feel of the Soldiers' Home, noting that it is more "than a nursing home, per se."[126]   It is.   Staff at the Soldiers' Home feel a genuine connection with the veterans, and some care providers have been at the facility for many years (e.g., tenures of 20+ years are

not uncommon).  Trustee Cindy Lacoste described the home as a "jewel and treasure in the area" and reports that families of veterans have told her the care they received is "phenomenal."[127]

Staff frequently refer to the facility as "a wonderful place"[128] and note that it is "100% better than nursing homes."[129]  Staff members also informed us that up until recently, "it was hard to get a job at the home" and "you had to know people to get in." [130]  Staff explained that historically, it was difficult to get a job at the Soldiers" Home because it "had a reputation as a great place to work."[131]  Staff and administrators agree that the wages at the Soldiers' Home are generally competitive with private facilities, and that workers are drawn to the additional benefit of a state pension.[132]

Another significant strength of the Soldiers' Home is the cost of care.  Superintendent Walsh noted that the average family paying for veterans' care at the home saves approximately $115,000 when compared to alternative care arrangements.[133]  With veterans only having to pay a modest daily fee to receive care, including high-acuity veterans with dementia, the cost is indeed modest.[134]

One tradition at the Soldiers' Home merits special mention.  When veterans die (and several typically pass away each week), the Home generally conducts a "dignified transfer" ceremony where staff and other veterans salute the deceased veteran and Taps is played to honor the veteran's service to our nation.[135]  A number of family members and staff commented on the importance of this meaningful ceremony, and regret that it was suspended during the COVID-19 outbreak.[136]

Nonetheless, like most healthcare facilities, the Soldiers' Home faces a number of headwinds. As described above, the facility is older and in need of some aesthetic updates.[137]  Some family members commented that the Soldiers' Home is "filthy,"[138] and "the smell of feces and urine was prevalent" on the Care Centers[139].  The facility does not currently use an electronic medical records system, and instead uses paper medical records.[140]  Similarly, the Soldiers' Home is an older-style "medical model" facility, as opposed to a modern "Community Living Center" facility.[141]  "Community Living Center" facilities are built to withstand viral spreads, while "medical model" facilities are not as well equipped due to their layout and number of patients per room.[142]  The Soldiers' Home also had issues with its HVAC system.[143]

31

In evaluating the general strengths and weaknesses of the facility, the Soldiers' Home in Chelsea provides a useful reference point.  First, although the Soldiers' Home at Holyoke and the Soldiers' Home at Chelsea both have a Board of Trustees and a Superintendent, the statutory rules concerning their appointment differ between the two homes.  Like the Soldiers' Home in Holyoke, the Soldiers' Home in Chelsea offers both dormitory and long-term care services.[144]   However, the Soldiers' Home at Holyoke has a larger long-term care facility (248 beds) compared to Chelsea (170 beds), and the Soldiers' Home at Chelsea has a larger dormitory (158 beds) compared to Holyoke (30 beds).[145]   Unlike Holyoke, which receives no Medicare funding, 66 of Chelsea's long-term beds are approved by Medicare to be billed as a "skilled level of care."   In addition, Holyoke has an outpatient facility, whereas Chelsea does not.[146]   Chelsea has been actively working to implement an electronic medical record system for several years.[147]  In 2019, both Soldiers' Homes submitted a joint grant to the federal VA for an electronic medical record solution.[148]

Compared to Chelsea, the Soldiers Home in Holyoke is generally in better condition; this includes the physical plant and infrastructure.[149]  Structurally, the Soldiers' Home in Chelsea is an open-ward design with no private rooms for veterans receiving care.[150]  Chelsea recently received a State Home Construction Grant from the VA to build a new facility.  The new campus will include a building better designed for long-term care, with private rooms and private bathrooms for veterans.[151]

With respect to staffing and labor relations, Chelsea has implemented a permanent staffing schedule—i.e., a schedule that does not change week-to-week—whereas Holyoke has not.  Furthermore, unlike Holyoke, Chelsea does not "mandate" staff to work overtime (i.e., forcing a staff member to work a shift on short notice, regardless of whether they are scheduled or not; staff who refuse are disciplined).[152]

Finally, the two facilities have differences in funding.  Both receive per-diem funding from the federal VA, but the Soldiers' Home in Chelsea bills Medicare for skilled beds, whereas Holyoke does not.[153]  Chelsea also has a larger budget than its counterpart in Holyoke. In Fiscal Years 2019 and 2020, Chelsea received an additional $4.8 million and $4.4 million, respectively, in funding from the General

Appropriations Act.[154] Historically, Chelsea has received greater General Appropriations funding compared to Holyoke: for example, in Fiscal Year 2014, Holyoke received about $6.8 million less funding than Chelsea, despite having more than 100 additional beds to service.[155]  Roughly $2.6 million of that gap was attributed to salary.[156]

**B.    Disputes concerning staffing levels and reporting structures during Superintendent Barabani's tenure**

Paul Barabani, the previous permanent Superintendent of the Soldiers' Home, served from 2011 through early 2016.[157]  His tenure was contentious, leading up to his resignation and the resignation of Mr. Barabani's deputy superintendent in late 2015.  This report does not purport to chronicle Mr. Barabani's tenure; rather, we will focus on issues that arose with respect to staffing and reporting structures that are relevant to our analysis of the COVID-19 outbreak in 2020.

Governor Deval Patrick appointed Mr. Barabani to be the Superintendent of the Holyoke Soldiers' Home in spring of 2011, following a 32-year career in the military.  Mr. Barabani did not have a medical or long-term care background, nor was he a licensed nursing home administrator.[158]  During an interview, he opined that he did "not need to be a licensed medical-care provider [or] a nurse or doctor" because he had "nurses and doctors" who advised him and he "capitalized on the expertise of others."  Mr. Barabani explained that his role was to be "the leader of the facility."[159] As of 2014, Mr. Barabani's deputy superintendent was John Paradis.  Mr. Paradis likewise did not have a long-term care background.[160]

Throughout his tenure, Mr. Barabani was concerned that nursing staff levels were too low.  For example, in 2014 Mr. Barabani attended an annual legislative breakfast with approximately 15 to 20 western Massachusetts legislators.[161]  He presented data showing what he consider to be deficiencies, especially with regard to the number of registered nurses.[162]  Mr. Barabani reports that he was reprimanded by Coleman Nee, who served as Secretary of the Department of Veterans' Services at the time, for raising this topic with the legislators.[163]  However, he indicates that as a result of his presentation, he received additional funding and was able to raise the number of registered nurse minutes per resident day, and that this increase "became a life preserver to keep us afloat."[164]

Governor Baker took office in January 2015, and appointed Francisco Urena to serve as Secretary of the Department of Veterans' Services.  Mr. Barabani met with Mr. Urena for the first time in February 2015.[165]  During this meeting, Mr. Barabani reported that staffing remained a "priority issue" and presented a two-tier approach to increase staffing levels.[166]  Mr. Barabani indicated that he never received a response from Secretary Urena about this presentation and his request to increase staffing levels.[167]

In early 2015, in response to state budget challenges, the Baker administration instituted a hiring freeze and Early Retirement Incentive Program ("ERIP") across state government.[168]  The ERIP had a profound and lasting effect on the Soldiers' Home's nursing staff; the facility immediately lost 46 staff members (approximately 30 of whom were nurses, including the Chief Nursing Officer and Chief Social Worker).[169]  Numerous staff members report that the loss of experienced nurses as a result of the ERIP continues to present substantial challenges to the mission of the Soldiers' Home today.[170]  Mr. Barabani presented a similar view in his April 9, 2015 testimony before the Joint Committee on Ways and Means, where he testified that the ERIP would have a detrimental impact upon the Soldiers' Home ability to achieve its mission.[171]

Mr. Barabani also asserts that he was placed under a "gag order" in 2015 by the Department of Veterans' Services that prevented him from informing the Governor or legislators about staffing issues at the Soldiers' Home.[172]  Secretary Urena disputed that Mr. Barabani was prohibited from raising these issues, but acknowledged that he required that Mr. Barabani do so "in concert with that of HHS. If a conversation was had with a member of the legislature or a member of the press, we wanted the conversation shared with us.  This was a constant reminder, and the role of Anthony Preston [Director of Legislative and Media Relations, Department of Veterans' Services] in our office was to write down those interactions and bring them to the awareness of our superiors at HHS."[173]  Mr. Barabani also asserts that the Department of Veterans' Services blocked his effort to hire a new Chief Financial Officer in 2015.[174]

Frustrated with these challenges, Mr. Barabani announced his intention to retire from the superintendent position during the December 2015 Soldiers' Home Board of Trustees meeting.[175]  He

formally left the post in January 2016.[176]  John Paradis, the Deputy Superintendent, resigned in December 2015.[177]

Following Mr. Barabani's resignation, Cheryl Poppe—the Superintendent of the Soldiers' Home in Chelsea—served as the interim director at the Soldiers' Home in Holyoke from February 1, 2016 through May 27, 2016.  She worked full-time at the facility during this period.[178]  On her arrival, she perceived a power vacuum at the Soldiers' Home: there was no Superintendent or Deputy Superintendent, the CFO had just been hired, all medical doctors were at the facility only part-time, the facilities director was new, and the Director of Nursing died suddenly during a meeting at the Soldiers' Home in early 2016, near the start of Ms. Poppe's tenure as interim director.[179]

When Bennett Walsh was appointed as the new Superintendent, Ms. Poppe held a two-day transition meeting with him and prepared a detailed transition memorandum.[180]  The memorandum highlighted "some areas that may require attention in the near future," including staffing concerns.[181]  Ms. Poppe "found two major facets to this [staffing] issue" which were (1) there was not sufficient planning to deploy the ERIP; and (2) although nursing staff exceeded the minimum hours per patient day in the high-acuity areas, structural issues related to how senior nurses were staffed created difficulties and shortages at times.[182] To combat these issues, Ms. Poppe recommended that Mr. Walsh exercise increased collaboration when reviewing staffing needs, consider whether certain nursing positions could be combined or converted to a part-time position, and to consider a more flexible nursing schedule around peak times in certain areas.[183]  She also noted that the "Holyoke Soldiers' Home has been making dedicated efforts to strengthen Labor Relations with a continued emphasis on regular meetings and clear communications of issues," and cited EOHHS' labor relations teams as being helpful in facilitating these improvements.[184]  Ms. Poppe provided a copy of this memorandum to Secretary Urena, his then-Chief of Staff Michael Rigas, and staff at EOHHS.[185]

C.      **Superintendent Walsh's tenure**

1.      **Background and selection as Superintendent**

Mr. Walsh was born and raised in Springfield, Massachusetts, and graduated from Providence College in 1992.[186]   He had a distinguished 24-year military career, which included seven combat deployments from 2002 through 2011 in Somalia, Iraq, Afghanistan, and elsewhere.[187]  Mr. Walsh left the military in 2016 at the rank of Lieutenant Colonel.[188]

After his retirement, Mr. Walsh began a career search.  A copy of his resume available on LinkedIn indicated that he was "[s]eeking a position in Management / Security Consulting," and he explained in an interview that after leaving the military, he began the process of applying to serve as the local deputy for security operations at the MGM Springfield casino.[189]

A number of witnesses remarked that Mr. Walsh's family has strong political connections in western Massachusetts.[190]  Indeed, Mr. Walsh pivoted his career search when a state legislator—Representative John Velis—reached out to suggest that Mr. Walsh apply to be the Superintendent at the Soldiers' Home.[191]  At the time, a job posting for this role published in the *Boston Globe* indicated that the Soldiers' Home sought an "experienced administrator for superintendent" and the "ideal candidate" would have "a proven track record in supervising, operating a residential/outpatient facility, budget management, planning/developing, medical, residential, long-term and acute care programs for veterans."[192]  Mr. Walsh expressed his concerns to Representative Velis that he did not have a clinical background, but Representative Velis assured Mr. Walsh that this was not a requirement for the job.[193]

Mr. Walsh interviewed with the Board of Trustees and with Secretary Urena.[194]  Secretary Urena indicated that the Board decided only to consider candidates who were military veterans.[195]  Secretary Urena suggested that he "did not have a lot of influence" with respect to the Board's decision.  He explained that he encouraged the Board to wait and interview one candidate who was both a veteran and licensed nursing home administrator—this candidate, John Crotty, was temporarily out of the country at the time.[196] Nevertheless, the Board settled on Mr. Walsh, and Secretary Urena then recommended to

Secretary Sudders that Mr. Walsh be appointed.[197] Secretary Sudders likewise recalls that Mr. Walsh was "overwhelmingly" the choice of the Soldiers' Home Board of Trustees, and Secretary Urena's choice for the role,[198] and she accepted these recommendations.[ix] Governor Baker formally appointed Mr. Walsh to be the Superintendent of the Soldiers' Home on May 29, 2016.

Given Mr. Walsh's lack of experience, Secretary Sudders instructed Secretary Urena to ensure that Mr. Walsh's Deputy Superintendent (the role was vacant at the time) would have a background in long-term care.[199] Mr. Crotty was eventually hired to serve as Deputy Superintendent under Mr. Walsh.[200]

Secretary Urena noted his surprise that shortly after Mr. Walsh was appointed, Mr. Walsh's "family" issued a press release about the new position.[201] Secretary Urena indicated that he found this to be out of place, as in his view the announcement should have come from the Governor's office.[202]

### 2.      Management and leadership style

Mr. Walsh is a polarizing figure. Some staff members we interviewed emphasized that he "was passionate about the veterans" and "he knew veterans by name and would come in on the weekends."[203] Mark Yankopoulos (Agency Counsel at the Soldiers' Home) likewise viewed Mr. Walsh as "an excellent leader and capable executive."[204] During our interviews, Mr. Walsh emphasized that he "loves" the Soldiers' Home, and that his time there does not feel like work.[205]

However, staff repeatedly raised concerns that there are two sides to Mr. Walsh's leadership: what the families of veterans see and what the staff observes.[206] With respect to Mr. Walsh's leadership style, our interviews with staff members echoed common themes of fear about retaliation and lack of communication.[207] As one staff member put it, "Walsh could run us as troops but not as people" and

---

[ix] Secretary Sudders noted that the appointing and supervision authority with respect to the Superintendent is the subject of "varying interpretations." Section 71 of chapter 6 of the General Laws grants the Board the authority to appoint a Superintendent, but § 17 of chapter 17 provides that the Superintendent "shall serve under the governor, and shall be subject to such supervision as the governor deems necessary and proper." In contrast, the General Laws expressly provide that "[t]he secretary of health and human services shall appoint, with the approval of the governor, the superintendent of the soldiers' home" in Chelsea. Mass. Gen. Laws c. 6, § 40.

there is an "isolation" or "aloofness" about him.[208]  Another staff member explained that "the Walsh administration has ruled with a lot of retaliation, bullying, unnecessary commentary, and not enough training."[209] The Soldiers' Home staff that we spoke with feel that Walsh's mantra is "what I say goes," and anyone who questions him is targeted.[210]

John Crotty, who served as Deputy Superintendent under Mr. Walsh from January 2017 until June 2019, also offered blunt observations about Mr. Walsh's leadership style.  He reports that he was initially "close" with Mr. Walsh and consulted on major decisions—but after he disagreed with Mr. Walsh in front of other staff, he was isolated and shut out from consultation on important matters.[211]  As Mr. Crotty put it, "don't disagree with him with others present, or you will pay a dear price."[212]  He described Mr. Walsh's interactions with others whom he thought Mr. Walsh disfavored as "bullying" and "psychological warfare to wear down an enemy."[213] He cited instances where Mr. Walsh would stop into a small office and greet the staff members he liked, while making a point to ignore those present with whom he was unhappy.[214]

Other staff members were frustrated with Mr. Walsh's lack of attention to detail.  Some report that he would change subjects repeatedly and had trouble focusing and staying on-topic during meetings, and indicate that he would be more interested in making references to movies and talking about sports than the business at hand.[215]  Likewise, the Assistant Director of Nursing referenced Mr. Walsh's lack of healthcare experience, and explained that when Mr. Walsh started, she had to explain the meaning of common terms like productivity standards, FTEs (full-time equivalents), CMS (the Centers for Medicare and Medicaid Services), and the Joint Commission.[216]

Our conversations with Secretary Urena and his Chief of Staff Paul Moran identified similar concerns:

- In March 2020, during the COVID-19 outbreak at the Soldiers' Home, Mr. Moran expressed concern to Secretary Urena that Mr. Walsh's "communication skills are not good and he is never thorough or forthright in his communication."[217]  Secretary Urena agreed with this assessment, and explained that "everything [Mr. Walsh sent] over four years was cryptic."[218]

- Secretary Urena noted that the high rate of staff turnover under Walsh's leadership was a red flag and "if one more employee had quit [under Mr. Walsh's management], there would be a more

serious conversation that had to happen with him."[219]  Secretary Urena explained that no other department had staff turnover at the level of the Soldiers' Home in Holyoke.[220]  He emphasized that Mr. Walsh would get defensive if asked about the resignations, and the Department of Veterans' Services could not conduct exit interviews with the staff because they felt retaliation would ensue if they were to share their views in an exit interview.[221]  In this regard, Secretary Urena perceives a "culture of retaliation" under Mr. Walsh's leadership.[222]

- Secretary Urena asserted that on March 30, 2020, when a state emergency response team arrived at the Soldiers' Home, Mr. Walsh informed them that the facility manager (Jerimiah LaPlante) was resigning, effective at the end of the week.  Secretary Urena indicated that he when asked Mr. Walsh when he learned about this departure, Mr. Walsh "lied" and indicated that it was a verbal resignation and he just learned about it.[223]  However, Secretary Urena later saw a copy of a written resignation letter dated about ten days earlier.[224]

- Secretary Urena also reported that when he arrived at the Soldiers' Home unannounced for a visit during Mr. Walsh's first year, Mr. Walsh called Secretary Sudders to object and suggested that Secretary Urena must seek permission from Mr. Walsh before coming to the facility.[225]

- As Secretary Urena put it, "the management style of Bennett Walsh was to never have anyone else have conversations with us."[226]

- After an employee raised concerns about Mr. Walsh's ability to manage his temper, he was assigned to work with an executive coach to address anger management issues.  This appointment was extended after the initial six-month term when another similar complaint arose.[227]

- Secretary Urena reports that he and Secretary Sudders had concerns that Mr. Walsh did not spend enough time at the facility.  Secretary Urena indicated that Mr. Walsh's "schedule would be inundated with free lunches and ways of promoting the Home."[228]  Mr. Moran reports that Secretary Urena rebuked Mr. Walsh for spending too much time at political engagements, and not enough time at the Home.[229]  Secretary Urena also recounted that during an exit interview, former Deputy Superintendent John Crotty reported that Mr. Walsh told him that Mr. Crotty was to be the "inside man" at the Home, and Mr. Walsh would be the "outside man."[230]

- Media reports indicate that Mr. Walsh was under investigation by the Massachusetts Office of the Inspector General as of January 30, 2020, relating to issues prior to the COVID-19 outbreak.[231]  The nature of this investigation has not been disclosed publicly.

**3.     Interactions with the Board of Trustees**

The Soldiers' Home is subject to supervision and oversight by both the Department of Veterans' Services and the Home's Board of Trustees.  By statute, the board consists of "seven persons, who shall be residents of the counties of Berkshire, Franklin, Hampden and Hampshire. Each of said counties shall be represented on said board by at least one trustee who is a resident therein . . . [and] the members shall serve without compensation."[232]  Massachusetts law provides that the Board "shall manage and control"

the Home, and appoint its Superintendent.[233]  Another statute established the role of an "executive director of veterans' homes" within the Department of Veterans' Services, but clarified that the "board[] of trustees . . . shall not be subject to the control of the executive director; and provided further, that the executive director shall not have control over the day-to-day operations of the . . . Soldiers' Home in Holyoke."[234]

Kevin Jourdain (the Board's current chairperson) describes the Board's role as the "conscience of the community."[235]  A former Board of Trustees member explained that the Board of Trustees was "not there to run the institution, but to try to make sure that the institution runs well."[236]  The Board administers a designated "Trustees' fund," but the Department of Veterans' Services has responsibility to prepare and approve the Home's main budget.

The current Board of Trustees is comprised of Kevin Jourdain (Chair), Christopher Dupont, Cindy Lacoste, Cesar Lopez, Carmen Ostrander, Isaac Mass, and Richard Girard.[237]  Generally, appointments to the Board of Trustees are for seven-year terms.[238]  When Mr. Walsh was appointed Superintendent of the Soldiers' Home in 2016, the members of the Board were Michael F. Case (Chair), Benjamin H. Cluff, Spiros Hatiras, Cesar A. Lopez, Margaret E. Oglesby, Daniel J. Smith, and Brian Q. Corridan.[239]

During Mr. Walsh's tenure, the Board of Trustees held meetings once a month for one to two hours in-person at the Soldiers' Home.[240]  Department of Veterans' Services officials also attended, as did senior leaders from the Soldiers' Home, including Mr. Walsh, the Chief Nursing Officer, and the Medical Director.[241]  The Board's meeting agendas were generally prepared by Mr. Walsh with input from Mr. Jourdain.[242]

Mr. Jourdain explained that after he joined the Board in October of 2018 and became Chairperson in November of 2019, he started to shift the focus of the Board of Trustees to more substantive issues, including discussions about financials, the trustees' account, strategy, and Board policies.[243]  The Board was also involved with the search process for the Superintendent position in 2016.[244]  Secretary Urena described his role as a "guide" to the "Trustees who were the hiring authority."[245]  Mr. Walsh was the

Board's clear choice for the role.  Trustee Brian Corridan explained that after meeting Mr. Walsh, he felt that "leadership oozed out of him."[246]

Mr. Walsh's relationship with the Board remained strong during his tenure, and our interviews with Trustees suggest he maintains substantial support within the Board.[247]

### 4.    Leadership team

Superintendent Walsh relied on and worked with a broad leadership team to operate the Soldiers' Home.  At the time of the outbreak in March 2020, this team consisted of:

- Vanessa Lauziere (Chief Nursing Officer)

- Celeste Surreira (Assistant Director of Nursing)

- Vanessa Gosselin (Infection Control Nurse)

- Dr. David Clinton (Medical Director)

- Jessica Powers (Human Resources Liaison)

- Mark Yankopoulos (Agency Counsel)

- Deb Foley (Director of Communications)

- Jeremiah Laplante (Director of Operations)

- Norman Gousy (Director of Finance)

Mr. Walsh's team had experienced substantial turnover in the years leading up to the outbreak. Three of these leaders—Ms. Lauziere, Mr. Yankopoulos and Mr. Goussy—assumed their positions in late 2019, and Ms. Powers had just returned in March 2020 from maternity leave.  There has been more turnover subsequently: Dr. Clinton recently resigned from his role as Medical Director, Mr. Laplante resigned from his role as Director of Operations, and Ms. Surreira has been placed on administrative leave.

While one Soldiers' Home Trustee perceived that everyone on the leadership team "seems to work as a cohesive unit [and] there does not seem to be any tension or animosity at the meetings [and] they all seem knowledgeable about what was going on,"[248] interviews with Soldiers' Home staff suggest a different picture.  Many staff members sensed that "there was no stable leadership" because of this turnover.[249]

Likewise, a number of staff members expressed concern about favoritism and insularity among Mr. Walsh's leadership team.[250]

Some people who were ostensibly included in the leadership team report that they were not listened to, and were excluded from meetings and decision-making in favor of a smaller, favored circle. Vanessa Gosselin, a registered nurse who was in charge of infection control, reported that Mr. Walsh "didn't listen to people," and "didn't like me because I am open and honest."[251]  Ms. Gosselin indicated that during the COVID-19 outbreak, she was not consulted on decisions (discussed in more detail below) about isolating veterans or moving veterans between rooms and units, and was not part of meetings in which the "administration" of the Home addressed personal protective equipment or interactions with public health authorities.[252]  Similarly, Celeste Surreira, the Assistant Director of Nursing and a licensed nurse practitioner, asserted that she was not part of the Soldiers' Home "executive team" and that she attended executive team meetings only "once in a blue moon, if someone was out."[253]  Ms. Surreira reported that even before the outbreak, she pushed the executive team to focus more on disaster preparedness, but "felt like I was on a sinking ship and waving the flag wasn't working, and that is a horrible feeling."[254]

Several members of the leadership team also expressed concerns about Dr. Clinton's performance in his role as Medical Director.  The Medical Director role is a 20-hours per week position, with a salary of approximately $116,000.  Ms. Lauziere (the Chief Nursing Officer) stated that she would have expected the Medical Director to be at the facility full-time and to be "more available."[255]  She indicated that she "was not really impressed with Dr. Clinton's practice—or lack of it—as a Medical Director" and that in her view, Dr. Clinton did not spend enough time "getting into the detail of the care."[256]  Val Liptak, (an experienced healthcare executive appointed as the Interim Administrator of the Soldiers' Home after Mr. Walsh's suspension) observed that Dr. Clinton is "not a strong physician to lead the organization especially if they are going to get their medical records up to snuff."[257]  Ms. Liptak noted that upon her arrival, the facility did not have an accurate list of health care directives and healthcare proxies for each veteran, and

Dr. Clinton "only knew his patients on his floor" and did not know the majority of the veterans in the facility.[258] Lisa Colombo (the Executive Vice Chancellor of Commonwealth Medicine, and a member of Ms. Liptak's response team) asked Dr. Clinton why he was not going to the floors of the facility and evaluating veterans, and Dr. Clinton responded that he was at "high risk" for COVID-19 and "did not want to go on the floors."[259]

On the other hand, Mr. Walsh's impressions of Dr. Clinton's performance as the Medical Director were positive, and he emphasized that "in four years I never overrode a decision made by Dr. Clinton."[260] Mr. Crotty (the former Deputy Superintendent) described Dr. Clinton as "a competent clinician" but "very laid back."[261]

### i.      The Deputy Superintendent's role

The position of Deputy Superintendent merits further discussion.  At the time Mr. Walsh was appointed Superintendent, Secretary Sudders instructed Secretary Urena to ensure that the Soldiers' Home had a Deputy Superintendent with healthcare experience.[262] John Crotty, a licensed nursing-home administrator, was appointed to this role in 2016.  Staff members describe Mr. Crotty as "fantastic", "old school," "transparent," and that "he knew what he was doing."[263]  However, Mr. Crotty resigned in June 2019, because of clashes with Walsh and the [then-]Director of Nursing, Randy Stone.[264]  The role remained vacant from June 2019 until March 30, 2020, and is again vacant as of the date of this report because the most recent Deputy Superintendent resigned after only several weeks at the Home.

In searching for a new Deputy Superintendent in 2019, Secretary Urena again sought a candidate who was a licensed nursing home administrator because "Walsh did not come from a medical background."[265]   David Laplante,[x] a licensed nursing home administrator and experienced healthcare executive, applied for the position in September 2019, and was ultimately selected for the position after

---

[x] David Laplante is not related to Jeremiah Laplante, who served as the Director of Operations at the Soldiers' Home until April 2020.

interviewing with Mr. Walsh, Paul Moran (Secretary Urena's Chief of Staff), and Secretary Urena in early 2020.[266]

Even understanding that state hiring processes move slowly, it is remarkable that Mr. Laplante did not start work at the facility until March 30, 2020 (and resigned several weeks later). Secretary Urena explained that "there was always a hesitation from Walsh" about Mr. Laplante because "he was not the candidate that Walsh wanted."[267] The candidate that Mr. Walsh apparently favored was one who was in the National Guard, but did not have a background in healthcare.[268] Secretary Urena and Mr. Moran were particularly concerned about this candidate, as the primary "accomplishment" listed on her resume was that she "busted a union."[269] In Mr. Moran's view, given the labor-relations difficulties at the Home, Mr. Walsh's decision to "even bring that person up the chain" for approval with this "accomplishment" on her on her resume, reflected a "total lack of judgment."[270] Secretary Urena expressed the same concern about Mr. Walsh's judgment with respect to this candidate.[271]

Secretary Urena emphasized that it was important for the Deputy Superintendent "to have a medical background and [be] licensed as an expert" but "Walsh was not interested in that."[272] Likewise, Mr. Moran reported that "Walsh was reluctant to move quickly" in hiring Mr. Laplante, and "it became clear that Walsh wanted to control the timeline."[273] Mr. Laplante reported that once he was offered the position and was ready to start, "Walsh was not easy to track down" to conduct final negotiations and logistical discussion about starting work.[274] He finally reported for work on March 23, 2020—in the midst of the COVID-19 crisis in which Mr. Walsh reported substantial staffing shortages—but Mr. Walsh sent him home for a week to await the results of his tuberculosis test.[275]

We asked Mr. Walsh to explain the delay in Mr. Laplante starting work. He represented to us that Mr. Laplante started work "virtually" on March 23, and participated in leadership meetings during the week of March 23 via videoconference.[276] The information that Mr. Walsh provided to us does not appear to be accurate: there is no record of Mr. Laplante participating in videoconferences during the week of March 23, 2020, no one else recalls him participating, and in a follow-up conversation Mr. Laplante stated

affirmatively that he did not participate in any meetings (remotely, or otherwise) prior to finally starting work in person on March 30, 2020—the day that Mr. Walsh was placed on administrative leave.[277]

**5.    Quality of care and survey results**

To assess how COVID-19 affected the Soldiers' Home, we sought to understand and evaluate the quality of care provided at the Home before the outbreak.

One way to measure the quality of care is to ask staff and family members about their perceptions of the facility.  The consistent sentiment among family members was that prior to the COVID-19 outbreak, the Soldiers' Home "is the best place for someone to be" and that the Soldiers' Home has a strong reputation within the community.[278]  Staff confirmed to us that they "truly care about the veterans" and take "good care of them on a day-to-day basis."[279]  One staff member who also had a family member living at the Soldiers' Home said that the Home "was phenomenal" and he was "impressed" with the quality of care.[280]  Even when facing staffing concerns and shortages, the Home prides itself "on our quality of care and the relationships that the nursing assistants have with the veterans that can go on for years."[281]  The general perception from family members was that the "care was as good as it could be with the staffing they had."[282]  Holyoke Mayor Alex Morse noted similarly that his sense about the quality of care provided at the Soldiers' Home was "they do the best they can with the resources they have."[283]

However, despite the facility's strong reputation in the community and the unquestioned dedication of its staff, family members and some staff expressed concerns about the facility's staffing levels. We asked a number of staff members whether they would recommend the Soldiers' Home to a family member who needed long-term care.  In response, one senior nursing leader emphasized that while the "staff is very caring . . . the level of care could be enhanced, there is room for improvement."[284]   Another staff member explained that "when a unit is staffed at staffing minimums, care is provided but at a barebones, minimal level."[285]  One family member felt that the care her father received at the Soldiers' Home was "mediocre at best due to problems with understaffing."[286]

Survey results provide additional information about the quality of care.  The Soldiers' Home is surveyed on an annual basis by inspectors from the federal VA and every three years by the private Joint Commission.[287]  Indeed, members of the Board of Trustees and senior executive branch leaders such as Secretary Urena emphasized that they relied heavily on the survey results in their oversight of the Soldiers' Home—they saw the surveys as the facility's "guide."[288]

The results of these surveys steadily improved during Superintendent Walsh's tenure. The VA surveyed the home four times during this period.  The first survey conducted in January 2017, and the Soldiers' Home failed to meet three standards.[289]  First, the accidents standard, requiring that the facility management must ensure "the resident environment remains free of accident hazards . . . and each resident receives adequate supervision and assistance devices to prevent accidents" was not met because the Home failed to directly supervise cognitively impaired residents while they smoked.[290]  Second, the facility management standard, requiring that the facility must be designed, constructed, equipped and maintained to protect the health and safety of residents, personnel and the public, was not met because "the facility failed to provide a clear path of egress" which affected 6 of 20 smoking compartments, staff and approximately 14 residents."[291]  Third, the residents rooms standard, requiring that resident rooms be designed and equipped for adequate nursing care, comfort, and privacy, was not met because "the facility failed to limit resident rooms to four residents involving 2 resident rooms on the secured units."[292]  In addition, there were several standards that were met but the VA made recommendations for improvement. For example, the "infection control" standard was met but the VA recommended that "the superintendent, interim director of nursing and infection control nurse . . . have the CDC guidance for the Influenza within the infection control policy and procedure."[293]

In the 2018 VA survey, the Soldiers' Home provisionally met two standards, and fully met the remaining standards.  Specifically, the Soldiers' Home provisionally met the per-diem drugs and medicines standard and the financial security standard.[294]  In 2019, the Soldiers' Home provisionally met four standards, and fully met the remaining standards.[295]  The Home provisionally met the quality of care

standard because "the facility failed to report a sentinel event for one resident following a major functional decline caused by a fall and fractured hip," provisionally met the physical environment standard because "the facility failed to provide the minimum required clear path of egress", and provisionally met the resident rooms standard because "the facility failed to provide resident rooms of the required minimum size."[296]

In the 2020 survey (completed on January 31, 2020), the Soldiers' Home did not meet two standards, provisionally met 11 standards, and met the remaining standards.[297]  The Soldiers' Home did not meet the standard that a resident has a right to be fully informed in the language that he or she can understand of his or her total health status because "the facility failed to inform veterans of how to directly contact the State Ombudsman office to file a complaint," and did not meet the standard requiring the facility to care for residents in a manner and in an environment that promotes maintenance or enhancement of each resident's quality of life because "it was determined that the facility failed to ensure resident cared for was always provided in a manner that maintained or enhanced each resident's dignity."[298] Four residents were observed being shaved in common areas of the facility and were not provided privacy when personal care was being provided.[299]   Among the standards that were met only "provisionally," several were related to the quality of care, including:

- the comprehensive care plans standard, because "nursing staff failed to ensure care plans were developed for two of 30 sampled residents"

- the requirements of the comprehensive care plan, because "nursing staff failed to update a nutrition care plan for one of 30 sampled residents"

- the standard requiring that services provided meet professional standards of quality, because "nursing staff failed to ensure that services met professional standards of quality for one of 30 sampled residents when nursing staff did not provide appropriate assessment for a resident with a history of seizure activity and recurrent vasovagal episodes"

- the standard that facility management must report sentinel events to the director of the VA medical center, because the facility failed to report two sentinel events to the VA within 24 hours of identification

- the nutrition standard, because "the facility failed to ensure one of 30 sampled residents received a therapeutic diet"

- the provision of services standard, because "the facility failed to obtain outside mental health services under a written sharing agreement for the provision of mental health services for one sampled resident which received mental health services at the VA"

- the requirement to provide routine and emergency drugs, because "nursing staff failed to ensure the accurate administration of medication for one of 30 sampled residents."

After receiving the 2020 VA survey results, Mr. Walsh informed Secretary Urena on March 4, 2020 that the Soldiers' Home "met (or provisionally met) all required VA health care standards" for the "third year in a row" which was the "first time this has occurred in the home's 68 year history."[300]  Mr. Walsh stated that this was a "wonderful accomplishment for our entire staff and our embrace of all employees (myself included) are care givers (in some way) for our veterans."[301] Paul Moran (Department of Veterans' Services Chief of Staff) noted that Mr. Walsh gave the impression that the VA survey was "100%" but argued this was not so—the Home received "3 dings from the VA."  Mr. Moran explained that his "skepticism towards Walsh is built on little things" like this that show "his information did not seem accurate."[302]

Several days later, Mr. Walsh reported to the Board of Trustees at its March 10, 2020 meeting that the Soldiers' Home had recently received the results from the VA survey and he was "happy to report a 'three-peat'" having met or provisionally met all healthcare standards for the third year in a row.[303]  He noted during that meeting that there were certain areas to be addressed.  During our interviews, Trustees from the Soldiers' Home cited the Joint Commission and VA inspections as indicators that the Home was being run well.[304]

### 6.    Staffing levels

The levels of nurse staffing[xi] at the Soldiers' Home have been a source of controversy for years. A number of current and former leaders at the Soldiers' Home (including former Superintendent Barabani and Deputy Superintendent John Paradis), current and former nurses and nursing aides, and family

---

[xi] Except where otherwise indicated, references to "nurse staffing" include registered nurses, licensed practical nurses, and certified nursing assistants.

members of veterans report that staffing levels are too low.[305]   Family members observed consistent "problems with staffing" and at times "there would be no one around" on the care centers.[306]   Staff reported that there would be practically "nobody on the weekends and they would mandate every single weekend to staff the second shift."[307]   The Chief Nursing Officer suggested that staffing resources available to her were "inadequate," and the Assistant Director of Nursing reported that the day-shift staffing levels are "fine," but the evening staff levels need to be increased.[308]

Apart from the question whether enough nursing staff are assigned to each shift, it is clear that the Soldiers' Home relies heavily on the undesirable practice of staff mandation.  "Mandation" refers to a scenario when insufficient staff are available for a shift and (absent volunteers) staff from the previous shift are ordered to remain at work to cover the next shift.  The practice is deeply unpopular and disruptive to the lives of the staff.[309]   Indeed, some nurses and nursing aides report that when they had commitments outside of work after a scheduled shift, they might call in sick before the scheduled shift just to avoid the possibility that they might be mandated to work another shift after the scheduled shift ended.  In contrast to the Soldiers' Home at Holyoke, mandation is rarely if ever used at the Soldiers' Home at Chelsea.[310]

### i.      The Moakley study

Persistent staffing concerns led EOHHS leaders to commission a 2019 study of the Soldiers' Home by the Moakley Center for Public Management at Suffolk University.  The principal investigator for the study, Nicole Rivers, previously conducted a similar study at the Chelsea facility.[311]   Ms. Rivers also taught a class at Suffolk in which Mr. Walsh enrolled as part of his continuing education in public management.[312]

There were both qualitative and quantitative facets of the Moakley study.  Ms. Rivers met with a series of focus groups at the Soldiers' Home, interviewed leaders, and reviewed relevant literature and staffing regulations. She also worked with the scheduling staff at the Home to download and replicate recent staff schedules in electronic format, so that she could conduct a statistical analysis.[313]   Ms. Rivers' reports from the staff interviews are striking: she recounts that "staff were crying" during the interviews

because they "need more help," that they "felt bullied by management," and were "overwhelmed with the amount of care they had to provide with limited resources."[xii]  Ms. Rivers concluded that "it was clear that was a major disconnect between what the Superintendent thought was going on, and what was actually going on."[314]  She spoke privately with Mr. Walsh to convey some of this feedback.

The quantitative portion of the Moakley study concluded that the average healthcare provider hours per patient day ("HPPD") are substantially above the hours required in applicable VA regulations,[315] and "just 0.15 care hours below the recommended 4.10 care hours" set out in recommendations from CMS.[316]  But there are substantial analytical flaws in the study.  First, the numbers are taken—and conclusions are drawn—from *scheduled* rather than *worked* hours.  Ms. Rivers agreed that the scheduling numbers were "aspirational" and were "not realistic" with respect to the hours actually worked, but nevertheless relied on them to conclude that the staffing levels were generally sufficient.[317]  She indicated that it was not feasible to evaluate the hours actually worked, due to data-format limitations.  Second, the study's computation of average HPPD for the facility is marred by methodological errors.  To compute the "average" HPPD, the study uses a simple average of the HPPD for each Care Center within the Soldiers' Home (without weighting by unit size).  But some small Care Centers (such as the 12-bed hospice unit) are heavily staffed (6.0 HPPD) while other large Care Centers are much more leanly staffed (the 56-bed Care Center 2 had 2.72 HPPD, according to the study)—this skews the unweighted average upward.  Although the study recommends more recruiting and other efforts to reduce overtime, it does not prescribe higher staffing levels.

The final version of the Moakley study was subject to review and editing by Mr. Walsh and EOHHS leaders.  Ms. Rivers explained that she received  "a few edits with wording" because they "didn't want to use certain words in the union environment."[318]  Mr. Walsh proposed a series of edits to the report's executive summary that amounted to a rebuttal of several of its conclusions.[319] Undersecretary

---

[xii] Ms. Rivers shared these observations during an interview with the McDermott team, but did not include them in the study itself.

Catherine Mick rejected these edits as "irrelevant" to the study, and in a later interview described them as "par for the course" as Mr. Walsh would want to explain away any criticism he received as incorrect.[320]

### ii.    BRG analysis

Because of the limitations and methodological errors in the Moakley study, McDermott retained Berkeley Research Group, LLC ("BRG") to analyze staffing data from the Soldiers' Home.  We tasked BRG to answer two questions with respect to a recent month shortly before the COVID-19 outbreak (February 2020): (1) what is the HPPD per unit, per shift, and by rank (i.e., registered nurses, licensed practical nurses, and certified nursing assistants), and (2) how do these levels compare to those prescribed by regulations and those observed at similar facilities elsewhere in Massachusetts and across the nation?

To perform its analysis, BRG relied on data sources provided by the Soldiers' Home and the Commonwealth's payroll data.  To avoid conflating scheduled hours with hours actually worked, BRG used state payroll data as the source-of-truth for hours worked, and then associated that data to the scheduling records to identify the units on which each staff member worked.  Finally, BRG identified comparison data from public sources for other facilities—both skilled-nursing facilities generally, and (where available) other state veterans' homes.

We draw several conclusions from the BRG analysis.  First, the mix of nursing staff across ranks at the Soldiers' Home is similar to that at other state veterans' homes and other skilled-nursing facilities (in Massachusetts and elsewhere):



**Figure 1: This chart compares the mix of nursing staff by rank at the Soldiers' Home to other facilities**

In the chart above, "Holyoke Geozip" refers to other skilled-nursing facilities in the greater Holyoke region; "all Massachusetts" refers to skilled-nursing facilities in Massachusetts; "Veterans' Facilities" refers to other state veterans' homes for which public data is available, and "All U.S." refers to all skilled-nursing facilities in the United States. The Soldiers' Home has the lowest percentage of registered nurses and highest percentage of nursing assistants of the comparison data sources, but the differences are fairly small.

Second, the aggregate staffing levels (measured as HPPD) at Soldiers' Home are similar to other state veterans' homes, and higher (i.e., better) than those seen at most skilled-nursing facilities:



**Figure 2: Comparison of Aggregate Staffing Hours (as HPPD)**

The shaded region in the chart above represents the 20th and 80th percentiles in the dataset of skilled-nursing facilities across the country. The peaks and valleys in the chart reflect differences between weekday and weekend staffing; the Soldiers' Home, like most facilities, has considerably less staff on weekends. The chart confirms that the Soldiers' Home's aggregate staffing levels are similar (although slightly lower with respect to weekday shifts) when compared to other veterans' homes, and markedly higher than the average for skilled-nursing facilities generally.

Third, there is substantial variance in staffing levels among the Care Centers within the Soldiers' Homes. The most thinly staffed Care Center (Care Center 2) has HPPD levels well below the average, but still above the 20th percentile of other skilled-nursing facilities:



**Figure 3: Comparison of HPPD by unit**

The chart above excludes the small hospice unit, as the considerably higher HPPD in this 12-bed unit would skew the axis of the chart.

Finally, BRG's analysis confirms that (as our interviews suggested) Soldiers' Home is staffed at markedly lower levels during the night shift. However, this pattern is similar to that observed at other state veteran homes elsewhere in the country:[xiii]



Figure 4: Comparison of HPPD by shift

There is no doubt that there are staffing problems at the Soldiers' Home, and that staffing resources need to be better allocated among different Care Centers and shifts. The staffing levels in some

---

[xiii] This chart compares the Soldiers' Home to state veterans' homes in New Jersey, which were the only facilities for which BRG was able to identify shift-level data for the purposes of comparison.

units—Care Centers 2 and 3, in particular—are considerably below what CMS recommends.  Likewise, as the Moakley study indicates, the modern approach of staffing levels set based on patient acuity levels (in other words, having more staff work in areas with sicker patients) rather than merely the number of patients would produce more uniform staffing coverage.  There is also heavy turnover at the Soldiers' Home, and the prevalence of new staff likely contributes to the problems that staff members reported in our interviews. However, we conclude from BRG's analysis that the Soldiers' Home's staffing levels are not substantially different from similar facilities, and that the staff shortages that occurred during the peak of the COVID-19 outbreak did not result from systemically low staffing levels prior to the outbreak.

### iii.        Permanent schedule

The Moakley study—released in August 2019—recommended that the Soldiers' Home implement a permanent staffing schedule to reduce uncertainty among staff, reduce overtime (including mandated overtime), and stabilize the facility.  Under the present approach, staff are scheduled on a rotating basis, or in other words, they do not typically work the same days and shifts each week.  Under a permanent schedule, staff "bid" (usually based on seniority) for certain days and particular shifts, and then work their assigned shifts on a consistent and predictable basis.

Management and labor—and every witness we interviewed who had an opinion on the subject— favor this approach.[321]   Undersecretary Mick explained that she "does not see any upside of not having a permanent schedule for staff" because "she does not understand how a facility could operate and how staff could plan their life and operate without a clear schedule."[322]

The Soldiers' Home in Chelsea transitioned to a permanent schedule several years ago, a process that took somewhere between two and six months to implement.[323]  However, despite the general support for this approach and the Moakley recommendation, it appears that through the time that Mr. Walsh was placed on administrative leave, the Soldiers' Home in Holyoke has not taken any substantial steps to design and implement the permanent schedule, beyond initial discussions about the idea.[324]  The cause of the delays is unclear, but we identified email correspondence reflecting that EOHHS's leadership were

frustrated by the delays.[325]  As one EOHHS staffer wrote to Mr. Walsh on February 27, 2020, "[t]ime is of the essence, as you yourself noted, this study was done a long time ago."[326]

## D.     The COVID-19 outbreak

### 1.     Guidance for healthcare facilities on the emerging COVID-19 pandemic

In evaluating the preparations for and response to the COVID-19 pandemic by the Soldiers' Home's leadership, we sought to identify the relevant guidance from public health authorities in Massachusetts and at the federal level.

Critically, however, we note that this guidance evolved over time as the nature and scope of the pandemic—and characteristics of the virus—became clear.  Accordingly, the question must be whether the Soldiers' Home team responded to and implemented the advice that was available to them *at the time* they faced each critical decision.  In particular, we note that (as discussed below) as recently as early March 2020, state public health officials were advising that the risk of COVID-19 was low, and that the flu was a greater risk to residents at long-term care facilities.

*          *          *

The first COVID-19 outbreak in the United States was at a skilled-nursing facility in Kirkland, Washington.  Two residents died with COVID-19 on February 26, 2020, and the facility was put on lockdown.  In all, over the next several weeks, 35 people died with the virus.  The outbreak was widely reported in the press, and the Soldiers' Home's leadership team was aware of it.[327]

COVID-19 had arrived in Massachusetts even earlier.  The Commonwealth identified its first COVID-19 case on February 1, 2020.[328]  An international conference hosted by a large pharmaceutical company in Boston on February 26 and 27, 2020 apparently catalyzed the spread of the virus in Massachusetts.[329]  By the time Governor Baker declared a State of Emergency on March 10, 2020, 70 of the 92 cases were linked to the conference.[330]

The Commonwealth began promulgating guidance, literature, and recommendations directed at protecting citizens from COVID-19 in February 2020.  Early in February, the Department of Public Health

circulated a "fact sheet" for long-term care facilities, stating it was preferable to use alcohol-based hand rubs rather than other type of hand rubs in order to prevent the spread of infectious agents.[331] But this guidance did not specifically mention COVID-19.[332] On February 21, 2020, the CDC released a preparedness checklist aimed at healthcare professionals, detailing procedures that should be in place to prepare for the arrival of patients with confirmed or possible COVID-19.[333] These procedures included reviewing a facility's infection-control procedures for visitor management and restriction, the usage of personal protective equipment for healthcare workers and patients, and ensuring proper patient placement in light of an infectious disease outbreak.[334]

On February 27, 2020, the Massachusetts Department of Public Health released guidance directed at long-term care facilities, noting the agency was closely monitoring the spread of COVID-19.[335]  The guidance letter recommended that long-term care facilities: (i) minimize the chance of exposure through communications with patients/residents/families; (ii) ensure triage procedures are in place at facility entry points to detect and isolate patients who may require evaluation for COVID-19; (iii) require healthcare personnel at risk of exposure to adhere to "Standard, Contact, and Airborne Precautions, including donning eye protection (e.g., goggles, face shield);" (iv) ensure healthcare personnel are educated, trained, and have practiced appropriate usage of protective equipment prior to caring for patients; and (v) perform alcohol-based hand hygiene.[336]

On March 2, 2020 Leslie Darcy (EOHHS Chief of Staff) sent an email to a variety of agency officials—including Mr. Walsh—regarding the Commonwealth's preparations for a potential outbreak of COVID-19.[337]  In her email, Ms. Darcy reported that "[t]he risk of COVID-19 in the Commonwealth is low; in contrast, the risk of flu is high."[338]  The same day, the Department of Public Health issued a press release announcing a presumptive positive case of COVD-19 in Massachusetts after testing began on February 28, 2020 at the State Public Health Laboratory.[339]  This result, if confirmed, would be the second positive COVID-19 case in Massachusetts.[340]  The press release reiterated that "[t]he risk to the public from COVID-19 remains low in Massachusetts."[341]

On March 4, 2020 the Baker administration convened a meeting of various leaders representing hospitals, public health boards, emergency response, long-term care facilities, and higher education to discuss ongoing preparations for COIVD-19.[342]  Governor Baker remarked "[w]hile the risk for COVID-19 in Massachusetts remains low, our partnership with these organizations and leaders is crucial to ensuring that the Commonwealth remains safe and prepared."[343]  Public Health Commissioner Dr. Monica Bharel stated "[w]hile the risk of COVID-19 is low in Massachusetts, the administration strongly urges schools to cancel all upcoming organized international travel for the foreseeable future."[344]  The press release reiterated "[a]lthough the risk of COVID-19 to Massachusetts residents remains low, and the risk of the flu is high, people are advised to take many of the same steps they do to help prevent colds and the flu . . ."[345]  On the same date, Dana Ohannessian (Communications Coordinator for the Department of Public Health) circulated an email to various contacts, including Vanessa Gosselin (Infection Control Nurse at the Soldiers' Home) again stating that the risk "for COVID-19 is low, but the risk for flu is high."[346]  The email attached updated guidance on optimizing the use of personal protective equipment and advising procurement measures in case of shortage.[347]

On March 6, 2020, Catherine Starr (EOHHS Human Resources Officer) circulated a staff member travel policy to agency contacts, including Mr. Walsh.[348]  The policy directed staff to self-disclose to the Hospital Employee Health Nurse[xiv] and their supervisor any planned or recent travel to COVID-19 risk areas.[349]  If staff did travel to risk areas, they were to disclose such travel for an appropriate assessment. Those returning from "Warning Level 3" areas were required to stay home from work for 14 days.[350]  Ms. Starr also included resources providing an overview and fact sheet on COVID-19 and urged recipients to ensure their workplaces have adequate disinfecting supplies.[351]

---

[xiv] The Soldiers' Home did not have an occupational nurse or occupational health function. Interim Administrator Val Liptak later cited this as one of the challenges in managing staff wellness and call-outs due to COVID-19.

Also on March 6, 2020, Elvira Loncto (a federal VA employee) distributed COVID-19 guidance to Mr. Walsh, Linda Lariviere (Minimum Data Set Coordinator), and Debra Foley (Director of Communications).[352]  The guidance advised limiting staff movements between COVID-19 contaminated and unaffected areas, screening and limiting visitors, assessing residents daily for symptoms, developing an isolation plan for suspected cases, and encouraging social distancing.[353]

In response to the growing COVID-19 crisis, Governor Baker declared a State of Emergency in the Commonwealth on the afternoon of March 10, 2020.[354]  There were 91 presumed cases of COVID-19 as of this date.[355]  On the same day, the VA issued a press release outlining precautions to be taken at all VA facilities, including: (i) prohibiting visitors; (ii) suspending new admissions;  and (iii) actively screening staff for COVID-19[356]

Shortly after Governor Baker's declaration of a State of Emergency, and the VA press release, the Department of Public Health issued an order on March 11, 2020 mandating that all long-term care facilities "implement procedures published by the [Department] to screen visitors . . . and [to] restrict visitation as necessary to protect the health of residents and staff."[357]  The order mandated that anyone meeting screening criteria be restricted from visiting long-term care facilities.[358]  While not explicitly referenced in the March 11, 2020 order, the text appears to suggest that long-term care facilities must follow the Department's guidance promulgated by the February 27, 2020 letter.[359]  The provisions mandated in the March 11, 2020 guidance were to remain in effect from March 12, 2020 onwards.[360]

On the same day, the CDC promulgated a long-term care facility "Respiratory Surveillance List"—a tool designed to assist healthcare personnel in tracking patients either confirmed or suspected of COVID-19.[361]  In turn, CMS published detailed guidance for nursing homes on March 13, 2020, which included the recommendation that all facilities nationwide restrict visitors, cancel all communal dining and group activities, and implement active screening of residents and staff for COVID-19.[362]  As to testing, CDC guidance as of March 14, 2020 largely deferred the decision to both state and local authorities, as well as clinician judgment.[363]

On March 12, 2020, Paul Moran (Department of Veterans' Services Chief of Staff) forwarded an email from Ms. Darcy with COVID-19 guidance to Mr. Walsh and other contacts at the Department of Veterans' Services.[364]   Mr. Moran's email attached COVID-19 guidance for assisted-living facilities, congregate care programs, agency based in-home caregivers and workers, community day programs, and non-agency based in-home caregivers.[365]  The documents provided largely the same guidance but differed in some ways.  All guidance counselled practicing good hygiene and screening individuals such as staff, vendors, and clients.[366]  The guidance for agency based in-home caregivers and workers, community day programs, and congregate care programs all suggested providing personal protective equipment as available, though the congregate care guidance specified that only symptomatic individuals should wear masks.[367]

The community day program, congregate care program, and assisted living facilities guidance directed isolating symptomatic individuals.[368]  The assisted-living facility guidance specified that a symptomatic resident should be moved to a single-person unit with the door closed.[369]  The congregate care guidance advised that symptomatic staff should be sent home and only permitted to return 24 hours after their last symptoms.[370]  Staff with a confirmed case of COVID-19 should only return after receiving clearance from the local health board.[371]

Later that day, Mr. Moran forwarded an email to Mr. Walsh and others about updating "Continuity of Operations" planning.[372]  On March 13, 2020, Mr. Moran forwarded a message with contacts from the State Purchasing Agent for the Commonwealth.[373]  The message provided notice that statewide contract vendors were experiencing significant shortages of certain COVID-19 response products, including hand sanitizer and N95 masks, and invited agencies to reach out if they have urgent need to access certain materials.[374]

On March 12, 2020, the CDC released guidance detailing "what healthcare personnel should know about caring for patients with confirmed or possible" cases of COVID-19.[375]  This March 12, 2020 guidance recommended isolating patients suspected of COVID-19, among other precautionary

measures.[376]  In particular the guidance recommended "placing a facemask on the patient and placing them in an examination room with the door closed in an Airborne Infection Isolation Room (AIIR), if available."[377]

The Department of Public Health issued another policy memorandum on March 16, 2020, focused on long-term care facilities.[378]  This memorandum replaced previous long-term care facility guidance issued on March 11, 2020.[379]  The memorandum: (i) restricted visitation by all visitors and non-essential health care personnel, except in certain compassionate care situations; (ii) suspended all communal dining, internal, and external group activities; (iii) recommended the use of eye protection, gowns, and gloves while caring for residents; (iv) required facilities to perform temperature checks at entryways (individuals with temperatures over 100.3 degrees Fahrenheit were not permitted to enter the facility); and (v) recommended that patients with known or suspected COVID-19 be cared for in single-person rooms with the door closed.[380]

Recognizing the stress placed on staffing by COVID-19, the Department of Public Health issued an order on March 17, 2020, allowing all licensed clinical staff working at any hospital or facility to work at any other hospital or facility if need be.[381]  At the same time, on March 17, 2020, CDC issued a series of guidance documents designed to help healthcare facilities optimize their supplies of eye protection, facemasks, and isolation gowns.[382]  On the same day, CDC released guidance detailing steps healthcare facilities can take to prepare for COVID-19, including screening visitors entering facilities and ensuring proper use of protective equipment.[383]

On March 22, 2020, the Department of Public Health issued guidance on the usage of personal protective equipment, the first of which focused on the "Optimization of PPE," and was applicable to all healthcare facilities as well as first responders.[384] Healthcare workers were required to use N95 masks or standard medical masks, standard medical gowns, full eye shields, and medical gloves in areas of medical facilities providing general care to COVID-19 patients (whether confirmed or presumptive).[385] The Department of Public Health also issued a chart detailing how facilities could request personal protective

equipment, and a table showing strategies for personal protective equipment "optimization" for all types of medical facilities.[386]

On March 23, 2020, the CDC published a single page guidance on "preferred" and "acceptable" personal protective equipment usage for healthcare providers—both standards recommend full isolation gowns, gloves, a face shield, and either an N95 respirator or face mask. [387]  The CDC expanded on this guidance on how to use personal protective equipment when caring for patients with confirmed or suspected COVID-19 on March 30, 2020, noting that the personal protective equipment should be donned prior to entering a room of a patient confirmed or suspected of having COVID-19.[388]  On April 5, 2020, the CDC published detailed guidance on preparing nursing home facilities for COVID-19, as well as detailed interim infection control and prevention measures for confirmed cases of COVID-19.[389]

### 2.    COVID-19 preparations at the Soldiers' Home

#### i.    2020 flu outbreak and response

The initial response to the COVID-19 threat at the Soldiers' Home overlapped in part with its response to an ongoing (but relatively minor) influenza outbreak in the facility.[xv]

In February 2020, five veterans tested positive for the flu and 22 others showed symptoms.[390]  On the morning of February 12, 2020, Courtney Cottle (Health Information Management Supervisor at the Home) sent an email to members of the Home's medical team informing them of three confirmed flu cases.[391]  The Home's infectious disease nurse, Vanessa Gosselin, organized a meeting later that day for clinicians and senior staff to discuss the flu outbreak.[392]

---

[xv] This overlap occurred at other skilled-nursing facilities as well. The early stages of the COVID-19 outbreak at the skilled-nursing facility in Washington were initially identified as flu cases.  *See* Jack Healy and Serge F. Kovaleski, "The Coronavirus's Rampage Through Suburban Nursing Home," THE NEW YORK TIMES, March 21, 2020, https://www.nytimes.com/2020/03/21/us/coronavirus-nursing-home-kirkland-life-care.html.  We have been unable to determine whether any of the February 2020 flu infections at the Soldiers' Home were in fact COVID-19 cases.  Staff reported that the first confirmed COVID-19 patient at the Soldiers' Home had symptoms of a dry cough in February, more than a month before his diagnosis.  *See* Interview of Jillian Orzechowski, Social Worker I (April 27, 2020); Interview of Mary Bergeron, Licensed Practical Nurse II (May 1, 2020); Interview of Cindy Cormier, Licensed Practical Nurse II (May 5, 2020).

On February 13, 2020, Nancy Shimel, on behalf of Mr. Walsh, sent an email to the Soldiers' Home staff confirming that there were three flu cases at the Home and implementing protocols to contain the spread.[393]  The email directed staff to encourage infected veterans to remain in their rooms and all other veterans to remain on their units, instructed staff to wear a mask if they were within five feet of an infected veteran, promoted hand hygiene and surface decontamination, partially restricted visitation (barring volunteers from entering the home and postponing community activities), and requested that staff who feel unwell stay home.[394]  Later that day, Dr. Clinton distributed additional guidelines on influenza outbreak measures during the medical staff meeting.[395]

### ii.    Initial COVID-19 preparations

In the wake of the flu outbreak, the Soldiers' Home leadership team—including Mr. Walsh, Dr. David Clinton (Medical Director), Vanessa Lauziere (Chief Nursing Officer), Celeste Surreira (Assistant Director of Nursing), Debra Foley (Director of Communications), Mark Yankopoulos (Agency Counsel), Jeremiah Laplante (Director of Operations), and Norman Gousy (Chief Financial Officer)—met in early March to discuss precautionary measures to prevent the introduction and spread of COVID-19 at the facility.[396]

On March 3, 2020, Ms. Gosselin posted signs asking visitors to consider refraining from visiting if they felt ill, and to wear a mask if they had a cough.[397]  On March 4, 2020, she sent an email to all staff encouraging them to observe proper hand hygiene, "cough etiquette," and continue surface cleaning.[398] In this email, Ms. Gosselin reported a shortage of masks, and requested that only those staff who had not received a flu vaccine, had a cough, or were working with a veteran who was ill and coughing wear masks.[399] On March 5, 2020, Ms. Gosselin notified supervisory staff that she had removed masks from the floors and public areas in order to conserve resources.[400]  She directed staff to speak to their assigned Veteran Care Coordinator (i.e., unit manager) or another supervisor if they needed a mask.[401]

On March 6, 2020, Ms. Lauziere sent an email to staff promoting hand washing and cough etiquette; lauding the infection control, housekeeping, and recreation teams for keeping the facility clean;

and notifying staff that flyers had been posted in the Home regarding COVID-19 safeguards.[402]  Ms. Gosselin also posted signs at entrances directing staff to notify a supervisor if a visitor had recently travelled internationally.[403]

On the same day, Paul Moran (Department of Veterans' Services Chief of Staff) sent an email to the Superintendents of the two Soldiers' Homes asking that they compile and send their external distribution lists to him to facilitate COVID-19 communications from EOHHS.[404]  The following day (March 7, 2020), Mr. Moran followed up with Mr. Walsh, attaching the distribution list provided by the Soldiers' Home in Chelsea.[405]  Mr. Walsh responded that he was presently checking on his list[406], and he informed Mr. Moran that the Soldiers' Home in Holyoke had instituted new visitation policies, including restrictions on volunteer visits and discouraging family members who had recently travelled outside the country from visiting. During that week, the Soldiers' Home department heads began to hold twice-daily meetings to discuss COVID-19.[407]

On March 10, 2020, Secretary Urena sent an email to Mr. Walsh and his counterpart in Chelsea, asking that the Superintendents document and compile all of their flu and COVID-19 policies in a dedicated binder.[408]  Secretary Urena also asked the Superintendents to document all cancelled events and all events the executive teams refrained from attending due to COVID-19.[409]  Mr. Walsh responded that he had notified his staff of the new policies and that "[g]eneral sense in the building is super positive- understanding the importance of preventing the spread and pro active (and teamwork) / good communications going forward."[410]

### iii.   The Board of Trustees' role during the outbreak

The Board of Trustees of the Soldiers' Home held a regularly scheduled meeting on March 10, 2020 at the Home.[411]  Trustees in attendance included Kevin Jourdain (Chair), Christopher Dupont, Cesar Lopez, Carmen Ostrander, Isaac Mass, and Richard Girard.[412]  Soldiers' Home leadership in attendance included Mr. Walsh, Deb Foley, Norman Gousy, Mark Yankopoulos, Vanessa Lauziere, Jeremiah

65

Laplante, Jessica Powers, and Nancy Shimel.[413]   Other attendees included Secretary Urena and Stuart Ivimey (General Counsel of the Department of Veterans' Services).[414]

During the meeting, the Trustees and leadership discussed the February 2020 flu outbreak at the Home.[415]  Mr. Walsh's presentation to the Board included a slide on "weathering the flu outbreak."[416]  Mr. Walsh reported that the Soldiers' Home had successfully contained the outbreak by implementing measures including distributing early prophylactic medication to veterans and undertaking thorough cleaning throughout the building.[417]

Mr. Walsh's prepared presentation did not contain any information about COVID-19.[418] Nonetheless, Board Chairman Kevin Jourdain asked whether the Soldiers' Home could take proactive measures given that the COVID-19 response criteria was changing rapidly.[419]  Mr. Walsh reported that while there were no positive COVID-19 cases at the Home,[420] in consultation with Dr. Clinton, he planned to employ precautionary measures for COVID-19 similar to those that successfully contained the recent flu outbreak.[421]  These measures included limiting visitation, cancelling planned entertainment events, and prioritizing hand sanitization and ensuring adequate supply of hand sanitization materials.[422]  The possibility of taking temperatures of staff prior to their shifts was also discussed.[423]  Secretary Urena expressed support for the proposal to restrict visitors.[424]  Ms. Foley stated that, beginning March 11, 2020, visitors will be restricted to a single point of entry where they will be screened upon arrival, and visitors under the age of 12 will be prohibited from entering the Home.[425]  Additionally, staff would be requested to remain at home if they feel unwell and asked to report any travel plans.[426]  There was no discussion of clearing space at the Soldiers' Home to use as isolation areas for infected residents.[427]

Trustee Isaac Mass inquired presciently whether the Home had developed a plan in case of staffing shortages related to COVID-19.[428]  In response, Mr. Walsh noted that the Soldiers' Home works with four outside staffing agencies that could deploy additional staff if the need arose.[429]  However, Mr. Walsh has subsequently confirmed that no steps were taken to confirm that the staffing agencies would continue to deploy staff in the event of a COVID-19 outbreak at the home.[430]

During the meeting, Mr. Walsh reported that he had received a press inquiry about COVID-19 precautions.[431]

Trustee Cesar Lopez asked about the availability of COVID-19 testing kits.[432]  According to the minutes, Dr. Clinton indicated that all lab testing from the Home would be sent to Holyoke Medical Center by courier.[433]

On March 19, 2020 (two days after the first Veteran was tested for COVID-19, and two days before his result came back positive), Mr. Jourdain sent Mr. Walsh an email proposing that Mr. Walsh provide the Board with weekly updates on the COVID-19 situation.  He did not receive a response.[434]

Mr. Jourdain also spoke with Mr. Walsh on Sunday March 29, 2020—the day before Mr. Walsh was put on administrative leave.  Mr. Jourdain explained that another Board member, Cindy Lacoste, had heard "grumblings that there might be something going on at the home" and thus Mr. Jourdain reached out.  He reported that Mr. Walsh indicated that three veterans had died, and that he was working in close coordination with state authorities.  Mr. Jourdain also reported that Mr. Walsh indicated that the staffing situation was "under control."[435]  Ms. Lacoste also reported speaking to Mr. Walsh on March 29 (a few minutes before Mr. Jourdain did).  According to Ms. Lacoste, Mr. Walsh reported that there had been five deaths, of which two were linked to COVID-19.[436]

The Board was not consulted before Mr. Walsh was placed on administrative leave on March 30, 2020.[437]

### iv.    Additional restrictions on visitation and screening measures for staff

Ms. Lauziere sent another set of guidelines to the Soldiers' Home staff on March 11, 2020 implementing a variety of new policies.[438]  The guidelines established a single entrance and screening process for visitors (but not staff[439]), which included answering a brief questionnaire about symptoms and travel, and a temperature check.[440] The screening process was conducted by the administrative staff at a check-in station that was initially set up in the front lobby, then was later moved to the outpatient entrance (where there was better access to sinks for handwashing).[441] These staff members conducting the screening

were not told to wear personal protective equipment while they conducted these screenings, nor were they provided with such equipment.[442] Hospice and agency (i.e., contract) nursing staff and veterans coming to the home for outpatient or dental services were also required to undergo the screening process prior to entering the home.[443]

The restrictions also prohibited visitors under 12 years old, limited each veteran to two visitors at a time, and prescribed that visitation would only occur in veterans' rooms. Visitors (but not veterans) were prohibited from entering the canteen, dining room, or any other common areas.  Visiting hours were shortened to 11 a.m. to 7 p.m.[444] Volunteers remained barred from the facility, under a restriction promulgated one week earlier.[445]

The March 11 policy also put a hold on new admissions to the Soldiers' Home, and staff members were discouraged from travelling.[446]

Further restrictions and policies were implemented the following day, March 12, 2020.[447]  Under these restrictions, veterans living in the dormitory and nursing students would now be screened prior to entry to the long-term care building, and a sign-in sheet was implemented.  (The experienced nursing-home administrator whom we retained as an expert and consultant for this report expressed his surprise that a sign-in sheet was not always in use at the Home.  He was unfamiliar with any skilled-nursing or long-term care facility that did not use sign-in procedures for visitors.[448])

The March 12 policy also provided that staff members were to complete a self-screening, which included taking their own temperature and answering the screening questions.[449]  Staff who registered a temperature of 100.3 degrees or above, or answered "yes" to any of the questions on the screening questionnaire were to return home.[450]

The policies were tightened again the next day, March 13, 2020.  Visiting hours were again narrowed, now to 12:00 p.m. until 5:00 p.m. (effective March 14).  Under the March 13 policy, everyone was to use a single entrance to the building, and all scheduled outpatient medical and dental appointments for non-resident veterans were canceled effective March 16.[451] When entering the building, staff were

asked screening questions by a colleague (rather than completing the questions on their own).  As of this date, dormitory veterans were no longer permitted to enter the long-term care building and their food was sent to the dormitory building using disposable paper supplies.[452] Ms. Lauziere noted in a subsequent email that in response to the restriction on dormitory veterans, "[t]en veterans actually said to me, it took long enough for they roam all around the community."[453]

On March 12, Mr. Walsh emailed Secretary Urena requesting permission to close the home to visitors over the weekend (Saturday, March 14 and Sunday, March 15) because families had not been adhering to the new restrictions.[454]  On March 13, CMS recommended closing all long-term care facilities to visitors.[455]  The Soldiers' Home implemented a prohibition on all visitors—with limited exceptions for the families of veterans who were near death—effective March 14.[456]

On March 15, Mr. Walsh notified staff by email that "effective immediately," the Soldiers' Home was now "under flu protocol."[457]  He explained that there were "two vets who have the flu," and noted that "this is not COVID-19 restriction protocol as this is a different item all together [sic]."[458]  Shortly after this email, Mr. Walsh sent a follow up email with a "minor update," that in fact the "flu results" were still pending for the two veterans who may have the flu.[459]  Mr. Walsh requested that all veterans remain in their units while they awaited the results as a "precautionary measure."[460] A review of the Soldiers' Home records showed that two veterans, one on Unit 3-West and one on Unit 4-East were tested for influenza and RSV on March 15.[461] Both veterans were kept in their rooms.[462] One veteran tested negative for influenza and RSV and his symptoms subsequently improved, while the other veteran was positive for RSV.[463] This veteran was ultimately tested for COVID-19 on March 31, 202, and was negative.[464]

On March 15, Governor Baker ordered that all non-essential state employees in the executive branch agencies should not report to work effective March 16, 2020.[465]  In response, Nancy Shimel sent an email—at Mr. Walsh's direction—on March 17 announcing that all Soldiers' Home staff were declared to be essential workers, and were to continue reporting to work.[466] In addition, the March 17

announcement required that any staff who were sick needed a "return to work note" from their medical provider before coming back to work.[467]

As of March 18, the Soldiers' Home began having a team take the temperature of staff upon arrival for work (as had been the process for visitors and contract staff earlier).[468] Mr. Walsh explained that the reason for the delay in implementing mandatory staff temperature checks (in lieu of the self-testing procedure used before) was that, in his view, the Soldiers' Home needed to receive union approval before they could do so.[469] (These temperature checks were implemented in Chelsea beginning on March 16).[470] The same email announcing this restriction also explained that veterans would no longer be able to send their laundry home with family members to wash, effective March 21.[471]

### v.   Recreation and dining

The Soldiers' Home also initiated restrictions on recreational programs and group activities during the first three weeks of March.[472] As of March 10, the St. Patrick's Day Parade had been canceled, but families were still permitted to visit with veterans in the Canteen. One family member reported that when she visited her father on March 10, the Canteen was "full of people."[473] The recreation department continued to host "socially-distant" activities in the indoor Canteen for veterans until the first COVID-19 positive test result in the third week of March.[474]

As of March 11, all veteran activities outside the building were cancelled.[475] During this week, the staff were also instructed to help families with "virtual visits" through Skype and FaceTime, although a number of staff and families reported difficulties given the absence of devices equipped with these services.[476] Some social workers reported using their personal phones to facilitate FaceTime calls between veterans and their families.[477]

Even after the March 13 policy update, the Canteen on the second floor remained open to staff and veterans who resided on that floor. The dining room was still open for communal dining.[478] Once Walsh notified the staff that the facility was now on "flu protocol" as of March 15, the dining hall was closed for the communal dining.[479] Yet as of March 17, veterans were still permitted to eat in the "Lion's

Den" recreation room, and those who smoked were still permitted to go to the smoking rooms as long as they were not experiencing symptoms.[480]

### vi.   Personal protective equipment

Prior to the first positive test result on March 21, 2020, staff reported receiving little to no communication regarding the use of personal protective equipment—other than being told that they should minimize their use of such equipment to conserve resources.[481]   For example, the March 11 guidelines did not contain instructions on the proper use of personal protective equipment.[482]   Staff members reported that they were discouraged from wearing masks unless they had not received a flu shot or had COVID-19 symptoms.[483]   This guidance was confusing because according to a "Coronavirus Q&A" distributed on March 11 by Catherine Starr (a Human Resources Officer at EOHHS), individuals who tested positive for COVID-19 were not to show up to work at all.[484] Guidance shared with Bennett Walsh by Paul Moran (Chief of Staff to Secretary Urena) on March 12 instructed staff to stay home if they were "displaying illness symptoms" and advised that if residents were symptomatic, staff should have them put on a facemask and self-isolate in their units.[485]

On or around March 13, staff members raised concerns that Ms. Gosselin had removed surgical masks from the floors on March 5 (apparently due to concerns about pilfering).[486] Ms. Gosselin instructed staff members that if they wanted to obtain a mask, that they would have to ask Ms. Gosselin or another supervisor.[487]   Some staff members reported difficulties in obtaining masks through this process while others reported that they never felt that masks were unavailable to them.[488] Around this time, some staff members began bringing their own masks from home.[489] Staff members were consistently reminded during this time to be "mindful" of their use of masks and gowns, and in an email on March 17, Mr. Walsh noted that the executive team was keeping a "watchful eye" on the supplies.[490]

As discussed below, on March 19, 2020, Mr. Walsh directed that a box of 60 N95 masks be sent to the Soldiers' Home in Chelsea.[491]

### vii.    Other communications with staff about COVID-19 preparations

Throughout the first two weeks of March, leadership provided limited instruction to staff on COVID-19 policies and procedures, including the use of personal protective equipment.[492]  At the time, staff reported that COVID-19 did not seem like anything "scary" and the administration did not make it seem like there was anything that they needed to worry about.[493]

Ms. Gosselin reported that she and Dr. Clinton went to each unit and shared education with staff about COVID-19 and how to protect themselves and the veterans.[494]  These trainings did not include how to handle a suspected COVID-19 positive case, but were instead focused on preventative measures like handwashing, social distancing, and the use of personal protective equipment.

In mid-March, Mr. Walsh also made a series of announcements over the public address system at the Soldiers' Home.  The public address system can be heard throughout the facility.  During the week of March 16, Mr. Walsh made a public announcement about use of marijuana by the staff.  He announced that he wanted staff to know that "doing a Mary Jane" is not acceptable before coming into work and that "[j]ust to clarify as I am sure everyone understands, but I will say it anyway, Mary Jane is not a girl."[495] When asked about the announcement and why he thought it would be appropriate to share this information with veterans (who could also hear public announcements), Walsh said that it had been brought to his attention that there had been a couple of staff members who came into work smelling like marijuana.[496] Mr. Walsh also made comments over the public address system telling staff that they should show up to work despite fears of COVID-19, and that those who did show up "would not be forgotten."[497] Several staff members assert that Mr. Walsh made an announcement listing the names of staff members who were being written-up or disciplined during this time period.[498] Mr. Walsh denied doing so, agreeing that it would not have been appropriate to list staff members' names.[499]

Again, many staff members reported hearing little from the administration about COVID-19 preparedness.[500] A contributing factor is that many staff members at the Soldiers' Home rarely access their

email accounts during their shifts, and do not have access at home.[501]   Multiple staff members have reported that email is not an effective way of communicating with staff.[502]

The staff was not instructed to take every veterans' temperature on every shift, prior to identification of the first COVID-19 case on March 21, 2020, discussed below.[503]

### *viii.* Communications with veterans' families

The Soldiers' Home's evolving policies concerning COVID-19 were generally communicated to families via Facebook postings, by phone, and through emails and letters.[504] As of March 14, family members were no longer allowed to visit the facility, so the Soldiers' Home began receiving an increased number of calls from family members who were concerned about their loved ones and looking for updates.[505]

By March 17, an iPad had been set up for FaceTime calls between the veterans and their families, and the Soldiers' Home recreation staff and social workers were called in to help facilitate these calls.[506] Exceptions to the visitation rule were made for the families of those veterans who were near death.[507] However, family members who visited in these circumstances report that they were not provided with personal protective equipment.[508]

After the first COVID-19 case was confirmed at the Home on March 21, families reported that there was a lack of communication from the Home and that it became increasingly difficult to get in touch with the staff to get updates on their loved ones.   Some family members learned about the first initial deaths at the Soldiers' Home through the media.[509]   Colleen Croteau, whose father passed away with COVID-19 at the Soldiers' Home, reported calling the Soldiers' Home three times on March 26, leaving messages asking whether there was a COVID-19 outbreak.[510] Her calls, and those of her sister, were not returned.[511] Ms. Croteau called again the next morning, and she was told that the Soldiers' Home was "taking precautions" but that there was not an outbreak.[512] Eileen Driscoll, another family member, reported that the hotline set up for families "became a futile tool" because most of the time she had to leave a message.[513] Ms. Driscoll recalled leaving a message on April 2 that was not returned until April 4.[514]

Susan Kenney had a similar experience using the hotline, which she described as ineffective and a "joke."[515] On April 3, after not hearing an update about her father in over 30 hours, Ms. Kenney wrote "Is my dad alive?" on the windows of her car and drove to the Soldiers' Home.[516] When she arrived, a nursing assistant came out and told her that her father was alive.[517] Ms. Kenney reported that communication from the Soldiers' Home improved after this.[518]

Family members also had difficulties speaking directly with their loved ones as residents were moved around in the building, and their landline telephones no longer rang at their current locations.[519]

For some family members, video calls were not an effective way of checking up on their loved ones, especially for those veterans who were very ill or in advanced stages of dementia.[520]

### ix. Communications with the state agencies prior to the first suspected case

Until the last week of March, the leadership team at the Soldiers' Home relied primarily on written guidance from external agencies such as the CDC and Department of Public Health to coordinate the COVID-19 response.[521]  Mr. Walsh tasked Dr. Clinton with monitoring CDC and Department of Public Health guidelines and providing updates to the team.[522]  Mr. Walsh reported that they would receive an update and guidance from Department of Public Health "every once and a while"[523] and that he and members of his team would attend teleconferences and video conferences such as the "Stakeholder Conference Call" with the Department of Public Health[524] and local Holyoke Board of Health meetings.[525]

Prior to the first positive COVID-19 test result, Mr. Walsh reports that he did not have "frequent" communications with the Department of Veterans' Services about COVID-19.  He continued to participate in weekly calls with Secretary Urena and Ms. Poppe (Superintendent of the Soldiers' Home in Chelsea).[526]

### x. Communications with labor unions regarding COVID-19 preparations

Labor-relations tensions—already a significant problem at the Soldiers' Home—increased in the weeks leading up to the COVID-19 outbreak, as union members raised concerns about the Home's preparations for the pandemic.

The SEIU Local 888 chapter was scheduled to have a membership meeting at the Soldiers' Home on March 11, with up to 200 members (plus union leaders who worked outside the Home) expected to be in attendance.  However, due to the concerns about COVID-19 and the increased emphasis on limiting large group gatherings and visitors, the union representatives decided to cancel the meeting.[527] Cory Bombredi (Internal Organizer for SEIU Local 888) cancelled a smaller labor-management meeting that was scheduled for March 12 for the same reasons.  The Massachusetts Nurses Association was also scheduled to have a meeting at the Home on March 12 to discuss, among other agenda items, staffing and "best practices/information regarding coronavirus crisis."  That meeting was also cancelled.[528]

Both SEIU Local 888 and the Massachusetts Nurses Association made inquiries into the measures that the Soldiers' Home was taking to prepare for COVID-19. Brenda Rodrigues (SEIU Local 888 President) reported that members were concerned that they were not hearing "anything" from management about preparedness protocols, and that one of the purposes of the cancelled March 11 meeting was to discuss COVID-19 preparedness.[529]  One nurse reported that when she first started hearing about COVID-19 on the news, she knew the Soldiers' Home would be "up the creek" if COVID-19 hit because they were short staffed and she felt that no one on the nursing management team had the experience or knowledge needed to handle an outbreak.[530] Another nurse commented that the staff were worried because they had not received any instruction regarding COVID-19.[531]

On March 11, the Massachusetts Nurses Association inquired about the restrictions and protective measures at both the Chelsea and Holyoke Soldiers' Homes.[532] On March 17, the SEIU Local 888 Union wrote to Mr. Walsh asking for details about any COVID-19 policies and procedures were being implemented.[533]  The SEIU Local 888 did not receive a response to this letter and it was not until a March 24 conference call with management that union leadership was provided more detailed updates on the measures taken to address COVID-19 at the Home.[534]

### *xi.*     Creation of isolation areas in preparation for COVID-19 cases

The Soldiers' Home leadership team began considering the creation of isolation rooms on or around March 10.[535] Mr. Walsh discussed the preparation of these isolation rooms with his clinical leadership team, including Dr. Clinton, Kelly Hansen (Quality Manager), and Ms. Lauziere; Ms. Gosselin was consulted separately.[536] Ms. Lauziere determined that the Home needed to establish the negative-pressure rooms[xvi] because they were "anticipating maybe a handful of positives or potentials."[537] Thomas Lingenberg, a building maintenance supervisor involved in the set-up of the negative-pressure rooms, noted that the Soldiers' Home had a negative-pressure room in the past, but it had been dismantled during the last remodeling.[538] The team decided that two rooms on the 3-North unit (rooms 315 and 317) were best suited to be converted into negative-pressure isolation rooms.[539] At the time, each of these rooms housed two veterans. The team decided that these four veterans would be moved to other rooms on 3-West, 3-East, 3-North, and 4-East on March 17.[540] Rooms 315 and 317, chosen because they were connected internally, were converted into negative pressure rooms.[541]

Ms. Hansen informed Mr. Walsh, Ms. Lauziere, Ms. Surreira and other managers "that the 3N veterans will be relocated on a temporary basis in order to facilitate an empty room should isolation become necessary."[542] She concluded her email by stating "[t]o be clear, there are no confirmed cases at [the Soldiers' Home] at this time, we are being proactive, should the need arise in the future."[543]

Later, on or around March 20, 2020, veterans on the 2-South hospice unit were moved to other locations (including one of the locked dementia units, 2-North) in order to create additional space for isolation of potential or confirmed COVID-19 cases.[544]

None of these rooms or units were ever used for isolation purposes during Mr. Walsh's tenure as Superintendent.[545]

---

[xvi] A negative-pressure room is one where the HVAC system is configured such that the pressure in the isolation room is lower than the surrounding space, to prevent virus particles from contaminating the air outside the room. *See* https://www.cdc.gov/infectioncontrol/guidelines/environmental/background/air.html#table6

The Soldiers' Home leadership team did not take steps to ensure that staff would be available to serve the isolation rooms on a dedicated basis (i.e., to avoid floating staff from contaminated to non-contaminated areas).[546] Ms. Gosselin asked Ms. Lauziere whether they would have dedicated staff for those rooms (as the CDC recommends[547]).  Ms. Lauziere told her that they would not be doing so.[548]  Mr. Walsh recalled that he did discuss the staffing needs for the isolation areas and whether they would be able to assign specific staff to a room,[549] but said that it did not seem possible because they did not have enough staff to do so.[550] He did not take any steps to request staffing assistance to facilitate use of the isolation rooms at the time they were established.

*          *          *

The following table summarizes the key public-health recommendations for COVID-19, and the timeline of their implementation at the Soldiers' Home:

| Protection Measure: | Date Recommended: | Status of Implementation: |
| --- | --- | --- |
| Restrict (and later prohibit) visitors at long-term care facilities; detect and screen for COVID-19 at entryways (e.g., questions about symptoms and travel, temperature checks) | **March 6, 2020** (VA) (recommending restrictions on visitors); **March 10** (VA) (recommending ban on visitors); **March 11, 2020** (Massachusetts Department of Family Health) | **March 11, 2020**: visitors screened upon arrival with questions and temperature checks; visitors under age 12 prohibited; visitors restricted to entering through a single point of entry.  **March 14, 2020**: Soldiers' Home closed to visitors, with limited exceptions for close family of veterans who were near death. |
| Limit staff movement (i.e., "floating") between contaminated and unaffected areas | **March 6, 2020** (VA) | **Not effectively or consistently implemented** during Mr. Walsh's tenure. |
| Suspend new admissions | **March 10, 2020** (VA) | **March 11, 2020**: new admissions suspended. |
| Suspend communal dining and activities | **March 13, 2020** (CMS) | **March 15, 2020**: canteen closed. However, on **March 17, 2020**, some veterans were still permitted to eat in the recreation room, and the smoking areas remained open until **March 28, 2020**. |

| Protection Measure: | Date Recommended: | Status of Implementation: |
| --- | --- | --- |
| Isolate patients suspected of COVID-19 | **March 12, 2020** (Department of Veterans' Services); **March 17, 2020** (Centers for Disease Control) | **Not effectively or consistently implemented** during Mr. Walsh's tenure. |
| Ensuring proper use of personal protective equipment when treating confirmed or suspected COVID-19 patients | **March 12, 2020** (Department of Veterans' Services); **March 17, 2020** (CDC); **March 22, 2020** (Massachusetts Department of Public Health) | **Not effectively or consistently implemented** during Mr. Walsh's tenure. |

### 3.    The response to suspected and confirmed cases of COVID-19 at the Soldiers' Home

#### i.    Veteran 1 shows symptoms and is tested for COVID-19

Veteran 1, residing on 1-North (a locked dementia unit), had a history of pneumonia and respiratory illness.[551] He first showed symptoms consistent with COVID-19 in February, including a high-pitched cough and fever.[552] Veteran 1 received multiple chest x-rays between February and early March, all of which were inconclusive.[553]  Veteran 1 had previously been tested for pneumonia, strep, and the flu, but all of the tests were negative.[554] Despite his symptoms and his cognitive challenges, Veteran 1 was ambulatory and walked freely around 1-North spending time in the common areas of the unit.[555]

On March 15, Veteran 1 was weak, feverish, and coughing more than he had been previously.[556] A nursing aide (with 25 years of experience at the Soldiers' Home) reported these symptoms to Ms. Surreira (the Assistant Director of Nursing).[557]  The nursing aide reported that in her view, Ms. Surreira "didn't take it seriously" that Veteran 1 might have COVID-19.[558]  The aide brought a mask from home, but Ms. Surreira reprimanded her verbally for wearing the mask while treating Veteran 1.  This aide tested positive for COVID-19 on March 19, 2020, and missed five weeks of work after developing pneumonia secondary to COVID-19.[559]

During the overnight shift beginning on March 16, another nursing aide observed that Veteran 1's symptoms, which included a fever and cough, appeared consistent with COVID-19.[560]  The nursing aide secured a mask for Veteran 1 to wear, but he was unable to keep it on (due to his advanced dementia). The aide brought Veteran 1's symptoms to the attention of Ms. Surreira at the end of her overnight shift (the morning of March 17).  Ms. Surreira again expressed skepticism that Veteran 1 had COVID-19,[561] but submitted a clinical report and told Veteran 1's treating physician, Dr. Munro, about Veteran 1's symptoms. Dr. Munro ordered that Veteran 1 be tested.[562]  A swab was collected from Veteran 1 on March 17, and sent to a private lab in California, which had a 4 to 5 day turnaround.[563] (At the time, the Soldiers' Home (and other state facilities) did not have access to testing in Massachusetts, which might have facilitated faster results.)[564]

Ms. Lauziere (the Chief Nursing Officer) reported that she was not informed of Veteran 1's symptoms or the decision to test him for COVID-19 in real time, and only learned later during a staff meeting that he had been tested.[565]  When she learned of the test, she asked Dr. Clinton whether Veteran 1 should be moved to an isolation unit (one of the two negative-pressure rooms that had been set up, and were not in use).  She reports that Dr. Clinton replied that this was a "moot point" because "everyone has been exposed already" on Veteran 1's unit, and it would put the rest of the Home at risk if Veteran 1 were moved elsewhere.[566]

Mr. Walsh reported that he only learned of the test the next day, March 18, 2020.[567]

A nursing aide who provided care to Veteran 1 shortly after he was swabbed reported that Veteran 1 was not isolated, he was sitting down in a common area with other veterans, and there were no apparent restrictions on his movement within the unit.[568]  At the time Veteran 1 was tested, he had three roommates who remained in his room until after his test results came back positive for COVID-19 four days later.[569] During an interview, Dr. Clinton shared his understanding that based on a presentation from New England Long Term Care Association, if a patient has a roommate with COVID-19, one should automatically assume that patient also has COVID-19.  We have been unable to locate a copy of a presentation or other

guidance that conveys such advice.  In any event, no restrictions were placed on Veteran 1's roommates—whom Dr. Clinton apparently assumed were infected—they were also allowed to move about the unit, and they were not tested for COVID-19 until after Veteran 1's test result came back positive.[570]

In the days after he was tested, staff again attempted to have Veteran 1 wear a mask, but he refused to keep it on.[571]  Other than gloves, staff members generally were not wearing personal protective equipment when caring for Veteran 1 between the time of his test (March 17) and the results of that test (March 21).[572]  As discussed below, some staff who did wear other protective equipment were told that they should not be wearing it.[573]  Staff continued to be floated on and off 1-North throughout March 2020, potentially spreading the infection elsewhere in the building.[574]

### ii.     Dr. Clinton becomes ill and leaves work

On March 21, 2020, Dr. Clinton started to develop respiratory symptoms, and he reported to the emergency room on March 22, 2020.[575]  Dr. Clinton eventually tested negative for COVID-19, but while the test was pending, his physician instructed him to remain at home.[576]

Dr. Clinton did not return to work at the Soldiers' Home until March 27, 2020.[577]  Dr. Barry Smith covered for Dr. Clinton's clinical patient treatment responsibilities during his absence.[578]  We have been unable to identify anyone who expressly assumed the roles and responsibilities of Medical Director during Dr. Clinton's absence.  While Dr. Clinton was out, he attempted to perform his job duties as much as possible on a remote basis.[579]

### iii.    Response to Veteran 1's positive test results

On the evening of Saturday, March 21, Veteran 1's test results came back confirming that he was positive for COVID-19.  Many staff members found out that a veteran had tested positive for COVID-19 through word-of-mouth over the course of the weekend of March 21 - 22.  Some staff members emailed Mr. Walsh and Ms. Lauziere for more information, but they did not respond to these inquiries.[580]  Ms. Lauziere informed the staff she spoke with that COVID-19 was similar to the flu and similar precautions should to be used.[581]

As soon as his positive test result was received (four days after Veteran 1 was initially swabbed for COVID-19) Veteran 1's three roommates were moved to a different room.  Prior to this, one of Veteran 1's roommates was "very mobile" and frequently visited other rooms.[582]  According to Ms. Lauziere, none of Veteran 1's roommates were exhibiting COVID-19 symptoms at this time.[583]

After testing positive, staff attempted to keep Veteran 1 in his room.  The door to Veteran 1's room was supposed to remain closed, but staff largely ignored this policy and kept the door open for faster access because Veteran 1 was a fall risk and required constant supervision.[584]  After Veteran 1 tested positive, plastic was put up over the entrance to Unit 1-North, and staff who worked with Veteran 1 were provided masks.[585]  However, some staff did not wear personal protective equipment when entering Veteran 1's room, despite working with other veterans.[586]

When Veteran 1 tested positive, Dr. Clinton and Ms. Lauziere again discussed whether Veteran 1 should be moved to the isolation unit.  Dr. Clinton advised against doing so, as in his view others in 1-North had been exposed already, and the facility would be at risk if Veteran 1 got out of his room on an unsecured unit.[587]  Dr. Clinton and Ms. Lauziere did not feel that there was adequate staff to prevent Veteran 1 from wandering if he were moved out of 1-North.[588]  They ultimately decided that the benefits of moving Veteran 1 to an isolation unit on 3-North were outweighed by the risks of doing so.[589]

Staff who worked on 1-North during the weekend of March 21-22, 2020, *after* the test result confirmed that Veteran 1 was positive for COVID-19, continued to "float" and work in other areas of the facility, potentially spreading COVID-19.  A nursing aide who primarily works on 2-North recalls being floated down to 1-North on March 26.[590]  She was tested for COVID-19 on March 27, and the result came back positive one week later.  A laundry worker reports that he changed the curtains on 1-North on March 22 and then proceeded to visit each of the other units for laundry purposes during the following week.[591]  This laundry worker later tested positive for COVID-19.[592]  A registered nurse recalled that even after Veteran 1 tested positive, nursing aides would be scheduled to work two hours on 1-North and then directed to complete the balance of their shift on the third floor.[593]  The nurse asked her supervisors,

including Ms. Lauziere, why staff were floated between positive and negative units given the risk of spreading COVID-19.[594]   Ms. Lauziere responded that the Home "had to work with the number of staff they had."[595]

### iv.      Discussions with families regarding MOLST forms

During the week of March 23, 2020, Ms. Lauziere (Chief Nursing Officer) and Sandy Moreno (a registered nurse who served as a unit manager) instructed two social workers (Carrie Forrant and Jill Orzechowski) to have conversations with veterans and their families relating to their Medical Orders for Life-Sustaining Treatment ("MOLST") forms in light of COVID-19.[596]   These forms are used to document veterans' end-of-life preferences on questions such as whether they wish to be intubated, resuscitated, or hospitalized if their condition deteriorates.

Ms. Forrant and Ms. Orzechowski were tasked with calling the family members of every veteran on 1-North, where veterans were quickly becoming quite ill.[597]   Ms. Forrant recalls that the process was emotionally very difficult both for the families, and for the social workers making the calls.[598]   She described these calls being made in the midst of "chaos."[599]

In our interview, Ms. Orzechowski reported that Ms. Lauziere pressured her to try to have the MOLST forms changed to "do not transfer" so that the veterans could be kept comfortable in the Soldiers' Home, rather than going back-and-forth to the hospital.  Despite this pressure, none of the Social Workers reported encouraging any veteran or family to make a particular choice.[600]   Ms. Forrant explained that their job was to educate and support the families in whatever they decided.[601]

Ms. Forrant reported that she and Ms. Orzechowski ultimately stopped making these phone calls because "it felt wrong . . . in the pit of my belly and heart."[602]   Ms. Forrant explained that due to the COVID-19 pandemic, families were asking them a barrage of different questions and sharing anxieties for which they did not have answers, and it was not possible for her to be a calming, reassuring voice in the midst of the chaos.[603]   Ms. Forrant elaborated: "my heart was just bleeding for these families.  I had already

been seeing some of the sickest guys at that point, it was a lot for any one person to handle, never mind that we were making a lot of phone calls."[604]

> **v.** **Continued discussions and disputes with labor unions regarding COVID-19**

Between March 17, 2020 and March 28, 2020, SEIU Local 888 Union leaders sent written requests for information to the Soldiers' Home on four different dates. These requests all went unanswered.

In response to members' growing concerns about COVID-19 and staffing levels, Cory Bombredi (a SEIU Local 888 Organizer) sent written requests for information to the Soldiers' Home on March 17, March 25, March 26, and March 28. Mr. Bombredi sent the first formal request for information on March 17, 2020, seeking information on what the Soldiers' Home was doing to "ensure our membership's safety, and the safety of their family. This request includes but [is] not limited to hours of operation, contact with the public, contact with coworkers, cleaning and sanitizing measures, a list of employees that are considered emergency or essential personnel, closures of buildings or departments, and employee payment."[605]

Mr. Bombredi sent his second request for information on March 25, 2020. Mr. Bombredi sent Mr. Walsh an email requesting a full list of all employees hired at the Soldiers' Home during the timeframe of January 1, 2015 to December 31, 2017.[606] Mr. Bombredi sent his third request for information on March 26, 2020. Brenda Rodrigues (President of SEIU Local 888) and Mr. Bombredi sent Mr. Walsh an email with a bargaining demand and formal request for information about the Soldiers' Home's COVID-19 plan.[607] They requested that the Soldiers' Home "comply with CDC guidelines and provide proper Safety Equipment and PPE for ALL SEIU Local 888 members in the Holyoke Soldiers' Home."[608] The email continued: "Please consider this a demand to bargain and a request for information pursuant to M.G.L. c.150E. SEIU Local 888 is prepared to take any and all necessary measures to remedy our concern, including going to higher levels of state government and making our case to Veterans' advocacy groups and the news media."[609] They requested to meet immediately via video call or conference call to discuss these concerns.[610] There was no response. Mr. Bombredi sent a fourth request for information to the Soldiers' Home on March 28, 2020 regarding the COVID-19 plan; again, there was no response.[611]

Union representatives also spoke with management during a WebEx conference call on March 24, 2020.  The participants on the call included SEIU Local 888 management (Ms. Rodrigues, Mr. Bombredi, Mr. Ablordeppey, Mr. Miller), the Massachusetts Nursing Association (Ms. Fox), Soldiers' Home Management (Mr. Walsh, Dr. Clinton, Ms. Lauziere, Ms. Gosselin), and EOHHS (Suzanne Quersher (Director of Labor Relations), Jeffrey Krok (Labor Relations Specialist)) to discuss the Soldiers' Home response to the COVID-19 pandemic.[612]  However, during this call, in response to questions raised about veterans and union members being at risk for COVID-19, Ms. Rodrigues reports that she was told that the substance of the matter could not be discussed due to "HIPAA restrictions."[613]  The management representatives confirmed that they had N95 masks and the proper safety equipment in the Soldiers' Home.[614]  According to Mr. Bombredi, on this call "Bennett Walsh also made a statement that [the Home] is not understaffed."[615]

### vi.    Updated guidance and continued disputes regarding protective equipment and infection control

Availability of and policies concerning personal protective equipment remained uneven and inconsistent during the week of March 22.  Some staff members reported that they felt "annoyed, paranoid, and fearful for their lives because they could not find masks."[616] Ms. Forrant reported that she was told "no" after asking Ms. Lauziere if the staff could wear masks and gowns because of their concerns when caring for particular veterans.[617] Ultimately, however, this approach softened during the course of this week: masks were provided upon request, and staff were permitted to wear them.  By March 23, clinical staff received new masks daily and non-clinical staff (housekeeping, maintenance, office staff) received new masks weekly.[618]

One key event suggests that the supply of masks never reached critical levels at the Soldiers' Home.  On March 19, Mr. Walsh authorized the transfer of 60 N95 masks to the Soldiers' Home in Chelsea, which immediately sent a driver to pick them up from Holyoke.[619]

On March 25, 2020, after a call with the Department of Public Health, Ms. Gosselin circulated updated infection control and personal protective equipment guidance to Mr. Walsh, Dr. Clinton, and Ms. Lauziere.[620]  She wrote:

> Person doing the swab must wear an N95 mask!!!!!!!...Positive cases or presumed positive cases should if possible:  in a private room with closed door; in a separate area of the facility; dedicated staff; appropriate PPE (facemask, eye protection, gown and gloves); N95 only for aerosolized procedures OR swabs; hand hygiene is still the best protection.

Ms. Gosselin also proposed scheduling "fit testing" for the N95 masks.[621]

Ms. Lauziere circulated guidance that staff who are suspected or confirmed to have COVID-19 should not return before 7 days after the test or onset of symptoms, and must be fever-free for 3 days without fever-reducing drugs before returning.[622]

One dispute regarding personal protective equipment has drawn substantial media attention and merits further discussion here.  Kwesi Ablordeppey, a certified nursing assistant and union representative, worked an overnight shift on March 17-18, 2020 on the 4-East unit.  His previous shift (the night of May 16-17, 2020) was on 1-North, and he provided direct care to Veteran 1 who was tested for COVID-19 on the morning of May 17 because he was showing COVID-19 symptoms.

When Mr. Ablordeppey reported to work on 4-East on March 17, the charge nurse informed him that a two veterans were vomiting and incontinent, which she said was indicative of a gastrointestinal problem.[623,xvii]  The nurse reminded Mr. Ablordeppey to follow infection control procedures.[624]  Mr. Ablordeppey reports that he then donned personal protective equipment the charge nurse provided him.[625]

Witnesses offered varying accounts of the equipment that Mr. Ablordeppey used.  According to Ms. Lauziere (who did not witness the incident), Alina Koziol (who did) reported that Mr. Ablordeppey was "grabbing PPE, inappropriately using PPE to bring notice to himself, and causing panic/anxiety among other staff members."[626]  Vanessa Gosselin (the Infection Control Nurse) later came onto the unit

---

xvii Diarrhea and vomiting are also symptoms of COVID-19.  *See* https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (accessed June 12, 2020).

during her rounds.  During this time, she reports that "people were getting anxious and were wearing full PPE all the time," but she found this problematic because personal protective equipment is meant to be worn individually and not full time because it can become contaminated.[627]  (We note that at this time, Ms. Gosselin had directed that personal protective equipment be removed from the floors, such that staff had to request equipment each time from a manager.  It is unclear how they could change equipment after each patient, in light of this restriction).

On Unit 4-East, Ms. Gosselin noticed that Mr. Ablordeppey was using personal protective equipment while performing direct care.[628]  According to Mr. Ablordeppey, Ms. Gosselin did not ask him questions about why he was using personal protective equipment, but rather did a "quick in-service about the COVID-19 and the distance we are to maintain."[629]  (It is unclear how Mr. Ablordeepey was to maintain social distance from the veterans he was cleaning and caring for as they experienced uncontrolled vomiting and diarrhea).

On March 20, 2020, Mr. Ablordeppey received a disciplinary letter signed by Ms. Lauziere stating:

> On this March 18, 2020, during your overnight shift in reaction to safety procedures of which you disagreed, you put on a Personal Protection Equipment without permission or need.  Your actions are disruptive, extremely inappropriate and have caused unnecessary resources to be deployed that may be needed in the future.  Your behavior unnecessarily disrupted and alarmed staff.  We expect more from you as a seasoned employee of the Soldiers' Home and perceived leader.  Please contact me Monday morning 3/23/20.[630]

Ms. Lauziere described the letter to Mr. Ablordeppey as an "FYI" and "not a discipline of any sort."[631] She also asserts that she did not write the letter (which bears her name), but agrees that she did review and approve it before it was sent.

As instructed in the letter, Mr. Ablordeppey went to speak with Ms. Lauziere at her office on the morning of March 23, 2020, but due to a family emergency Ms. Lauziere did not arrive at the Soldiers' Home until after Mr. Ablordeppey's shift had ended and he had left for the day.[632]  Ms. Lauziere and Mr. Ablordeppey never ended up meeting to discuss this incident.[633]  Ms. Lauziere explained that "I had all intentions of meeting with him, but when I got back into the roll of things, COVID-19 was up-and-running."[634]

Mr. Ablordeppey said that he tried to ignore the letter, but "it hurt my feelings a lot."[635]   Mr. Ablordeppey viewed this letter as a form of retaliation for his union activity.[636] On March 24, 2020, Mr. Ablordeppey filed a formal Incident Report with Mr. Walsh, Mr. Bombredi, Mr. Krok, Ms. Quersher, Ms. Rodrigues, and Ms. Medeiros.[637]   Among other things, he asserted that the incident was retaliation for protected union / organizing activity.   We have not been able to locate a formal response to Mr. Ablordeppey's grievance.

### *vii.*      Unit 2-North is closed and consolidated with Unit 1-North

A critical decision was made on the afternoon of Friday, March 27: Unit 2-North, one of the two locked dementia units, was closed and all of its 21 veterans were moved to Unit 1-North—doubling the number of veterans in 1-North (which previously held 21 veterans).[638]   This required that veterans be crowded into rooms and common spaces, with their beds inches apart.

At the time that this decision was made, both 1-North and 2-North contained a mix of veterans who had tested positive for COVID-19, veterans for whom test results were still pending, and veterans who were not symptomatic and had not been tested.[639]   The end product was a severely overcrowded unit with veterans of different COVID-19 statuses.

Our first investigative task is to identify who made this decision.   Final clinical decision-making authority resided with the Medical Director, Dr. Clinton—who had returned from medical leave on the morning of this day, March 27.   Dr. Clinton told the McDermott team that he "was not involved in, or consulted" in the decision-making process that led to combining these two units.   He stated that his job, instead, was to "pronounce deaths and tell families that their loved one had passed."   Dr. Clinton indicated he would not have made or approved the decision to combine the units, if he had been asked.[640]

Assistant Director of Nurses Celeste Surreira also asserts that she was not consulted in the decisions to combine 1-North and 2-North, and would have opposed it had she been consulted.   She was at the Home when the decision was made, but reports that she was only informed of it when it came time to move residents.   Ms. Surreira recalls Ms. Lauziere (the Chief Nursing Officer) approaching her after

walking out of the "executive suite" and reporting that "we were not getting help" from outside the building, and the two units would have to be merged. [641]

Superintendent Walsh also denies that he participated in the decision to combine these units. He reported that he was focused on making telephone calls to request National Guard assistance while the "medical team" were having discussions about closing the 2-North unit.[642]  In an interview conducted seven days after the date when the units were combined, he reported that he does not know what they discussed, what alternatives were considered, the names of the full team involved, or how this "medical team" reached the decision to combine the units. Mr. Walsh reports that Ms. Lauziere informed him of the decision in a telephone call (despite the fact their offices are nearby, and both were in the building at the time), and that he did not overrule the decision. Mr. Walsh acknowledged that he was aware that 1-North and 2-North contained a "mix of those who were tested, pending test, and not showing signs."[643] Mr. Walsh asserts that the ultimate decision to combine the units was "a medical decision submitted to Dr. Clinton."[644]  He did not discuss it with Dr. Clinton.[645]

Only Ms. Lauziere admits participating in the decision to combine the units.  Initially, she told the McDermott team that during a staff meeting on March 27, she decided to "bring the veterans who had tested positive on 2-North down to 1-North."  When we asked what would happen to the remaining veterans on 2-North who had not tested positive, she acknowledged that *all* 2-North veterans would be moved, and stated that "2-North is a closed unit.  At this time, we had about 40 of our clinical team out and refusing to work.  We did not have the staff to safely care for the veterans that were in the Home according to the formula that the VA came up with for staffing."  Ms. Lauziere could not recall who else (apart from Jeremiah Laplante, who was in charge of operations with respect to the physical plant) participated or was present for the meeting where this decision was made.  She does not recall Mr. Walsh being present for the meeting, but said he "had to have attended" by telephone.[646]

We reach several conclusions in light of these conflicting and inconsistent accounts of a critical decision-making process that occurred only a few weeks before the interviews in question.  First, we reject

as implausible Dr. Clinton's assertion that he was not involved in the decision.  At the very least, he acknowledges that he was aware of it, and—as the ultimate clinical authority for the Soldiers' Home—should have involved himself.  Second, while he is not a clinician, Mr. Walsh nevertheless abandoned his managerial responsibilities by permitting the consolidation to go forward based on a brief phone call from the Chief Nursing Officer, without consulting the Medical Director, the Infection Control Nurse, or otherwise pressure-testing the decision.  If Mr. Walsh's role was to serve as a manager, he failed in the key responsibility of ensuring that the decision-making process was robust and that all stakeholders were present.  Third, at the very least, Ms. Lauziere made a decision inconsistent with her training, inconsistent with reasonable judgment, and inconsistent with her duty to the veterans at the Soldiers' Home.

There is no dispute that the consequences of this decision were devastating to the veterans on both housing units.  Staff describe the move as "total pandemonium," "when hell broke loose," and "a nightmare."[647]  They reported that "all of a sudden they just started moving people."[648]  One staff member reported thinking: "How can they do this because this [is] the most insane thing I ever saw in my entire life?"[649]  She "felt it was like moving the concentration camp—we are moving these unknowing veterans off to die.  I will never get those images out of my mind—what we did, what was done to those veterans."[650]

A number of staff members reported discussions with Ms. Lauziere in which they questioned the decision to combine the two units, or tried to convince her to change course.  One staff member reports that she "marched over" to Unit 1-North and asked Ms. Lauziere "what is going on . . . there are a lot of people here who are not showing symptoms and you are going to move them in with people who are and put them right on top of each other?"[651]

With assistance from Ms. Surreira, Ms. Lauziere "direct[ed] traffic" during the move.[652]  Housekeeping also was instructed to remove tables and chairs from the dining room on Unit 1-North so that veterans' beds could be lined up in the dining room.[653]  Ms. Surreira told housekeeping staff that if they were not going to be on the floor for more than 15 minutes, they did not need an N95 mask and

could use a surgical mask instead.[654]  Some housekeeping staff refused, and ultimately received N95 masks to wear during the move.[655]

After the consolidation, Unit 1-North was packed with 42 veterans.[656]  The veterans' beds and nightstands were directly next to each other and there were no privacy curtains between them.[657]  None of the veterans' clothing or personal items were initially moved down to Unit 1-North with them.[658]  There were insufficient outlets to plug in the beds, so some veterans could not elevate their beds.[659]  At times, the names above the beds did not match the veteran who was in the bed, although the veterans wore ID bracelets and later the veterans' names were posted outside of their rooms.[660]  The dining room was made into a bedroom with nine beds in it.[661]  Veterans were sitting in common day rooms in their gowns.[662]

One nursing aide reflected: "We always took pride in our care with honor and dignity, and I thought my god where is the respect and dignity for these men, we are leaving them sitting there in johnnies more confused because there is 40-something of them now."[663]

Social Worker Terri Gustafson (who has worked at the Home for 21 years) reports that she saw Ms. Surreira point to a room and state: "All this room will be dead by tomorrow."[664]  Similarly, at approximately 7:00 p.m. on March 27, Social Worker Jill Orzechowski heard Ms. Lauziere—while standing outside of a room on 1-North—say "something to the effect that this room will be dead by Sunday so we will have more room here."[665]

Ms. Orzechowski reports that she does not believe that dying veterans received sufficient pain-management medications on the night of March 27, 2020.  She recalled raising concerns with Ms. Lauziere about the risk of COVID-19 spreading, and Ms. Lauziere responding that "it didn't matter because [the veterans] were all exposed anyway and there was not enough staff to cover both units."[666]

Observing the conditions on 1-North on March 30, 2020, interim Administrator Val Liptak explained that she and her team have a "collective 90-plus years of nursing," but "none of us have ever seen anything like this."  The 1-North unit "looked like a war zone." [667] According to Incident Commander Lisa Colombo, on March 30, 2020, this "hot" unit had veterans "crammed in on top of each other," some

of whom "were clearly dying." There were "chairs of people lined up, some were clothed, some unclothed, some were wearing masks, some weren't."[668]

Another troubling aspect of the consolidation of 2-North and 1-North is that three of the veterans on 2-North were hospice patients who had been transferred there from 2-South a few days earlier, to create another unit for possible isolation of infected veterans.[669]  We presume that many of these veterans were not ambulatory dementia patients who needed to be on a locked ward—instead, they were dying and in need of hospice care.  They were then transferred to the crowded 1-North unit, where they and other patients stretched the limited staff beyond their ability to provide the required care.

We find substantial evidence that the conditions and quality of care on the combined 1-North unit during the weekend of March 28-29 were deplorable.  Clinical staff report that they tried to do the best they could under the circumstances, but they were unprepared, understaffed, and without sufficient resources and guidance.[670]  Some staff members reported that they were struggling to provide adequate care, including to keep veterans hydrated and to provide sufficient morphine and comfort medications to certain veterans who were dying.[671]  Staff reported difficulties tracking which veterans had been fed.[672]  One staff member said she observed a COVID-19 positive veteran who "had fecal matter on his socks and was laying on another vet's bed."[673]  Staff reported that they felt like it was "difficult" and "impossible" to keep the veterans in 1-North isolated from one another.[674]  Many of the veterans in the consolidated unit were "bed hoppers," meaning that in the fog of dementia, they would climb into various beds on the units.[675] Some nursing aides expressed a concern that they could not keep track of which veterans were positive and which veterans was negative for COVID-19.[676]

Several staff members described situations where "one veteran [was] taking his last breaths while the veteran next to him [was] eating his meals without the privacy of curtains" between them.[677]  Social Worker Carrie Forrant provided this narrative:

> I was sitting with a veteran holding his hand, rubbing his chest a little bit. Across from him is a veteran moaning and actively dying. Next to me is another veteran who is alert and oriented, even though he is on a locked dementia unit. There is not a curtain to shield him from the man across from him actively dying and moaning, or a curtain to divide me

and the veteran I am with at the time, from this alert, oriented veteran from making small talk with the confused little fellow. He is alert and oriented, pleasantly confused, and talking about the Swedish meatballs at lunch and comparing them with the ones his wife used to make.  I am trying to not have him concentrate on the veteran across from him who is actively dying, or the one next to him who I am holding his hand while he is dying.

It was surreal . . . I don't know how the staff over in that unit, how many of us will ever recover from those images.  You want to talk about never wanting this to happen again.[678]

During the weekend of March 27-29, 2020, veterans' family members called the Soldiers' Home for information on their loved ones, seeking to speak with them (given the ban on in-person visits).  Staff had a difficult time trying to handle caring for the patients and answering the phone as there were not enough people to do both.[679]  Staff reported that they had not received instructions or scripts about what they could or could not tell family members.[680]  The Social Workers tried to review nurses' notes so that they could answer questions without bothering the clinical staff.[681]  One social worker commented, "It was chaos . . . The families didn't realize how bad it was."[682]  Staff reported offering veterans' desk phones, nursing unit phones, and their own personal cell phones to make calls to family members, but there were not adequate resources for staff to adequately keep families connected with their veterans.[683]

### viii.    The outbreak spreads: more veterans test positive and the death toll grows

The Soldiers' Home staff collected the second round of samples for COVID-19 testing on March 21—the evening that Veteran 1's positive result came back.  More samples were collected on March 26, 27, and 29.

One veteran passed away on March 24, while his test result was pending (it came back positive on March 29).  The death toll then began to grow dramatically on Friday, March 27, 2020.  Another three veterans suspected of COVID-19 died on that date.  The Home received positive results for one of these three veterans that day (March 27; he was tested on March 21), and the other two were tested on the same day they died (positive results came back on April 2).  Two more veterans died with COVID-19 the next day, March 28 (one was Veteran 1, who was known to be positive at the time of his death; the other died

with his result pending).  Another veteran died with COVID-19 on March 29 (he was tested on March 24, and the result came back on March 29).

The table below lists all deceased veterans who were tested for COVID-19 *or* who passed away between the date the first veteran was tested (March 17, 2020) and when Mr. Walsh was placed on administrative leave (March 30, 2020):[684]

| Veteran ID: | Date of First Test: | Date of (+) Test Result: | Date of Death: | Unit:[xviii] |
|---|---|---|---|---|
| Veteran A | (none) | (none) | **March 17, 2020** | (unknown) |
| Veteran 5 | **March 24, 2020** | **March 29, 2020** | **March 24, 2020** | 2N |
| Veteran 2 | **March 21, 2020** | **March 27, 2020** | **March 27, 2020** | 1N |
| Veteran 7 | **March 27, 2020** | April 2, 2020 | **March 27, 2020** | 2N |
| Veteran 8 | **March 27, 2020** | April 2, 2020 | **March 27, 2020** | 1N |
| Veteran 1 | **March 17, 2020** | **March 21, 2020** | **March 28, 2020** | 1N |
| Veteran 9 | **March 27, 2020** | April 2, 2020 | **March 28, 2020** | 1N |
| Veteran 6 | **March 24, 2020** | **March 29, 2020** | **March 29, 2020** | 2E |
| Veteran C | (none) | (none) | **March 29, 2020** | 1N |
| Veteran 3 | **March 21, 2020** | **March 27, 2020** | **March 30, 2020** | 1N |
| Veteran 10 | **March 27, 2020** | April 2, 2020 | **March 30, 2020** | 1N |
| Veteran 30 | **March 21, 2020** | **March 27, 2020** | **March 30, 2020** | (hospital; previously 1N) |
| Veteran B | **March 21, 2020** | **(none – negative on March 27, 2020)** | March 31, 2020 | 1N |
| Veteran 32 | **March 22, 2020** | **March 27, 2020** | April 1, 2020 | 2N |
| Veteran 40 | **March 27, 2020** | April 2, 2020 | April 1, 2020 | 2N |
| Veteran 41 | **March 27, 2020** | April 3, 2020 | April 1, 2020 | 2N |
| Veteran 33 | **March 22, 2020** | **March 26, 2020** | April 2, 2020 | 1N |
| Veteran 37 | **March 26, 2020** | April 4, 2020 | April 2, 2020 | 2N |
| Veteran 43 | **March 29, 2020** | April 8, 2020 | April 3, 2020 | 2E |
| Veteran 36 | **March 25, 2020** | March 31, 2020 | April 4, 2020 | 1N |
| Veteran 42 | **March 27, 2020** | April 2, 2020 | April 4, 2020 | 1N |
| Veteran 38 | **March 26, 2020** | April 2, 2020 | April 6, 2020 | 2W |
| Veteran 34 | **March 22, 2020** | **March 27, 2020** | April 7, 2020 | 1N |
| Veteran 12 | **March 28, 2020** | April 3, 2020 | April 8, 2020 | 2N |
| Veteran 35 | **March 24, 2020** | **March 29, 2020** | April 8, 2020 | 2W |
| Veteran 39 | **March 26, 2020** | April 2, 2020 | April 8, 2020 | 2E |
| Veteran 44 | **March 30, 2020** | April 3, 2020 | April 15, 2020 | 2W |
| Veteran 11 | **March 27, 2020** | April 2, 2020 | April 17, 2020 | 2N |

Boldface text indicates tests, results, and deaths that occurred during the period when Mr. Walsh served as Superintendent.

---

[xviii] Unit location for each veteran reflects the assignment as of the morning of March 27, 2020.

Thus, from the time of the first test (March 17) through the day Mr. Walsh was placed on leave (March 30) 12 veterans died.  Of these, 2 were never tested, 6 tested positive, and there are 4 for whom results were still pending as of Mr. Walsh's last day.

We note that the rapid acceleration in the death toll was to some degree anticipated by the Home's leadership.  On Friday, March 27, 2020, a storekeeper employee delivered 13 body bags to 1-North at around 2:45 p.m., shortly before the consolidation of the two units began.  On March 28, 2020, a tractor trailer refrigeration unit (ordered earlier in the week) arrived outside of the Soldiers' Home to store the remains of veterans who passed away, as there was not enough space in the morgue.

Mr. Walsh was not present at the Soldiers' Home on the weekend of March 28-29, 2020, as he was home caring for his wife who was recovering from treatment for a serious illness.  He did not visit the combined 1-North housing unit during the period March 27-30, 2020.[685]

### 4.   Reporting out: requests for assistance and communications regarding reportable events

This section addresses communications between the Soldiers' Home and other state agencies and officials during the course of the COVID-19 outbreak—including both requests for guidance and assistance, and reports of infections and deaths.

### *i.*   Reporting requirements related to COVID-19

Much like the COVID-19 infection control guidance that continued to change and evolve throughout March 2020, the requirements for reporting to state and local officials changed and expanded as the scope of the pandemic came to light.  We have identified the following pertinent reporting requirements, beginning approximately at the time of the first COVID-19 test on March 17, 2020:

- **Pre-existing requirements**: before the period of the outbreak, the Soldiers' Home was subject to a general requirement that it report the deaths of any veterans to the Holyoke Board of Health, and that "serious communicable disease" or deaths from "non-natural causes" be reported to the Department of Veterans' Services and EOHHS using a Critical Incident Report (i.e., a template form).[686]

- **March 16-23**: The Soldiers' Home had no requirement to report *suspected* COVID-19 cases (or pending test results) to the Department of Veterans' Services or EOHHS.[687]  Instead, the

requirement concerning COVID-19 was to report any *confirmed* cases to the Department of Veterans' Services and EOHHS using a Critical Incident Report, and to alert the Holyoke Board of Health of any *confirmed* COVID-19 cases (as well as *any* deaths, regardless of COVID-19 status). The Board of Health would, in turn, contact the Department of Public Health.[688]

- **March 24-29:** Colleen Arons (Assistant Secretary for Communications and Public Affairs for EOHHS) sent an email at 4:21 pm to agency heads with a new daily tracker format to replace the Critical Incident Reports for COVID-19 cases.  Paul Moran (Department of Veterans' Services Chief of Staff) forwarded it to Ms. Poppe and Mr. Walsh the afternoon of March 25.  Ms. Arons wrote that EOHHS is "implementing a new reporting process for all agencies to track any *confirmed* cases of COVID-19.  This new process . . . requires each agency head to designate a member of your team who will be responsible for collecting and reporting daily updates to share with EHS." (emphasis added)[689]  The only required reporting in EOHHS' COVID-19 daily tracker, as illustrated below, were confirmed COVID-19 cases.  The tracker did not require reporting of pending tests and did not include a column to report deaths of veterans who were suspected or confirmed to have COVID-19.[690]  On March 27, Ms. Arons confirmed to Mr. Yankopoulos that EOHHS was only collecting confirmed, not pending, cases.[691]



**Figure 5: March 24 EOHHS COVID-19 Tracker Form**

- **March 29:** At 10:38 a.m., Secretary Urena sent an email to Mr. Walsh and Ms. Poppe with another new reporting form attached ("Homes Daily Data") and requested that the information be provided by 11:30 a.m. on Monday, March 30.[692]  **For the first time, as of March 30, the Department of Veterans' Services now requested daily reporting of the number of *pending* COVID-19 cases (i.e., veterans awaiting test results), the number of patients recovered from COVID-19, and the number of deaths associated with pending or confirmed COVID-19 cases**.  Secretary Urena's updated daily reporting tracker—which again, was not due for submission until March 30—is shown below:



**Figure 6: March 29 COVID-19 Tracker Form**

ii.        Summary of reports-out and requests for advice and assistance

Against the background of these changing requirements for reporting, the following timeline

recounts the spectrum of COVID-19 related reporting, communications, requests for assistance, and

potential omissions with respect to the Soldiers' Home, from the time of the first test (March 17, 2020)

until Mr. Walsh was placed on administrative leave (March 30, 2020):

**March 17**

- Veteran 1 on the 1-North dementia unit was exhibiting symptoms and was tested for COVID-19.
  There was no requirement to report this pending test.  Secretary Urena told us that while "he had
  weekly calls" with Mr. Walsh leading up to Veteran 1's test, he was not informed of the pending
  test until the positive result came back from the lab in the late evening of March 21, 2020.[693]  But
  in an email sent on March 21, Mr. Walsh wrote to Secretary Urena reciting that he had "briefed
  [Secretary Urena] earlier in the week" about the "veteran with covid symptoms."[694]

**March 21**

- 9:15 p.m.: The Soldiers' Home received notification that Veteran 1 tested positive for COVID-19.
  The laboratory's computer system also sent a copy of the result (using an automated electronic
  data exchange) directly to the Department of Public Health.[695]  After receiving the test results, Ms.
  Lauziere immediately drove to the Soldiers' Home, and called Dr. Clinton while en route.  Dr.
  Clinton explained that "the plan was to put [Veteran 1] in isolation.  I understood he was a person
  with advanced dementia who was up walking, would not wear a mask.  I was told that Vanessa
  Lauziere didn't have the staff to make sure he stayed in one of the isolation rooms so he remained
  on 1-North."[696]

- 10:54 p.m.: Mr. Walsh emailed Secretary Urena (copying Paul Moran (Department of Veterans'
  Services Chief of Staff), Stuart Ivimey (General Counsel for the Department of Veterans' Services),
  and Anthony Preston (Communications Director for the Department of Veterans' Services)),
  stating: "As briefed earlier in the week, (veteran with covid symptoms) we received the test results
  back on our veteran and the results are positive for covid-19.  **We have isolated said veteran
  and quarantined the unit.**  We're currently are [sic] testing 5 other veterans and sending out their
  samples this evening for testing.  We'll have the full report once all the information is collected
  and protocol actions taken/implemented." (emphasis added)[697]  Mr. Walsh did not explain that
  the Soldiers' Home did not have adequate staffing to use the isolation rooms that had been set up
  on the third floor.

**March 22**

- 1:21 a.m.: Secretary Urena informed Daniel Tsai (Acting Secretary for EOHHS), Alda Rego
  (Assistant Secretary for Administration and Finance for EOHHS), Catherine Starr (Human
  Resources Officer for EOHHS), Erica Crystal (Labor Relations Director for EOHHS), and Ms.
  Arons at EOHHS that there was a positive COVID-19 case at the Soldiers' Home, and five other
  veterans were being tested.  In this report, Secretary Urena repeated Mr. Walsh's confirmation that
  the positive patient "has been isolated."  Ms. Rego responded that "by the end of today, we are

going to have a streamlined process for reporting these cases for us to elevation to the Command Center."[698]

- 9:31 a.m.: Acting Secretary Tsai emailed Secretary Marylou Sudders (Secretary of EOHHS)[xix] that "we just received a confirmed COVID-19 case (a veteran) at the Holyoke Soldiers' Home. The unit is now isolated and 5 other vets being tested—awaiting results."[699]

- 9:54 a.m.: Mr. Walsh sent a Critical Incident Report to Secretary Urena, Catherine Mick (Undersecretary for EOHHS), Brooke Karanovich (Media Relations Manager for EOHHS), Ms. Arons, Acting Secretary Tsai, Mr. Moran, and Mr. Preston, stating that "[o]n March 16, 2020,[xx] we tested a long-term care veteran who had been exhibiting COVID-19 symptoms. On March 21, 2020 at approximately 2115, we received notification that the test was positive for COVID-19. The veteran who tested positive has been placed in isolation. **Five other veterans in the same ward who were exhibiting symptoms have been tested.** We expect to have results by the end of the week. In the meantime, those veterans have been placed in one room to try to prevent the spread of the disease. Additionally, we have initiated a deep cleaning of all areas that the patient may have occupied for more than 15 minutes. All proper protocols are in place at this time." (emphasis added)[700]

- 10:17 a.m.: In response to questions from Mr. Moran, Mr. Walsh responded that "the protocol is to isolate the veteran (which we did)" and "staff has the necessary PPE at this time."[701]

- 11:02 a.m.: Mr. Walsh confirmed to Secretary Urena that the Department of Public Health and the Holyoke Board of Health were informed of the positive COVID-19 case. Shortly thereafter, Mr. Walsh provided Secretary Urena with the names of the direct care staff that worked at the facility from March 17 through March 21 who might have been exposed to the symptomatic veterans.[702]

- 12:30 p.m.: Mr. Walsh notified Secretary Urena that VA Northampton Leeds and the VA central office were notified of the positive COVID-19 case. Specifically, the VA was informed that "[t]he veteran who is on the secure memory impaired unit was tested for influenza and RSV and Covid on Tuesday March 17th. The influenza and RSV were negative, the Covid test came back around 2130 on Saturday the 21st. The veteran was encouraged to wear a mask, this was complicated by his dementia, he kept removing it and needed constant cues to keep on his face. **Staff tried to keep him separate from the other vets on the unit.** The staff were instructed to wear PPE when in contact with this veteran. This veteran has had respiratory symptoms on and off (+ pneumonia) and he has not left the building. His nephew was his only visitor prior to banning visitation and the board of health is following up with him. **The veteran was isolated as soon as the positive test was received.**" (emphasis added).[703]

---

[xix] Ms. Sudders is the Secretary of EOHHS. However, effective March 12, 2020, Governor Baker appointed Secretary Sudders to lead the Commonwealth's COVID-19 Command Center. During this period, Dan Tsai (the Assistant Secretary at EOHHS ordinarily in charge of MassHealth) served as the Acting Secretary of EOHHS.

[xx] The test did not occur on March 16, 2020, but rather March 17. *See* GOV0072675.

- Ms. Gosselin (the Infection Control Nurse at the Soldiers' Home) reported the positive COVID-19 cases to Deborah Schaier, Holyoke's Public Health Nurse, by phone.  (On March 27, 2020, Ms. Gosselin changed the process to provide subsequent notifications by fax).

- Ms. Gosselin also called Department of Public Health to report the positive COVID-19, however the agent she spoke with informed Ms. Gosselin that she only needed to report positive cases to the local board of health.[704]

**March 24:**

- 4:30 p.m.: Joyce Cohen, the Department of Public Health Epidemiologist assigned to the Soldiers' Home COVID-19 cluster, entered the cluster into the Department's MAVEN database after receiving notification of the Soldiers' Home COVID-19 case from the state lab computer system.[705]

**March 25:**

- 11:09 a.m.: Lindsay Tucker (Associate Commissioner, Department of Public Health) emailed Secretary Urena informing him that Catherine Starr (Human Resources Officer, EOHSS) shared his request for support at the Soldiers' Home.[706]  Following this email, Ms. Tucker connected Mr. Walsh with two epidemiologists at the Department of Public Health—Melissa Cumming and Joyce Cohen—who were assigned to the Soldiers' Home COVID-19 outbreak.  A conference call between the epidemiologists and Soldiers' Home leadership team was scheduled for 3:00 p.m. that day.[707]

- 12:00 p.m.: Ms. Cohen spoke with Ms. Gosselin and again explained that direct reporting to the Department of Public Health was not required, and requested the contact information for the person at the Soldiers' Home who was responsible for reporting staff and veterans being tested.  Ms. Gosselin told Ms. Cohen that she was the contact, and was in touch with Deborah Schaier with respect to all residents who were positive, and the Soldiers' Home's Human Resources Director, Jessica Powers, was handling reporting of any staff members who tested positive.[708]  Following that call, Ms. Gosselin emailed Mr. Walsh, Ms. Lauziere, and Dr. Clinton stating that "**positive cases or presumed cases should if possible [be] in private room with closed door, in a separate area of the facility [with] dedicated staff.**"  (emphasis added).[709]  Ms. Gosselin did not report to Ms. Cohen that Veteran 1 was not placed in an isolation room because there was no staff available to watch him.

- 2:21 p.m.: Acting Secretary Tsai texted Secretary Sudders that he was "flagging Holyoke soldiers home.  A number of residents—less than 10—and the medical director appear to have symptoms following the 1 positive case. Follow up discussions happening immediately on that as well."[710]

- 3:00 p.m.:  Several members of the Soldiers' Home leadership team, including Mr. Walsh, Ms. Lauziere, Ms. Surreira, and Dr. Clinton, attended a call with Department of Public Health epidemiologists Joyce Cohen and Melissa Cumming to discuss staffing issues and COVID-19 protocols.  Ms. Cohen reported that during this call, Mr. Walsh said he was concerned about personal protective equipment and staffing, but he did not "ring any alarm bells" and Ms. Cohen did not "hear anxiety from Mr. Walsh."[711]  During this call, the Soldiers' Home representatives did not inform the Department that they did not have adequate staffing to use the isolation areas.

Likewise, there was no discussion of a plan (implemented two days later) to combine the 1-North and 2-North housing units.

- 4:25 p.m.: Lindsey Tucker (Associate Commissioner, Department of Public Health) emails Secretary Urena, copying Ms. Starr, Mr. Walsh and Mr. Moran, stating, "I just heard from our DPH staff that they completed the call with staff at the Soldiers' Home.  From their perspective, it sounds like Holyoke staff are doing everything they can and consistent with DPH recommendations."

- 4:34 p.m.: Mr. Walsh forwarded this email to Ms. Lauziere and Ms. Surreira stating only: "boom."[712]  When asked why he sent this email, Mr. Walsh said he was happy that "we were doing the right thing."[713]

-  According to Mr. Walsh's lawyers, he reported to Secretary Urena that one of the pending COVID-19 veterans died on March 24.  We have been unable to substantiate this assertion independently.

## March 26

- 11:11 a.m.: Ms. Lauziere emailed Ms. Tucker, Mr. Krok, Mr. Trangese, Mr. Walsh, and Ms. Surreira asking for the Department of Public Health to provide confirmation that the Soldiers' Home is doing what is appropriate based on the telephone conversation the day before.  She explained that the staff expected that "the veteran's 'be isolated' meaning confined to a room with a mask on. We have tried to explain that given these individuals are cognitively impaired as well as ambulatory that we cannot force the use of a mask nor confinement to a room without the use of restraint, which is not in keeping with our practice or ethics."  In response, Mr. Walsh replied only to Ms. Lauziere, stating "another boom."[714]  When asked why he sent this email, Mr. Walsh said that, like the "boom" email he sent on March 25, he was "happy that the Department of Public Health was agreeing with us."[715]

- 4:30 p.m.: Ms. Cumming replied to Ms. Lauziere's email concerning questions about the Soldiers' Home COVID-19 protocols.  Ms. Cumming responded that she agreed that restraining the dementia patients in their rooms is not appropriate.[716]

## March 27:

- 9:45 a.m.: Secretary Urena sent a text message to Mr. Walsh about the number of COVID-19 tests that the Soldiers' Home had pending; he responded that there are "28 tested, 7 positives, 3 negative, and 18 pending."[717]  Mr. Walsh also confirmed that the Soldiers' Home was in the process of reporting the required information to the Holyoke Board of Health.

- 10:23 a.m.: Ms. Schaier emailed Ms. Gosselin the COVID-19 questionnaire form required by the Holyoke Board of Health.  Before this, Ms. Gosselin had called Ms. Schaier to report confirmed COVID-19 cases to the Holyoke Board of Health.[718]  That morning, Ms. Gosselin told Ms. Schaier that there were six new COVID-19 positive cases and one of the veterans associated with the Soldiers' Home COVID-19 cluster had died.[719]  Ms. Schaier reported this information to the Department of Public Health's MAVEN database.[720]

- 10:30 a.m.: Secretary Urena, Mr. Walsh and Ms. Poppe attended a call in which Mr. Walsh raised concerns about a lack of staff in light of sick-calls. Secretary Urena suggested bringing back staff who had recently resigned or retired. Mr. Walsh also told Secretary Urena that there had been no staff mandations. Secretary Urena reported that he had not felt that Mr. Walsh had been 'ringing the alarm bells' concerning staffing on this call.[721]

- 1:24 p.m.: Mr. Walsh then sent an email to Secretary Urena formally requesting National Guard assistance for staffing at the Soldiers' Home.[722] Secretary Urena recalled that until he received this email, he was never under the impression that "there was a sense that the place was being overrun" by COVID-19, and that Walsh "had a level of calmness" leading up to the request for National Guard assistance.[723] There was no reference to a plan (apparently approved at a 1:30 p.m. emergency staff meeting) to combine the 1-North and 2-North housing units in light of staff shortages.[724]

- 3:00 p.m.: Mr. Walsh attended a phone call with Secretary Urena, Ms. Arons, Ms. Rego, Ms. Starr, and Undersecretary Mick. There was no reference to the plan to combine the 1-North and 2-North housing units in light of staff shortages.[725]

- (Late afternoon): Mr. Walsh told Secretary Urena that the two units were going to be consolidated during the afternoon of March 27. Mr. Walsh did not tell Secretary Urena that there were veterans who had tested positive, those who were not symptomatic, and those whose results were still pending in both of those units.[726]

- 3:41 p.m.: Mark Yankopoulos sent the COVID-19 tracker to Ms. Arons, reporting six new COVID-19 positive cases as of March 27 and reporting previous positive cases from March 21 and March 24.[727]



**Figure 7: COVID-19 tracker sent to EOHHS on the afternoon of March 27**

- 4:00 p.m.: Ms. Arons wrote in response to Mr. Yankopoulos: "I just got off the phone with Superintendent Walsh[xxi] and was under the impression there were only 6 new cases for today. Did you just receive 2 more positives? **Also I was not planning to include the 2 deaths since those results are pending.** I assume you didn't include those, but please let me know either way." (emphasis added). Mr. Yankopoulous responded: "[t]o confirm, we did receive an additional two positive reports this afternoon. Those were included in the update that I sent to you. As of now our confirmed positive total is 9 residents and 1 employee. **The report only includes the positive test results that we have received so far. Pending results are not included.**"

---

[xxi] This apparently refers to the 3:00 p.m. phone call described above.

(emphasis added).[728]  Ms. Arons responded, "**Yes we are only collecting confirmed cases. Not pending**. Can you please respond with which case was today's death?"  (emphasis added).  Mr. Yankopoulous responded, "I can't identify which specific row is a potential COVID-19-related death, because we have not included personal information, and the same reported measures were taken for each case.  As tabular data, the rows are essentially interchangeable.  Additionally, we have not received confirmation yet that COVID-19 was the cause of death."[729]

- 4:11 p.m.: Mr. Walsh emailed Ms. Arons, Ms. Rego, Ms. Starr, Undersecretary Mick, and Secretary Urena with an update on the COVID-19 numbers. [730]  Consistent with Mr. Yankopoulous's email a few minutes earlier, he stated that after their 3:00 p.m. conference call, there had been two more confirmed COVID-19 positive cases.  Mr. Walsh also reported that another of the COVID-19 positive veterans died (bringing the death toll among confirmed-COVID-19 veterans to 2), and the Home had received the positive test results for the deceased veteran that day.  This email made no reference the combination of 1-North and 2-North, which was underway at the time.

- 5:25 p.m.: Mr. Yankopoulous sent an updated COVID-19 tracker to Ms. Arons, reflecting the eight cases that were confirmed positive on March 27, and deleting the two positive COVID-19 cases there were reported earlier in the week (because the tracker was only to reflect updates from the day the tracker is sent).[731]



**Figure 8: Second COVID-19 tracker sent to EOHHS on the afternoon of March 27**

- 6:30 p.m.: Ms. Gosselin provided updated COVID-19 numbers to an internal distribution list including Mr. Walsh, Mr. Lauziere, Dr. Clinton, Ms. Foley, Mr. Yankopoulos, and Ms. Surreira.[732]  The update stated that the total veterans swabbed was 43, total veterans tested positive was 10, total veterans negative was 3, total swabs pending was 30, and there were 3 deaths of those who were swabbed (though not all 3 had been confirmed positive).  Ms. Gosselin stated that the Board of Health is aware of all 3 of the deaths.[733]

- 8:33 p.m.: Ms. Schaier confirmed receipt of fax forms that Ms. Gosselin sent that evening for six confirmed COVID-19 cases.[734]  The fax notifications state that each of the six confirmed COVID-19 cases reside on the dementia unit.[735]  Ms. Gosselin had verbally informed Ms. Schaier of these cases earlier in the day.[736]  In addition to these six cases, Ms. Schaier also wrote that "Carol (Infection Control, Holyoke Medical Center) gave me two other names" of veterans who were confirmed COVID-19 positive as of March 27.[737]

**March 28:**

- 7:29 a.m.: Holyoke Mayor Alex Morse received an anonymous email from a Soldiers' Home employee asserting that there were "horrific circumstances at the Soldiers' Home." Among other concerns, the email stated that the first positive COVID-19 veteran was not isolated but instead "left to sit amongst 20 other veterans on a dementia care unit," "as of yesterday we had 7 positive cases," and "2 bedrooms are now turned into 3 bedrooms with less than 3 feet between patients."[738]

- 9:39 a.m.: Amy Phillips, a reporter with WWLP 22News, emailed Mr. Preston that her station had been contacted by an employee at the Soldiers' Home alleging that, "one veteran has died and others are sick with the symptoms, that the management is refusing to test sick vets on the dementia unit placing all the rest of the vets on the open unit in jeopardy, families are not being appraised of the situation, and staff are not having their temperatures and other symptoms checked before entering the building."[739] Mr. Preston forwarded the media request to Secretary Urena and Mr. Moran. Mr. Moran emailed Mr. Walsh asking him to contact Mr. Preston immediately.

- 11:22 a.m.: Mr. Yankopoulos sent Ms. Arons the daily COVID-19 tracker for the Soldiers' Home, reporting the one new confirmed positive case from that day, March 28.[740]

- 11:39 a.m.: Mr. Yankopoulos sent Ms. Arons a revised daily COVID-19 tracker, explaining that he "was just notified that we received a positive test for one of the veterans, making our total to date 2 positive employees and 10 positive veterans."[741]

- 4:37 p.m.: Ms. Arons emailed Secretary Sudders, copying Acting Secretary Tsai, to report that there were two new COVID-19 cases at the Soldiers' Home (one veteran, one employee).[742]

- 6:49 p.m.: Mr. Yankopoulos forwarded a copy of the daily COVID-19 report to Mr. Moran. The report incorrectly listed a staff member as COVID-positive instead of a veteran. Mr. Moran asked about this, and Mr. Yankopoulos replied to Mr. Moran, copying Mr. Preston, Mr. Walsh, and Secretary Urena, stating, "that was an error on my part. The second entry is a veteran." Mr. Moran replied again at 9:14 p.m. that, "we need an accounting of cases please see Anthony's email…this is not acceptable; given the emergency we are facing."[743]

- 7:00 p.m.: Brenda Rodrigues (President, SEIU Local 888) sent an email to Secretaries Sudders and Urena informing them that she had just received an email from Mr. Ablordeppey (a nursing aide) that stated, in part, "I just received word that another 2 Veterans passed away, bringing the total to 6 in less than 24 hours, and 8 within days at the Holyoke Soldiers' Home."[744] After sending the email, Ms. Rodrigues sent a text message to Secretary Sudders' mobile phone, and Secretary Sudders called her approximately 30 minutes later. During that call, Secretary Sudders said that she had read Ms. Rodrigues' email and told her that the 8 deaths that Ms. Rodrigues reported did not comport with what Ms. Sudders was hearing from the daily reports.[xxii] Ms. Sudders told Ms. Rodrigues that "all I can say is we have one death."[745] Secretary Sudders then spoke with Secretary

---

[xxii] Ms. Rodrigues' email was accurate in that six veterans died at the Soldiers' Home on March 27 and 28. As of the end of the day on March 28, only two of these veterans were confirmed as COVID-19 positive. Positive test results for three more were announced on April 2. The remaining veteran who died on March 27 tested negative for COVID-19 on April 2.

Urena and told him that someone needed to look into the report from Ms. Rodrigues and get back to her and Ms. Rodrigues about what was going on.

- 9:05 p.m.: Secretary Urena forwarded Ms. Rodrigues' email to Mr. Walsh.  At 9:56 p.m., Mr. Walsh responded that he had not seen the letter previously and disputed the allegations that the Soldiers' Home management was responsible for the deaths.  Mr. Walsh did not address the suggestion that there had been eight deaths.[746]

- 10:01 p.m.: Secretary Urena directed Mr. Walsh to provide an update with specific number of deaths and positive test results by Monday morning, and scheduled a call regarding the situation for the next day (Sunday, March 29) at 3 p.m. [747]

- 10:03 p.m.: Mr. Walsh replied again stating that "what should be discussed is the amount of call outs by [SEIU Local] 888 the past week.  The reference that the management is creating this issue and has a part in deaths is very concerning."[748]

**March 29**

- 12:16 p.m.: Secretary Urena texted Mr. Walsh and asked if the staff in the two infected units (presumably 1-North and 2-North) were still being floated to other units.  Secretary Urena noted that the Department of Public Health has requested "they only work in the one unit."  Mr. Walsh replied, "We've done that for two weeks, attempt[ed] to keep same staff on same unit."[749]  Mr. Walsh's statement is not accurate: interviews with staff and our review of the staffing schedules from the last two weeks in March confirm that the staff were in fact being floated between various units.  A registered nurse on Care Center 3 stated that "some [certified nursing assistants] on my unit were floated to 1-North and 2-North. [Certified nursing assistants] from my unit would sometimes be scheduled to work 2 hours on 1-North and then were directed to report back to 3rd Floor in the same shift."[750]  Another nurse confirmed that "even between shifts" she was "floated between positive and negative patients."[751]

- 1:30 p.m.: Secretary Urena, Mr. Moran, and Mr. Preston held a call with the Soldiers' Home leadership, including Mr. Walsh, Ms. Lauziere, Dr. Clinton, Ms. Powers, Ms. Foley, and Mr. Yankopoulos.[752]  The call focused on the staffing shortage at the Home, and this call was intended to be in preparation for the 3:30 p.m. agency heads' call with Acting Secretary Tsai (as noted below, this 3:30 p.m. call was cancelled).  At Acting Secretary Tsai's request, Dr. Mohammad Dar, Medical Director at MassHeath, also attended the 1:30 p.m. call.[753]  Following that call, Dr. Dar emailed Acting Secretary Tsai, Ms. Cumming, and Ms. Cohen, among others, listing some of his recommendations, including to "close any communal areas.  The canteen and smoke room should've been long closed already."  Dr. Dar also noted that "it's going to be tough to prevent the spread if patients continue to wander and cannot wear masks all the time.  DPH guidance would help.  It's very hard with dementia for obvious reasons."[754]  By this time, eight veterans who were either COVID-19 positive or were waiting for test results had died at the Soldiers' Home.  Neither Mr. Walsh nor any of the other Soldiers' Home representatives on the call mentioned the new death toll.[755]

- 2:48 p.m.: Mr. Yankopoulos sent Ms. Arons the daily COVID-19 tracker for the Soldiers' Home.[756]  This report indicated that there were three new positive COVID-19 veteran cases and one new positive COVID-19 employee case at the home.[757]

- Approximately 3:00 p.m.: Mr. Yankopoulos spoke with Department of Veterans' Services General Counsel Stuart Ivimey to discuss the data reporting error the day before, in which Mr. Yankopoulos incorrectly characterized a positive test result for a patient as a positive test result for an employee. Mr. Ivimey characterized this call as a "fatherly chat" in which they "spoke generally about what was going on" and he reassured Mr. Yankopoulos that he had confidence in him, despite his error the day before.[758] **During this call, Mr. Yankopoulos and Mr. Ivimey discussed the "bottom line" number of how many veterans had died in recent days. Mr. Yankopoulos reported—accurately—that by this time four veterans had died who were known, by the time of the call, to be COVID-19 positive. According to Mr. Ivimey, Mr. Yankopoulos also told Mr. Ivimey that "it was looking like" there were four additional veterans who had died and whose COVID-19 test results were pending.** Mr. Ivimey perceived that these numbers were "not solid at this time."[759]

- 3:30 p.m.: Ms. Rego informed Acting Secretary Tsai, Secretary Urena, Undersecretary Mick, Ms. Aron, Ms. Starr, Ms. Crystal, and Mr. Walsh, among others, that the 3:30 Agency Head meeting was cancelled and "we will catch up tomorrow."[760]

- 3:36 p.m.: Ms. Arons emailed Secretary Sudders, copying Acting Secretary Tsai that there were "7 confirmed cases at Holyoke Soldiers' Home", "1 veteran had passed away on 3/24 and we just received the rest [of the] results today," and there were cumulatively 2 veteran deaths.[761]

- 4:18 p.m.: By email, Mr. Walsh scheduled an emergency conference call with the Board of Trustees for the next day (Monday March 30) to update the Board on the COVID-19 situation.[762] The call never took place.[763]

- 4:31 p.m.: Mr. Yankopoulos sent an email to Mr. Walsh with the data Mr. Walsh had been asked to provide to Secretary Urena on Monday by 10:30 a.m. The report stated that there were 15 veterans who had tested positive, 25 veterans' tests were pending, 4 deaths with positive test results, 4 deaths with pending test results, and 4 staff had tested positive.[764]

- 6:30 p.m.: Holyoke Mayor Alex Morse and Michael Bloomberg (Mr. Morse's Chief of Staff) called Mr. Walsh to discuss information they had learned suggesting that the number of COVID-19 cases and deaths at the Soldiers' Home was larger than had been reported to the Holyoke Board of Health, and offered to make city resources available to assist the Home.[765] Mr. Walsh declined Mayor Morse's offer of assistance, but confirmed that there had been eight deaths between Wednesday and Sunday of that week.[766] Mr. Walsh told Mayor Morse about a "difficult dementia patient" who would not keep a mask on, and would wander on the unit.[767]

- Shortly before 7:00 p.m.: Mr. Walsh called Mr. Preston, who then connected Mr. Walsh with Secretary Urena to report on the call with Mayor Morse. According to Secretary Urena, Mr. Walsh told him that Mayor Morse was "frantic" and "speaking very fast" during their 6:30 p.m. phone call.[768] Mr. Walsh informed Secretary Urena that Mayor Morse planned to put out a statement on Facebook about an "anonymous letter" that "was not true… was not accurate." Mr. Walsh told Secretary Urena that Mayor Morse "was not a good guy" and noted that he was running for Congress.[769] Secretary Urena proposed a call with Mr. Walsh and Mayor Morse, but Mr. Walsh stated that he did not recommend doing so. Secretary Urena asked Mr. Preston to "get a better understanding" of the situation, and Secretary Urena texted Mayor Morse to arrange a call for 8:00 p.m. that night.[770]

- 7:00 p.m.: Secretary Urena attended a scheduled call with Acting Secretary Tsai, Undersecretary Mick, Ms. Rego, Ms. Starr, Ms. Arons, Mr. Moran, and Mr. Ivimey, and others affiliated with EOHHS.  During the call, Secretary Urena reported the death toll at the Soldiers' Home based on the information he received at 11:21 a.m.: 28 tests, 10 positives, 3 negatives, 3 staff members in quarantine, and 2 deaths.[771]  **Mr. Ivimey was on this call, but did not share the information he learned from Mr. Yankopoulos earlier that day, as he did not feel that it was "solid"**.[772]  Acting Secretary Tsai ordered that by the end of the day Monday, the Soldiers' Home needed to report back on a plan to "escalate" its containment approach, including construction of temporary plastic walls with assistance from the National Guard or Army Corps of Engineers.[773]  Later in the call, Secretary Urena asked Acting Secretary Tsai for permission to speak with Mayor Morse to discuss the situation at the Soldiers' Home, and noted that Mayor Morse had been "complaining" and "threatening to go to the media" to reveal that the death toll was larger than previously reported.  Acting Secretary Tsai said that "we need as many partners as we can", and approved the conversation with Mayor Morse.[774]  Secretary Urena and Acting Secretary Tsai both reported during the 7:00 p.m. call that they understand there were two deaths, as of the time of the call.[775]  **Inexplicably, Mr. Ivimey did not interject to share the information he learned earlier that day from Mr. Yankopoulos, or warn that there may be reason to doubt the numbers that Secretary Urena and Acting Secretary Tsai shared earlier in the call.  He later explained that he did not do so because he perceived that there was "not an adequate level of certainty" in the information that Mr. Yankopoulos shared with him**.[776]

- Shortly before 8:00 p.m.: Secretary Urena and Mr. Walsh spoke again briefly.  Mr. Walsh reiterated his view that he disagreed with the idea of another call with Mayor Morse, and voiced what Secretary Urena perceived to be "hesitation" that was "out of character."[777]

- 8:00 p.m.: Secretary Urena, Mr. Preston, Mr. Walsh, Mayor Morse, and Mr. Bloomberg connected for another conference call.  Several other of Mayor Morse's staff members (including the Director of Communications and Director of Operations) were also on the line.  Mayor Morse opened the call by explaining that Mr. Walsh had told him earlier that night that there were eight deaths.  Mr. Walsh confirmed this death toll—eight deaths.  Secretary Urena was "very troubled" because he had just reported to senior EOHHS leaders that the death toll was two veterans, and this was the first time he was hearing there had been eight deaths.[778]  Mayor Morse offered to provide a gymnasium or other space in city facilities to assist with the response to the crisis at the Soldiers' Home; Secretary Urena declined this offer, noting that such space would likely not be suitable to house veterans with dementia.  Mayor Morse again emphasized his intent to put out a statement to alert the media about the situation.  Secretary Urena indicated that he would follow-up with Mayor Morse by noon the next day with an update.[779]

- Shortly after the 8:00 p.m. call: Mayor Morse sent a text message to Lieutenant Governor Karyn Polito reporting that eight veterans at the Soldiers' Home had died.  Lieutenant Governor Polito responded that she was "on it." Lieutenant Governor Polito then sent a text message to Governor Baker and Secretary Sudders.[780]  Approximately 40 minutes later, Secretary Sudders called Mayor Morse.  During this call, Secretary Sudders confirmed her understanding that the death toll was two veterans; Mayor Morse pushed back, noting that Mr. Walsh had already confirmed that there were eight deaths.  Secretary Sudders called Mayor Morse again later in the evening, to report that there have been "four COVID deaths," and indicated that an emergency response team would arrive at the facility the next morning to provide assistance.[781]

- 8:45 p.m.: Secretary Urena texted Undersecretary Mick asking if she had time for a call, and Undersecretary Mick replied, "Yes. Feel free."[782] Secretary Urena called Undersecretary Mick and told her what happened during the 8:00 p.m. call with Mayor Morse.[783] Undersecretary Mick determined that she needed to immediately elevate the matter to Secretary Sudders, and scheduled a conference call for 9:30 p.m.

- Approximately 9:00 p.m.: Governor Baker, Lieutenant Governor Polito, and Secretary Sudders had a brief call regarding the report that Lieutenant Governor Polito received from Mayor Morse concerning the eight deaths. Secretary Sudders indicated that Mayor Morse's information was "not right."[784] Following Secretary Sudders' first call with Mayor Morse, she called Secretary Urena and he confirmed that Mr. Walsh had informed the Mayor that there had been eight deaths, and that this was the first Secretary Urena had heard this information.[785] Secretary Sudders told Secretary Urena that she would speak to the Governor and asked Secretary Urena to set up a phone call with Mr. Walsh that evening.

- Approximately 9:00 p.m.: Secretary Urena texted Mr. Walsh asking him "have you had 8 deaths? Is that accurate? On the phone with HHS . . . can we get on a conference call; HHS is looking for more information." Mr. Walsh replied, "Is this because of the mayor of Holyoke. I hope not."[786]

- Approximately 9:00 p.m.: In a series of calls, Secretary Urena spoke with Mr. Moran and Mr. Ivimey, and concluded that he had been "misled" with respect to the death toll (two veterans) he reported to Mayor Morse.[787]

- 9:05 p.m.: Acting Secretary Tsai texted Undersecretary Mick and Ms. Starr asking, "is it 2 deaths at Holyoke?" Ms. Starr replied, "Yes. Based on my notes – 2 deaths." Undersecretary Mick then replied, "on the phone with sec Urena. I'll call you. We need a conf call ASAP."[788]

- Approximately 9:15 p.m.: Secretary Sudders called Governor Baker again to report that Mayor Morse's information was, in fact, essentially accurate, and that she would be arranging a team to respond to the Soldiers' Home in the morning to assist.[789] Secretary Sudders then called Mayor Morse back to tell him that the information she had conveyed about the death total earlier was incorrect and that she would call him back when she had more information.[790]

- 9:30 p.m.: Mr. Walsh and Ms. Lauziere participated in a conference call with Secretary Sudders, Secretary Urena, Mr. Moran, Acting Secretary Tsai, Undersecretary Mick, Ms. Starr and Ms. Arons.[791] Secretary Sudders asked Mr. Walsh to explain how the death toll had increased so dramatically, and asked him for details about the call with Mayor Morse. Mr. Walsh told Secretary Sudders that the call with Mayor Morse was "his regular update to the Mayor."[792] Secretary Sudders then asked Mr. Walsh what the accurate numbers were, and Mr. Walsh hesitated. At one point during the call, Mr. Walsh and Secretary Urena contradicted each other about the number of deaths, with Secretary Urena saying that Mr. Walsh had said that there were four—not eight—deaths.[793] Mr. Walsh tried to explain that the Soldiers' Home was not counting deaths of pending cases in its reporting, but Secretary Sudders shut down this conversation.[794] Secretary Sudders then asked Ms. Lauziere to report the accurate number of deaths. Ms. Lauziere was shuffling papers in the background and put the phone on hold "for a few minutes," where Acting Secretary Tsai perceived that she was calling other people.[795] Ms. Lauziere then reported that the death toll was eight veterans. Secretary Sudders reprimanded Mr. Walsh in strong terms, expressing her "outrage and disappointment," and reminded him that "a sign of strength is asking for help." Secretary Sudders reported later that she felt "deceived or lied to."[796] She then dropped off the

call, in order to call Governor Baker to provide information about the correct death toll.  The call continued in her absence.

- 10:00 p.m.: Mr. Walsh texted Mr. Yankopoulos to discuss the numbers that Mr. Yankopoulos provided to Mr. Walsh at 4:31 p.m.  Mr. Walsh asked whether Mr. Yankopoulos had provided these numbers to the Department of Veterans' Services and EOHHS.  Mr. Yankopoulos responded that he "talked with [Mr. Ivimey]" and "[w]ent over a couple of stats, but I don't think I gave him the whole picture that I laid out in my email to you." Mr. Yankopoulos recounted that Mr. Ivimey "asked about the number of employees we had positive and the number of deaths we had recently, positive and pending."  Mr. Walsh asked: "Did u tell him 8 deaths," and Mr. Yankopoulos responded "I think so.  Over the course of the last couple of days, 8 deaths, 4 positive, 4 pending test results."[797]

- 10:28 p.m.: Mr. Walsh texted Secretary Urena that there were "27 pending cases, 9 deaths (just had another), 2 not related to covid, 4 had positive covid confirmed, 3 pending.  We'll solidify all the reporting procedures/process tomorrow."[798]

**March 30**

- 4:04 a.m.: Ms. Lauziere emailed Mr. Urena and Mr. Walsh, copying Ms. Poppe, Mr. Moran and Mr. Preston, the updated COVID-19 numbers as of 3:45 a.m.  In this report, Ms. Lauziere stated that six positive COVID-19 veterans had died; two veterans had passed for whom the results were pending; and one veteran had not been tested.[799]  At 4:31 a.m., Ms. Lauziere updated Mr. Urena and Mr. Walsh that at 4:30 a.m., "another veteran on CC1 passed – results are still pending," bringing the total number of deaths to 10.[800]

- 6:14 a.m.: Mr. Walsh texted Mr. Urena that "we sent an update this am per the info requested last night.  Please let me know if we answered all the rfis's."[801]

- Approximately 7:00 a.m.:  Mr. Walsh updated Secretary Urena of the situation in a telephone call, stating: "Mr. Secretary, I apologize for not telling you about all these deaths."[802]  Secretary Urena explained later that, in retrospect, he wished he would have kept Mr. Walsh talking to understand precisely for what he was apologizing.[803]

- 7:13 a.m.: Acting Secretary Tsai texted Secretary Sudders that the "deaths [were] now at 10."[804]

- 7:19 a.m.: Ms. Lauziere recirculated the COVID-19 numbers to Secretary Urena, Mr. Walsh, copying Ms. Poppe, Mr. Moran and Mr. Preston, stating that the total deaths count was 10.[805]

- 7:36 a.m.: Secretary Urena emailed Acting Secretary Tsai, Undersecretary Mick, Ms. Starr, Ms. Arons, Ms. Rego, Mr. Moran, Mr. Preston and Mr. Ivimey the latest COVID-19 numbers that he had as of 7:30 a.m., and he reported that there had been nine total deaths: six positive COVID-19 veterans had passed; two pending COVID-19 veterans had passed; and one veteran had died who had received no COVID-19 test.[806]  Undersecretary Mick responded "you texted 10 total earlier this morning . . . we need accurate and consistent factual information in all the communications."[807] Secretary Urena responded, at 7:51 a.m., stating: "I just got off phone with Bennett.  He said the number he gave me was not accurate.  We should follow the information Vanessa has.  The number is 9 as of 7:30 am."[808]

- 8:02 a.m.: Acting Secretary Tsai texted Secretary Sudders correcting his previous text, stating "FYI the number is 9 not 10.  We know [sic] have a tracker from Vanessa. Bennett told Urena 10 this morning.  The numbers from Vanessa are 9.  The 10 is wrong.  We will remove Bennett today."[809]

- 1:36 p.m.: Acting Secretary Tsai texted Secretary Urena that "I will be sending a simple letter to Superintendent Walsh relieving him of his duties/terminating him effective immediately." Secretary Sudders responded, "Just fire him.  I'll deal with any fallout."[810]

- 4:30 p.m.: Acting Secretary Tsai and Secretary Urena met with Mr. Walsh, placing him on administrative leave and ordering him to vacate the facility.

### iii.   State and local leaders' knowledge of the evolving crisis at the Soldiers' Home

Based on our interviews and review of written communications, we find that Secretary Sudders' first learned of the evolving crisis at the Soldiers' Home in her communications with Ms. Rodrigues on Saturday, March 28, 2020.  However, she received conflicting information from EOHHS staff during her follow-up inquiries based on confusion regarding the number of deaths (i.e., which deaths reflected confirmed as opposed to suspected COVID-19 veterans).[811]  Upon learning of the information that Ms. Rodrigues provided, Secretary Sudders promptly informed Secretary Urena and tasked him with investigating the situation.

We likewise find that Governor Baker and Lieutenant Governor Polito first learned of the evolving crisis at the Soldiers' Home on the evening of Sunday, March 29, after Mayor Morse raised the issue with Lieutenant Governor Polito and she in turn informed Governor Baker.  We did not identify any evidence to suggest that the information Ms. Rodrigues submitted on March 28 was provided to Governor Baker or Lieutenant Governor Polito at the time.

Secretary Urena received updates from Mr. Walsh several times a week during the last two weeks of March 2020.  He was not included in Mr. Walsh's call with the Department of Public Health epidemiologists on March 25, although he helped arrange it and he received an email summary later.[812] He explained that "[i]t calmed down my concerns a bit to have the medical expert scientist tell me the Homes are operating" under proper procedures.[813]  He also learned on the afternoon of March 25 that the Soldiers' Home was "heavy" on personal protective equipment (i.e., it had more equipment) than other

facilities.[814] Secretary Urena perceived a greater sense of urgency on March 27, when he learned of Mr. Walsh's request for National Guard assistance.  However, he did not sense that Mr. Walsh was "overwhelmed" and he perceived a "level of calmness" in the reports he was receiving.[815]

Secretary Urena acknowledged that he was informed of the decision to close 2-North and combine it with 1-North on the afternoon of Friday March 27, 2020, but was not asked for input into the decision— as he put it, "it was 'this is what we are doing.'"[816]  He indicated that Mr. Walsh did not inform him that veterans who were COVID-19 positive, those for whom results were pending, and those who were not showing symptoms would be "mixed" in 1-North and reports that this would have been a "big red flag." He was nevertheless aware that both 1-North and 2-North contained some COVID-19 positive veterans at the time the units were combined.[817]

Finally, we also note that Mayor Morse's aggressive and persistent efforts to investigate reports from social media concerning problems at the Soldiers' Home—and his decision to elevate these reports to Lieutenant Governor Polito—were critical.  Had he not done so, it would likely have taken several additional days before a command team responded to the Soldiers' Home to address the COVID-19 crisis.

5.     **Superintendent Walsh is placed on administrative leave, and an Interim Administrator takes command of the Soldiers' Home**

*i.*     **Val Liptak is appointed Interim Administrator, and a response team arrives at the facility**

Acting Secretary Tsai placed Mr. Walsh on administrative leave and ordered him to vacate the Soldiers' Home on the afternoon of March 30, 2020.  The decision to remove Mr. Walsh was made the evening before: based on the series of breakdowns at the Soldiers' Home, Secretary Sudders lost confidence in Mr. Walsh's ability to lead the facility.[818] Leadership at EOHSS, including Secretary Sudders and Acting Secretary Tsai, felt that Mr. Walsh was disconnected from the developments unfolding at the Soldiers' Home, and that he did not ask for help when it was needed.[819] Acting Secretary Tsai explained that "when you realize you don't have the right leadership in crisis, you go get the right leadership."[820]

By the time Mr. Walsh was informed of this decision, a response team organized by Secretary Sudders, Acting Secretary Tsai, and Undersecretary Mick had arrived at the facility to take command of the rapidly devolving situation.[821] These experienced healthcare executives left their regular jobs and arrived at the Soldiers' Home with less than a day's notice. Their quick decisions to triage patients, compile essential records, institute infection control measures, and send ill patients to the hospital undoubtedly helped reduce the scope of the outbreak. The key members of this response team deployed to the Soldiers Home included[822]:

- Val Liptak, Chief Executive Officer of Western Massachusetts Hospital, would serve as Acting Administrator;

- Lisa Colombo, Executive Vice Chancellor of Commonwealth Medicine, was installed as the incident command leader;

- Catherine Mick, EOHHS Undersecretary, was the EOHHS point of contact for the response team;

- Mark Sugrue, Managing Director of Clinical Delivery and Informatics Solutions at Commonwealth Medicine, was tasked with leading operations;

- Mohammad Dar, Medical Director for MassHealth, provided consulting support to the response team;

- Cheryl Poppe, Superintendent of the Soldiers' Home in Chelsea provided consulting support to the response team;

The National Guard also dramatically expanded its presence on site on March 30, "swabbing all employees and residents," with the plan to "re-swab negative individuals every 48 hours."[823] The Guard's medical units (consisting of doctors and nurses) assumed an active role in patient care in place of the scores of Soldiers' Home staff members who were sick with COVID-19. The administrators, staff, and veterans' families we spoke with were universal in their praise of the Guard's immediate, indispensable, and highly professional response at the Soldiers' Home.[824]

ii.     **The response team's observations regarding the condition of the Soldiers'**
        **Home**

One of the response team's first tasks was to assess the condition and immediate needs of the

facility and the veterans present.  Their observations are striking and alarming:

- Ms. Liptak and her team have a "collective 90-plus years of nursing," but "none of us have ever
  seen anything" like this.  Upon arrival, "we did not know what patients were in the Home or where
  they were."  She and her team put in 15-hour days trying to accurately count, assess, and cohort
  the patients.  The existing census records were "incomplete" and "disorganize[d]," at best.  It was
  "complete mayhem." There were "not assessments being made on all patients." [825]

- As Ms. Colombo put it, "In my 35 years of nursing, I have never seen such a cluster . . . When we
  asked [them] to describe census/staffing, there was nothing."[826]

- The records concerning veterans' advanced directives (i.e., whether they wished to be hospitalized,
  intubated, or necessitated) were incomplete and disorganized.[827]

- Dr. Clinton informed Ms. Liptak and Ms. Colombo that physicians working at the Soldiers' Home
  were reluctant to conduct rounds and examine veterans because of their personal risk of
  contracting COVID-19.[828]

- The 1-North unit "looked like a war zone." [829] According to Ms. Colombo, this "hot" unit had
  veterans "crammed in on top of each other," some of whom "were clearly dying." There were
  "chairs of people lined up, some were clothed, some unclothed, some were wearing masks, some
  weren't." [830]

- Ms. Colombo asked Ms. Lauziere (the Chief Nursing Officer) to explain the reasons for combining
  1-North and 2-North, but "did not get an adequate response, other than it was done because of
  staffing . . . she appeared to know it wasn't the right thing to do, but did it anyway."[831]  It appeared
  to Ms. Colombo that "they pooled [veterans] together based on dementia status instead of COVID
  status."[832]

- Based on a review of records from the previous week, Ms. Liptak concluded that the Soldiers'
  Home was badly understaffed during the previous days.  Where there should have been 4 to 5
  HPPD (healthcare provider hours per patient day), "they were not even at 1 HPPD."[833]

- Ms. Liptak observed some staff with gowns but no masks; some with only masks; and some with
  only gloves on.  Her initial assessment was that there was "no understanding of what the infection
  control guidelines were." When Ms. Liptak scheduled an interview with Ms. Gosselin (Infection
  Control nurse) to discuss the events that had transpired, Ms. Gosselin reported that Ms. Lauziere
  (Chief Nursing Officer) and Ms. Surreira (Assistant Director of Nursing) "did not want to have
  anything to do with the infection control nurse."

- Ms. Gosselin told Ms. Liptak that she "would rather be dead" than continue being at the facility;
  Ms. Liptak referred Ms. Gosselin to trauma and grief counseling.[834]

The conditions that Ms. Liptak and Ms. Colombo identified at the facility led Ms. Cumming and Ms. Cohen from the Department of Health to feel as if they had been "duped based on what had been described in prior calls [with the Soldiers' Home] as to what they were doing to manage patients and to care for them."[835]

### iii.   Additional discussions with family members regarding MOLST status

Shortly after the response team arrived at the Soldiers' Home, Ms. Colombo tasked Ms. Lauziere with confirming each veteran's MOLST status to ensure the veterans received care consistent with their advanced directives.[836]  Ms. Colombo made this request because she perceived confusion as to patients' end-of-life preferences.[837]   When asked about this process, Ms. Lauziere explained that "I believe that was when the State brought in the Command team," and "Lisa Colombo wanted calls made.  This is when I started to get sick [with COVID-19] and I was out."[838]  Explaining further, she said that "there was stuff going on" and "hospitals were saying they would not accept them, or something like that—what were we going to do if it was a full code?"[839]

The details regarding how this instruction was implemented are unclear, but troubling.  Sandy Marino, a nurse, recalled on or around April 1 or 2, 2020, she saw two other social workers in the office in the early evening, and asked what they were doing.[840]  They explained they had been instructed to call healthcare proxies for each veteran and "double-check" whether they wanted to change their MOLST status.[841]  Ms. Marino was unsure who gave the instruction, but understood from the social workers that they "were being pushed a little bit" to encourage the families to change veterans' statuses to "do not hospitalize."  Ms. Marino recalled thinking "Oh, my god."[842]

An entry in one veteran's medical record confirms this account.  The veteran's admission note from March 9, 2020 states that "he is a DNR [do-not-resuscitate] and DNI [do-not-intubate], but does want to be transferred to the hospital."[843]  But an entry from Tuesday, March 31, 2020 states: "Last evening, SS [social services] called invoked HCP [health care proxy], wife [name omitted] to go over

MOLST per direction of the CNO [Chief Nursing Officer].  The MOLST was changed to DNH [do-not-hospitalize]. . . ."[844]

We have not conducted a detailed medical review of each veteran's records to determine whether they received care that was inconsistent with previous MOLST selections, but this may be a subject of further investigation by teams evaluating whether the care provided satisfied legal standards.

### iv.      Final death toll

Given the extensive comorbidities in the elderly population of the Soldiers' Home, it is likely impossible to determine the total number of veterans who died because of the COVID-19 outbreak.  76 Soldiers' Home veterans who were COVID-19 positive died in the 11-week period between March 25, 2020 and June 12, 2020.  18 additional veterans died during this period who tested negative for COVID-19, or for whom no test was conducted.  Prior to the outbreak, approximately 2.8 veterans died each week. The only thing that we can say with certainty is that the death toll is tragic and unbearable.

# V.   ANALYSIS AND RECOMMENDATIONS

## A.   The Soldiers' Home leadership team made serious errors in responding to the COVID-19 outbreak

COVID-19 has killed over 115,000 Americans, and—in particular—has ravaged long-term care facilities across the nation.[845]   Government data indicates that at least 80 long-term care facilities in Massachusetts alone had at least 20 or more COVID-19 deaths.[846]   Even the best preparations and most careful response cannot eliminate the threat of this virus.   Thus, the presence of COVID-19 at a healthcare facility does not prove that the facility's leaders made errors.

But this reality does not mean that careful planning and administration are irrelevant. And it absolutely does not excuse a failure to plan and execute on long-standing infection control principles and to seek outside help when it is required to keep patients safe.   Indeed, the extraordinary danger of COVID-19 makes these steps all the more important.

We conclude that the leadership team at the Soldiers' Home made a number of serious errors during the COVID-19 outbreak that likely contributed to the scope and severity of the outbreak.   Our investigation has determined that Superintendent Bennett Walsh, Chief Nursing Officer Vanessa Lauziere, and Medical Director Dr. David Clinton were the primary decision-makers during this period—and that Mr. Walsh and Ms. Lauziere excluded others (including the designated Infection Control nurse, Vanessa Gosslin) from participating in critical decisions.

We have identified the following as the most serious errors during the COVID-19 response at the Soldiers' Home:

### 1.   Combining two locked dementia units containing veterans with a mix of COVID-19 statuses, and failing to ensure an appropriate standard of care on the newly combined unit

The worst decision made during the Soldiers' Home's response to COVID-19 occurred on the afternoon of Friday, March 27, 2020.   On that afternoon, Chief Nursing Officer Vanessa Lauziere decided that—because a number of staff members had called in sick for the evening shift that was about to begin—

one of the Home's two locked dementia units (2-North) would be closed and consolidated with the other (1-North).  Some of the veterans living on 2-North at the time were not there because they had dementia and were prone to wandering—instead, they were hospice patients nearing death who had been moved from the 2-South hospice unit in an effort to create isolation spaces for veterans infected with COVID-19.  These same dying veterans were then moved again, to a newly crowded and combined 1-North unit.

During our interviews, no one apart from Ms. Lauziere took responsibility for this decision.  Medical Director Dr. David Clinton, who was present at the Home on this date, asserts that he "was not involved in, or consulted" in this decision. [847]  For the reasons set out in Section IV(D)(3)(vii), above, we reject Dr. Clinton's account as not credible.  Assistant Director of Nursing Celeste Surreira claims she too was not consulted in the decision to consolidate units (although she acknowledges that she helped to implement the consolidation that afternoon).[848]  And Superintendent Bennett Walsh indicates that he was advised of the decision, and did nothing to probe or evaluate whether this dramatic step was appropriate.[849]

This decision was a catastrophe.  Staff described the move as "total pandemonium," "when hell broke loose," and "a nightmare."[850]  One staff member remembered thinking, "How can they do this because this [is] the most insane thing I ever saw in my entire life."[851]  She "felt it was like moving the concentration camp—we are moving these unknowing veterans off to die.  I will never get those images out of my mind—what we did, what was done to those veterans."[852]  Other witnesses, including the Interim Administrator brought in three days later to stabilize the situation, described the combined unit as resembling a "war zone."[853] A number of witness accounts suggest that veterans on the combined unit did not receive sufficient nursing care, hydration, or pain relief medications during the weekend of March 28 and 29.[854]

Mr. Walsh and his team implemented a decision to combine two units that each contained a mix of patients: some were COVID-19 positive; some were awaiting COVID-19 test results; some had not been tested for COVID-19; and some would later test negative for COVID-19.[855]  They took this heterogeneous group of elderly veterans, some of whom were "actively dying" from either COVID-19 or

other conditions[856] and combined them together, in close physical proximity to one another, and then failed to provide them with sufficient medical care.  Those under-resourced staff members who were present did not use proper personal protective equipment.[857]  **In short, this was the *opposite* of infection control: Mr. Walsh and his team created close to an optimal environment for the spread of COVID-19.**

Mr. Walsh and Ms. Lauziere argue that because of staffing shortages, they had no choice but to combine these units.[858]  They are incorrect. Within hours of arriving on March 30, 2020, the Commonwealth's emergency response team assessed the acuity of the patients and quickly sent many of them to hospitals and other acute-care facilities.  The same option was available to Mr. Walsh and his team.

### 2.   Failure to promptly isolate patients suspected of COVID-19 using the rooms set aside for isolation

After showing symptoms consistent with COVID-19 for weeks, and after testing negative for other conditions such as the flu or respiratory syncytial virus, Veteran 1 was tested for COVID-19 on March 17, 2020.[859]  By any reasonable measure, he represented a suspected COVID-19 case.  Indeed, the COVID-19 testing guidelines for the state laboratory at the time only authorized testing of those veterans who were suspected of having COVID-19.[860]

As of this time, the Soldiers' Home had already moved other veterans in order to set aside at least two rooms (315 and 317) for isolation, and spent time to configure a negative-pressure system to contain the virus in those rooms.[861]  Isolation of suspected and confirmed cases is required under the standard of care: VA guidance distributed to Mr. Walsh on March 6, 2020 recommended developing an isolation plan for suspected cases;[862] on March 12, 2020, the Department of Veterans' Services distributed guidance to Mr. Walsh ordering isolation of symptomatic patients;[863] and a Department of Public Health policy memorandum dated March 16, 2020 confirmed that patients with known or suspected COVID-19 infections should be isolated in single-person rooms with the doors closed.[864]

These isolation rooms were never used, nor did the Soldiers' Home's leaders take other steps to isolate suspected and confirmed COVID-19 cases.  In reality, they did almost nothing.  For example,

Veteran 1's roommates (who were not showing COVID-19 symptoms[865]) were not moved out of his room at the time he was tested—they remained present until his test came back positive, and were then moved only after spending these additional four days confined in a room with a COVID-19-positive patient who was coughing.  Moreover, numerous reports from staff confirm that Veteran 1 was not restricted to his room during this period, and instead was seen wandering around his unit, coughing and unknowingly spreading COVID-19 to others.[866]

We find that two factors—neither of which is an acceptable justification—led to the Home's failure to isolate suspected and confirmed COVID-19 cases as required under the public health guidance that the Home's leaders had received.  First, it appears that Dr. Clinton concluded that because Veteran 1 had already been moving about the unit, the whole unit should be considered contaminated.  Ms. Surreira reports that Dr. Clinton decided that "we would wait until determining his COVID status to determine the response" and "we aren't going to do anything until we have a positive test result because essentially they have all been exposed."[867]  In lay terms, they apparently concluded that the unit was a lost cause.  Moreover, the subsequent decision to partially reverse course (and move Veteran 1's roommates out) only once a test confirmed that Veteran 1 was positive illustrates the folly of this approach.

The second factor was a perception that the Home did not have enough staff to provide dedicated nurses or nursing aides to monitor veterans such as Veteran 1 (who was known to wander from his bed) if they were moved to the designated isolation unit.[868]  This, too, is an inadequate justification.  We do not find evidence that the Home was suffering substantial staff shortages as of March 17 (although within several days, it began to suffer shortages).  Most importantly, *if* there were a staff shortage that made it impossible to comply with public health guidance and isolate *one* veteran, this would have been the time for Mr. Walsh and his team to sound the alarm and seek more staff.[869]

### 3.    Delays in testing additional veterans for COVID-19

Several witnesses reported Ms. Surreira's reluctance to test Veteran 1, even though he was showing COVID-19 symptoms and was negative for flu and other respiratory conditions.[870]  And even after he was

tested on March 17, 2020, the Soldiers' Home leadership team failed to test additional veterans on the same unit who were showing COVID-19 symptoms. They waited until Veteran 1's test results came back positive, allowing the virus additional days to spread unchecked.

When the test result for Veteran 1 came back as positive at approximately 9:30 p.m. on Saturday, March 21, 2020, Dr. Clinton and Ms. Lauziere swung into action and quickly ordered the testing of five additional veterans. The Home's "24-hour nursing report" states that five test swabs were delivered to a courier at 11:00 p.m.[871] In an email sent that evening, after the first positive test result, Mr. Walsh explained that "we received the test results back on our veteran and the results are positive for covid-19 . . . We're currently are [sic] testing 5 other veterans and sending out their samples this evening for testing."[872] In an email the next morning, he acknowledged that the five additional veterans tested the evening before "were exhibiting symptoms."[873]

There is no justification for this delay, particularly where Dr. Clinton had concluded earlier—at the time Veteran 1 was tested on March 17—that the whole unit had likely been exposed to COVID-19. Instead, this delay appears to be additional evidence of the leadership team's failure to confront the reality that a number of the veterans at the Home were likely infected with COVID-19.

### 4. Delays in closing common spaces

The Soldiers' Home leadership team was inexcusably slow in taking steps to close communal areas to reduce the spread of COVID-19.

On March 13, 2020, CMS recommended that long-term care facilities close communal dining rooms and stop all group activities.[874] The Soldiers' Home did not comply with this recommendation. The main dining room was closed on March 15, but as of March 16, veterans were still permitted in common recreation rooms. Veterans were permitted to congregate in indoor smoking rooms until March 28 (a senior EOHHS official noted that these smoking rooms should have been closed "long ago.").[875] And even in heavily infected units such as 1-North, veterans were not restricted to their rooms and were permitted to congregate in common areas as late as March 27. Some of the veterans in the consolidated

unit were "bed hoppers" who roamed around the unit, impossible to contain.[876]  Congregating in confined indoor spaces presents a high risk for COVID-19 transmission, yet the Soldiers' Home leadership team failed to take basic steps to address this risk.[877]

###### 5.    Failure to stop rotation of staff among units

The leadership of the Soldiers' Home failed to prevent the rotation or "floating" of staff members from unit to unit.  This floating presents a substantial and obvious transmission risk.  Furthermore, when Secretary Urena asked about this issue, Mr. Walsh provided inaccurate information.

On March 6, 2020, the Department of Veterans' Affairs circulated guidance to Mr. Walsh recommending that long-term care facilities limit staff movement between infected and un-infected areas. We find that this guidance was never implemented, and that the Soldiers' Home made no serious effort to implement it.

On March 29, 2020, as the crisis unfolded, Secretary Urena sent a series of text messages to Mr. Walsh asking whether the staff in the two infected units were still being "floated" to other units:

> **Are the staff in the two affected units still rotating to other units? Or are they only to that unit?**
>
> **DPH is requesting that they only be to that unit.**
>
> **Is that possible?**

Mr. Walsh replied:

> **We've done that for two weeks, attempt to keep same staff on same unit**.[878]

Mr. Walsh's statement to Secretary Urena is false: during the past two weeks, staff were routinely floated between units, including units with infected veterans, and we find no evidence that Mr. Walsh or anyone else took any serious steps to stop this practice.[879]

For example, a registered nurse recalled that even after Veteran 1 tested positive, nursing aides would be scheduled to work two hours on 1-North and then directed to complete their shift on the third floor.[880]  She asked her supervisors, including Ms. Lauziere, why staff were floated between positive and negative units given the risk of spreading COVID-19.[881]  She was told "they had to work with the number

of staff they had."[882]  Another nursing aide reports that he treated Veteran 1 during a night shift on March 16-17, and then worked a shift on the 4-East unit the next evening—where he was given a written reprimand for wearing personal protective equipment while treating veterans who were vomiting and having bowel movements possibly caused by GI problems.[883]  A number of staff members who floated from unit to unit, or interacted with staff who floated from unit to unit, later tested positive for COVID-19.[884]

### 6. Inconsistent policies and practices with respect to personal protective equipment

Even taking into account evolving regulatory guidance and the potential for shortages in inventory if not carefully managed, the Soldiers' Home's approach to the use of personal protective equipment during the COVID-19 crisis was inconsistent and indeed incoherent.

Upon her arrival at the Soldiers' Home, Interim Administrator Val Liptak observed some staff with gowns but no masks; some with only masks; and some with only gloves on.  Her initial assessment was that there was "no understanding of what the infection control guidelines were."[885]  These observations are unsurprising in light of interviews with staff members who reported inconsistent policies for the use of personal protective equipment (especially masks and gowns), and that the Soldiers' Home took steps to make it more difficult to access such equipment (as of early March, dispensers were removed from units based on concerns about pilfering).  In addition, as described above, one staff member was disciplined in writing[xxiii] for using personal protective equipment while treating a sick veteran, the day after he provided care to Veteran 1.[886]

Personal protective equipment is essential to protect staff members and to protect patients from secondary transmission of bacteria and viruses, including COVID-19.  The Soldiers' Home's failure to

---

[xxiii] Some witnesses disputed whether this nursing aide was using the right protective equipment, or was using it correctly.  But in any event, issuing a written disciplinary notice from the Chief Nursing Officer on the grounds that the aide's use of the equipment was causing "anxiety" for other staff—at a time when staff were not using *enough* protective equipment—was the wrong approach.

make personal protective equipment available and to have consistent policies requiring its use endangered both veterans and the staff who provided care for them.

### 7.      Document and recordkeeping failures

When the response team arrived to take command of the Soldiers' Home on March 30, 2020, they found an organization in disarray.  Upon arrival, "we did not know what patients were in the Home or where they were."[887]  The team began work to count, assess, and cohort the patients.  The existing census records were "incomplete" and "disorganize[d]," at best.  It was "complete mayhem." There were "not assessments being made on all patients."[888]  The records concerning veterans' advanced directives (i.e., whether they wished to be hospitalized, intubated, or necessitated) were incomplete and disorganized.   As one member of the team put it, "in my 35 years of nursing, I have never seen such a cluster . . . When we asked [them] to describe census/staffing, there was nothing."[889]

The team also found that some staff members had decided not to use the Home's designated computer systems and databases for tracking admissions, the location of veterans in the facility, and other records because they found them to be inconvenient or clunky, and instead used one-off solutions such as Microsoft Office documents saved in scattered locations across the computer network.[890]

Knowing how many patients are in a facility and their medical conditions is, of course, a fundamental task in healthcare administration.  Reflecting long-standing failures of leadership, organization, and healthcare experience, the Soldiers' Home failed this basic requirement.

*        *        *

During our interviews, we explored the question whether a leader with a distinguished military background, but no experience in healthcare administration, can properly manage a long-term care facility. One common response is that as an experienced leader and manager, Mr. Walsh could lead the facility by relying on his management skills together with the specialized medical knowledge of his team members. But the facts surrounding the errors described above—and in particular, the decision to close 2-North and combine this unit with 1-North—illustrate the problem with this reasoning.  Mr. Walsh did not know what

he did not know, and he did not exercise his responsibility as a manager to run a careful and deliberative decision-making process, with input from all stakeholders.  For example, independent of the pandemic, a nursing-home administrator would understand that the notion of placing 42 veterans into a unit designed for half that number is never an acceptable solution.[891]  Moreover, if Dr. Clinton's, Ms. Lauziere's, and Ms. Surreira's accounts are credited at face value, closing 1-North was a decision made by a single nurse. It should never have happened.

**B.**    **The Department of Veterans' Services did not take steps to address substantial and long-standing concerns regarding the leadership of the Soldiers' Home**

The Department of Veterans' Services, an agency within EOHHS, has supervisory and administrative responsibility for the Soldiers' Home.[892]  We find that the Department of Veterans' Services and its leader, Secretary Urena, should have responded to a series of warning signs and concerns about the administration of the Soldiers' Home in the years and months leading up to the COVID-19 outbreak.

During the interviews we conducted for this investigation, we asked Secretary Urena and his Chief of Staff, Paul Moran, to describe their observations and impressions of Secretary Walsh's leadership of the Soldiers' Home.  Both had concerns about Mr. Walsh's management skills and his candor well prior to the COVID-19 outbreak, and both listed a number of material concerns with Mr. Walsh's performance of his responsibilities:

- Secretary Urena's view of Mr. Walsh was "one of caution . . . from the inception."[893]  He agreed with Mr. Moran's assessment that Mr. Walsh's communications skills were poor and he was neither thorough nor "forthright in his communications."[894]  As Secretary Urena put it, "everything four years prior [to the outbreak] was cryptic."[895]

- Mr. Moran told us that "I think a medical person or someone with some administrative understanding of how a facility should be administrated would have been a good idea."[896]  Mr. Moran noted that he was "less than impressed with Walsh as a 'serious' kind of leader" and he thought Mr. "Walsh was "in over his head . . . he thought the way to run the place was through the media."[897]

- Both Secretary Urena and Mr. Moran shared concerns about whether Mr. Walsh was physically present at the facility for an appropriate amount of time to do his job. As Secretary Urena put it, "both myself and Secretary Sudders told him to spend more time at the Home. His schedule would be inundated with free lunches and ways of promoting the Home."[898]  Mr. Moran agreed with these concerns, and noted that senior staff at the Home would say to him: "we don't know where

[Mr. Walsh] is."[899]   Mr. Moran confirmed that Secretary Urena "had conversations with [Mr. Walsh] about spending more time at the Home versus political engagements."[900]

- The concerns about Mr. Walsh's physical presence at the Home are consistent with broader concerns about how he conceived of his role.  When Deputy Superintendent John Crotty resigned, he told Mr. Moran in an exit interview that Mr. Walsh thought his role at the home was to be the "outside man" while Mr. Crotty was the "inside man."[901]

- Both Secretary Urena and Mr. Moran shared concerns about the substantial turnover in senior leadership at the Home.  Secretary Urena noted that "over the course of four years, his whole entire team resigned, plus two additional people who rotated positions."[902]

- They also had concerns that Mr. Walsh tried to control the flow of information in and out of the home.  At one point, Mr. Walsh asked Secretary Sudders to bar Secretary Urena from visiting the Home without giving Mr. Walsh prior notice.[903]  As Secretary Urena explained, "[y]ou need to understand that the management style of Bennett Walsh was to never have anyone else have conversations with us."[904]  On March 30, 2020, when they learned from the response team about concerns regarding veterans receiving adequate food, water, and comfort medication, "it was a total 180 of the picture of 'everything is perfect and everything is great.'"[905]

- Secretary Urena had concerns that Mr. Walsh was "withholding" information from the Board of Trustees.  He noted that Mr. Walsh's reports to the Board would "be much more like picture collages . . . rather than factual reports."[906]

- When Mr. Walsh was hired, Secretary Sudders instructed Secretary Urena to ensure that there would be a Deputy Superintendent with healthcare administration experience.[907]  But when Mr. Crotty (who was a licensed nursing home administrator) resigned from that role in June 2019, the Home went nine months with no deputy superintendent at all, including the period of the COVID-19 outbreak.[908]

- Secretary Urena arranged for an executive coach to work with Mr. Walsh based on complaints regarding "anger management." He had to extend the term of this coaching when another complaint arose about similar issues.[909]

We asked Secretary Urena to explain how he approached his oversight responsibilities given his own lack of experience in healthcare administration.  He replied that "we depend on the experts from [the Soldiers' Homes] . . . the Chief Nursing Officer and Medical Director."[910]  Yet, as noted above, Secretary Urena felt that Mr. Walsh's "management style . . . was to never have anyone else have conversations with us."[911]

One resource that should have been available to bring healthcare oversight experience to bear was the Executive Director of Veterans' Homes.  In 2016, the Legislature created this role within the Department of Veterans' Services with reporting and oversite responsibilities for the Soldiers' Home:

> The commissioner of veterans' services shall appoint an executive director of veterans' homes and housing who shall have: (i) at least 5 years of management, healthcare experience and (ii) military or other experience working with veterans . . . The office shall: (i) coordinate and oversee implementation and enforcement of laws, regulations and policies relative to the veterans' homes and other housing for veterans; and (ii) investigate and make recommendations on best practices for providing housing for veterans.[912]

But this role was never filled because Secretary Urena determined that the Legislature did not appropriate sufficient funds to fulfill this mandate.

The bottom line is that the leadership of the Department of Veterans' Services—charged by law with oversight responsibilities—had material concerns about Mr. Walsh's candor, competence, and performance for years prior to the COVID-19 outbreak. Likewise, while they indicated that they relied on the medical and nursing staff at the Home to help carry out their oversite roles, they understood that Mr. Walsh's approach was to limit the flow of information up to the Department from those who reported to him. They also knew that when Mr. Crotty—the "inside man" to Mr. Walsh as the "outside man"—resigned, and his role was not filled for nine months leading up to and including the COVID-19 outbreak, the Home was left with a void of leadership.

Accordingly, we find that the Department of Veterans' Services did not take steps to address substantial and long-standing concerns regarding the leadership of the Soldiers' Home.

## C.   Although Mr. Walsh reported other information that was inaccurate and incomplete, we have not identified any material violations of the reporting requirements concerning COVID-19 test results and deaths

### 1.   Inaccurate and incomplete information

Mr. Walsh's communications with the Department of Veterans' Services and EOHHS omitted important information, and at times, contained affirmatively inaccurate information. For example, Mr. Walsh stated that the first veteran who had tested positive for COVID-19 had been "isolated" in his room in an informal report to the Department of Veterans' Services and EOHHS on the evening of March 21, and likewise in the March 22 Critical Incident Report.[913] This was, at best, incomplete. Mr. Walsh's reports did not explain that the Soldiers' Home only took steps to "isolate" this veteran *after* he tested positive. He did not explain (1) that in his view the Home did not have adequate staffing to use the isolation rooms

that had been set up on the third floor; (2) that the positive veteran had dementia and continued to move around 1-North even after his positive test; or (3) that the veteran did not have the cognitive ability to keep a mask on.[xxiv]   Acting Secretary Tsai explained that, had Mr. Walsh informed EOHHS that the Soldiers' Home could not staff its isolation areas, EOHHS could have "done an assessment of the available options" and "handled" emergency staffing for the Soldiers' Home.[914]

In deciding to combine the 2-North and 1-North units, Mr. Walsh purportedly relied on his understanding that public health authorities approved "cohorting" of similarly situated patients.[915]   He asserted during an interview with the McDermott team that the Department of Public Health "approved what we were doing" in this regard.[916]   This is not so: Mr. Walsh acknowledges that he did not inform the Department of Public Health that he would be combining two COVID-19 heterogeneous units, and we find that what happened on 1-North is entirely inconsistent with any definition of "cohorting."  Likewise, Ms. Lauziere confirmed that the decision to combine the units was not based on advice from the Department of Public Health.  After learning of the conditions that Ms. Liptak and Ms. Colombo identified at the facility on March 30, Ms. Cumming and Ms. Cohen (the Department of Health team with whom the Soldiers' Home team spoke on March 25) felt as if they had been "duped based on what had been described in prior calls [with the Soldiers' Home] as to what they were doing to manage patients and to care for them."[917]

Mr. Walsh continued to present misleading and incomplete information over the weekend of March 28-29.  In response to Secretary Urena's text message on March 29 asking if the staff in the two infected units (presumably 1-North and 2-North) were still being floated to other units, Mr. Walsh inaccurately replied, "We've done that for two weeks, attempt to keep same staff on same unit."[918]  As discussed above, this was not true.

---

[xxiv] As discussed above, Mr. Walsh and his team provided details about the struggles with keeping Veteran 1 in his room during a call with the Department of Public Health on March 25, 2020.

## 2.    No material violations of reporting requirements

We have not identified any instances where the Soldiers' Home leadership committed material violations of the reporting requirements concerning COVID-19 test results and deaths.  Indeed, much of the confusion on this issue appears to be the result of EOHHS's and the Department of Veterans' Services' evolving reporting requirements including a policy (during the relevant time period) that only deceased veterans who were confirmed to be COVID-19 positive (rather than those awaiting test results) were to be included in certain death tolls.  Thus, when the Home reported the number of "deaths" through March 29, this total—consistent with the requirements—referred to the number of deaths of veterans who had tested positive for COVID-19 as of the time of the report.  However, it appears that leaders in the Department of Veterans' Services and EOHHS misunderstood these reports, thinking that they reflected the total death toll including veterans who were symptomatic and awaiting test results.

Prior to March 24, the Soldiers' Home had no requirement to report instances of suspected COVID-19 cases (or pending test results) to the Department of Veterans' Services or EOHHS, but instead was only required to report confirmed cases (using a Critical Incident Report).[919]  The Soldiers' Home met this reporting requirement by sending the Critical Incident Report on March 22 (the result came back positive late the previous evening, a Saturday) about the Soldiers' Home's first positive COVID-19 case.  Indeed, the Home provided informal notification to senior leaders within hours of the test result, and volunteered that an additional five suspected cases were being tested.

Between March 24 and 29, EOHHS implemented a daily tracker and required each agency head to designate who would be responsible for collecting and reporting daily updates to share with EOHHS.  The Soldiers' Home selected its legal counsel, Mark Yankopoulos, to be responsible for the daily COVID-19 reporting.  Here again, the only required reporting in EOHHS' COVID-19 daily tracker were *confirmed* COVID-19 cases.  Indeed, on March 27, Coleen Arons from EOHHS confirmed with Mr. Yankopoulos that EOHHS was only collecting confirmed, not pending, cases.[920]  Mr. Yankopoulos met this daily reporting requirement by reporting the number of confirmed cases—both for veterans and staff—each

day. Per Ms. Arons' instructions, Mr. Yankopoulos did not report deaths of veterans whose COVID-19 status was still pending test results.[921]

On March 29, Secretary Urena sent a new reporting form to Mr. Walsh and Ms. Poppe that would go into effect on Monday, March 30.[922]  **For the first time, the Department of Veterans' Services requested daily reporting of the number of pending COVID-19 cases (i.e., veterans awaiting their test results), the number of patients recovered from COVID-19, and the number of deaths associated with pending or confirmed COVID-19 cases.**  But again, the first such report was not due until March 30.

On March 29, Mr. Yankopoulos spoke with the Department of Veterans' Services' legal counsel, Mr. Ivimey, and discussed the "bottom line" number of how many veterans had died in recent days.[923]  Mr. Yankopoulos reported—accurately—that by this time four veterans had died who were known to be COVID-19 positive, and that "it was looking like" there were four additional veterans who had died and whose COVID-19 test results were pending.  Mr. Ivimey perceived that these numbers were "not solid at this time."[924]   During the March 29 call at 7:00 p.m. with Secretary Urena, Acting Secretary Tsai, Undersecretary Mick, Ms. Rego, Ms. Starr, Ms. Arons, Mr. Moran, and Mr. Ivimey, a question arose about the death toll at the Soldiers' Home, and Secretary Urena reported the number of confirmed COVID-19 cases that the Soldiers' Home had reported per EOHHS' reporting requirements.  Inexplicably, Mr. Ivimey did not interject to share the information he learned earlier that day from Mr. Yankopoulos, or that there might be reason to doubt the numbers that Secretary Urena and Acting Secretary Tsai shared.  He later explained that he did not do so because he perceived that there was "not an adequate level of certainty" in the information that Mr. Yankopoulos shared with him.[925]

Confusion about the correct death toll at the Soldiers' Home continued to escalate over the next few hours, leading up to the 9:30 p.m. call with Secretary Sudders during which Ms. Lauziere confirmed that the death toll was eight veterans, not the two veterans that Secretary Urena had reported during the 7:00 p.m. call.  Mr. Walsh texted Mr. Yankopoulos following the 9:30 p.m. call that the issue was "not

anyone's fault, just a communications issue."[926]  We agree with Mr. Walsh that there was a communications issue that evening.  We have not identified any material violations of the reporting requirements committed by the Soldiers' Home that caused this communications breakdown.

In concluding that there was no material violation of the reporting requirements, we do not mean to suggest that all involved exercised good judgment.  For example, as the death toll of patients with pending or confirmed COVID-19 results rapidly climbed from one (as of the morning of Friday, March 27) to eight (by mid-day on Sunday, March 28), Mr. Walsh would have been wise to bring this to Secretary Urena's attention.  There *was* a rapidly escalating crisis situation, and Mr. Walsh does not appear to have appreciated its urgency and certainly could have done more to alert others.  Likewise, Mr. Ivimey exercised bad judgment in failing to mention to his agency client—Secretary Urena— and Acting Secretary Tsai that there was at least some reason to think that Mayor Morse was correct that there had been eight deaths at the Home.  Finally, given the multiple-day lag in getting results of COVID-19 tests during this time period, the Department of Veterans' Services and EOHHS would have been well served to require notification about deaths of suspected COVID-19 patients far earlier than they did.

## D.    The Soldiers' Home should not be exempt from the requirements for licensing and inspection that apply to other long-term care facilities in Massachusetts

Our investigation elicited a number of perspectives and answers to the questions whether the Soldiers' Home should be licensed as a long-term care and skilled-nursing facility and subject to the same surveys and inspections as other such facilities, and whether its leader should be a licensed nursing home administrator and have experience in healthcare administration.

Several witnesses pointed to the example of Cheryl Poppe, Superintendent of the Soldiers' Home at Chelsea.  By all accounts, Ms. Poppe is a highly competent manager who does an exceptional job in her role, even though she is not licensed as a nursing home administrator.  Likewise, others noted that in their view, the Superintendent need not have healthcare experience so long as she or he is a strong leader and has a team that has such experience.[927]

Our recommendation and answers to these questions stem from a simple premise: the veterans who served our country and spend the last years of their lives at the Soldiers' Home deserve—at a *minimum*—the same standards and protections as residents at private long-term care and nursing facilities. This is not to say that someone cannot do a good job as Superintendent without being licensed—but licensure in this profession (like other professions for which Massachusetts requires licensure) is one way to help ensure a baseline of competence. The same is true as to the Commonwealth's licensing and inspection (survey) regime for long-term care facilities: the Commonwealths should conduct the same surveys at the Soldiers' Homes as it does at private nursing homes. Again, we can think of no reason or explanation why the veterans at the Soldiers' Home should not receive the same protections as residents at private facilities.

Accordingly, we recommend that future Superintendents of the Soldiers' Home should be licensed nursing home administrators with substantial healthcare experience, and that the facility should comply with the Department of Public Health's licensing and inspection regime.

### E. Staffing, technology, and physical plant improvements would help protect the veterans at the Soldiers' Home

The Soldiers' Home, under the interim leadership of Acting Secretary Tsai and Interim Administrator Val Liptak, has already begun plans to implement physical plant upgrades, new infection control protocols, and reduce the number of beds available in the facility in order to increase staffing levels and square-footage available for each veteran.[928] These recommendations are consistent with our findings, and will ameliorate many of the issues identified in this report. In addition to these steps, we offer the following recommendations based on our interviews with staff and subject-matter experts conducted during our investigation:

- **Governance and oversight improvements**. In 2016, the Legislature passed a statute requiring that the Department of Veterans' Services employ an experienced healthcare leader to help oversee the two Soldiers' Homes in the Commonwealth. Mass. Gen. Laws ch. 115A, § 12. The Department has not complied with this mandate—but should act immediately to fill this role. Likewise, we respectfully suggest that the Legislature act to ensure that funding is in place to carry out its 2017 mandate;

- **At least two Trustees should have relevant clinical or healthcare administration experience.** The Legislature has empowered the Soldiers' Home's Board of Trustees with a broad range of authority to appoint the Home's leaders and supervise the its administration and operations. We recommend that either through an exercise of the Governor's appointing authority or a change in law, at least two Trustees should have clinical or healthcare administration experience, preferably with a focus on long-term care. To be clear, the Board is a volunteer group that meets periodically; no matter its composition, it cannot replace the day-to-day professional management by the Home's clinical staff or the role of the Executive Director of Veterans' Homes within the Department of Veterans' Services. Nonetheless, healthcare experience will help the Board better exercise its oversight roles: it will help Trustee ask better questions, spot issues, and understand and evaluate the performance of the Superintendent and other appointed leaders at the Home.

- **Implement a permanent staffing schedule, with flexibility to staff based on patient acuity.** The Moakley study released in August 2019 recommended that the Soldiers' Home transition to a permanent staffing schedule. The Soldiers' Home in Chelsea completed a similar process several years ago. A permanent schedule provides staff with greater stability and predictability, while reducing overtime (including mandatory overtime). Similarly, a scheduling approach that is adaptable to ensure the areas of the building with the greatest acuity (patient need) will help ensure quality of care without substantial additions in staffing costs;

- **Implement an Electronic Health Record system.** During an interview with Mark Bowman (President of the National Association of State Veteran Homes), Mr. Bowman explained that the VA makes available substantial funds (in the form of "construction grants") to convert state veterans' homes to electronic medical records systems. He indicated that he would be "surprised" to find that any veterans' homes still operate with paper medical records.[929] Unfortunately, the Soldiers' Home in Holyoke is such a facility. Conversion to an Electronic Health Records system has been in discussion for years—including during Mr. Barabani's tenure as Superintendent and during the period when Ms. Poppe served as Interim Administrator in 2016. Nonetheless, as of the time of the COVID-19 outbreak, we have not identified any substantial progress toward implementation. This should be a priority, especially in light of the documentation and record-keeping problems identified in the wake of the COVID-19 outbreak;

- **Hire a designated occupational health nurse.** One of the most substantial challenges that the Soldiers' Home faced during the COVID-19 crisis was ensuring that staff members complied with evolving guidance on what to do when they became sick, and managing the staffing shortages that developed as a result of dozens of staff becoming infected with COVID-19. Part of the problem was disseminating policies, enforcing them, tracking which staff were sick, and determining when they should return to work. An occupational health function is standard at large healthcare facilities, and we recommend that the Soldiers' Home implement such a role to help protect staff and monitor staffing levels in the event of another infectious disease outbreak;

- **Better education and training.** The Soldiers' Home's existing written policies concerning infection control appear to be generally consistent with industry standards.[930] There is a substantial deficiency, however, in training and education to ensure compliance with these policies, especially given the high levels of turnover in the nursing staff in recent years. The Soldiers' Home would benefit from an expanded and professionalized staff training program;

- **Efforts to improve labor relations.**  Some degree of tension—and healthy debate—between labor and management is inevitable.  However, our interviews with labor and management suggest that the relationship at the Soldiers' Home has been remarkably acrimonious for years, and that these tensions increased under Mr. Walsh's tenure.  We note, for example, Mr. Walsh's attempt to hire a Deputy Administrator who boasted on her resumé of having of being a "union buster," [931] and his remarkable suggestion on the evening of March 28, 2020—in response to concerns about the rapidly increasing death toll, as COVID-19 spread across the patients and staff—that union members were responsible for the problems because they were calling in sick.[932] The unions too will need to make compromises, particularly with respect to implementation of a permanent schedule with flexibility to address patient acuity.  Leadership on both sides must strive to rebuild a productive working relationship.

# VI.   CONCLUSION

It is possible—perhaps even likely—that even if the leadership of the Soldiers' Home in Holyoke had done everything right, and administered the Home consistent with public health guidance and long-standing infection control principles, COVID-19 would have nonetheless infected and event potentially claimed the lives of some veterans residing at the Home.

However, as set out above, the Soldiers' Home leadership team did *not* do everything right—in fact, they made substantial errors in preparing for and responding to COVID-19.  We conclude that these errors likely contributed to the scope of the outbreak, and its horrific toll.  Likewise, we conclude that as a result of these errors, the Soldiers' Home fell short of its mission to provide "care with honor and dignity."

In reaching these conclusions, we neither discount nor overlook the efforts of the front-line staff at the Home during the weeks of the COVID-19 outbreak.  Caring for senior citizens—and especially those with cognitive deficits—is always demanding, underappreciated, and vital work.  It was far more difficult still in the midst of a pandemic, and without competent leadership to manage the crisis.  The nurses, nursing aides, social workers, maintenance staff, and others caring for veterans at the Home during this difficult period will never forget the experience.  Indeed, many suffered both physically from the effects of the virus and mentally from the stress and trauma of what they witnessed in March 2020.  The administration of the Soldiers' Home failed them too.

Our principal task in conducting this investigation was determining what happened, and why. The legal and other consequences of these facts will be left to other state and federal agencies to consider as they complete their own investigations.

The Soldiers' Home in Holyoke has a proud history of serving people who have given so much for this country. The tragic events described in this report cry out for reform, and it has already begun. We hope that the process of rebuilding the Home's legacy will receive full support from the Commonwealth's political leaders, so that veterans will once again be assured of receiving the high-quality care they so richly deserve.

Respectfully submitted,

Mark W. Pearlstein

*On behalf of the Investigation Team:*

Mark W. Pearlstein
Matthew L. Knowles
Elizabeth Rodd
Greer Griffith
Natasha L. Dobrott
Jeff York
Adam J. Camiel

MCDERMOTT WILL & EMERY LLP[xxv]
200 Clarendon Street, 58th Floor
Boston, Massachusetts 02116
Email:   soldiershome@mwe.com

June 23, 2020

---

[xxv] Ms. Rodd and Ms. Griffith are admitted in other jurisdictions, and their work on this investigation was supervised by principals of the firm who are members of the Massachusetts bar.

## VII.   TABLE OF INTERVIEWS CONDUCTED

| Witness | Position / Role | Date(s) of Interview(s) |
| --- | --- | --- |
| Ablordeppey, Kwesi | Nursing Assistant I | April 7, 2020 |
| Baker, Charlie | Governor of Massachusetts | May 19, 2020 |
| Barabani, Paul | Former Superintendent, Soldiers' Home in Holyoke | April 28, 2020 |
| Bartlett, Colleen | Licensed Practical Nurse II | April 23, 2020 |
| Bartscht, Karl | Expert / Consultant (former nursing-home administrator), BRG | June 18, 2020 |
| Beaudette, Laurie | Family Member | May 6, 2020 |
| Bergeron, Mary | Licensed Practical Nurse II | May 1, 2020 |
| Bombredi, Cory | SEIU Local 888 Internal Organizer | April 7, 2020 |
| Boronski, Emily | Registered Nurse II | May 21, 2020 |
| Bowman, Mark | President, National Association of State Veterans Homes (NASVH) | May 6, 2020 |
| Cavalier, David | Owner of Palmer Healthcare | April 2, 2020 |
| Chevalier, Wendy | Recreational Therapist II | April 20, 2020 |
| Clark, Caitlin | Licensed Practical Nurse II | April 28, 2020 |
| Clinton, David | M.D., Medical Director, Soldiers' Home in Holyoke | April 21, 2020 |
| Cohen, Joyce | Department of Public Health Epidemiologist, Influenza Coordinator | May 8, 2020 |
| Colombo, Lisa | DNP, MHA, RN, Executive Vice Chancellor of Commonwealth Medicine (Command Lead) | April 13, 2020 |
| Cormier, Cindy | Licensed Practical Nurse II | May 5, 2020 |
| Corridan, Brian | Former Board of Trustees member | April 14, 2020 |
| Coughlin, Denise | Licensed Practical Nurse II | May 22, 2020 |
| Croteau, Colleen | Family Member | April 16, 2020 |
| Crotty, John | Former Deputy Superintendent, Soldiers' Home in Holyoke | June 12, 2020 |
| Cumming, Melissa | Department of Public Health Epidemiologist Antibiotic Resistance and Hemovigilance Coordinator, Bureau of Infectious Disease and Laboratory Sciences | May 8, 2020 |

| Witness | Position / Role | Date(s) of Interview(s) |
| --- | --- | --- |
| Davila, Cynthia | Nursing Assistant I | April 27, 2020 |
| Digris, Jackie | Registered Nurse II | April 29, 2020 |
| Driscoll, Eileen | Family Member | May 7, 2020 |
| Dupont, Christopher | Soldiers' Home in Holyoke Board of Trustees member | April 13, 2020 |
| Feyre, Margaret | Recreation Program Coordinator III | April 24, 2020 |
| Foley, Patti | Training Program Coordinator I | May 27, 2020 |
| Forrant, Carrie | Social Worker I | April 27, 2020 |
| Fowler, Robyn | Registered Nurse IV, Veteran Care Coordinator | April 30, 2020 |
| Fox, Andrea | RN, Associate Director, Massachusetts Nurses Association Division of Labor Action | April 15, 2020 |
| Gauthier, Rachel | Recreational Therapist I | April 7, 2020 |
| Gentile, Sherrie | Nursing Assistant I | April 22, 2020 |
| Goff, Roland | Director of Strategic Campaigns, Massachusetts Nurses Association | April 15, 2020 |
| Gosselin, Vanessa | RN, Infection Prevention/Clinical Nursing Coordinator | April 16, 2020 |
| Green, Shelly | Family member | May 8, 2020 |
| Gregersen, Eileen | Licensed Practical Nurse II | April 24, 2020 |
| Gridley, Brandy | Food Service Supervisor II | April 29, 2020 |
| Gustafson, Terri | Social Worker I | April 29, 2020 |
| Ivimey, Stuart | Department of Veterans' Services General Counsel | June 4, 2020 |
| James, Melissa | Nursing Assistant III | April 20, 2020 |
| Jourdain, Kevin | Soldiers' Home in Holyoke Board of Trustees Chairman | April 10, 2020 |
| Kenney, Susan | Family member | May 4, 2020 |
| King, Theresa | Licensed Practical Nurse II | April 9, 2020 |
| Korsen, Lindsay | Nursing Assistant I | April 24, 2020 |
| Krok, Jeffrey | EOHHS Labor Relations Specialist  (Springfield Office) | April 16, 2020 |
| Lacombe, Lynn | Licensed Practical Nurse II | April 24, 2020 |

| Witness | Position / Role | Date(s) of Interview(s) |
| --- | --- | --- |
| Lacoste, Cindy | Soldiers' Home in Holyoke Board of Trustees member | April 13, 2020 |
| Laplante, David | Former Deputy Superintendent, Soldiers' Home in Holyoke | May 4, 2020<br>June 4, 2020 |
| Lariviere, Linda | Registered Nurse III, Minimum Data Set Coordinator | May 15, 2020 |
| Lauziere, Vanessa | MSN, Soldiers' Home in Holyoke Chief Nursing Officer | May 14, 2020 |
| Lindsay, Amber | Nursing Assistant I | May 4, 2020 |
| Lingenberg, Thomas | Building Maintenance Supervisor I | May 5, 2020 |
| Liptak, Valenda | RN (Command Leadership Administrator; CEO of Western MA Hospital; Acting Superintendent) | April 9, 2020<br>April 21, 2020 |
| Lopez, Cesar | Soldiers' Home in Holyoke Board of Trustees member | April 10, 2020 |
| Maladrinos, Cheryl | Family Member | May 12, 2020 |
| Mancini, Donna | Nursing Assistant III | May 4, 2020 |
| Marino, Sandy | Registered Nurse IV, Veteran Care Coordinator | May 6, 2020 |
| Mass, Isaac | Board of Trustees Member | May 18, 2020 |
| Mick, Catherine | Undersecretary of Human Services | April 2, 2020<br>May 30, 2020 |
| Miller, Joan | Registered Nurse II | April 22, 2020 |
| Moran, Paul | Department of Veterans' Services Chief of Staff | May 26, 2020 |
| Morse, Alex | Mayor of Holyoke | April 3, 2020 |
| Murphy-Tapanes, Michaelena | Family Member | May 8, 2020 |
| Nadel, Ronald | M.D., Dermatologist, former Soldiers' Home provider | April 7, 2020 |
| O'Connor, Tricia | Canteen Worker I | April 20, 2020 |
| Olybrych, Carrie | Licensed Practical Nurse II | April 28, 2020 |
| Orzechowski, Jillian | Social Worker I | April 27, 2020 |
| Ostrander, Carmen | Soldiers' Home in Holyoke Board of Trustees member | April 13, 2020 |
| Paradis, John | Former Deputy Superintendent, Soldiers' Home in Holyoke | April 20, 2020 |

| Witness | Position / Role | Date(s) of Interview(s) |
|---|---|---|
| Patenaude, Ronald | Assistant Director Labor Action, Massachusetts Nurses Association) and former SEIU Local 888 Representative | April 9, 2020 |
| Polito, Karyn | Lieutenant Governor of Massachusetts | May 21, 2020 |
| Poppe, Cheryl | Superintendent, Soldiers' Home in Chelsea | April 30, 2020 June 8, 2020 |
| Proietti, Angelo | Food Service Supervisor I | May 26, 2020 |
| Quersher, Suzanne | EOHHS Director of Labor Relations | April 17, 2020 |
| Ramirez, Joseph | Nursing Assistant I | April 8, 2020 |
| Regensburger, Michael & Susan | Family Member | May 7, 2020 |
| Rivera, Carmen | Nursing Assistant I | April 8, 2020 |
| Rivers, Thalia | Nursing Assistant I | April 21, 2020 |
| Rivers, Nicole | Associate Director, Center for Public Management, Suffolk University | April 28, 2020 |
| Rodrigues, Brenda | President of SEIU Local 888 | April 6, 2020 |
| Rodriguez, Luis | Storekeeper II, Central Supply | April 20, 2020 |
| Santana, Doris | Nursing Assistant I | April 23, 2020 |
| Saykin, Erin | Nursing Assistant I | April 10, 2020 |
| Scoble, Erika | Administrative Secretary I | May 29, 2020 |
| Serra, Sheila | Dietician III | May 18, 2020 |
| Stafford, Elisia | Nursing Assistant I | April 28, 2020 |
| Suarez, Ulises | Launderer I | May 18, 2020 |
| Sudders, Marylou | Secretary of EOHHS; Head of COVID-19 Command Center | May 28, 2020 June 7, 2020 |
| Sullivan, Patricia | Nursing Assistant I | April 21, 2020 |
| Surreira, Celeste | Assistant Director of Nursing | April 17, 2020 May 21, 2020 |
| Szczur, Kim | Clerk III (Scheduler) | May 8, 2020 |
| Taft, Anne | Registered Nurse IV | April 30, 2020 |
| Tsai, Daniel | Acting Secretary of EOHHS | May 27, 2020 |
| Tucker, Lindsey | Associate Commissioner, Department of Public Health | April 27, 2020 |

| Witness | Position / Role | Date(s) of Interview(s) |
| --- | --- | --- |
| Turgeon, Cheryl | Family Member | April 9, 2020 |
| Twining, Roberta | Family Member | April 13, 2020 |
| Urena, Francisco | Secretary of the Department of Veterans' Services | May 28, 2020<br>June 5, 2020 |
| Walsh, Bennett | Superintendent, Soldiers' Home in Holyoke | April 3, 2020<br>April 6, 2020<br>June 1, 2020 |
| Weber, Kristin | Recreational Therapist I | April 30, 2020 |
| Yankopoulos, Mark | Agency Counsel, Soldiers' Home in Holyoke | April 16, 2020<br>June 5, 2020 |

# VIII.   REFERENCES

[1] Nancy Asiamah, *81 Holyoke Soldiers' Home veterans recover from COVID-19 as cases continue to drop*, 22 WWLP (June 17, 2020, 10:04 PM (EST)), https://www.wwlp.com/news/local-news/hampden-county/81-holyoke-soldiers-home-veterans-recover-from-covid-19-as-cases-continue-to-drop/.

[2] Robert Weisman and Rebecca Ostriker, *For the first time, state divulges death toll by nursing home, and more than 80 have 20 or more COVID-19 deaths*, BOSTON GLOBE (May 27, 2020, 9:18 PM (EST)).

[3]  Interview of Bennett Walsh, Soldiers' Home Superintendent (April 3, 2020).

[4] Interview of Mary Bergeron, Licensed Practical Nurse II (May 1, 2020).

[5] Interview of Kristin Weber, Recreational Therapist I (April 30, 2020).

[6] Interview of Carrie Forrant, Social Worker I (April 27, 2020).

[7] Interview of Anne Taft, Registered Nurse IV (April 30, 2020).

[8] Interview of Valenda Liptak, Soldiers' Home Interim Administrator (April 9, 2020).

[9] Interview of Carrie Forrant, Social Worker I (April 27, 2020).

[10] *Id.*

[11] Interview of Luis Rodriguez, Storekeeper II (April 22, 2020).

[12] Email from Jeremey Meade to Soldiers' Home Staff (March 28, 2020 6:43 PM (EST)).

[13] Copy of EOHHS Confirmed COVID-19 Daily Case Tracker, March 24, 2020 (REVPROB0028-00007435).

[14] Interview of Vanessa Lauziere, Soldiers' Home Chief Nursing Officer (May 14, 2020).

[15] Interview of Jill Orzechowski, Social Worker I (April 27, 2020).

[16] Interview of Mary Bergeron, Licensed Practical Nurse II (May 1, 2020); Interview of Carrie Forrant, Social Worker I (April 27, 2020).

[17] Interview of Carrie Forrant, Social Worker I (April 27, 2020).

[18] Interview of Lisa Colombo, Soldiers' Home Incident Command Lead (April 13, 2020).

[19] *Id.*

[20] Interview of Sandy Marino, Registered Nurse IV (May 6, 2020); Interview of Cindy Cormier, Licensed Practical Nurse II (May 5, 2020).

[21] Interview of Sandy Marino, Registered Nurse IV (May 6, 2020); Soldiers' Home Resident Profile for Veteran 36 (GOV0067423).

[22] Interview of Dr. David Clinton, Soldiers' Home Medical Director (April 21, 2020).

[23] Interviews of Celeste Surreira, Soldiers' Home Assistant Director of Nursing (April 17, 2020 and May 19, 2020); Interview of Vanessa Gosselin, Soldiers' Home Infection Control Nurse (April 16, 2020).

[24] Interview of Bennett Walsh, Soldiers' Home Superintendent (June 1, 2020).

[25] *Id.*

[26] Interview of Vanessa Lauziere, Soldiers' Home Chief Nursing Officer (May 14, 2020); Interviews of Bennett Walsh, Soldiers' Home Superintendent (April 6, 2020 and June 1, 2020).

[27] Interview of Valenda Liptak, Soldiers' Home Interim Administrator (April 9, 2020).

[28] Interview of Mary Bergeron, Licensed Practical Nurse II (April 23, 2020); Interview of Lindsay Korsen, Nursing Assistant I (April 24, 2020).

[29] *See, e.g., 3/10/2020: Lab Advisory: Updated Guidance on Testing Persons for Coronavirus Disease 2019 (COVID-19),* Centers for Disease Control and Prevention (March 10, 2020).

[30] Interview of Bennett Walsh, Soldiers' Home Superintendent (June 1, 2020)

[31] Interview of Cindy Cormier, Licensed Practical Nurse II (May 5, 2020).

[32] *See, e.g.,* Interview of Bennett Walsh, Soldiers' Home Superintendent (June 1, 2020).

[33] Interview of Francisco Urena, Secretary of the Department of Veterans' Services (June 5, 2020).

[34] Carmen Rivera, Nursing Assistant I (April 8, 2020); Interview of Lindsay Korsen, Nursing Assistant I (April 24, 2020).

[35] Soldiers' Home 24-Hour Nursing Report, dated March 21, 2020 (REVPROB0028-00002251).

[36] Interview of Brandy Gridley, Food Service Supervisor II (April 29, 2020).

[37] *Id.*

[38] Interview of Melissa Cumming, Department of Public Health Epidemiologist (May 8, 2020) (citing Mohammad Dar, Medical Director, MassHealth).

[39] Interview of Sheila Serra, Dietician III (May 18, 2020); Interview of Cheryl Poppe, Soldiers' Home in Chelsea Superintendent (April 30, 2020).

[40] Interview of Patricia Sullivan, Nursing Assistant I (April 21, 2020); Interview of Lindsay Korsen, Nursing Assistant I (April 24, 2020).

[41] Text Message from Secretary Urena to Bennett Walsh (March 29, 2020 12:16 PM (EST) (GOV0051814).

[42] Text Message from Bennett Walsh to Secretary Urena (March 29, 2020 1:30 PM (EST)) (GOV0051814).

[43] Interview of Emily Boronski, Registered Nurse II (May 21, 2020).

[44] Email from Kwesi Ablordeppey to Bennett Walsh et al. (March 24, 2020 8:29 PM (EST)) (REVPROB0028-00007765).

[45] *See, e.g.* Interview of Jackie Digris, Registered Nurse II (April 29, 2020) (worked on 2-South and 2-West); Interview of Amber Lindsay, Nursing Assistant 1 (May 4, 2020) (worked on 1 and 2-North); Interview of Donna Mancini. Nursing Assistant III (May 4, 2020) (worked on 1 and 2-North and in the cafeteria); Interview of Joseph Ramirez, Nursing Assistant I (April 8, 2020); Interview of Erin Saykin, Nursing Assistant I (April 10, 2020) (floated between units on the first and second floors).

[46] Interview of Valenda Liptak, Soldiers' Home Interim Administrator (April 9, 2020).

[47] *Id.*

[48] Interview of Cheryl Poppe, Soldiers' Home in Chelsea Superintendent (June 8, 2020).

[49] Nancy Asiamah, *81 Holyoke Soldiers' Home veterans recover from Covid-19 as cases continue to drop,* WWLP (June 17, 2020 10:04 PM (EST)), *available at* https://www.wwlp.com/news/local-news/hampden-county/81-holyoke-soldiers-home-veterans-recover-from-covid-19-as-cases-continue-to-drop/ (June 17, 2020).

[50] Interview of Valenda Liptak, Soldiers' Home Interim Administrator (April 9, 2020).

[51] *Id.*

[52] Interview of Valenda Liptak, Soldiers' Home Interim Administrator (April 9, 2020); Interview of Lisa Colombo, Soldiers' Home Incident Command Lead (April 13, 2020).

[53] Interview of Lisa Colombo, Soldiers' Home Incident Command Lead (April 13, 2020).

[54] Email to McDermott from Sharon Boyle, General Counsel of EOHHS (June 15, 2020)

[55] Interview of Bennett Walsh, Soldiers' Home Superintendent (April 3, 2020).

[56] *Id.*

[57] Interview of John Crotty, Former Soldiers' Home Deputy Superintendent (June 12, 2020); Interview of Paul Moran, Department of Veterans' Services Chief of Staff (May 26, 2020).

[58] Interview of Paul Moran, Department of Veterans' Services Chief of Staff (May 26, 2020).

[59] Interview of Paul Moran, Department of Veterans' Services Chief of Staff (May 26, 2020); Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020); Email from Paul Moran to Secretary Urena and Anthony Preston (March 22, 2020 12:00 a.m. (EST)) (GOV0045633).

[60] Interview of Paul Moran, Department of Veterans' Services Chief of Staff (May 26, 2020).

[61] Interview of Paul Moran, Department of Veterans' Services Chief of Staff (May 26, 2020); Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020).

[62] Copy of EOHHS Confirmed COVID-19 Daily Case Tracker, March 24, 2020 (REVPROB0028-00007435).

[63] *See, e.g.,* Jeanette DeForge, *Coronavirus: State inspector general began investigation into Holyoke Soldiers' Home weeks before residents were infected with COVID-10* (April 22, 2020), *available at* https://www.masslive.com/news/2020/04/coronavirus-state-inspector-general-began-investigation-into-holyoke-soldiers-home-weeks-before-residents-infected-with-covid-19.html.

[64] Chapter 475, Session Laws of 1946, Section 1.

[65] Holyoke Soldiers' Home Long Term Capital & Deferred Maintenance Needs Presentation (April 30, 2018) (REVPROB0028-00009471).

[66] Mass. Gen. Laws ch. 6A, § 16.

[67] Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020).

[68] *Id.*

[69] State of the Commonwealth's Soldiers' Homes (December 2016) (GOV0083358); State of the Commonwealth's Soldiers' Homes (November 2017) (GOV0083343); State of the Commonwealth's Soldiers' Homes (October 2018) (GOV0083371); State of the Commonwealth's Soldiers' Homes (October 2019) (GOV0083327).

[70] 105 C.M.R. 153.005; *see also* Mass. Gen. Laws ch. 111, § 71 (providing for the licensing of convalescent and nursing homes, infirmaries, etc.).

[71] 105 C.M.R. § 153.004.

[72] 105 C.M.R. § 150.002(B)(5.)

[73] 105 C.M.R. 150.001.

[74] Mass. Gen. Laws. ch. 111, § 71; *see generally* 150 C.M.R. 150.00 (Standards for Long-Term Care Facilities); 105 CMR 153.000 (licensure procedures and suitability requirements for long-term care facilities).

[75] 38 C.F.R. § 51.210.

[76] 38 C.F.R. § 51.60–51.210 (Standards Applicable to the Payment of Per Diem for Nursing Home Care); 38 C.F.R. § 51.300–51.390 (Standards Applicable to the Payment of Per Diem for Domiciliary Care).

[77] Email to McDermott from Sharon Boyle, General Counsel of EOHHS (June 15, 2020).

[78] Mass. Gen. Laws ch. 111 § 71; *see also* Mass. Gen. Laws ch. 4 § 7.

[79] Mass. Gen. Laws ch. 111 § 71.

[80] Interview of Mark Bowman, President, National Association of State Veterans Homes (May 6, 2020).

[81] Interview of Mark Bowman, President, National Association of State Veterans Homes (May 6, 2020).

[82] Interview of Ronald Patenaude, Assistant Director Labor Action, Massachusetts Nurses Association (MNA) And Former SEIU Local 888 Representative (April 9, 2020).

[83] State of the Commonwealth's Soldiers' Homes, p. 10 (October 2019) (GOV0083327).

[84] *Id.*

[85] *Id.*

[86] Interview of Cheryl Poppe, Soldiers' Home in Chelsea Superintendent (April 30, 2020).

[87] 38 C.F.R. § 51.40–41 (denoting the two types of per diem rates: basic per diem rates and per diem rates authorized through a contract or state home care agreement for certain Veterans with service-connected disabilities).

[88] Department of Veterans Affairs State Home Per Diem Payment Rate Information, *available at* https://www.va.gov/COMMUNITYCARE/providers/SH_Payment_Rate.asp.

[89] December 6, 2019 Draft Memorandum Re: Electronic Medical Record FY21 IT Capital Funding Request (REVPROB0028-00010674).

[90] Interview of Cindy Lacoste, Soldiers' Home in Holyoke Board of Trustees Member (April 13, 2020).

[91] *Id.*

[92] *Id.*

[93] *Id.*

[94] Interview of Cheryl Poppe, Soldiers' Home in Chelsea Superintendent (April 30, 2020).

[95] Holyoke Soldiers' Home Long Term Capital & Deferred Maintenance Needs presentation, April 30, 2018, p.11 (REVPROB0028-00009471).

[96] *Id.*

[97] *Id.*

[98] *Id.*

[99] *Id.*

[100] Soldiers' Home in Holyoke Floor Plans; Holyoke Soldiers' Home Long Term Capital & Deferred Maintenance Needs presentation, April 30, 2018, p.11 (REVPROB0028-00009471).

[101] Holyoke Soldiers' Home Long Term Capital & Deferred Maintenance Needs presentation, April 30, 2018, p.12 (REVPROB0028-00009471).

[102] Interview of Valenda Liptak, Soldiers' Home Interim Administrator (April 9, 2020).

[103] Interview of Roberta Twining, Family Member (April 13, 2020).

[104] Interview of Susan Kenney, Family Member (May 4, 2020); Interview with Laurie Beaudette, Family Member (May 6, 2020).

[105] Interview of Laurie Beaudette, Family Member (May 6, 2020); Interview of Michael & Susan Regensburger, Family Members (May 7, 2020).

[106] Interview of John Pardis, Former Soldiers' Home Deputy Superintendent (April 20, 2020).

[107] VA 2015 Survey of Soldiers' Home at Holyoke (indicating that the Soldiers' Home met the requirements for resident rooms).

[108] *Id.*

[109] *Id.*

[110] Interview of Bennett Walsh, Soldiers' Home Superintendent (April 3, 2020)

[111] Holyoke Soldiers' Home Long Term Capital & Deferred Maintenance Needs presentation, p.12-13 (REVPROB0028-00009471).

[112] Brief to the Department of Veterans' Services from Paul Barabani (February 12, 2015).

[113] M.G.L. ch. 4, § 7, clause 43.

[114] State of the Commonwealth's Soldiers' Homes, p. 10 (October 2019) (GOV0083327).

[115] *Id.*

[116] *Id.*

[117] *Id.*

[118] Soldiers' Home in Holyoke Discharge Database, Mortality 2016-Present (GOV0014507).

[119] Mass. Gen. Laws c. 6, § 71.

[120] Soldiers' Home Interim Organizational Chart, revised May 1, 2020 (GOV0013402).

[121] *Id.*

[122] *Id.*

[123] *Id.*

[124] *See, e.g.* Interview of Colleen Croteau, Family Member (April 16, 2020).

[125] *See e.g.*, Interview of Patricia Sullivan, Nursing Assistant I (April 1, 2020); Interview of Luis Rodriguez, Storekeeper II, Central Supply (April 20, 2020).

[126] Interview of Marylou Sudders, Secretary of EOHHS (May 28, 2020).

[127] Interview of Cindy Lacoste, Soldiers' Home in Holyoke Board of Trustees Member (April 13, 2020).

[128] *See e.g.*, Interview of Theresa King Licensed Practical Nurse II (April 9, 2020); Interview of Denise Coughlin Licensed Practical Nurse II (May 22, 2020); Interview of Colleen Bartlett, Licensed Practical Nurse II (April 23, 2020); Interview of Sheila Serra, Dietician III (May 18, 2020).

[129] Interview of Sheila Serra, Dietician III (May 18, 2020.)

[130] Interview of Joan Miller, Registered Nurse II (April 22, 2020).

[131] Interview of Joan Miller, Registered Nurse II (April 22, 2020).

[132] Interview of Cory Bombredi, SEIU Local 888 Internal Organizer (April 7, 2020); Interview of Lindsay Korsen, Nursing Assistant I (April 24, 2020); Interview of Angelo Proietti, Food Services Supervisor I (May 26, 2020).

[133] Interview of Bennett Walsh, Soldiers' Home Superintendent (April 3, 2020); *see also* Interview of Mark Yankopoulos, Legal Counsel (April 16, 2020).

[134] Interview of Bennett Walsh, Soldiers' Home Superintendent (April 3, 2020).

[135] Interview of Cheryl Poppe, Soldiers' Home in Chelsea Superintendent  (April 30, 2020).

[136] *See, e.g.*, Interview of Brandy Gridley, Food Service Supervisor II (April 29, 2020).

[137] Interview of Valenda Liptak, Soldiers' Home Interim Administrator (April 9, 2020).

[138] Interview of Roberta Twining, Family Member (April 13, 2020).

[139] Interview of Laurie Beaudette, Family Member (May 12, 2020).

[140] Interview of Linda Lariviere, Registered Nurse III and MDS Coordinator (May 15, 2020); Interview of David Laplante, Former Soldiers' Home Deputy Superintendent (May 4, 2020).

[141] Interview of Mark Bowman, President, National Association of State Veterans Homes (May 6, 2020).

[142] *Id.*

[143] Interview of Cheryl Poppe, Soldiers' Home in Chelsea Superintendent (April 30, 2020).

[144] *Id..*

[145] State of the Commonwealth's Soldiers' Homes, p. 10 (October 2019) (GOV0083327).

[146] *Id.*

[147] Transition Memorandum from Cheryl Poppe to Bennett Walsh (GOV0010741).

[148] Department of Veteran Services Soldiers' Home in Chelsea and Soldiers' Home in Holyoke EMR Project Update (February 2020) (REVPROB0028-00005707).

[149] Interview of Cheryl Poppe, Soldiers' Home in Chelsea Superintendent (April 30, 2020); Interview of John Paradis, Former Soldiers' Home Superintendent April 20, 2020.

[150] Interview of Cheryl Poppe, Soldiers' Home in Chelsea Superintendent (April 30, 2020).

[151] *Id.*

[152] *Id.*; Interview of Suzanne Quersher, Director of Labor Relations EOHHS (April 17, 2020).

[153] Interview of Bennett Walsh, Soldiers' Home Superintendent (April 3, 2020); Interview of Cheryl Poppe, Soldiers' Home in Chelsea Superintendent (April 30, 2020).

[154] State of the Commonwealth's Soldiers' Homes, p. 10 (October 2019) (GOV0083327).

[155] Resource Allocation to State Veterans' Homes in Massachusetts  FY-14 (January 15, 2016).

[156] *Id.*

[157] Interview of Paul Barabani, Former Soldiers' Home Superintendent (April 28, 2020).

[158] *Id.*

[159] *Id.*

[160] *Id.*; Interview of John Paradis, Former Deputy Superintendent at the Soldiers' Home (April 20, 2020).

[161] Interview of Paul Barabani, Former Soldiers' Home Superintendent (April 28, 2020).

[162] *Id.*

[163] *Id.*

[164] *Id.*

[165] *Id.*

[166] *Id.*

[167] *Id.*

[168] *See, e.g.,* "Gov. Baker Signs State Employee Early Retirement Plan," (May 4, 2015), *available at* https://www.wbur.org/news/2015/05/04/legislature-oks-state-employee-early-retirement-plan.

[169] Interview of Paul Barabani, Former Soldiers' Home Superintendent (April 28, 2020); Interview of John Paradis, Former Soldiers' Home Deputy Superintendent (April 20, 2020).

[170] *See, e.g.,* Interview of Terri Gustafson, Social Worker I (April 29, 2020); Interview of Ulises Suarez, Launderer I (May 18, 2020.)

[171] Interview of Paul Barabani, Former Soldiers' Home Superintendent (April 28, 2020).

[172] *Id.*

[173] Interview of Francisco Urena, Secretary of Department of Veterans' Services (May 28, 2020).

[174] Interview of Paul Barabani, Former Soldiers' Home Superintendent (April 28, 2020).

[175] *Id.*

[176] *Id.*

[177] Interview of John Paradis, Former Deputy Superintendent at Soldiers' Home in Holyoke (April 20, 2020).

[178] Interview of Cheryl Poppe, Soldiers' Home in Chelsea Superintendent (April 30, 2020); Transition Memorandum from Cheryl Poppe to Bennett Walsh (GOV0010741).

[179] Interview of Cheryl Poppe, Soldiers' Home in Chelsea Superintendent (April 30, 2020.

[180] *Id.*

[181] Transition Memorandum from Cheryl Poppe to Bennett Walsh (GOV0010741).

[182] *Id.*

[183] *Id.*

[184] *Id.*

[185] *Id*; Interview of Cheryl Poppe, Superintendent of Soldiers' Home in Chelsea (April 30, 2020).

[186] Bennett Walsh Resume, *available at* https://www.linkedin.com/in/bennett-walsh-4a9a9087/(October 14, 2014); Interview of Bennett Walsh, Soldiers' Home Superintendent (April 3, 2020).

[187] *Id.*

[188] *Id.*

[189] Interview of Bennett Walsh, Soldiers' Home Superintendent (April 3, 2020).

[190] Interview of Joseph Ramirez, Nursing Assistant I (April 8, 2020); *see also Bennett Walsh sworn in as Holyoke Soldiers' Home superintendent* (July 7, 2016), *available at* https://www.masslive.com/politics/2016/07/bennett_walsh_sworn_in_as_holy.html (article regarding Mr. Walsh's swearing-in, noting that his mother is a Springfield city councilor).

[191] Interview of Bennett Walsh, Soldiers' Home Superintendent (April 3, 2020).

[192] Boston Globe Advertisement (Jan. 31, 2016), *available at* https://www.newspapers.com/newspage/444597482/

[193] Interview of Bennett Walsh, Soldiers' Home Superintendent (April 3, 2020).

[194] *Id.*

[195] Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020).

[196] *Id.*

[197] Interview of Marylou Sudders, Secretary of EOHSS (May 28, 2020).

[198] *Id.*

[199] *Id.*

[200] Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020); Interview of John Crotty, Former Soldiers' Home Deputy Superintendent (June 12, 2020).

[201] Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020).

[202] *Id.*

[203] Interview of Robyn Fowler, Registered Nurse IV (April 30, 2020).

[204] Interview of Mark Yankopoulos, Legal Counsel (April 16, 2020).

[205] Interview of Bennett Walsh, Soldiers' Home Superintendent (April 3, 2020).

[206] *See, e.g.,* Interview of Wendy Chevalier, Recreational Therapist II (April 20, 2020).

[207] *See, e.g.,* Interview of Joseph Ramirez, Nursing Assistant I (April 8, 2020); Interview of Ulises Suarez, Launderer I (May 18, 2020).

[208] Interview of Wendy Chevalier, Recreational Therapist II (April 20, 2020).

[209] Interview of Joseph Ramirez, Nursing Assistant I (April 8, 2020).

[210] *Id.*

[211] Interview of John Crotty, Former Soldiers' Home Deputy Superintendent (June 12, 2020).

[212] *Id.*

[213] *Id.*

[214] *Id.*

[215] *See, e.g.,* Interview of Ulises Suarez, Launderer I (May 18, 2020); Interview of Carmen Rivera, Nursing Assistant I (April 8, 2020); Interview of Wendy Chevalier, Recreational Therapist II (April 20, 2020).

[216] Interview of Celeste Surreira, Soldiers' Home Assistant Director of Nursing (May 9, 2020).

[217] Interview of Paul Moran, Department of Veterans' Services Chief of Staff (May 26, 2020); Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020); Email from Paul Moran to Secretary Urena and Anthony Preston (March 22, 2020 12:00 a.m. (EST)) (GOV0045633).

[218] Interview of Paul Moran, Department of Veterans' Services Chief of Staff (May 26, 2020); Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020); Email from Paul Moran to Secretary Urena and Anthony Preston (March 22, 2020 12:00 a.m. (EST)) (GOV0045633).

[219] Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020).

[220] *Id.*

[221] *Id.*

[222] *Id.*

[223] *Id.*

[224] *Id.*

[225] *Id.*

[226] *Id.*

[227] *Id.*

[228] *Id.*

[229] Interview of Paul Moran, Department of Veterans' Services Chief of Staff (May 26, 2020).

[230] Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020).

[231] *Coronavirus: State inspector general began investigation into Holyoke Soldiers' Home weeks before residents were infected with COVID-19* (April 22, 2020), *available at* https://www.masslive.com/news/2020/04/coronavirus-state-inspector-general-began-investigation-into-holyoke-soldiers-home-weeks-before-residents-infected-with-covid-19.html

[232] Mass. Gen. Laws c. 6, § 70.

[233] Mass. Gen. Laws c. 6, § 71.

[234] Mass. Gen. Laws Ann. C. 115A, § 12.

[235] Interview of Kevin Jourdain, Soldiers' Home in Holyoke Board of Trustees Chairman (April 10, 2020).

[236] Interview of Brian Corridan, Former Soldiers' Home Board of Trustees Member (April 14, 2020).

[237] Soldiers' Home Board of Trustees Meeting Minutes (March 10, 2020) (GOV0014389). Brian Corridan was a member of the Board of Trustees until he received a letter on February 28, 2020, informing him that he would not be reappointed to the Board of Trustees. Interview of Brian Corridan, Soldiers' Home Trustee (April 14, 2020).

[238] Interview of Brian Corridan, Former Soldiers' Home Board of Trustees Member (April 14, 2020).

[239] Soldiers' Home Board of Trustees Meeting Minutes (February 17, 2016) (GOV0043756).

[240] Interview of Kevin Jourdain, Soldiers' Home in Holyoke Board of Trustees Chairman (April 10, 2020).

[241] *Id.*

[242] *Id.*

[243] *Id.*

[244] Interview of Charlie Baker, Governor of Massachusetts (May 19, 2020).

[245] Interview of Francisco Urena, Secretary of Department of Veterans' Services (May 28, 2020).

[246] Interview of Brian Corridan, Former Soldiers' Home Board of Trustees Member (April 14, 2020).

[247] *See, e.g.,* Interview of Cindy Lacoste, Soldiers' Home Board of Trustees Member (April 13, 2020); Interview of Carmen Ostrander, Soldiers' Home Board of Trustees Member (April 13, 2020).

[248] Interview of Carmen Ostrander, Soldiers' Home Board of Trustees Member (April 13, 2020).

[249] Interview of Angelo Proietti, Food Service Supervisor I (May 26, 2020).

[250] *See, e.g.,* Interview of Carrie Forrant, Social Worker I (April 27, 2020); Interview of Jill Orzechowski, Social Worker I (April 27, 2020); Interview of Vanessa Gosselin, Soldiers' Home Infection Control Nurse (April 16, 2020).

[251] Interview of Vanessa Gosselin, Soldiers' Home Infection Control Nurse (April 16, 2020).

[252] *Id.*

[253] Interview of Celeste Surreira, Soldiers' Home Assistant Director of Nursing (April 17, 2020).

[254] *Id.*

[255] Interview of Vanessa Lauziere, Soldiers' Home Chief Nursing Officer (May 14, 2020).

[256] *Id.*

[257] Interview of Valenda Liptak, Soldiers' Home Interim Administrator (April 9, 2020).

[258] *Id.*

[259] Interview of Lisa Colombo, Soldiers' Home Incident Command Lead (April 13, 2020).

[260] Interview of Bennett Walsh, Soldiers' Home Superintendent (June 1, 2020).

[261] Interview of John Crotty, Former Soldiers' Home Deputy Superintendent (June 12, 2020).

[262] Interview of Marylou Sudders, Secretary EOHSS (May, 28, 2020).

[263] Interview of Angelo Prioetti, Food Service Supervisor I (May 26, 2020); Interview of Sheila Serra, Dietician III (May 18, 2020).

[264] Interview of Joan Miller, Registered Nurse II (April 22, 2020).

[265] Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020).

[266] Interview of David Laplante, Former Soldiers' Home Deputy Superintendent (May 4, 2020).

[267] Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020).

[268] *Id.*

[269] Interview of Paul Moran, Department of Veterans' Services Chief of Staff (May 26, 2020).

[270] *Id.*

[271] Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020).

[272] *Id.*

[273] Interview of Paul Moran, Department of Veterans' Services Chief of Staff (May 26, 2020).

[274] Interview of David Laplante, Former Deputy Superintendent (May 4, 2020).

[275] Interviews of David Laplante, Former Deputy Superintendent (May 4, 2020; June 4, 2020).

[276] Interview of Bennett Walsh, Soldiers' Home Superintendent (June 1, 2020).

[277] Interview of David Laplante, Former Deputy Superintendent (June 4, 2020).

[278] Interview of Kwesi Ablordeppey, Nursing Assistant I (April 7, 2020).

[279] Interview of Linda Lariviere, Registered Nurse III and MDS Coordinator (May 15, 2020)

[280] Interview of Thomas Lingenberg, Building Maintenance Supervisor I (May 5, 2020)

[281] Interview of Paul Barabani, Former Soldiers' Home Superintendent (April 28, 2020).

[282] Interview of Eileen Driscoll, Family Member (May 7, 2020).

[283] Interview of Alex Morse, City of Holyoke Mayor (April 3, 2020).

[284] Interview of Celeste Surreira, Soldiers' Home Assistant Director of Nursing (April 17, 2020).

[285] Interview of Emily Boronski, Registered Nurse II (May 21, 2020).

[286] Interview of Laurie Beaudette, Family Member (May 6, 2020.)

[287] VHA Directive 1145.01 (November 2, 2016).

[288] Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020).

[289] 2017 Soldiers' Home VA Annual Survey, Completed January 31, 2020 (GOV0013644; GOV0013694).

[290] *Id.*

[291] *Id.*

[292] *Id.*

[293] *Id.*

[294] 2018 Soldiers' Home VA Annual Survey, Completed March 22, 2018 (GOV0013716).

[295] 2019 Soldiers' Home VA Annual Survey, Completed February 1, 2019 (GOV0013856).

[296] *Id.*

[297] 2020 Soldiers' Home VA Annual Survey, January 31, 2020 (GOV0013992, GOV0014039).

[298] *Id.*

[299] *Id.*

[300] Email from Bennett Walsh to Francisco Urena et al. (March 4, 2020 10:29 AM (EST)) (REVPROB0028-00010224).

[301] *Id.*

[302] Interview of Paul Moran, Department of Veterans' Services Chief of Staff (May 27, 2020).

[303] Soldiers' Home Board of Trustee Meeting Minutes, March 10, 2020 (GOV0014389).

[304] *See, e.g.,* Interview of Kevin Jourdain, Soldiers' Home Board of Trustees Chairman (April 10, 2020).

[305] Interview of Paul Barabani, Former Soldiers' Home Superintendent (April 28, 2020); Interview of John Paradis, Former Soldiers' Home Deputy Superintendent (April 20, 2020).

[306] Interview of Cheryl Malandrinos, Family Member (May 12, 2020).

[307] Interview of Mary Bergeron, Licensed Practical Nurse II (May 1, 2020).

[308] Interview of Vanessa Lauziere, Soldiers' Home Chief Nursing Officer (May 14, 2020); Interview of Celeste Surreira, Soldiers' Home Assistant Director of Nursing (April 17, 2020).

[309] *See, e.g.,* Interview of Cory Bombredi, SEIU Local 888 Internal Organizer(April 7, 2020).

[310] Interview of Cheryl Poppe, Soldiers' Home in Chelsea Superintendent (April 30, 2020).

[311] Interview of Nicole Rivers, Associate Director, Center for Public Management, Suffolk University (April 28, 2020); Overtime and Nursing Staff Assessment Report Prepared for the Soldiers' Home in Holyoke by the Moakley Center for Public Management (August 2019).

[312] Interview of Nicole Rivers, Associate Director, Center for Public Management, Suffolk University (April 28, 2020).

[313] *Id.*

[314] *Id.*

[315] *See* 38 CFR 51.130 (providing for 2.50 HPPD).

[316] Overtime and Nursing Staff Assessment Report Prepared for the Soldiers' Home in Holyoke by the Moakley Center for Public Management (August 2019).

[317] Interview of Nicole Rivers, Associate Director, Center for Public Management, Suffolk University (April 28, 2020).

[318] *Id.*

[319] Email from Bennett Walsh to Catherine Mick et al. (July 11, 2019 8:27 AM (EST)) (GOV0015477).

[320] Email from Catherine Mick to Catherine Starr and Marianne Dill (July 11, 2019 8:53 AM (EST)) (GOV0015477); Interview of Catherine Mick, EOHHS Undersecretary of Human Services (May 30, 2020).

[321] *See, e.g.,* Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020); Interview of Nicole Rivers, Associate Director, Center for Public Management, Suffolk University (April 28, 2020).

[322] Interview of Catherine Mick, EOHHS Undersecretary of Human Services (May 30, 2020).

[323] Interview of Cheryl Poppe, Soldiers' Home in Chelsea Superintendent (June 8, 2020).  Ms. Poppe recalled that the permanent schedule was implemented in just a couple of months whereas Matthew Deacon, Agency Counsel for the Soldiers' Home in Chelsea, recalled that the implementation of the permanent schedule took approximately six months.

[324] *See, e.g.,* Interview of Bennett Walsh, Soldiers' Home Superintendent (June 1, 2020); Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020).

[325] Email from Erica Crystal to Bennett Walsh et al. (February 27, 2020 1:39 (EST)) (GOV0083315).

[326] *Id.*

[327] Interview of Kwesi Ablordeppey, Nursing Assistant I (April 7, 2020); Interview of Carmen Rivera, Nursing Assistant I (April 8, 2020); Interview of Isaac Mass, Soldiers' Home Board of Trustees Member (May 18, 2020).

[328] *Man returning from Wuhan, China is first case of 2019 Novel Coronavirus confirmed in Massachusetts* (February 1, 2020), *available at* https://www.mass.gov/news/man-returning-from-wuhan-china-is-first-case-of-2019-novel-coronavirus-confirmed-in

[329] *Public Health Response to the Initiation and Spread of Pandemic COVID-19 in the United States, February 24–April* 21, 2020, CENTERS FOR DISEASE CONTROL AND PREVENTION, *available at* https://www.cdc.gov/mmwr/volumes/69/wr/mm6918e2.htm?s_cid=mm6918e2_w; https://www.bostonglobe.com/2020/03/11/nation/how-biogen-leadership-conference-boston-spread-coronavirus/

[330] Mark Arsenault et al., *How the Biogen leadership conference in Boston spread the coronavirus*, BOSTON GLOBE (March 10, 2020 8:52 PM (EST)), *available at* https://www.bostonglobe.com/2020/03/11/nation/how-biogen-leadership-conference-boston-spread-coronavirus/

[331] *Fact Sheet: Alcohol-Based Hand Rub in Long Term Care Facilities*, MASSACHUSETTS DEPARTMENT OF PUBLIC HEALTH (February 2020), *available at* https://www.mass.gov/doc/fact-sheet-alcohol-based-hand-rub-in-long-term-care-facilities/download.

[332] *Id.*

[333] *Healthcare Provider Checklist,* CENTERS FOR DISEASE CONTROL AND PREVENTION, *available at* https://www.cdc.gov/coronavirus/2019-ncov/hcp/hcp-personnel-checklist.html.

[334] *Id.*

[335] *COVID-19 Guidance for Nursing Homes and Rest Homes, available at* https://www.mass.gov/doc/COVID-19-guidance-nursing-home-and-rest-homes/download.

[336] *Id.*

[337] Email from Leslie Darcy to Bennett Walsh, et al. (March 2, 2020 8:57 AM (EST)) (REVPROB0028-00010509).

[338] *Id.*

[339] *First Presumptive Positive Case of COVID-19 Identified by Massachusetts State Public Health Laboratory*, MASSACHUSETTS DEPARTMENT OF PUBLIC HEALTH (March 2, 2020), *available at* https://www.mass.gov/news/first-presumptive-positive-case-of-covid-19-identified-by-massachusetts-state-public-health.

[340] *Id.*

341 *Id.*

342 *Governor Baker and State Health Officials Discuss Community Preparedness With Health Care, Infectious Disease Experts and Front Line Leaders*, MASSACHUSETTS DEPARTMENT OF PUBLIC HEALTH (March 4, 2020), *available at* https://www.mass.gov/news/governor-baker-and-state-health-officials-discuss-community-preparedness-with-health-care.

343 *Id.*

344 *Id.*

345 *Id.*

346 Email from Dana Ohannessian to Vanessa Gosselin (March 4, 2020 5:43 PM (EST)) (REVPROB0028-00009998).

347 COVID-19 Response: Optimizing Use of Personal Protective Equipment (March 4, 2020) (REVPROB0028-00000999).

348 Email from Catherine Starr to Bennett Walsh, et al. (March 6, 2020 12:29 PM (EST)) (REVPROB0028-00009875); Memorandum from Francis J. Doyle to Department of Public Health Public Health Hospitals System (March 7, 2020) (REVPROB0028-00009876).

349 Memorandum from Francis J. Doyle to Department of Public Health Public Health Hospitals System (March 7, 2020) (REVPROB0028-00009876).

350 Memorandum from Francis J. Doyle to Department of Public Health Public Health Hospitals System (March 7, 2020) (REVPROB0028-00009876).

351 Email from Catherine Starr to Bennett Walsh, et al. (March 6, 2020 12:29 PM (EST)) (REVPROB0028-00009875).

352 Email from Elvira Loncto to Bennett Walsh, Linda Lariviere, and Debra Foley March 6, 2020 (9:29 AM) (EST)) (REVPROB0028-00005274).

353 VA Response to COVID-19: Guidance for VA Community Living Centers March 6, 2020 (REVPROB0028-00005275).

354 *Executive Order No. 591: Declaration of a State of Emergency to Respond to COVID-19* (March 10, 2020), *available at* https://www.mass.gov/executive-orders/no-591-declaration-of-a-state-of-emergency-to-respond-to-COVID-19.

355 *Id.*

356 *VA announces safeguards to protect nursing home and spinal cord injury patients,* VA (March 10, 2020), *available at* https://www.va.gov/opa/pressrel/pressrelease.cfm?id=5400#:~:text=WASHINGTON%20%E2%80%93%20While%20the%20Centers%20for,susceptible%20patient%20populations%3A%20nursing%20home.

357 *Order of the Commissioner of Public Health*, Executive Office of Health and Human Services (March 11, 2020), *available at* https://www.mass.gov/doc/order-of-the-commissioner-of-public-health-implementing-policies-and-procedures-for-restricting/download.

358 *Id.*

359 *Id.*

360 *Id.*

361 *Long-Term Care (LTC) Respiratory Surveillance Line List*, Centers for Disease Control and Prevention (March 12, 2020).

362 *Guidance for Infection Control and Prevention of Coronavirus Disease 2019 (COVID-19) in Nursing Homes (REVISED)*, Centers for Medicare and Medicaid Services (March 13, 2020), *available at* https://www.cms.gov/files/document/qso-20-14-nh-revised.pdf.

363 *Evaluating and Testing Persons for Coronavirus Disease 2019 (COVID-19)*, CMS (March 14, 2020).

364 Email from Paul Moran to Bennett Walsh , Cheryl Poppe, et al. March 12, 2020 (2:28 PM (EST))(REVPROB0028-00009195).

365 Email from Paul Moran to Bennett Walsh, Cheryl Poppe, et al. March 12, 2020 (2:28 PM (EST))(REVPROB0028-00009195); Agency Based in-Home Caregivers & Workers COVID-19 Guidance March 12, 2020 (REVPROB0028-00009196); Community Day Program COVID-19 Guidance March 12, 2020 (REVPROB0028-00009197); Non-Agency Based in-Home Caregivers (COVID-19) Guidance March 12, 2020 (REVPROB0028-00009198); Guidance Issued by Executive Office of Elder Affairs Secretary Elizabeth Chen March 12, 2020 (REVPROB0028-00009199); March 12, 2020 Congregate Care Program COVID-19 Guidance March 12, 2020 (REVPROB0028-00009200).

366 Agency Based in-Home Caregivers & Workers COVID-19 Guidance (March 12, 2020) (REVPROB0028-00009196); Community Day Program COVID-19 Guidance (March 12, 2020) (REVPROB0028-00009197); Non-Agency Based in-Home Caregivers (COVID-19) Guidance (March 12, 2020) (REVPROB0028-00009198); Guidance Issued by Executive Office of Elder Affairs Secretary Elizabeth Chen (March 12, 2020) (REVPROB0028-00009199); Congregate Care Program COVID-19 Guidance (March 12, 2020) (REVPROB0028-00009200).

367 Agency Based in-Home Caregivers & Workers COVID-19 Guidance (March 12, 2020) (REVPROB0028-00009196); Community Day Program COVID-19 Guidance (March 12, 2020) (REVPROB0028-00009197); Congregate Care Program COVID-19 Guidance (March 12, 2020) (REVPROB0028-00009200).

368 Community Day Program COVID-19 Guidance (March 12, 2020) (REVPROB0028-00009197); Guidance Issued by Executive Office of Elder Affairs Secretary Elizabeth Chen March 12, 2020 (REVPROB0028-00009199); Congregate Care Program COVID-19 Guidance (March 12, 2020) (REVPROB0028-00009200).

369 Guidance Issued by Executive Office of Elder Affairs Secretary Elizabeth Chen (March 12, 2020) (REVPROB0028-00009199).

370 Congregate Care Program COVID-19 Guidance (March 12, 2020) (REVPROB0028-00009200).

371 Congregate Care Program COVID-19 Guidance (March 12, 2020) (REVPROB0028-00009200.).

372 Email from Paul Moran to Bennet Walsh, et al. (March 12, 2020) 4:48 PM (EST)) (REVPROB0028-00009152).

373 Email from Paul Moran  to Bennet Walsh, et al. (March 13, 2020 8:46 AM (EST)) (REVPROB0028-00009117).

374 Email from Paul Moran to Bennett Walsh, et al. (March 13, 2020 8:46 AM (EST)) (REVPROB0028-00009117).

375 *What Healthcare Personnel Should Know about Caring for Patients with Confirmed or Possible Coronavirus Disease 2019 (COVID-19)*, CDC March 12, 2020.

376 *Id.*

377 *Id.*

378 *Id.*

379 *Policies and Procedures for Restricting Resident Visitors in Nursing Homes and Rest Homes and Personal Protective Equipment Recommendation Updates during the COVID-19 Outbreak*, MASSACHUSETTS DEPARTMENT OF PUBLIC HEALTH (March 16, 2020), *available at* https://www.mass.gov/doc/policies-and-procedures-for-restricting-resident-visitors-in-nursing-homes-and-rest-homes-and/download.

[380] *Id.*

[381] *Order of the Commissioner of Public Health Implementing Emergency Credentialing and Licensed Staff Transfer Procedures for Medical Facilities in the Commonwealth,* MASSACHUSETTS DEPARTMENT OF PUBLIC HEALTH (March 17, 2020), *available at* https://www.mass.gov/doc/order-of-the-commissioner-of-public-health-implementing-emergency-credentialing-and-licensed/download.

[382] *Coronavirus Disease 2019: Eye Protection,* CENTERS FOR DISEASE CONTROL AND PREVENTION, *available at* https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/eye-protection.html; Coronavirus Disease 2019- Facemasks, CENTERS FOR DISEASE CONTROL AND PREVENTION, *available at* https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/face-masks.html; Coronavirus Disease 2019: Gowns, CENTERS FOR DISEASE CONTROL AND PREVENTION, *available at* https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/isolation-gowns.html.

[383] *Steps Healthcare Facilities Can Take Now to Prepare for Coronavirus Disease 2019 (COVID-19),* CENTERS FOR DISEASE CONTROL AND PREVENTION (March 17, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/hcp/steps-to-prepare.html.

[384] *Guidance on Optimization of PPE in the Commonwealth of Massachusetts,* MASSACHUSETTS DEPARTMENT OF PUBLIC HEALTH (March 22, 2020), *available at* https://www.mass.gov/doc/guidance-for-prioritization-of-personal-protective-equipment-ppe-in-massachusetts/download

[385] *Id.*

[386] *Guidance for PPE Optimization, available at* https://www.mass.gov/doc/ma-COVID-19-ppe-request-process-chart/download.

[387] *COVID-19 Personal Protective Equipment (PPE) for Healthcare Personnel,* CENTERS FOR DISEASE CONTROL AND PREVENTION (March 23, 2020).

[388] *Use Personal Protective Equipment (PPE) When Caring for Patients with Confirmed or Suspected COVID-19,* CENTERS FOR DISEASE CONTROL AND PREVENTION (March 30, 2019).

[389] *Preparing for COVID-19: Long-term Care Facilities, Nursing Homes,* CENTERS FOR DISEASE CONTROL AND PREVENTION (April 5, 2020); *Interim Infection Prevention and Control Recommendations for patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings,* CDC (April 5, 2020).

[390] Email from Courtney Cottle to Alan Munro, Robert Byrne, Barry Smith, Barry Izenstein, Celeste Surreira, Dr. David Clinton (February 12, 2020 9:38 AM (EST)) (GOV0028811); Email from Bennett Walsh to all Soldiers' Home staff (March 15, 2020 10:28 AM (EST)) (REVPROB0028-00008967).

[391] Email from Courtney Cottle to Celeste Surreira, et al. (February 12, 2020 (9:38 AM (EST)) (GOV0028811).

[392] Meeting Invitation from Vanessa Gosselin to Celeste Surreira et al. regarding the flu outbreak follow up (February 12, 2020 (12:00 PM (EST)) (GOV0025491).

[393] Email from Nancy Shimel, sent on behalf of Bennett Walsh, to all Soldiers' Home staff (February 13, 2020 10:20 AM (EST)) (REVPROB0028-00011935).

[394] *Id.*

[395] Soldiers' Home in Holyoke February 13, 2020 Monthly Medical Staff Meeting Minutes (February 13, 2020) (GOV0014451).

[396] Interview of Dr. David Clinton, Soldiers' Home Medical Director (April 21, 2020).

[397] Email from Vanessa Gosselin (March 3, 2020 11:29 a.m. (EST)) (REVPROB0028-00002356); Sign printed by Vanessa Gosselin (REVPROB0028-00002358).

[398] Interview of Brandy Gridley, Food Service Supervisor II (April 29, 2020); Email from Vanessa Gosselin to all Soldiers' Home staff (March 4, 2020 12:55 PM (EST)) (REVPROB0028-00001005).

[399] Interview of Brandy Gridley, Food Service Supervisor II (April 29, 2020); Email from Vanessa Gosselin to all Soldiers' Home staff (March 4, 2020 12:55 PM (EST)) (REVPROB0028-00001005).

[400] Email from Vanessa Gosselin to Sandra Marino, Anne Taft, Emily Moriarty, Paul Brown, Joseph Grab, Jodie Alaimo, Robyn Fowler, Kelly Hansen, and Vanessa Lauziere (March 5, 2020 2:38 PM (EST)) (REVPROB0028-00005311).

[401] Id.

[402] Interview of Brandy Gridley, Food Service Supervisor II (April 29, 2020); Interview of Vanessa Lauziere, Soldiers' Home Chief Nursing Officer (May 14, 2020).

[403] Email from Vanessa Gosselin to Joseph Grab, Paul Brown, Darcy Barry, Emily Moriarty, Kelly Hansen, Leonor Rodriguez, Jodie Alaimo, Sandra Marino, Anne Taft, and Vanessa Lauziere (March 6, 2020 3:27 PM (EST)) (REVPROB0028-00000962).

[404] Email from Paul Moran to Anthony Preston, Evan Makrinikolas, Claire Makrinikolas, David Moore, Susan Nagy, Susan McDonough, Maureen Hagerty, Cheryl Poppe, Bennett Walsh, Richard Bastien, Daniel Brennan, Secretary Urena, Stuart Ivimey (March 6, 2020 12:25 PM (EST)) (REVPROB0028-00009780).

[405] Email from Paul Moran to Bennett Walsh (March 7, 2020 9:48 AM (EST)) (REVPROB0028-00009780).

[406] Email from Bennett Walsh to Paul Moran (March 7, 2020 10:27 AM (EST)) (REVPROB0028-00009780).

[407] Interview of Dr. David Clinton, Soldiers' Home Medical Director (April 21, 2020).

[408] Email from Secretary Urena to Cheryl Poppe, Bennett Walsh, Paul Moran, Stuart Ivimey, Anthony Preston, Debra Foley, and Vanessa Lauziere (March 10, 2020 7:44 PM (EST)) (REVPROB0028-00005176).

[409] Id.

[410] Email from Bennett Walsh to Secretary Urena, Cheryl Poppe, Bennett Walsh, Paul Moran, Stuart Ivimey, Anthony Preston, Debra Foley, and Vanessa Lauziere (March 11, 2020 8:24 AM (EST)) (REVPROB0028-00005176).

[411] March 10, 2020 Soldiers' Home in Holyoke Board of Trustees Meeting Minutes (GOV0014389).

[412] Id.

[413] Id.

[414] Id.

[415] March 10, 2020 Soldiers' Home in Holyoke Board of Trustees Meeting Minutes (GOV0014389).

[416] March 10, 2020 Soldiers' Home in Holyoke Board of Trustees Meeting PowerPoint (GOV0014348).

[417] March 10, 2020 Soldiers' Home in Holyoke Board of Trustees Meeting Minutes (GOV0014389); Interview of Isaac Mass, Board of Trustees Member (May 18, 2020).

[418] March 10, 2020 Soldiers' Home in Holyoke Board of Trustees Meeting PowerPoint (GOV0014348).

[419] Id.

[420] Interview of Kevin Jourdain, Soldiers' Home Board of Trustees Chairman (April 10, 2020).

[421] March 10, 2020 Soldiers' Home in Holyoke Board of Trustees Meeting PowerPoint (GOV0014348).

[422] Id.; Interview of Isaac Mass, Soldiers' Home Board of Trustees Member (May 18, 2020); Interview of Kevin Jourdain, Soldiers' Home Board of Trustees Chairman (April 10, 2020).

[423] Interview of Isaac Mass, Soldiers' Home Board of Trustees Member (May 18, 2020).

[424] Interview of Cesar Lopez, Soldiers' Home Board of Trustees Member (May 10, 2020).

425 March 10, 2020 Soldiers' Home in Holyoke Board of Trustees Meeting Minutes (GOV0014389).

426 *Id.*

427 Interview of Isaac Mass, Soldiers' Home Board of Trustees Member (May 18, 2020).

428 March 10, 2020 Soldiers' Home in Holyoke Board of Trustees Meeting Minutes (GOV0014389).

429 *Id.*

430 Interview of Bennett Walsh, Soldiers' Home Superintendent (June 1, 2020).

431 March 10, 2020 Soldiers' Home in Holyoke Board of Trustees Meeting Minutes (GOV0014389).

432 *Id.*

433 *Id.*

434 Interview of Kevin Jourdain, B Soldiers' Home Board of Trustees Chairman (April 9, 2020).

435 *Id.*

436 Interview of Cindy Lacoste, Soldiers' Home Board of Trustees Member (April 13, 2020).

437 Interview of Kevin Jourdain, Soldiers' Home Board of Trustees Chairman (April 9, 2020).

438 Email from Vanessa Lauziere to the Soldiers' Home staff (March 11, 2020 5:13 PM (EST)) (REVPROB0028-00009301).

439 Attachment to email from Vanessa Lauziere to the Soldiers' Home staff (March 11, 2020 5:13 PM (EST)) (REVPROB0028-00009302).

440 *Id.*

441 Interview of Patti Foley, Training Program Coordinator I (May 27, 2020); Interview of Erika Scoble, Administrative Secretary I (May 29, 2020).

442 Interview of Erika Scoble, Administrative Secretary I (May 29, 2020).

443 Attachment to email from Vanessa Lauziere to the Soldiers' Home staff (March 11, 2020 5:13 PM (EST)) (REVPROB0028-00009302).

444 *Id.*

445 *Id.*; Interview of Margaret Feyre, Recreation Program Coordinator III (April 24, 2020).

446 Attachment to email from Vanessa Lauziere to the Soldiers' Home staff (March 11, 2020 5:13 PM (EST)) (REVPROB0028-00009302).

447 Email from Vanessa Lauziere to the Soldiers' Home staff (March 12, 2020 10:07 AM (EST)) (REVPROB0028-00009255); Interview of Vanessa Lauziere, Soldiers' Home Chief Nursing Officer (May 14, 2020).

448 Interview of Karl Bartscht, BRG (June 18, 2020).

449 Email from Vanessa Lauziere to the Soldiers' Home staff (March 12, 2020 10:07 AM (EST)) (REVPROB0028-00009255).

450 *Id.*

451 Email from Debra Foley to the Soldiers' Home staff (March 13, 2020 2:02 PM (EST)) (REVPROB0028-00016167).

452 Interview of Sheila Serra, Dietician III (May 18, 2020).

[453] Email from Vanessa Lauziere to Bennett Walsh, Debra Foley, Robert Malikin, Margaret Feyre, Norman Gousy, Mark Yankopoulos, Jeremiah Laplante, Brandy Gridley, Robert Fox, Darcy Barry, Emily Moriarty, Kelly Hansen, Celeste Surreira, Dr. David Clinton, Anne Taft, Angelo Proietti, Vanessa Gosselin, Linda Betley, Linda Lariviere, Sandra Marino, Jillian Orzechowski, Sharon Lange, Carrie Forrant, Jane Sevigne, Jessica Powers (March 13, 2020 8:31 PM (EST)) (REVPROB0028-00008999).

[454] Email from Bennett Walsh to Secretary Fransciso Urena, Paul Moran, Anthony Preston, Debra Foley, Vanessa Lauziere, Cheryl Poppe (March 12, 2020 at 2:19 PM (EST)) (REVPROB0028-00009202).

[455] Interview of Dr. David Clinton, Soldiers' Home Medical Director (April 21, 2020); ); Interview of Vanessa Gosselin, Soldiers' Home Infection Control Nurse (April 16, 2020); Email from Paul Moran to Secretary Urena, Bennett Walsh, Cheryl Poppe (March 13, 2020 at 5:43 PM (EST)) (REVPROB0028-00009004) (noting that CMS is directing that all nursing homes nationwide cease visitations to those facilities); CMS Guidance for Infection Control and Prevention of Coronavirus Disease 2019 (COVID-19) in Nursing Homes (Revised), Ref. QSO-20-14-NH (March 13, 2020) (REVPROB0028-00005087).

[456] Interview of Cory Bombredi, SEIU Local 888 Internal Organizer (April 7, 2020) (noting that he received notification that the Soldiers' Home had cancelled visitation within the Home); Interview of Jackie Digris, Registered Nurse II (April 29, 2020); Interview of Eileen Driscoll, Family Member (May 7, 2020); Interview of Susan Kenney, Family Member (May 4, 2020); Interview of Cheryl Turgeon, Family Member (April 9, 2020); Interview of Roberta Twining, Family Member (April 13, 2020).

[457] Email from Bennett Walsh to the Soldiers' Home staff (March 15, 2020 at 10:24 AM (EST)) (REVPROB0028-00008968).

[458] Id.

[459] Email from Bennett Walsh to the Soldiers' Home staff (March 15, 2020 at 10:28 AM (EST)) (REVPROB0028-00008967).

[460] Id.

[461] March 15, 2020 24-Hour Nursing Report (GOV0010805).

[462] Id.

[463] March 15, 2020 24-Hour Nursing Report (GOV0010805); March 16, 2020 24-Hour Nursing Report, (GOV0010831); March 17, 2020 24-Hour Nursing Report (GOV0010835).

[464] Soldiers' Home Morgue Census (April 23, 2020) (REVPROB0028-00016168).

[465] Email from John Langan (March 15, 2020 at 8:29 PM (EST)) (REVPROB0028-00008958).

[466] Email and Attachment from Nancy Shimel to Bennett Walsh, Debra Foley, Jeremiah Laplante, Mark Yankopoulos, Norman Gousy, Vanessa Lauziere, Dr. David Clinton, Vanessa Gosselin, Kari Redinger, Linda Betley, Jennifer DeWitt, Marie Flynn, Robert Fox, John Fydenkevez, Angelo Proietti, Robert Malikin, Patricia Foley, Jeremy Meade, Jillian Orzechowski, Jessica Powers, Carolyn Rogers, Stephen Pultorak, Celeste Surreira, Mark Yankopoulos (March 16, 2020 at 12:15 PM (EST)) (REVPROB0028-00008920); REVPROB0028-00008921); Email from Nancy Shimel on behalf of Bennett Walsh to the Soldiers' Home staff (March 17, 2020 at 3:52 PM (EST)) (REVPROB0028-00008686).

[467] Email and Attachment from Nancy Shimel to Bennett Walsh, Debra Foley, Jeremiah Laplante, Mark Yankopoulos, Norman Gousy, Vanessa Lauziere, Dr. David Clinton, Vanessa Gosselin, Kari Redinger, Linda Betley, Jennifer DeWitt, Marie Flynn, Robert Fox, John Fydenkevez, Angelo Proietti, Robert Malikin, Patricia Foley, Jeremy Meade, Jillian Orzechowski, Jessica Powers, Carolyn Rogers, Stephen Pultorak, Celeste Surreira, Mark Yankopoulos (March 16, 2020 at 12:15 PM (EST)) (REVPROB0028-00008920).

[468] Email from Nancy Shimel on behalf of Bennett Walsh to the Soldiers' Home staff (March 17, 2020 at 3:52 PM (EST)) (REVPROB0028-00008686); Interview of Sheila Serra, Dietician III (May 18, 2020); Interview of Vanessa Gosselin, Soldiers' Home Infection Control Nurse (April 16, 2020).

[469] Interview of Bennett Walsh, Soldiers' Home Superintendent (April 3, 2020).

[470] Interview of Cheryl Poppe, Soldiers' Home in Chelsea Superintendent (June 8, 2020).

[471] Email from Nancy Shimel on behalf of Bennett Walsh to the Soldiers' Home staff (March 17, 2020 at 3:52 PM (EST)) (REVPROB0028-00008686).

[472] Interview of Kristin Weber, Recreational Therapist I (April 30, 2020); Interview of Margaret Feyre, Recreation Program Coordinator III (April 24, 2020).

[473] Interview of Eileen Driscoll, Family Member (May 7, 2020).

[474] Interview of Margaret Feyre, Recreation Program Coordinator III (April 24, 2020).

[475] Email and Attachment from Vanessa Lauziere to the Soldiers' Home staff (March 11, 2020 5:13 PM (EST)) (REVPROB0028-00009301; REVPROB0028-00009302).

[476] Email from Nancy Shimel – on behalf of Bennett Walsh - to the Soldiers' Home staff (March 16, 2020 at 3:24 PM (EST)) (REVPROB0028-00008875).

[477] Interview of Carrie Forrant, Social Worker I (April 27, 2020).

[478] Interview of Sheila Serra, Dietician III (May 18, 2020).

[479] Email from Bennett Walsh to the Soldiers' Home staff (March 15, 2020 at 10:24 AM (EST)) (REBPROB0028-00008968) (noting that this policy was implemented "in coordination with the CDC and DPH as a preventative measure"); Email from Camilla Madziar (March 15, 2020) (REVPROB0028-00016167) (noting that a sign was placed on the dining room doors and that the sign should be updated or revised once a decision is made regarding staff.). Brandy Gridley reported that the dining room had actually closed the day before on March 14. Interview of Brandy Gridley, Food Service Supervisor II (April 29, 2020).

[480] Email and Attachment from Nancy Shimel to Bennett Walsh, Debra Foley, Jeremiah Laplante, Mark Yankopoulos, Norman Gousy, Vanessa Lauziere, Dr. David Clinton, Vanessa Gosselin, Kari Redinger, Linda Betley, Jennifer DeWitt, Marie Flynn, Robert Fox, John Fydenkevez, Angelo Proietti, Robert Malikin, Patricia Foley, Jeremy Meade, Jillian Orzechowski, Jessica Powers, Carolyn Rogers, Stephen Pultorak, Celeste Surreira, Mark Yankopoulos (March 16, 2020 at 12:15 PM (EST)) (REVPROB0028-00008920).

[481] Email from Nancy Shimel on behalf of Bennett Walsh to the Soldiers' Home staff (March 17, 2020 at 3:52 PM (EST)) (REVPROB0028-00008686) (encouraging staff to be "mindful of supplies").

[482] Email and Attachment from Vanessa Lauziere to the Soldiers' Home staff (March 11, 2020 5:13 PM (EST)) (REVPROB0028-00009301); Interview of Brandy Gridley, Food Service Supervisor II (April 29, 2020).

[483] Interview of Robyn Fowler, Registered Nurse IV (April 30, 2020); Interview of Joseph Ramirez, Nursing Assistant I (April 8, 2020); Interview of Thalia Rivers, Nursing Assistant I (April 21, 2020).

[484] Email from Catherine Starr to Bennett Walsh et al. (March 11, 2020 at 11:26 AM (EST)) (REVPROB0028-00009371).

[485] Email from Paul Moran to Bennett Walsh et al. (March 12, 2020 at 2:28 PM (EST)) (REVPROB0028-00009195); Attachment to email from Paul Moran to Bennett Walsh et al. (March 12, 2020) (REVPROB0028-00009199).

[486] Email from Kwesi Ablordeppey to Vanessa Lauziere, Bennett Walsh, and Vanessa Gosselin (March 13, 2020 at 1:53 AM (EST)) (REVPROB0028-00002861); Interview of Emily Boronski, Registered Nurse II (May 21, 2020); Interview of Caitlin Clark, Licensed Practical Nurse II (May 28, 2020); Interview of Patti Foley, Training Program Coordinator I (May 27, 2020); Interview of Sherri Gentile, Nursing Assistant I (April 22, 2020); Interview of Vanessa Gosselin, Infection Prevention/ Clinical Nursing Coordinator (April 16, 2020).; Interview of Theresa King. Licensed Practical Nurse (April 9, 20200); Interview of Vanessa Lauziere, Soldiers' Home Chief Nursing Officer (May 14, 2020).

[487] Interview of Colleen Bartlett, Licensed Practical Nurse II (April 23, 2020); Interview of Patricia Sullivan, Nursing Assistant I (April 21, 2020).

[488] Interview of Emily Boronski, Registered Nurse II (April 21, 2020); *see also* Interview of Celeste Surreira, Soldiers' Home Assistant Director of Nursing (April 17, 2020) (noting that because the PPE was not being stored on the units and staff had to ask a supervisor for it, there may have been a perception that there was a PPE shortage).

[489] Interview of Carmen Rivera, Nursing Assistant I (April 8, 2020); Interview of Doris Santana, Nursing Assistant I (April 23, 2020).

[490] Email from Nancy Shimel on behalf of Bennett Walsh to the Soldiers' Home staff (March 17, 2020 at 3:52 PM (EST)) (REVPROB0028-00008686).

[491] Interview of Cheryl Poppe, Soldiers' Home in Chelsea Superintendent (June 8, 2020).

[492] Interview of Robyn Fowler, Registered Nurse IV (April 30, 2020); Interview of Joseph Ramirez, Nursing Assistant I (April 8, 2020); Interview of Thalia Rivers, Nursing Assistant I (April 21, 2020).

[493] Interview of Carrie Forrant, Social Worker I (April 27, 2020); Interview of Jackie Digris, Registered Nurse II (April 29, 2020); Interview of Patti Foley, Training Program Coordinator I (May 27, 2020); Interview of Robyn Fowler, Registered Nurse IV (April 30, 2020).

[494] Interview of Vanessa Gosselin, Soldiers' Home Infection Control Nurse (April 16, 2020). Ms. Gosselin reported that she did these oral trainings on each of the shifts. *Id.* Some staff, however, reported that they did not receive any training prior to the first positive test.

[495] Interview of Caitlin Clark, Licensed Practical Nurse II (April 28, 2020); Interview of Brandy Gridley, Food Service Supervisor (April 29, 2020).

[496] Interview of Bennett Walsh, Soldiers' Home Superintendent (June 1, 2020).

[497] Interview of Theresa King, Licensed Practical Nurse II (April 9, 2020).

[498] Interview of Luis Rodriguez, Storekeeper II, Central Supply (April 20, 2020).

[499] Interview of Luis Rodriguez, Storekeeper II, Central Supply (April 20, 2020); Interview of Bennett Walsh, Soldiers' Home Superintendent (June 1, 2020).

[500] Interview of Lynn Lacombe, Licensed Practical Nurse II (April 24, 2020).

[501] Interview of Patti Foley, Training Program Coordinator (May 27, 2020).

[502] Interview of Lynn Lacombe, Licensed Practical Nurse II (April 24, 2020); Interview of Mary Bergeron, Licensed Practical Nurse II (May 1, 2020) (noting that she never had time to look at her email); Interview of Jackie Digris, Registered Nurse II (April 29, 2020).

[503] Interview of Lynn Lacombe, Licensed Practical Nurse II (April 24, 2020). Ms. Lacombe would only check the veterans' temperatures if they seemed sick.

[504] Interview of Jillian Orzechowski, Social Worker I (April 27, 2020); Interview of Michael & Susan Regensburger, Family Members (May 7, 2020).

[505] Interview of Jackie Digris, Registered Nurse II (April 29, 2020).

[506] Interview of Jackie Digris, Registered Nurse II (April 29, 2020); Email from Nancy Shimel on behalf of Bennett Walsh to the Soldiers' Home staff (March 17, 2020 at 3:52 PM (EST)) (REVPROB0028-00008686) (encouraging staff to be "mindful of supplies").

[507] Interview of Jackie Digris, Registered Nurse II (April 29, 2020).

[508] *Id*

[509] Interview of Laurie Beaudette, Family Member (May 6, 2020).

[510] Interview of Colleen Croteau, Family Member (April 16, 2020).

[511] *Id.*

[512] *Id.*

[513] Interview of Eileen Driscoll, Family Member (May 7, 2020).

[514] *Id.*

[515] Interview of Susan Kenney, Family Member (May 4, 2020).

[516] *Id.*

[517] *Id.*

[518] *Id.*

[519] Interview of Eileen Driscoll, Family Member (May 7, 2020); Interview of Michael & Susan Regensburger, Family Members (May 7, 2020).

[520] Interview of Susan Kenney, Family Member (May 4, 2020).

[521] Email from Dana Ohannessian (DPH) to Vanessa Gosselin (March 11, 2020 at 3:55 PM (EST)) (REVPROB0028-00000570).

[522] Interview of Bennett Walsh, Soldiers' Home Superintendent (April 3, 2020).

[523] *Id.*

[524] Calendar Invite to Secretary Sudders, et al. (March 11, 2020 at 2:00 PM (EST)) (GOV0039341); Calendar Invite to Bennett Walsh, Cheryl Poppe, et al. (March 11, 2020 at 10:08 AM (EST)) (REVPROB0028-00009376). *See also* Email from Nancy Shimel on behalf of Bennett Walsh to the Soldiers' Home staff (March 17, 2020 at 3:52 PM (EST)) (REVPROB0028-00008686).

[525] Interview of Celeste Surreira, Soldiers' Home Assistant Director of Nursing (April 17, 2020) (noting that there were Board of Health city meetings that Ms. Gosselin was likely attending).

[526] Interview of Bennett Walsh, Soldiers' Home Superintendent (April 3, 2020); Secretary's Week in Advance 03-14-2020 (March 6, 2020 at 5:09 PM (EST)) (GOV0040970) (noting that Mr. Walsh participated in the weekly managers' meeting hosted by Secretary Urena on March 9).

[527] Interview of Kwesi Ablordeppey, Nursing Assistant I (April 7, 2020); Interview of Cory Bombredi, SEIU Local 888 Internal Organizer (April 7, 2020) (noting that the topic of the meeting was to launch the campaign, "Protect Our Veterans, Stop Mandation.").

[528] Email from Andrea Fox to Jeffrey Krok et al. (March 13, 2020 (9:42 AM (EST)) (REVPROB0028-00009113); Email from Andrea Fox to Jeffrey Krok et al. (March 11, 2020 (10:09 AM (EST)) (REVPROB0028-00005146)

[529] Interview of Brenda Rodrigues, SEIU Local 888 President (April 6, 2020).

[530] Interview of Denise Coughlin, Licensed Practical Nurse II (May 22, 2020).

[531] Interview of Mary Bergeron, Licensed Practical Nurse II (May 1, 2020).

[532] Email from Jeff Krok to Bennett Walsh, Vanessa Lauziere, David Tranghese, Jessica Powers, Mark Yankopoulos (March 11, 2020 at 12:09 PM (EST)) (REVPROB0028-00009358) (passing along the MNA's request and attached a Q&A on COVID-19 preparedness).

[533] Interview of Brenda Rodrigues, SEIU Local 888 President (April 6, 2020).

[534] Interview of Brenda Rodrigues, SEIU Local 888 President (April 6, 2020); Interview of Andrea Fox and Roland Goff, Associate Director of the MNA Division of Labor Action and the Director of Strategic Campaigns (April 15, 2020).

[535] Email from Vanessa Lauziere to the Soldiers' Home staff (March 11, 2020 5:13 PM (EST)) (REVPROB0028-00009301) (attaching guidelines noting that the executive team would look into "room changes to allow for at least 2 empty rooms in case of the need for isolation").

[536] Interview of Bennett Walsh, Soldiers' Home Superintendent (June 1, 2020).

[537] Interview of Vanessa Lauziere, Soldiers' Home Chief Nursing Officer (May 14, 2020).

[538] Interview of Thomas Lingenberg, Building Maintenance Supervisor II (May 5, 2020); Interview of Patricia Sullivan, Nursing Assistant I (April 21, 2020).

[539] Interview of Emily Boronski, Registered Nurse II (May 21, 2020); Interview of Denise Coughlin, Licensed Practical Nurse II (May 22, 2020); Interview of Robyn Fowler, Registered Nurse IV (April 30, 2020); Interview of Vanessa Gosselin, Soldiers' Home Infection Control Nurse (April 16, 2020).

[540] Interview of Denise Coughlin, Licensed Practical Nurse II (May 22, 2020); Email from Kelly Hansen to Vanessa Lauziere, Bennett Walsh, Emily Moriarty, Robyn Fowler, Robert Malikin, Carolyn Rogers, Michele Haymes, Kelley Rathman, Celeste Surreira (March 17, 2020 at 9:06 AM (EST)) (REVPROB0028-00005043); Interview of Bennett Walsh, Soldiers' Home Superintendent (June 1, 2020).

[541] Interview of Denise Coughlin, Licensed Practical Nurse II (May 22, 2020) (noting that when asked why they were emptying these rooms, Walsh said that they had to do it so that they could have a negative pressure room in place in case there was a COVID-19 outbreak).

[542] Email from Kelly Hansen to Vanessa Lauziere, Bennett Walsh, Emily Moriarty, Robyn Fowler, Robert Malikin, Carolyn Rogers, Michele Haymes, Kelley Rathman, Celeste Surreira (March 17, 2020 at 9:06 AM (EST)) (REVPROB0028-00005043).

[543] Email from Kelly Hansen to Vanessa Lauziere, Bennett Walsh, Emily Moriarty, Robyn Fowler, Robert Malikin, Carolyn Rogers, Michele Haymes, Kelley Rathman, Celeste Surreira (March 17, 2020 at 9:06 AM (EST)) (REVPROB0028-00005043).

[544] March 20, 2020 9:00 AM (EST) Department Head COVID-19 Meeting Minutes (REVPROB0028-00008243).

[545] Interview of Emily Boronski, Registered Nurse II (May 21, 2020); Interview of Denise Coughlin, Licensed Practical Nurse II (May 22, 2020).

[546] Interview of Vanessa Gosselin, Soldiers' Home Infection Control Nurse (April 16, 2020).

[547] *Considerations for the Public Health Response to COVID-19 in Nursing Homes*, CENTERS FOR DISEASE CONTROL AND PREVENTION, *available at* https://www.cdc.gov/coronavirus/2019-ncov/hcp/nursing-homes-responding.html (noting that facilities should dedicate health care providers to work only on COVID-19 care units).

[548] Interview of Vanessa Gosselin, Infection Prevention/ Clinical Nursing Coordinator (April 16, 2020).

[549] Interview of Bennett Walsh, Soldiers' Home Superintendent (June 1, 2020).

[550] *Id.*

[551] Interview of Linda Lariviere, Registered Nurse III, MDS Coordinator (May 15, 2020). In her interview, Lariviere noted that she thinks that Veteran 1's illness was underestimated because of his history of respiratory illnesses.

[552] Interview of Cindy Cormier, Licensed Practical Nurse II (May 5, 2020); Interview of Mary Bergeron, Licensed Practical Nurse (May 1, 2020); Interview of Jillian Orzechowski, Social Worker I (April 27, 2020);

Interview of Lindsay Korsen, Nursing Assistant I (April 24, 2020); Interview of Carmen Rivera, Nursing Assistant I (April 8, 2020).

[553] Interview of Mary Bergeron, Licensed Practical Nurse II (May 1, 2020).

[554] Interview of Lindsay Korsen, Nursing Assistant I (April 24, 2020).

[555] Interview of Cindy Cormier, Licensed Practical Nurse II (May 5, 2020); Interview of Margaret Feyre, Recreation Program Coordinator III (May 24, 2020); Interview of Doris Santana, Nursing Assistant I (April 23, 2020).

[556] Interview of Thalia Rivers, Nursing Assistant I (April 21, 2020).

[557] *Id.*

[558] *Id.*

[559] *Id.*

[560] Interview of Cindy Cormier, Licensed Practical Nurse II (May 5, 2020); Interview of Lindsay Korsen, Nursing Assistant I (April 24, 2020).

[561] Interview of Lindsay Korsen, Nursing Assistant I (April 24, 2020); Interview of Carmen Rivera, Nursing Assistant I (April 8, 2020).

[562] Interview of Celeste Surreira, Soldiers' Home Assistant Director of Nursing (April 17, 2020); Interview of Vanessa Lauziere, Soldiers' Home Chief Nursing Officer (May 15, 2020).

[563] Interview of Vanessa Lauziere, Soldiers' Home Chief Nursing Officer (May 14, 2020). The critical incident report notes that the test was conducted on March 16, however other information suggests that March 17 is the more probable testing date. March 22, 2020 Critical Incident Report (REVPROB0028-00008095).  Mr. Walsh recalled that Ms. Surreira brought up Veteran 1's symptoms at the morning huddle and he was tested later that day. Ms. Lauziere notified Lindsay Korsen via voicemail that Veteran 1 would be tested for COVID-19, but that he was low risk for the virus and likely did not have it.

[564] Interview of Bennett Walsh, Soldiers' Home Superintendent (April 3, 2020).

[565] Interview of Vanessa Lauziere, Soldiers' Home Chief Nursing Officer (May 14, 2020).

[566] *Id.*

[567] Interview of Bennett Walsh, Soldiers' Home Superintendent (April 6, 2020).

[568] Interview of Kwesi Ablordeppey, Nursing Assistant I (April 7, 2020).

[569] Interview of Lindsay Korsen, Nursing Assistant I (April 24, 2020).

[570] Interview of Vanessa Lauziere, Soldiers' Home Chief Nursing Officer  (May 14, 2020); Interview of Bennett Walsh, Soldiers' Home Superintendent (June 1, 2020).

[571] Interview of Lindsay Korsen, Nursing Assistant I (April 24, 2020).

[572] Interview of Cindy Cormier, Licensed Practical Nurse II (May 5, 2020).

[573] Interview of Carmen Rivera, Nursing Assistant I (April 8, 2020).

[574] Interview of Cindy Cormier, Licensed Practical Nurse II (May 5, 2020); Interview of Eileen Gregersen, Licensed Practical Nurse (April 24, 2020); Interview of Doris Santana, Nursing Assistant I (April 23, 2020); Interview of Elisia Stafford, Nursing Assistant I (April 28, 2020); Interview of Anne Taft, Registered Nurse IV (April 30, 2020). One aide reported that she was only allowed to wear a mask later in the day on March 17, after Veteran 1 had been tested. Interview of Elisia Stafford, Nursing Assistant I (April 28, 2020).

[575] Interview of Dr. Clinton, Soldiers' Home Medical Director (April 21, 2020).

[576] *Id.*

[577] *Id.*

[578] *Id.*

[579] Interview of Bennett Walsh, Soldiers' Home Superintendent, (June 1, 2020).

[580] Interview of Emily Boronski, Registered Nurse II (May 21, 2020).

[581] Interview of Denise Coughlin, Licensed Practical Nurse II (May 22, 2020).

[582] Interview of Lindsay Korsen, Licensed Practical Nurse II (April 24, 2020).

[583] Interview of Vanessa Lauziere, Soldiers' Home Chief Nursing Officer   (May 14, 2020).

[584] Interview of Lindsay Korsen, Licensed Practical Nurse II (April 24, 2020); Interview of Cindy Cormier, Licensed Practical Nurse II (May 5, 2020).

[585] Interview of Vanessa Lauziere, Soldiers' Home Chief Nursing Officer   (May 14, 2020).

[586] Interview of Lindsay Korsen, Licensed Practical Nurse II (April 24, 2020).

[587] Interview of Vanessa Lauziere, Soldiers' Home Chief Nursing Officer   (May 14, 2020).

[588] *Id.*

[589] *Id.*

[590] Interview of Patricia Sullivan, Nursing Assistant I (April 21, 2020).

[591] Interview of Ulises Suarez, Nursing Assistant I (May 18, 2020).

[592] *Id.*

[593] Interview of Emily Boronski, Nursing Assistant I (May 21, 2020).

[594] *Id.*

[595] *Id.*

[596] Interview of Carrie Forrant, Social Worker (April 27, 2020).

[597] *Id.*

[598] *Id.*

[599] *Id.*

[600] Interview of Terri Gustafson, Social Worker (April 29, 2020); Interview of Carrie Forrant, Social Worker (April 27, 2020); Interview of Jill Orzachowski, Social Worker (April 27, 2020).

[601] Interview of Carrie Forrant, Social Worker (April 27, 2020).

[602] *Id.*

[603] *Id.*

[604] *Id.*

[605] Email from Cory Bombredi to Bennett Walsh et al. (March 17, 2020 (10:52 AM (EST)) (REVPROB0028-00008736).

[606] Email from Cory Bombredi to Bennett Walsh et al. (March 25, 2020 4:05 PM (EST)) (GOV0034916).

[607] Email from Cory Bombredi to Bennett Walsh et al. (March 26, 2020 9:36 AM (EST)) (GOV0034908).

[608] *Id.*

[609] *Id.*

[610] *Id.*

[611] Email from Cory Bombredi to Bennett Walsh et al. (March 28, 2020 5:36 PM (EST)) (REVPROB0028-00015961).

[612] Email from Cory Bombredi to Suzanne Quersher et al. (March 23, 2020 3:20 PM (EST)) (REVPROB0028-00015942); Interview of Cory Bombredi, SEIU Local 888 Internal Organizer (April 7, 2020); Interview of Kwesi Ablordeppey, Nursing Assistant (April 7, 2020).

[613] Interview of Brenda Rodrigues, SEIU Local 888 President (April 6, 2020).

[614] Interview of Brenda Rodrigues, SEIU Local 888 President (April 6, 2020); Interview of Kwesi Ablordeppey, Nursing Assistant I (April 7, 2020).

[615] Email from Cory Bombredi to Brenda Rodrigues et al. (March 30 8:48 AM (EST)) (REVPROB0028-00015958).

[616] Interview of Kwesi Ablordeppey, Nursing Assistant I (April 7, 2020).

[617] Interview of Carrie Forrant, Social Worker (April 27, 2020).

[618] Interview of Robyn Fowler, Registered Nurse IV (April 30, 2020); Email and attachment from Vanesa Gosselin to all Soldiers' Home Staff (March 23 4:13 PM (EST)) (GOV0076083).

[619] Interview of Cheryl Poppe, Soldiers' Home in Chelsea Superintendent (June 8, 2020).

[620] Email from Vanessa Gosselin to Bennett Walsh, Vanessa Lauziere, and Dr. David Clinton (March 25, 2020 12:16 PM (EST)) (REVPROB0028-00007727).

[621] *Id.*

[622] *Id.*

[623] Email from Kwesi Ablordeppey to Bennett Walsh et al. (March 24, 2020 8:29 PM (EST)) (REVPROB0028-00007765).

[624] *Id.*

[625] *Id.*

[626] Interview of Vanessa Lauziere, Soldiers' Home Chief Nursing Officer   (May 14, 2020); Interview of Cory Bombredi, SEIU Local 888 Internal Organizer (April 7, 2020); Interview of Jeffrey Krok, EOHHS Labor Relations Specialist  (Springfield Office) (April 16, 2020); Staffing Assignment Sheet for the Third Shift of March 18, 2020 (GOV0012604).

[627] Interview of Vanessa Gosselin, RN, Infection Prevention/Clinical Nursing Coordinator (April 16, 2020).

[628] Email from Kwesi Ablordeppey to Bennett Walsh et al. (March 24, 2020 8:29 PM (EST)) (REVPROB0028-00007765).

[629] Email from Kwesi Ablordeppey to Bennett Walsh et al. (March 24, 2020 8:29 PM (EST)) (REVPROB0028-00007765).

[630] Memorandum from Vanessa Lauziere to Kwesi Ablordeppey (March 20, 2020) (REVPROB0028-00015801).

[631] Interview of Vanessa Lauziere, Soldiers' Home Chief Nursing Officer   (May 14, 2020); Interview of Kwesi Ablordeppey, Nursing Assistant I (April 7, 2020).

[632] Interview of Vanessa Lauziere, Soldiers' Home Chief Nursing Officer   (May 14, 2020); Interview of Kwesi Ablordeppey, Nursing Assistant I (April 7, 2020).

[633] Interview of Vanessa Lauziere, Soldiers' Home Chief Nursing Officer   (May 14, 2020); Interview of Kwesi Ablordeppey, Nursing Assistant I (April 7, 2020).

[634] Interview of Vanessa Lauziere, Soldiers' Home Chief Nursing Officer   (May 14, 2020).

[635] Interview of Kwesi Ablordeppey, Nursing Assistant I (April 7, 2020).

[636] *Id.*

[637] Email from Kwesi Ablordeppey to Bennett Walsh et al. (March 24, 2020 8:29 PM (EST)) (REVPROB0028-00007765).

[638] Email from Vanessa Lauziere to Bennett Walsh et al. (March 27, 2020 7:32 PM (EST)) (REVPROB0028-00007306).

[639] Soldiers' Home Morgue Census (April 23, 2020) (REVPROB0028-00016168).

[640] Interview of Dr. David Clinton, Soldiers' Home Medical Director (April 21, 2020).

[641] Interview of Celeste Surreira, Assistant Director of Nursing (May 19, 2020).

[642] Interview of Bennett Walsh, Soldiers' Home Superintendent (June 1, 2020).

[643] *Id.*

[644] *Id.*

[645] *Id.*

[646] Interview of Vanessa Lauziere, Soldiers' Home Chief Nursing Officer   (May 14, 2020).

[647] Interview of Mary Bergeron, Licensed Practical Nurse II (May 1, 2020); Interview of Carrie Forrant, Social Worker (April 27, 2020).

[648] Interview of Mary Bergeron, Licensed Practical Nurse II (May 1, 2020).

[649] Interview of Carrie Forrant, Social Worker (April 27, 2020).

[650] *Id.*

[651] Interview of Sandy Marino, Registered Nurse IV, Veteran Care Coordinator (May 6, 2020).

[652] Interview of Ulises Suarez, Launderer I (May 18, 2020).

[653] *Id.*

[654] *Id.*

[655] *Id.*

[656] Email from Vanessa Lauziere to Soldiers' Home staff (March 27, 2020 7:10 PM (EST)) (REVPROB0028-00007306).

[657] Interview of Mary Bergeron, Licensed Practical Nurse II (May 1, 2020).

[658] Interview of Carrie Forrant, Social Worker (April 27, 2020).

[659] Interview of Mary Bergeron, Registered Nurse (May 1, 2020).); Interview of Cindy Cormier, Licensed Practical Nurse (May 5, 2020).

[660] Interview of Carrie Forrant, Social Worker I (April 27, 2020).

[661] *Id.*

[662] *Id.*

[663] *Id.*

664 Interview of Terri Gustafson, Social Worker I (April 29, 2020).

665 Interview of Jill Orzechowski, Social Worker I (April 27, 2020).

666 *Id.*

667 Interview of Valenda Liptak, Soldiers' Home Interim Administrator (April 9, 2020).

668 *Id.*

669 24-Hour Nursing Report (March 20, 2020) (REVPROB0028-00002252).

670 Interview of Terri Gustafson, Social Worker I (April 29, 2020).

671 Interview of Emily Boronski, Registered Nurse II (May 21, 2020); Interview of Cindy Cormier, Licensed Practical Nurse II (May 5, 2020); Interview of Carrie Forrant, Social Worker I (April 27, 2020); Interview of Orzechowski, Social Worker I (April 27, 2020).

672 Interview of Carrie Forrant, Social Worker I (April 27, 2020).

673 Email from Maryellen Baker to Vanessa Gosselin, Bennett Walsh, Vanessa Lauziere, Celeste Surreiea, et al. (March 29, 2020 9:19 AM (EST)) (REVPROB0028-00006811).

674 Interview of Mary Bergeron, Licensed Practical Nurse II (May 1, 2020).

675 *Id.*

676 Interview of Carrie Forrant, Social Worker (April 27, 2020).

677 Email from Cory Bombredi to Brenda Rodrigues et al. (March 30, 2020 8:33 AM (EST)) (REVPROB0028-00015958).

678 Interview of Carrie Forrant, Social Worker I (April 27, 2020).

679 Interview of Mary Bergeron, Licensed Practical Nurse II (May 1, 2020).

680 Interview of Cindy Cormier, Licensed Practical Nurse II (May 5, 2020); Interview of Terri Gustafson, Social Worker I (April 29, 2020).

681 Interview of Terri Gustafson, Social Worker I (April 29, 2020).

682 *Id.*

683 Interview of Carrie Forrant, Social Worker I (April 27, 2020).

684 Soldiers' Home Morgue Census (April 23, 2020) (REVPROB0028-00016168).

685 Interview of Bennett Walsh, Soldiers' Home Superintendent (June 1, 2020).

686 *See, e.g.,* March 22, 2020 Critical Incident Report (GOV0010942).

687 Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020).

688 *Id.*

689 Email from Paul Moran to Cheryl Poppe and Bennett Walsh (March 25, 2020 1:48 PM (EST)) (GOV0080500).

690 EOHHS Confirmed COVID-19 Daily Case Tracker, March 24, 2020 (REVPROB0028-00007435).

691 Email from Colleen Arons to Mark Yankopoulos (March 27, 2020 4:44 PM (EST)) (REVPROB0028-00007347).

692 Email from Secretary Urena to Cheryl Poppe and Bennett Walsh (March 29, 2020 10:38 AM (EST)) (REVPROB0028-00006800).

693 Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020).

694 Email from Bennett Walsh to Secretary Urena et al. (March 21, 2020 10:54 PM (EST)) (GOV0045632).

695 Interview of Joyce Cohen, Department of Public Health Epidemiologist and Influenza Coordinator (May 8, 2020).

696 Interview of Dr. David Clinton Interview, Soldiers' Home Medical Director (April 21, 2020).

697 Email from Bennett Walsh to Secretary Urena et al. (March 21, 2020 10:54 PM (EST)) (GOV0045632).

698 Email from Alda Rego to Secretary Urena and Daniel Tsai et al. (March 22, 2020 5:32 AM (EST)) (GOV0040939).

699 Email from Daniel Tsai to Secretary Sudders and Leslie Darcy (March 22, 2020 9:31 AM (EST)) GOV0051381).

700 Email from Bennett Walsh to Secretary Urena, Catherine Mick, Brooke Karanovich, Colleen Arons, and Daniel Tsai et al. (March 22, 2020 9:54 AM (EST)) and March 22, 2020 Critical Incident Report Attachment (REVPROB0028-00008094 and REVPROB0028-00008095).

701 Email from Bennett Walsh to Paul Moran et al. (March 22, 2020 10:17 AM (EST)) (REVPROB0028-00008109).

702 Email from Bennett Walsh to Secretary Urena et al. (March 22, 2020 11:17 AM (EST)) (GOV0048262).

703 Email from Linda Lariviere to Elvira Loncto (VA)(March 23, 2020 10:11 AM (EST)) (REVPPROB0028-00008034).

704 Interview of Vanessa Gosselin, Soldiers' Home Infection Control Nurse (April 16, 2020).

705 Massachusetts Department of Public Health MAVEN database entries, March 24, 2020-May 3, 2020 (GOV0039324).

706 Email from Lindsay Tucker to Secretary Urena (March 25, 2020 (11:09 AM (EST)) (REVPROB0028-00007110).

707 Email from Lindsay Tucker to Bennett Walsh et al. (1:09 PM (EST)) (REVPROB0028-00007405).

708 Interview of Joyce Cohen, Department of Public Health Epidemiologist and Influenza Coordinator (May 8, 2020).

709 Email from Vanessa Gosselin to Bennett Walsh, Vanessa Lauziere, and Dr. David Clinton (March 25, 2020 12:16 PM (EST)) (REVPROB0028-00007727).

710 Text Message from Daniel Tsai to Secretary Sudders (March 25, 2020 2:21 PM (EST)) (GOV0051560).

711 Interview of Joyce Cohen, Department of Public Health Epidemiologist and Influenza Coordinator (May 8, 2020).

712 Email from Bennett Walsh to Vanessa Lauziere and Celeste Surreira (March 25, 2020 4:34 PM (EST)) (REVPROB0028-00004892).

713 Interview of Bennett Walsh, Soldiers' Home Superintendent (June 1, 2020).

714 Email from Bennett Walsh to Vanessa Lauziere (March 26, 2020 11:11: AM (EST)) (REVPROB0028-00006960)

715 Interview of Bennett Walsh, Soldiers' Home Superintendent (June 1, 2020).

716 Email from Melissa Cumming to Vanessa Lauziere et al. (March 26, 2020 4:29 PM (EST))(REVPROB0028-00016117).

717 Text Messages between Bennett Walsh and Secretary Urena (March 27, 2020 9:45 AM (EST)) (GOV0051814).

[718] Email from Deborah Schaier to Vanessa Gosselin (March 27, 2020 (10:23 AM (EST)) (REVPROB0028-00000733).

[719] Department of Public Health MAVEN Notes (GOV0039324).

[720] *Id.*

[721] Interview of Francisco Urena, Secretary of the Department of Veterans' Services (June 5, 2020).

[722] Email from Bennett Walsh to Secretary Urena (March 27, 2020 at 1:24 PM (EST)) (GOV0044938).

[723] Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020).

[724] Email from Vanessa Lauziere to Vanessa Gosselin, Jennifer DeWitt, Linda Betley, Sandra Marino, Robyn Fowler, Tracy Clapp, Darcy Barry, Joseph Grab, Emily Moriarty, Kelly Hansen, Celeste Surreira, Erika Scoble, Kimberly Szczur, Jodie Alaimo, Anne Taft, and Linda Lariviere (March 27, 2020 1:32 PM (EST)) (REVPROB0028-00000393) (Lauziere circulated dial-in number for "emergency staff meeting" for those who were not present at the meeting).

[725] Interview of Catherine Mick, EOHHS Undersecretary of Human Services (May 30, 2020).

[726] Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020).

[727] Email from Mark Yankopoulos to Colleen Arons (March 27, 2020 3:41 PM (EST)) (REVPROB0028-00007440).

[728] Email from Mark Yankopoulos to Colleen Arons (March 27, 2020 4:42 PM (EST)) (REVPROB0028-00007391).

[729] Email from Colleen Arons to Mark Yankopoulos (March 27, 2020 4:44 PM (EST)) (REVPROB0028-00007356).

[730] Email from Bennett Walsh to Colleen Arons, Alda Rego, Catherine Starr, and Secretary Urena (March 27, 2020 4:11 PM (EST)) (GOV0044864).

[731] Email from Mark Yankopoulos to Colleen Arons and Bennett Walsh (March 27, 2020 5:25 PM (EST)) (REVPROB0028-00007347).

[732] Email from Vanessa Gosselin to Bennett Walsh, Vanessa Lauziere, Dr. David Clinton, Debra Foley, , Mark Yankopoulos, and Celeste Surreira (March 27, 2020 6:30 PM (EST)) (REVPROB0028-00007331).

[733] Department of Public Health MAVEN Notes (GOV0039324).

[734] Email from Deborah Schaier to Vanessa Gosselin (March 27, 2020 8:33 PM (EST)) (REVPROB0028-00000723).

[735] Copies of Vanessa Gosselin's COVID-19 Interview Tool for Confirmed Cases (GOV0083409; GOV0083428; GOV0083447; GOV0083523).

[736] Email from Deborah Schaier to Vanessa Gosselin (March 27, 2020 8:33 PM (EST)) (REVPROB0028-00000723).

[737] *Id.*

[738] Email from "smith smith" to Mayor Alex Morse (March 28, 2020 7:29 AM (EST)) (REVPROB0028-00016033).

[739] Email from Amy Phillips (WWLP) to Anthony Preston and Bennett Walsh (March 28, 2020 9:26 AM (EST)) (REVPROB0028-00007236).

[740] Email from Mark Yankopoulos to Colleen Arons (March 28, 2020 1!:22 AM (EST)) (REVPROB0028-00007220).

[741] Email from Mark Yankopoulos to Colleen Arons (March 28, 2020 11:39 AM (EST)) (REVPROB0028-00007193).

[742] Email from Colleen Arons to Secretary Sudders and Daniel Tsai et al. (March 28, 2020 4:37 PM (EST)) (GOV0039498).

[743] Email from Paul Moran to Mark Yankopoulos (March 28, 2020 9:14 PM (EST)) (REVPROB0028-00007092).

[744] Email from Brenda Rodrigues to Secretary Sudders (March 28, 2020 8:11 PM (EST)) (GOV0049128).

[745] Interview of Brenda Rodrigues, President of SEIU Local 888 (April 6, 2020); Interview of Marylou Sudders, Secretary of EOHHS (June 7, 2020).

[746] Email from Bennett Walsh to Secretary Urena (March 28, 2020 9:56 PM (EST)) (REVPROB0028-00006817).

[747] Email from Secretary Urena to Bennett Walsh (March 28, 2020 10:01 PM (EST)) (REVPROB0028-00007079).

[748] Email from Bennett Walsh to Secretary Urena (March 28, 2020 10:03 PM (EST)) (REVPROB0028-00007079).

[749] Text Message from Bennett Walsh to Secretary Urena (March 29, 2020 1:30 PM (EST)) (GOV0051814).

[750] Interview of Emily Boronski, Registered Nurse II (May 21, 2020).

[751] Interview of Caitlin Clark, Licensed Practical Nurse II (April 28, 2020)

[752] Email from Paul Moran to Bennett Walsh, Vanessa Lauziere, Dr. David Clinton, Jessica Powers, Debra Foley, Mark Yankopoulos, Mohammad Dar, Secretary Urena, and Anthony Preston (March 29, 2020 12:39 PM (EST)) (REVPROB0028-00006788).

[753] Interview of Daniel Tsai, Acting Secretary of EOHHS (May 27, 2020).

[754] Email from Mohammad Dar to Daniel Tsai, et al. (4:18 PM (EST)) (GOV0050903)

[755] *See, e.g.* Interview of Daniel Tsai, Acting Secretary of EOHHS (May 27, 2020); Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020).

[756] Email from Mark Yankopoulos to Colleen Arons (March 29, 2020 2:48 PM (EST)) (REVPROB0028-00006779).

[757] *Id.*

[758] Interview of Stuart Ivimey, General Counsel for the Department of Veterans' Services (June 4, 2020).

[759] *Id.*

[760] Cancelled Calendar Invite and Message from Alda Rego to Secretary Urena, Catherine Mick, Daniel Tsai, Bennett Walsh et al. (March 29, 2020) (REVPROB0028-00007058).

[761] Email from Colleen Arons to Marylou Sudders et al. (March 29, 2020 3:36 PM (EST)) (GOV0040196).

[762] Email from Bennett Walsh to Soldiers' Home Board of Trustees (March 29, 2020 4:19 PM (EST)) (REVPROB0028-00006874).

[763] Interview of Christopher Dupont, Soldiers' Home Board of Trustee member (April 13, 2020); Email form Nancy Shimel to Bennett Walsh and the Board of Trustees (March 30, 2020 3:55 PM (EST)) (REVPROB0028-00006874) (noting that the call needed to be postponed until March 31, 2020).

[764] Email from Mark Yankopoulos to Bennett Walsh (March 29, 2020 4:31 PM (EST)) (REVPROB0028-00007032).

765 Interview of Alex Morse, Mayor of Holyoke (April 3, 2020).

766 *Id.*; Interview of Bennett Walsh, Soldiers' Home Superintendent (June 1, 2020).

767 Interview of Alex Morse, Mayor of Holyoke (April 3, 2020).

768 Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020).

769 *Id.*

770 *Id.*

771 *Id.*

772 Interview of Stuart Ivimey, General Counsel of the Department of Veterans' Services (June 4, 2020).

773 *See id.*

774 Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020).

775 *Id.*; Interview of Daniel Tsai, Acting Secretary of EOHHS (May 27, 2020).

776 Interview of Stuart Ivimey, General Counsel of the Department of Veterans' Services (June 4, 2020); Interview of Paul Moran, Chief of Staff to Secretary of DVS (May 26, 2020); Interview of Daniel Tsai, Acting Secretary of EOHHS (May 27, 2020); Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020); Interview of Catherine Mick, EOHHS Undersecretary of Human Services (May 30, 2020).

777 Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020).

778 *Id.*

779 *Id.*

780 Interview of Karyn Polito, Lieutenant Governor of Massachusetts (May 21, 2020).

781 Interview of Alex Morse, Mayor of Holyoke (April 3, 2020).

782 Text Messages Between Secretary Urena and Catherine Mick (March 29, 2020 8:42 PM (EST), 8:45 PM (EST)) (GOV0051829).

783 Interview of Catherine Mick, EOHHS Undersecretary of Human Services (May 30, 2020).

784 Interview of Charlie Baker, Governor of Massachusetts (May 19, 2020); Interview of Marylou Sudders, Secretary of EOHHS (May 28, 2020).

785 Interview of Marylou Sudders, Secretary of EOHHS (May 28, 2020).

786 Text Messages between Bennett Walsh and Secretary Urena (March 29, 2020) (GOV0051814).

787 Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020).

788 Text Messages between Daniel Tsai and Catherine Mick (March 29, 2020) (GOV0051560).

789 Interview of Charlie Baker, Governor of Massachusetts (May 19, 2020).

790 Interview of Marylou Sudders, Secretary of EOHHS (May 28, 2020).

791 Calendar Invitation to Catherine Mick, Secretary Urena, Secretary Sudders, Colleen Arons, Catherine Starr, Bennett Walsh, Vanessa Lauziere, and Daniel Tsai (March 29, 2020 9:30 PM (EST)) (GOV0039335).

792 Interview of Marylou Sudders, Secretary of EOHHS (May 28, 2020).

793 *Id.*

794 Interview of Catherine Mick, Undersecretary of Human Services, EOHHS (May 30, 2020).

[795] Interview of Daniel Tsai, Acting Secretary of EOHHS (May 27, 2020).

[796] Interview of Marylou Sudders, Secretary of EOHHS (May 28, 2020).

[797] Email from Mark Yankopoulos to Bennett Walsh (March 29, 2020 4:31 PM (EST)) (REVPROB0028-00006776); Text Messages between Mark Yankopoulos and Bennett Walsh (March 29, 2020).

[798] Text Message from Bennett Walsh to Secretary Francisco (March 29, 2020 10:28 PM (EST)) (GOV0051814).

[799] Email from Vanessa Lauziere to Secretary Urena and Bennett Walsh (March 30, 2020 4:04 AM (EST)) and attached "COVID Master Census 2020" (REVPROB0028-00005988 & REVPROB0028-00005989).

[800] Email from Vanessa Lauziere to Secretary Urena and Bennett Walsh (March 30, 2020 4:31 AM (EST)) (REVPROB0028-00006756).

[801] Text Message from Bennett Walsh to Secretary Urena (March 30, 2020 6:14 AM (EST)) (GOV0051814).

[802] Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020).

[803] Id.

[804] Text Message from Daniel Tsai to Secretary Sudders (March 30, 2020 7:13 AM (EST)) (GOV0051560).

[805] Email from Vanessa Lauziere to Secretary Urena and Bennett Walsh (March 30, 2020 7:19 AM (EST)) (REVPROB0028-00006753).

[806] Email from Secretary Urena to Daniel Tsai, Secretary Sudders, Catherine Mick, Catherine Starr, Colleen Arons, Alda Rego, Paul Moran, Anthony Preston, and Stuart Ivimey (March 30, 2020 7:36 AM (EST)) (GOV0044697).

[807] Email from Catherine Mick to Secretary Urena (March 30, 2020 7:46 AM (EST)) (GOV0044697).

[808] Email from Secretary Urena to Daniel Tsai, Secretary Sudders, Catherine Mick, Catherine Starr, Colleen Arons, Alda Rego, Paul Moran, Anthony Preston, and Stuart Ivimey (March 30, 2020 7:51 AM (EST)) (GOV0044697).

[809] Text Message from Daniel Tsai to Secretary Sudders (March 30, 2020 8:02 AM (EST)) (GOV0051560).

[810] Text Messages between Daniel Tsai and Secretary Sudders (March 30, 2020 1:36 PM (EST)) (GOV0051560).

[811] Interview of Brenda Rodrigues, President of SEIU Local 888 (April 6, 2020); Interview of Marylou Sudders, Secretary of EOHHS (May 28, 2020 & June 7, 2020).

[812] Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020).

[813] Id.

[814] Id.

[815] Id.

[816] Id.

[817] Id.

[818] Interview of Marylou Sudders, Secretary of EOHHS (May 28, 2020).

[819] Id.

[820] Interview of Daniel Tsai, Acting Secretary of EOHHS, (May 28, 2020).

[821] Interview of Valenda Liptak, Soldiers' Home Interim Administrator (April 9, 2020).

[822] Email from Sharon Torgerson to Secretary Sudders, et. al (March 31, 2020 10:13 AM (EST))(GOV0050789).

[823] Infection Control Chart (GOV0039324).

[824] Interview of Colleen Bartlett, Licensed Practical Nurse II (April 23, 2020); Interview of Lisa Colombo, Soldiers' Home Incident Command Lead (April 13, 2020); Interview of Cindy Cormier, Licensed Practical Nurse II (May 5, 2020); Interview of Joan Miller, Registered Nurse II (April 22, 2020); Interview of Eileen Driscoll, family member (May 7, 2020).

[825] Interview of Valenda Liptak, Soldiers' Home Interim Administrator (April 9, 2020).

[826] Interview of Lisa Colombo, Soldiers' Home Incident Command Lead (April 13, 2020).

[827] Interview of Valenda Liptak, Acting Superintendent (April 9, 2020).

[828] *Id.*; Interview of Lisa Colombo, Soldiers' Home Incident Command Lead (April 13, 2020).

[829] Interview of Valenda Liptak, Acting Superintendent (April 9, 2020).

[830] Interview of Lisa Colombo, Soldiers' Home Incident Command Lead (April 13, 2020).

[831] *Id.*

[832] *Id.*

[833] Interview of Valenda Liptak, Soldiers' Home Interim Administrator (April 9, 2020).

[834] *Id.*

[835] Interview of Melissa Cumming, Epidemiologist Bureau of Infectious Disease and Laboratory Sciences (May 8, 2020).

[836] Interview of Lisa Colombo, Soldiers' Home Incident Command Lead (April 13, 2020).

[837] *Id.*

[838] Interview of Vanessa Lauziere, Soldiers' Home Chief Nursing Officer (May 14, 2020).

[839] *Id.*

[840] Interview of Sandy Marino, Registered Nurse IV (May 6, 2020).

[841] *Id.*

[842] *Id.*

[843] Veteran Medical Chart from the Soldiers' Home (GOV0067423).

[844] *Id.*

[845] Google.com COVID-19 Alert, Coronavirus Disease, Total Cases.

[846] R. Weisman, R. Ostriker, "*For the first time, state divulges death toll by nursing home, and more than 80 have 20 or more COVID-19 deaths*," THE BOSTON GLOBE, May 27, 2020, *available at* https://www.bostonglobe.com/2020/05/27/metro/first-time-state-divulges-death-toll-by-nursing-home-more-than-80-have-20-or-more-covid-19-deaths/

[847] Interview of Dr. David Clinton Interview, Soldiers' Home Medical Director (April 21, 2020).

[848] Interview of Celeste Surreira, Soldiers' Home Assistant Director of Nursing (April 17, 2020).

[849] Interview of Bennett Walsh, Soldiers' Home Superintendent (June 1, 2020).

[850] Interview of Mary Bergeron, Licensed Practical Nurse II (May 1, 2020); Interview of Carrie Forrant, Social Worker I (April 27, 2020).

[851] Interview of Carrie Forrant, Social Worker I (April 27, 2020).

[852] *Id.*

[853] Interview of Valenda Liptak, Soldiers' Home Interim Administrator (April 9, 2020).

[854] Interview of Sandy Marino, Registered Nurse IV (May 6, 2020); Interview of Carrie Forrant, Social Worker I (April 27, 2020).

[855] Interview of Bennett Walsh, Soldiers' Home Superintendent (June 1, 2020); Interview of Dr. David Clinton, Soldiers' Home Medical Director (April 21, 2020).

[856] Interview of Carrie Forrant, Social Worker I (April 27, 2020).

[857] Interview of Valenda Liptak, Soldiers' Home Interim Administrator (April 9, 2020). Ms. Liptak said she observed some staff with gowns and no masks, some with only masks, and only some with gloves on. Ms. Liptak's initial assessment was that "there was no understanding of what the infection control guidelines were." *Id.*

[858] Interview of Bennett Walsh, Soldiers' Home Superintendent (June 1, 2020); Interview of Vanessa Lauziere, Soldiers' Home Chief Nursing Officer (May 14, 2020).

[859] COVID-19 Monitoring Spreadsheet (March, 2020) (GOV0001245).

[860] "RE: Testing of Persons with Suspect COVID-19," Massachusetts Department of Public Health, April 2, 2020.

[861] *See e.g.,* Interview of Robyn Fowler, Registered Nurse IV (April 30, 2020); Interview of Jill Orzechowski, Social Worker I (April 27, 2020); Interview of Denise Coughlin, Licensed Practical Nurse II (May 22, 2020).

[862] Email from Elvira Loncto to Bennett Walsh, Linda Lariviere, and Debra Foley (March 6, 2020 (EST)) (REVPROB0028-00005274).

[863] Email from Paul Moran to Anthony Preston, Cheryl Poppe, Bennett Walsh, Francisco Urena, Stuart Ivimey, Evan Makrinikolas, Daniel Brennan, and Susan McDonough (March 12, 2020 (EST)) (REVPROB0028-00009195).

[864] "Policies and Procedures for Restricting Resident Visitors in Nursing Homes and Rest Homes and Personal Protective Equipment Recommendation Updates during the COVID-19 Outbreak," Massachusetts Department of Public Health, March 16, 2020, *available at* https://www.mass.gov/doc/policies-and-procedures-for-restricting-resident-visitors-in-nursing-homes-and-rest-homes-and/download.

[865] Interview of Vanessa Lauziere, Soldiers' Home Chief Nursing Officer (May 14, 2020).

[866] Interview of Rachel Gauthier, Recreational Therapist I (April 7, 2020); interview of Sheila Serra, Dietician III (May 18, 2020).

[867] Interview of Celeste Surreira, Soldiers' Home Assistant Director of Nursing (April 17, 2020).

[868] Interview of Francisco Urena, Secretary of Veterans Services (June 5, 2020); Interview of Kwesi Ablordeppey, Nursing Assistant (April 7, 2020).

[869] Interview of Francisco Urena, Secretary of the Department of Veterans' Services (June 5, 2020).

[870] Interview of Lynn Lacombe, Licensed Practical Nurse II (April 8, 2020); Interview of Mary Bergeron, Licensed Practical Nurse II (May 1, 2020).

[871] 24 Hour Nursing Report (March 21, 2020) (REVPROB0028-00002251).

[872] Email from Bennett Walsh to Secretary Urena (March 21, 2020 10:54PM (EST)) (GOV0048298).

[873] Critical Incident Report of Bennett W. Walsh, March 22, 2020 (REVPROB0028-00008095).

[874] Guidance for Infection Control and Prevention of Coronavirus Disease 2019 (COVID-19) in Nursing Homes (REVISED), CENTER FOR CLINICAL STANDARDS AND QUALITY/QUALITY, SAFETY & OVERSIGHT GROUP, CENTERS FOR MEDICARE & MEDICAID SERVICES, March 13, 2020, *available at* https://clientcentral.mwe.com/cc/099746/0028/Documents/Research/Guidelines%20re%20COVID%20and%20IC/CMS/2020-03-13%20CMS%20-%20nursing-home-guidance-covid-19.pdf.

875  Interview of Melissa Cumming, Department of Public Health Epidemiologist (May 8, 2020).

876 Interview of Mary Bergeron, Licensed Practical Nurse II (May 1, 2020).

877  "Policies and Procedures for Restricting Resident Visitors in Nursing Homes and Rest Homes and Personal Protective Equipment Recommendation Updates during the COVID-19 Outbreak," MASSACHUSETTS DEPARTMENT OF PUBLIC HEALTH, March 16, 2020. "Early reports suggest person-to-person transmission most commonly happens during close exposure to a person infected with COVID-19." *Id.*

878  Text exchange between Secretary Urena and Bennett Walsh (March 29, 2020 (12:16 PM (EST)) (GOV0051814)

879 Interview of Eileen Gregersen, Licensed Practical Nurse (April 24, 2020).  One aide reported that she was only allowed to wear a mask later in the day on March 17, after Veteran 1 had been tested.  Interview of Elisia Stafford, Nursing Assistant I (April 28, 2020).

880 Interview of Emily Boronski, Registered Nurse II (May 21, 2020).

881  *Id.*

882  *Id.*

883 Email from Kwesi Ablordeppey to Bennett Walsh, Cory Bombredi, Jeffrey Krok, Suzanne Quersher, Brenda Rodrigues, and Maureen Medeiros (March 24, 2020 8:39PM (EST)) (REVPROB0028-00007765).

884  *See e.g.*, Interview of Eileen Gregerson, Licensed Practical Nurse II (April 24, 2020); Interview of Sherrie Gentile, Nursing Assistant I (April 22, 2020); Interview of Melissa James, Nursing Assistant III (April 20, 2020); Interview of Donna Mancini, Medical Assistant (May 4, 2020).

885 Interview of Valenda Liptak, Soldiers' Home Interim Administrator (April 9, 2020).

886 Incident Report email from Kwesi Ablordeppey to Bennett Walsh, Cory Bombredi, Jeffrey Krok, Suzanne Quersher, Brenda Rodrigues, and Maureen Medeiros (March 24, 2020 8:39PM (EST)) (REVPROB0028-00007765).

887 Interview of Valenda Liptak, Soldiers' Home Interim Administrator (April 9, 2020).

888  *Id.*

889 Interview of Lisa Colombo, Soldiers' Home Incident Command Lead (April 13, 2020).

890 Interview of Valenda Liptak, Soldiers' Home Interim Administrator (April 9, 2020).

891 Interview of Karl Bartscht, BRG (June 18, 2020).

892  *See* Mass. Gen. Laws c. 6A, § 16.

893 Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020).

894  *Id.*; Interview of Paul Moran, Department of Veterans' Services Chief of Staff (May 26, 2020).

895 Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020).

896 Interview of Paul Moran, Department of Veterans' Services Chief of Staff (May 26, 2020).

897  *Id.*

898 Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020).

899 Interview of Paul Moran, Department of Veterans' Services Chief of Staff (May 26, 2020).

900  *Id.*

901  *Id.*

902 Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020).

[903] *Id.*

[904] *Id.*

[905] *Id.*

[906] *Id.*

[907] Interview of Marylou Sudders, Secretary EOHSS (May 28, 2020).

[908] Interview of David Laplante, Former Soldiers' Home Deputy Superintendent (May 4, 2020).

[909] Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020).

[910] *Id.*

[911] *Id.*

[912] Mass. Gen. Laws Ann. C. 115A, § 12

[913] Email from Bennett Walsh to Secretary Urena et al. (March 21, 2020 (10:54 PM (EST)) (GOV0045632)

[914] Interview of Daniel Tsai, Acting Secretary of EOHSS (May 27, 2020).

[915] Interview of Bennett Walsh, Soldiers' Home Superintendent (June 1, 2020).

[916] *Id.*

[917] Interview of Melissa Cumming, Department of Public Health Epidemiologist, May 8, 2020.

[918] Text exchange between Secretary Urena and Bennett Walsh (March 29, 2020 (12:16 PM (EST)) (GOV0051814)

[919] Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020).

[920] Email from Colleen Arons to Mark Yankopoulos (March 27, 2020 4:44 PM (EST)) (REVPROB0028-00007356). ).

[921] *Id.*

[922] Email from Secretary Urena to Cheryl Poppe and Bennett Walsh (March 29, 2020 10:38 AM (EST)) (REVPROB0028-00006800).

[923] Interview of Stuart Ivimey, General Counsel of the Department of Veterans Services (June 4, 2020).

[924] *Id.*

[925] *Id.*

[926] Text Messages between Mark Yankopoulos and Bennett Walsh (March 29, 2020).

[927] Interview of Paul Barabani, Former Superintendent of the Soldiers' Home (April 28, 2020).

[928] *Holyoke Soldiers' Home Gets Overhaul in Wake of Deaths,* WBUR (May 13, 2020), *available at* https://www.wbur.org/news/2020/05/13/holyoke-soldiers-home-management-fewer-residents-safety.

[929] Interview of Mark Bowman, President, National Association of State Veteran Homes (May 6, 2020).

[930] Interview of Valenda Liptak, Interim Superintendent of the Soldiers' Home in Holyoke (April 9, 2020).

[931] Interview of Francisco Urena, Secretary of the Department of Veterans' Services (May 28, 2020); Interview of Paul Moran, Department of Veterans' Services Chief of Staff (May 26, 2020).

[932] Email from Bennett Walsh to Francisco Urena (March 28, 2020 10:03PM (EST)) (REVPROB0028-00007079). In response to a complaint from Brenda Rodriguez, raising the alarm to Secretary Sudders about the unfolding crisis at the Soldiers' Home, Mr. Walsh responded: "Mr. Secretary; what should be discussed is

the amount of call outs by 888 the past week. The reference that the management is creating this issue and has a part in deaths is very concerning." *Id.*