UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                        )
ESTATE OF ROBERT E. BLAIS               )    No. 20-CV-30115
ESTATE OF WILLIAM C. CHANDLER           )
ESTATE OF STANLEY CHIZ                   )
ESTATE OF EARL W. DESROCHERS,           )    FIRST AMENDED COMPLAINT
ESTATE OF EMILIO J. DIPALMA,            )
ESTATE OF JOHN J. FASZCZA               )    JURY TRIAL DEMANDED
ESTATE OF JULIUS GREEN                   )
ESTATE OF THEODORE A. KAPINOS           )
ESTATE OF HARRY P. MALANDRINOS          )
ESTATE OF JAMES MANDEVILLE,             )
ESTATE OF JAMES L. MILLER,              )
ESTATE OF ALAN DAVID MUNDIE             )
ESTATE OF ALBERT WARREN NOTHE           )
ESTATE OF RICARDO J. RUSSO, SR.,        )
ESTATE OF JOSEPH C. SANTOS              )
ESTATE OF JOSEPH SNIADACH,              )
                                        )
   and                                  )
                                        )
JOSEPH SANKY,                           )
                                        )
   On behalf of themselves and          )
   all others similarly situated,       )
                                        )
          Plaintiffs                    )
                                        )
 v.                                     )
                                        )
BENNETT WALSH,                          )
DAVID CLINTON,                          )
VANESSA LAUZIERE,                       )
CELESTE SURREIRA,                       )
FRANCISCO UREÑA,                        )
                                        )
      and                               )
                                        )
MARYLOU SUDDERS,                        )
                                        )
          Defendants                    )
_____)

1

<u>INTRODUCTION</u>

1.    The Commonwealth of Massachusetts made a promise to its citizen-soldiers: you take care of us in times of conflict, and we will take care of you when you return.  Although the Massachusetts veterans residing at the Soldiers' Home in Holyoke, Massachusetts ("Soldiers' Home") kept their promise to serve their country, the Commonwealth did not keep its promise to protect and keep them safe from harm when they were unable to care for themselves.  Instead of providing the veterans the appropriate care to which they were entitled, the six defendants in this lawsuit showed deliberate indifference to the veterans' basic needs.  As a result of the defendants' actions and inactions, more than 76 veterans unnecessarily died and many other veterans were unnecessarily infected with the deadly COVID-19 virus.  Our veterans deserved better.

2.    This is a civil rights class action, brought pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983, on behalf of residents of the Soldiers' Home who contracted and suffered from COVID-19, including the estates of those veterans who, like those whose estates are named in this suit, died of COVID-19-related illness contracted while residing at the Soldiers' Home. This case seeks to redress the needless pain, suffering, and death that these veterans endured as a result of the actions of the defendants.

3.    Each of these six defendants acted with deliberate indifference to the risks posed by the COVID-19 pandemic, an indifference that resulted in the spread of COVID-19 throughout the Soldiers' Home.  The spread of COVID-19 at the Soldiers' Home was preventable.

4.    The facts that led to the needless deaths and infections of veterans at the Soldiers' Home from COVID-19 are not genuinely in dispute.  An independent investigation, commissioned by the Governor of the Commonwealth, details the unprofessional, unethical, and deliberately indifferent behavior of the individuals primarily charged with the care of the veterans at the Soldiers' Home, including the defendants in this lawsuit.  The investigation report, "The COVID-19 Outbreak at the Soldiers' Home in Holyoke: An Independent Investigation Conducted for the Governor of Massachusetts" ("Report"), attached as Exhibit 1,[1]  describes a litany of "utterly baffling" misrepresentations, misjudgments, mistakes, and blatant errors, which by any standard amounted to a callous disregard for the health and safety of the veterans residing in the Soldiers' Home.

5.    Although no legal proceeding can ever restore the lives of the veterans who died unnecessarily at the Soldiers'

_____

[1] The Report is also available at https://www.mass.gov/doc/report-to-governor-baker-re-holyoke-soldiers-home/download.

Home, or restore the health of the other veterans who unnecessarily contracted COVID-19, this case seeks to right those wrongs and afford these citizen-soldiers and their families some modicum of respect for their losses.

<u>PARTIES</u>

6.   The claims of the Estate of Robert E. Blais are brought by Mr. Blais's daughter, Sheryl Ann Blais, who has been appointed as the Personal Representative of the Estate.  See Hampden County Probate and Family Court No. HD21P0208EA.  Ms. Blais lives in South Hadley, Massachusetts.

7.   The claims of the Estate of William C. Chandler are brought by Mr. Chandler's daughter, Darby E. Chandler-LaDouceur, who has been appointed as the Personal Representative of the Estate.  See Hampden County Probate and Family Court No. HD20P1646EA.  Ms. Chandler-LaDouceur lives in West Springfield, Massachusetts.

8.   The claims of the Estate of Stanley Chiz are brought by Mr. Chiz's surviving spouse, Vickie Phillips-Chiz, who has been appointed as the Personal Representative of the Estate. See Hampden County Probate and Family Court No. HD20P1646EA. Ms. Phillips-Chiz lives in Springfield, Massachusetts.

9.   The claims of the Estate of Earl Desrochers are brought by Mr. Desrochers' son, Roland Desrochers, who has been appointed as the Personal Representative of the Estate.  See

Hampden County Probate and Family Court No. HD20P2043EA.  Mr. Desrochers lives in West Springfield, Massachusetts.

10.  The claims of the Estate of Emilio J. DiPalma are brought by Mr. DiPalma's daughter, Donna DiPalma, who has been appointed as the Personal Representative of the Estate.  See Hampden County Probate and Family Court No. HD20P2029EA.  Ms. DiPalma lives in Ellington, Connecticut.

11.  The claims of the Estate of John J. Faszcza are brought by Mr. Faszcza's son, Jeffrey J. Faszcza, who has been appointed as the Personal Representative of the Estate.  See Hampden County Probate and Family Court No. HD21P0506EA.  Mr. Faszcza lives in Windsor, Connecticut.

12.  The claims of the Estate of Julius Green are brought by Mr. Green's granddaughter, Pauline A. Reynolds, who has been appointed as the Personal Representative of the Estate.  See Hampden County Probate and Family Court No. HD20P1250EA.  Ms. Reynolds lives in Belchertown, Massachusetts.

13.  The claims of the Estate of Theodore Anthony Kapinos are brought by Mr. Kapinos's surviving spouse, Helen Kapinos, who has been appointed as the Personal Representative of the Estate.  See Hampshire County Probate and Family Court No. HS21P0101EA.  Ms. Kapinos lives in Hadley, Massachusetts.

14.  The claims of the Estate of Harry P. Malandrinos are brought by Cheryl C. Malandrinos, who has been appointed as the

5

Personal Representative of the Estate.  See Hampden County
Probate and Family Court No. HD21P1132EA.  Ms. Malandrinos lives
in Wilbraham, Massachusetts.

15.  The claims of the Estate of James Mandeville are
brought by Mr. Mandeville's daughter, Laura A. Beaudette, who
has been appointed as the Personal Representative of the Estate.
See Hampden County Probate and Family Court No. HD20P2052EA.
Ms. Beaudette lives in Springfield, Massachusetts.

16.  The claims of the Estate of James L. Miller are
brought by Mr. Miller's daughter, Linda McKee, who has been
appointed as the Personal Representative of the Estate.  See
Hampden County Probate and Family Court No. HD20P0771EA.  Ms.
McKee lives in Easthampton, Massachusetts.

17.  The claims of the Estate of Alan David Mundie are
brought by Mr. Mundie's surviving spouse, Barbara H. Mundie, who
has been appointed as the Personal Representative of the Estate.
See Franklin County Probate and Family Court No. FR21P0079EA.
Ms. Mundie lives in Bernardston, Massachusetts.

18.  The claims of the Estate of Albert Warren Nothe are
brought by Mr. Nothe's sister-in-law, Lucinda A. Nothe, who has
been appointed as the Personal Representative of the Estate.
See Hampden County Probate and Family Court No. HD20P0684EA.
Ms. Nothe lives in Bernardston, Massachusetts.

19.  The claims of the Estate of Ricardo J. Russo, Sr. are

6

brought by Hyman Darling, who has been appointed as the Personal Representative of the Estate.  See Hampden County Probate and Family Court No. HD20P2195EA.  Mr. Darling resides in Longmeadow, Massachusetts.

20.  The plaintiff, Joseph Sanky, resides in Holyoke, Massachusetts.

21.  The claims of the Estate of Joseph Correia Santos are brought by his children, Cynthia A. Comeau and Michael J. Santos, who have been appointed as the Co-Personal Representatives of the Estate.  See Hampshire County Probate and Family Court No. HD21P1695EA.  Cynthia A. Comeau lives in East Longmeadow, Massachusetts, and Michael J. Santos lives in Wilbraham, Massachusetts.

22.  The claims of the Estate of Joseph Sniadach are brought by Paul Sniadach, who has been appointed as the Personal Representative of the Estate.  See Hampshire County Probate and Family Court No. HS20P0353EA.  Paul Sniadach lives in Easthampton, Massachusetts.

23.  Pursuant to Federal Rule of Civil Procedure 23, the plaintiffs seek to certify a class of similarly situated individuals and/or estates of individuals who, like the veterans named in this suit, contracted COVID-19 because they had been residing at the Soldiers' Home in Holyoke, Massachusetts between March 1, 2020, and June 23, 2020, and suffered as a result.

a. Certification of a class pursuant to Rule 23(a) is appropriate because:

    i. The class is so numerous that joinder of all members is impracticable.  At least "76 Soldiers' Home veterans who were COVID-19 positive died in the 11-week period between March 25, 2020 and June 12, 2020," and at least an additional 84 veterans contracted COVID-19 during that time period.  Report at 6, 113.

    ii. There are common questions of law or fact, including: (1) Whether the defendants acted or failed to act in a manner that deprived residents of the Soldiers' Home of their civil rights, including their rights to safety, freedom from harm, and the full enjoyment of their lives; (2) Whether the defendants substantially departed from acceptable professional standards in providing care to residents of the Soldiers' Home; (3) Whether the defendants' actions and inactions constituted deliberate indifference to the health and safety of residents of the Soldiers' Home; and (4) Whether the defendants acted in a manner that caused the death of residents of the Soldiers' Home.

     iii.  The claims of the named plaintiffs are typical of the claims of the class, since all suffered from a common cause, the result of the common actions of the defendants.

     iv.  The named plaintiffs will fairly and adequately protect the interests of the class, and there are no antagonistic interests with other members of the class.

b.  Certification of a class pursuant to Rule 23(b)(3) is appropriate because "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

c.  Appointment of undersigned counsel as class counsel is appropriate under Rule 23(g) because counsel has more than four decades of experience with complex litigation and has the resources necessary to commit to representing the class.

24.  The defendant, Bennett Walsh, is the former Superintendent of the Soldiers' Home in Holyoke, Massachusetts. He resides in Massachusetts.

25.  The defendant, Dr. David Clinton, is the former Medical Director of the Soldiers' Home in Holyoke,

Massachusetts.  He resides in Massachusetts.

26.  The defendant, Vanessa Lauziere, is the former Chief Nursing Officer of the Soldiers' Home in Holyoke, Massachusetts. She resides in Massachusetts.

27.  The defendant, Celeste Surreira, is the former Assistant Director of Nursing of the Soldiers' Home in Holyoke, Massachusetts.  She resides in Massachusetts.

28.  The defendant, Francisco Ureña, is the former Massachusetts Secretary of Veterans' Affairs.  He resides in Massachusetts.

29.  The defendant, Marylou Sudders, currently serves as the Secretary of the Executive Office of Health and Human Services for the Commonwealth of Massachusetts.  She resides in Massachusetts.

## JURISDICTION AND VENUE

30.  This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because the claims arise under the laws of the United States, i.e., the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

31.  This Court has supplemental jurisdiction over any state law claims the plaintiffs might bring pursuant to 28 U.S.C. § 1367(a).

32.  This Court has personal jurisdiction over the defendants because they each reside in Massachusetts and, during

10

the relevant time period, they each worked in Massachusetts where the incidents underlying the Complaint occurred.

33.   Venue is proper in the Western Division of this Court because several of the parties reside in either Franklin County, Hampden County, or Hampshire County, Massachusetts.

FACTUAL BACKGROUND

A.   Background Regarding the Soldiers' Home in Holyoke

34.   The Soldiers' Home in Holyoke was established by statute in 1946 and is governed by G.L. c. 6, §§ 17, 70, and 71.

35.   Chapter 70, § 70 creates a seven-member Board of Trustees, comprised of residents of Berkshire, Franklin, Hampden, and Hampshire counties.   Its members are appointed by the Governor of Massachusetts.

36.   Chapter 70, § 71 charges the Board of Trustees with the appointment of a Superintendent, who serves as the "administrative head of the home" and who shall, "subject to the approval of the trustees, appoint and may remove a medical director. . . ."

37.   Bennett Walsh was appointed Superintendent of the Soldiers' Home on May 29, 2016.   Mr. Walsh served as Superintendent until March 30, 2020.

38.   Chapter 70, § 71 provides that the "medical director shall have responsibility for the medical, surgical and outpatient facilities and shall make recommendations to the

superintendent regarding the appointments of all physicians, nurses and other medical staff."

39.  Dr. David Clinton served as Medical Director of the Soldiers' Home during the relevant events set forth in this Complaint.

B.  <u>State and Federal COVID-19 Guidance</u>

40.  The SARS-COV-2 coronavirus is referred to throughout this Complaint as "COVID-19."

41.  Beginning in February 2020, the Commonwealth and the United States government began promulgating guidance directed at protecting people from COVID-19, guidance which expressly directed institutions to (a) identify patients with COVID-19, and (b) isolate patients with COVID-19 from other patients and staff.

42.  As the Report clearly established, isolating suspected cases of COVID-19 was epidemiology 101.  The Soldiers' Home received clear directives to that effect, including the following:

> a. "[O]n March 6, 2020, Elvira Loncto (a federal VA employee) distributed COVID-19 guidance to Mr. Walsh . . . . [that] <u>advised limiting staff movements between COVID-19 contaminated and unaffected areas</u>, screening and limiting visitors, <u>assessing residents daily for symptoms</u>, <u>developing an isolation plan for suspected cases</u>, and <u>encouraging social distancing</u>."  Report at 60 (emphasis added).

> b. "On March 12, 2020, Paul Moran (Department of

Veterans' Services Chief of Staff) forwarded an email . . . to Mr. Walsh . . . . attach[ing] COVID-19 guidance for assisted-living facilities, congregate care programs, agency based in-home caregivers and workers, community day programs, and non-agency based in-home caregivers. . . . The community day program, congregate care program, and assisted living facilities guidance directed isolating symptomatic individuals. The assisted-living facility guidance specified that a symptomatic resident should be moved to a single-person unit with the door closed." Report at 61 (emphasis added).

c. "On March 12, 2020, the CDC released guidance detailing 'what healthcare personnel should know about caring for patients with confirmed or possible' cases of COVID-19. This March 12, 2020 guidance recommended isolating patients suspected of COVID-19, among other precautionary measures. In particular the guidance recommended 'placing a facemask on the patient and placing them in an examination room with the door closed in an Airborne Infection Isolation Room (AIIR), if available." Report at 61 (emphasis added).

d. "The Department of Public Health issued another policy memorandum on March 16, 2020, focused on long-term care facilities. This memorandum replaced previous long-term care facility guidance issued on March 11, 2020. The memorandum: (i) restricted visitation by all visitors and non-essential health care personnel, except in certain compassionate care situations; (ii) suspended all communal dining, internal, and external group activities; (iii) recommended the use of eye protection, gowns, and gloves while caring for residents; (iv) required facilities to perform temperature checks at entryways (individuals with temperatures over 100.3 degrees Fahrenheit were not permitted to enter the facility); and (v) recommended that patients with known or suspected COVID-19 be cared for in single-person rooms with the door closed." Report at 62 (emphasis added).

C.    Failed Preparation at the Soldiers' Home

43.  The Soldiers' Home leadership team, including the

defendants, Bennett Walsh (Superintendent), David Clinton
(Medical Director), Vanessa Lauziere (Chief Nursing Officer),
and Celeste Surreira (Assistant Director of Nursing), met in
early March to discuss measures to prevent the introduction and
spread of COVID-19 at the Soldiers' Home.

44.  Dr. Clinton was tasked "with monitoring CDC and
Department of Public Health guidelines and providing updates to
the team."  Report at 74.  These guidelines would and/or should
have included, among others, the guidelines described in
Paragraph 42 above.

45.  Despite the repeated guidance from the Commonwealth
and the federal government, no isolation rooms were ever used
during Mr. Walsh's tenure as Superintendent.

46.  In addition, staff at the Soldiers' Home had
inadequate access to Personal Protective Equipment.  Indeed,
staff were discouraged from using Personal Protective Equipment.
See Report at 70-71.

D.  "Veteran 1"

47.  As explained in detail below, the first veteran at the
Soldiers' Home diagnosed with COVID-19 (referred to in the
Report as "Veteran 1") had flu-like symptoms suggesting that he
may have carried the virus in February 2020, but he was not
tested until March 17, 2020, and, even after receiving his
positive test result on March 21, 2020, the defendants allowed

14

Veteran 1 to continue living among other veterans and staff because, in Dr. Clinton's opinion, consideration of whether to isolate him was a "moot point" since "everyone has been exposed [to COVID-19] already."  Report at 78-80.

48.  More specifically, Veteran 1, who resided in the dementia unit, "first showed symptoms consistent with COVID-19 in February, including a high-pitched cough and fever."  Report at 78.  Despite these classic COVID-19 symptoms, Veteran 1 was not tested for COVID-19.  Instead, he was tested for "pneumonia, strep, and the flu" in February and early March.  Report at 78.

49.  On March 15, 2020, a veteran nursing aide reported to Ms. Surreira that Veteran 1 "was weak, feverish, and coughing more than he had been previously."  He was still not tested for COVID-19.  Report at 79.

50.  Even after Veteran 1 was finally tested for COVID-19 on March 17, 2020, inadequate precautions were taken to mitigate the potential spread of the virus from Veteran 1 to other veterans (or staff) with whom he had come in contact.  Report at 79-80.

51.  Following Veteran 1's COVID-19 diagnosis, the defendants repeatedly made decisions that further exacerbated the spread of COVID-19 at the Soldiers' Home:

> As soon as his positive test result was received (four days after Veteran 1 was initially swabbed for COVID-19) Veteran 1's three roommates were moved to a different

15

room. Prior to this, one of Veteran 1's roommates was
"very mobile" and frequently visited other rooms.
According to Ms. Lauziere, none of Veteran 1's roommates
were exhibiting COVID-19 symptoms at this time.

After testing positive, staff attempted to keep Veteran
1 in his room. The door to Veteran 1's room was supposed
to remain closed, but staff largely ignored this policy
and kept the door open for faster access . . . .

When Veteran 1 tested positive, Dr. Clinton and Ms.
Lauziere again discussed whether Veteran 1 should be
moved to the isolation unit. Dr. Clinton advised against
doing so, as in his view others in 1-North had been
exposed already, and the facility would be at risk if
Veteran 1 got out of his room on an unsecured unit.

. . . .

Staff who worked on 1-North during the weekend of March
21-22, 2020, after the test result confirmed that
Veteran 1 was positive for COVID-19, continued to
"float" and work in other areas of the facility,
potentially spreading COVID-19. A nursing aide who
primarily works on 2-North recalls being floated down to
1-North on March 26. She was tested for COVID-19 on March
27, and the result came back positive one week later. A
laundry worker reports that he changed the curtains on
1-North on March 22 and then proceeded to visit each of
the other units for laundry purposes during the
following week. This laundry worker later tested
positive for COVID-19. A registered nurse recalled that
even after Veteran 1 tested positive, nursing aides
would be scheduled to work two hours on 1-North and then
directed to complete the balance of their shift on the
third floor. The nurse asked her supervisors, including
Ms. Lauziere, why staff were floated between positive
and negative units given the risk of spreading COVID-
19. Ms. Lauziere responded that the Home "had to work
with the number of staff they had."

Report at 81-82.

E.   Mr. Walsh falsely reported to Secretary Ureña that
     Veteran 1 had been quarantined.

52.  Later in the evening of March 21, 2020, after Veteran

16

1's COVID-19 test came back positive, Mr. Walsh informed
Secretary Ureña of Veteran 1's diagnosis, but, in doing so, he
falsely stated that the Soldiers' Home had isolated Veteran 1
from others.  According to the Report:

> Mr. Walsh emailed Secretary Ureña (copying Paul Moran
> (Department of Veterans' Services Chief of Staff),
> Stuart Ivimey (General Counsel for the Department of
> Veterans' Services), and Anthony Preston (Communications
> Director for the Department of Veterans' Services),
> stating: "As briefed earlier in the week, (veteran with
> covid symptoms) we received the test results back on our
> veteran and the results are positive for covid-19. **We
> have isolated said veteran and quarantined the unit.**
> We're currently are [sic] testing 5 other veterans and
> sending out their samples this evening for testing.
> We'll have the full report once all the information is
> collected and protocol actions taken/implemented."
> (emphasis added) Mr. Walsh did not explain that the
> Soldiers' Home did not have adequate staffing to use the
> isolation rooms that had been set up on the third floor.

Report at 96 (emphasis in original).

53.  Later that day, "In response to questions from Mr.
Moran, Mr. Walsh responded that 'the protocol is to isolate the
veteran (which we did)' and 'staff has the necessary PPE at this
time,'" and, following that communication, Mr. Walsh wrote
directly to Secretary Ureña and again falsely represented, "The
veteran was isolated as soon as the positive test was received."
Report at 97.

F.   COVID-19 devastated veterans and staff at the
     Soldiers' Home.

54.  On March 27, 2020, the ill-fated decision was made to
combine the Soldiers' Home's two dementia units, despite the

17

fact that several veterans in those units had already been
diagnosed with COVID-19 and were obviously at high risk of
transmitting the virus to others.  According to the Report:
"Unit 2-North, one of the two locked dementia units, was closed
and all of its 21 veterans were moved to Unit 1-North—doubling
the number of veterans in 1-North (which previously held 21
veterans).  This required that veterans be crowded into rooms
and common spaces, with their beds inches apart."  Report at 87.

55.  Mr. Walsh, Dr. Clinton, Ms. Lauziere, and Ms. Surreira
were each involved in the decision to combine the two dementia
units.  Report at 88.

56.  During the independent investigation, Mr. Walsh
admitted that "Ms. Lauziere informed him of the decision" to
combine the two dementia units, "that he did not overrule the
decision," and that he "was aware that 1-North and 2-North
contained a 'mix of those who were tested, pending test, and not
showing signs,'" but he maintained "that the ultimate decision
to combine the units was 'a medical decision submitted to Dr.
Clinton.'"  Report at 88-89.

57.  Dr. Clinton denied responsibility for combining the
dementia units, but the Report "reject[s] as implausible Dr.
Clinton's assertion that he was not involved in the decision. At
the very least, he acknowledges that he was aware of it, and—as
the ultimate clinical authority for the Soldiers' Home—should

18

have involved himself." Report at 88-89.

58. The Report properly concluded that Ms. Lauziere's decision to combine the two dementia units was "inconsistent with her training, inconsistent with reasonable judgment, and inconsistent with her duty to the veterans at the Soldiers' Home." Report at 89.

59. The Report laid out in detail the devastating impact that the combination of the two dementia units had on veterans and staff:

> Staff describe the move as "total pandemonium," "when hell broke loose," and "a nightmare." They reported that "all of a sudden they just started moving people." One staff member reported thinking: "How can they do this because this [is] the most insane thing I ever saw in my entire life?" She "felt it was like moving the concentration camp—we are moving these unknowing veterans off to die. I will never get those images out of my mind—what we did, what was done to those veterans."

> A number of staff members reported discussions with Ms. Lauziere in which they questioned the decision to combine the two units, or tried to convince her to change course. One staff member reports that she "marched over" to Unit 1-North and asked Ms. Lauziere "what is going on . . . there are a lot of people here who are not showing symptoms and you are going to move them in with people who are and put them right on top of each other?"

> With assistance from Ms. Surreira, Ms. Lauziere "direct[ed] traffic" during the move. Housekeeping also was instructed to remove tables and chairs from the dining room on Unit 1-North so that veterans' beds could be lined up in the dining room. Ms. Surreira told housekeeping staff that if they were not going to be on the floor for more than 15 minutes, they did not need an N95 mask and could use a surgical mask instead. Some housekeeping staff refused, and ultimately received N95 masks to wear during the move.

After the consolidation, Unit 1-North was packed with 42 veterans. The veterans' beds and nightstands were directly next to each other and there were no privacy curtains between them. None of the veterans' clothing or personal items were initially moved down to Unit 1-North with them. There were insufficient outlets to plug in the beds, so some veterans could not elevate their beds. At times, [t]he names above the beds did not match the veteran who was in the bed, although the veterans wore ID bracelets and later the veterans' names were posted outside of their rooms. The dining room was made into a bedroom with nine beds in it. Veterans were sitting in common day rooms in their gowns.

One nursing aide reflected: "We always took pride in our care with honor and dignity, and I thought my god where is the respect and dignity for these men, we are leaving them sitting there in johnnies more confused because there is 40-something of them now."

Social Worker Terri Gustafson (who has worked at the Home for 21 years) reports that she saw Ms. Surreira point to a room and state: "All this room will be dead by tomorrow." Similarly, at approximately 7:00 p.m. on March 27, Social Worker Jill Orzechowski heard Ms. Lauziere—while standing outside of a room on 1-North—say "something to the effect that this room will be dead by Sunday so we will have more room here."

Ms. Orzechowski . . . . recalled raising concerns with Ms. Lauziere about the risk of COVID-19 spreading, and Ms. Lauziere responding that "it didn't matter because [the veterans] were all exposed anyway and there was not enough staff to cover both units."

Report at 90-91.

60.  The Report concluded:

We find substantial evidence that the conditions and quality of care on the combined 1-North unit during the weekend of March 28-29 were deplorable. Clinical staff report that they tried to do the best they could under the circumstances, but they were unprepared, understaffed, and without sufficient resources and guidance. Some staff members reported that they were

struggling to provide adequate care, including to keep
veterans hydrated and to provide sufficient morphine and
comfort medications to certain veterans who were dying.
Staff reported difficulties tracking which veterans had
been fed. One staff member said she observed a COVID-19
positive veteran who "had fecal matter on his socks and
was laying on another vet's bed." Staff reported that
they felt like it was "difficult" and "impossible" to
keep the veterans in 1-North isolated from one another.
Many of the veterans in the consolidated unit were "bed
hoppers," meaning that in the fog of dementia, they would
climb into various beds on the units. Some nursing aides
expressed a concern that they could not keep track of
which veterans were positive and which veterans was
negative for COVID-19.

. . . .

Social Worker Carrie Forrant provided . . . .

It was surreal . . . I don't know how the staff over in
that unit, how many of us will ever recover from those
images. You want to talk about never wanting this to
happen again.

Report at 90-91.

61.   The first confirmed COVID-19 death occurred on March

24, 2020, three days before the two dementia units were

combined.  Report at 92.

62.   The dementia units were combined on March 27, 2020.

63.   Veteran 1 died on March 28, 2020.  Report at 93.

64.   The rapid spread of COVID-19 and the rise in the death

toll after the two units were combined was anticipated by the

Soldiers' Home's leadership: "13 body bags" were delivered to

the 1-North unit on Friday, March 27, 2020, "shortly before the

consolidation of the two units began," and on March 28, 2020, "a

tractor trailer refrigeration unit (ordered earlier in the week)
arrived outside of the Soldiers' Home to store the remains of
veterans who passed away, as there was not enough space in the
morgue. . . ."  Report at 94.

      G.   <u>Removal of Mr. Walsh as Superintendent.</u>

65.  Mr. Walsh was placed on administrative leave on March
30, 2020.  Report at 109.

66.  As Mr. Walsh was placed on administrative leave, "a
response team organized by Secretary Sudders, Acting Secretary
Tsai, and Undersecretary Mick had arrived at the facility to
take command of the rapidly devolving situation."  The team
quickly "triage[d] patients, compile[d] essential records,
institute[d] infection control measures, and sen[t] ill patients
to the hospital."  Their actions significantly reduced the scope
of the outbreak.  Report at 110.

67.  The National Guard assisted by "'swabbing all
employees and residents,' with the plan to 're-swab negative
individuals every 48 hours.' The Guard's medical units
(consisting of doctors and nurses) assumed an active role in
patient care in place of the scores of Soldiers' Home staff
members who were sick with COVID-19."  Report at 110.

68.  The team that converged at the Soldiers' Home reported
shocking conditions.  According to the Report:

- Ms. Liptak and her team have a "collective 90-plus

years of nursing," but "none of us have ever seen anything" like this. Upon arrival, "we did not know what patients were in the Home or where they were." She and her team put in 15-hour days trying to accurately count, assess, and cohort the patients. The existing census records were "incomplete" and "disorganize[d]," at best. It was "complete mayhem." There were "not assessments being made on all patients."

. . . .

- The 1-North unit "looked like a war zone." According to Ms. Colombo, this "hot" unit had veterans "crammed in on top of each other," some of whom "were clearly dying." There were "chairs of people lined up, some were clothed, some unclothed, some were wearing masks, some weren't."

- Ms. Colombo asked Ms. Lauziere (the Chief Nursing Officer) to explain the reasons for combining 1-North and 2-North, but "did not get an adequate response, other than it was done because of staffing . . . she appeared to know it wasn't the right thing to do, but did it anyway." It appeared to Ms. Colombo that "they pooled [veterans] together based on dementia status instead of COVID status."

- Based on a review of records from the previous week, Ms. Liptak concluded that the Soldiers' Home was badly understaffed during the previous days. Where there should have been 4 to 5 HPPD (healthcare provider hours per patient day), "they were not even at 1 HPPD."

- Ms. Liptak observed some staff with gowns but no masks; some with only masks; and some with only gloves on. Her initial assessment was that there was "no understanding of what the infection control guidelines were." When Ms. Liptak scheduled an interview with Ms. Gosselin (Infection Control nurse) to discuss the events that had transpired, Ms. Gosselin reported that Ms. Lauziere (Chief Nursing Officer) and Ms. Surreira (Assistant Director of Nursing) "did not want to have anything to do with the infection control nurse."

23

- Ms. Gosselin told Ms. Liptak that she "would rather be dead" than continue being at the facility; Ms. Liptak referred Ms. Gosselin to trauma and grief counseling.

Report at 111.

69.  Defendants Walsh, Clinton, Lauziere, and Surreira consistently failed to exercise minimally adequate professional judgment in the administration of the Soldiers' Home during the pandemic and in the provision of care and treatment to the veterans in the Home.

70.  The actions, inactions, judgments, and decisions of Defendants Walsh, Clinton, Lauziere, and Surreira directly created unsafe conditions of confinement for the veterans at the Soldiers' Home, deprived them of basic care, denied them minimally adequate treatment, and exposed them to harm.

71.  As a direct result of the actions and inactions of Defendants Walsh, Clinton, Lauziere, and Surreira, between March 1 and June 12, 2020, at least 160 veterans at the Soldiers' Home were infected with COVID-19, 76 or more of whom died as a result.

H.   Secretary Sudders and Secretary Ureña

72.  The crisis at the Soldiers' Home would have been averted had Secretary Sudders and Secretary Ureña not acted with deliberate indifference and substantially departed from accepted professional standards.

73.   Secretary Sudders served as the head of the
Massachusetts Executive Office of Health and Human Services
throughout the timeframe relevant to this dispute.

74.   Secretary Ureña served as the head of the
Massachusetts Department of Veterans Services under the
supervision and direction of Secretary Sudders throughout the
timeframe relevant to this dispute.

75.   Secretary Sudders has at all times acknowledged that
the crisis at the Soldiers' Home was the result of a breakdown
in management at the Soldiers' Home and a failure to follow
federal and state guidelines relating to the management of
COVID-19.

76.   In her sworn testimony on January 21, 2021, to the
Massachusetts General Court Special Joint Oversight Committee on
the Soldiers' Home in Holyoke COVID-19 Outbreak ("Joint
Oversight Committee"), Secretary Sudders testified that "there
was not the internal processes . . . to withstand the pandemic."
She explained, "There are many nursing homes in Massachusetts
that faced the pandemic . . . but their internal structures
didn't collapse.  And what happened at Holyoke was a complete .
. . collapse because it didn't exist, and so staff were left on
their own to come up with responses.  We left staff on the front
lines without the clinical and management oversight and support
to manage through a pandemic."  She referred to the crisis in

management as a "fundamental collapse of structures that should be in place."

77.   The crisis in management that Secretary Sudders acknowledged at the Soldiers' Home was in large part the result of her own failure, and that of Secretary Ureña, to take corrective action at various points leading up to and during the COVID-19 outbreak at the Soldiers' Home.

78.   Mr. Walsh's shortcomings as Superintendent were well known to Secretary Sudders and Secretary Ureña prior to the outbreak of COVID-19 at the Soldiers' Home.

79.   Before Mr. Walsh was appointed as Superintendent in May 2016, Secretary Sudders and Secretary Ureña were aware of the fact that Mr. Walsh had no experience in either health care or health care administration.  Report at 36-37.

80.   On account of "Mr. Walsh's lack of experience," Secretary Sudders "instructed Secretary Ureña to ensure that Mr. Walsh's Deputy Superintendent . . . would have a background in longterm care."  Report at 37.

81.   John Crotty, who had a background in longterm care, was hired as Deputy Superintendent, but resigned in June 2019. As Secretary Sudders and Secretary Ureña were aware, following Mr. Crotty's resignation, the Deputy Superintendent role was left unfilled until the response team organized by Ms. Sudders

took over the administration of the Soldiers' Home on March 30, 2020.  Report at 43.

82.  Mr. Walsh created a hostile and poorly managed work environment that repeatedly created strife, which was reported both to Secretary Ureña as well as to the Executive Office of Health and Human Services.

83.  According to Secretary Ureña's testimony before the Joint Oversight Committee, by 2018, the leadership at the Executive Office of Health and Human Services had taken over much of the oversight of Mr. Walsh's employment and therefore had both a better understanding of Walsh's shortcomings and a more direct role in his supervision.

84.  Secretary Ureña found the Executive Office of Health and Human Services' handling of complaints concerning Mr. Walsh troubling.  He reported many of these concerns to Secretary Sudders and/or the Executive Office of Health and Humans Services' leadership team.

85.  As a result of ongoing concerns about Mr. Walsh's leadership at the Soldiers' Home, the Executive Office of Health and Human Services commissioned a study of the Soldiers' Home by the Moakley Center for Public Management at Suffolk University," which was conducted by Nicole Rivers.  According to the 2019 study:

> Ms. Rivers' reports from the staff interviews are striking: she recounts that "staff were crying" during the interviews because they "need more help," that they "felt bullied by management," and were "overwhelmed with the amount of care they had to provide with limited resources."

Report at 49-50.  Secretary Sudders and Secretary Ureña were aware of this study after it was released, but took no action.

86.  Issues persisted.  According to the Report:

> Secretary Ureña noted that the high rate of staff turnover under Walsh's leadership was a red flag and "if one more employee had quit [under Mr. Walsh's management], there would be a more serious conversation that had to happen with him." Secretary Ureña explained that no other department had staff turnover at the level of the Soldiers' Home in Holyoke. He emphasized that Mr. Walsh would get defensive if asked about the resignations, and the Department of Veterans' Services could not conduct exit interviews with the staff because they felt retaliation would ensue if they were to share their views in an exit interview.

Report at 38-39.

87.  Thus, prior to the outbreak of COVID-19 at the Soldiers' Home, Secretary Sudders and Secretary Ureña were well aware of Mr. Walsh's shortcomings as Superintendent and took inadequate steps to protect the veterans at the Soldiers' Home and keep them safe from harm.

88.  Secretary Sudders and Secretary Ureña were also aware of Mr. Walsh's shortcomings in addressing the COVID-19 crisis.

89.  Secretary Ureña was present when Mr. Walsh addressed the Soldiers' Home Board of Trustees on March 10, 2020, at which time "Mr. Walsh's prepared presentation did not contain any

information about COVID-19."  In fact, when he was asked about
COVID-19 during that meeting, Mr. Walsh did not address the
steps he would take to prevent the spread of COVID-19 at the
Soldiers' Home, e.g., by "clearing space at the Soldiers' Home
to use as isolation areas for infected residents."  Report at
65-66.

90.  On March 17, 2020, the date when Veteran 1 was tested
for COVID-19 symptoms, Mr. Walsh briefed Secretary Ureña about
the "veteran with covid symptoms" (which Secretary Ureña
attempted to deny during his interview with investigators).
Report at 96.

91.  On March 21, 2020, Mr. Walsh reported to Secretary
Ureña that Veteran 1 had tested positive for COVID-19.  Report
at 96.

92.  On March 22, 2020, Mr. Walsh reported to Secretary
Ureña that "[f]ive other veterans in the same ward who were
exhibiting symptoms have been tested," and he provided "the
names of the direct care staff that worked at the facility from
March 17 through March 21 who might have been exposed to the
symptomatic veterans."  Report at 97.

93.  On March 22, 2020, Mr. Walsh also communicated the
following information to Secretary Ureña regarding Veteran 1:

> The veteran was encouraged to wear a mask, this was
> complicated by his dementia, he kept removing it and
> needed constant cues to keep on his face. Staff tried to

keep him separate from the other vets on the unit. The staff were instructed to wear PPE when in contact with this veteran. This veteran has had respiratory symptoms on and off (+ pneumonia) and he has not left the building. His nephew was his only visitor prior to banning visitation and the board of health is following up with him. The veteran was isolated as soon as the positive test was received.

Report at 97.

94.   On March 27, 2020, the date when Veteran 1 was tested for COVID-19 symptoms, "Mr. Walsh told Secretary Ureña that the two [dementia] units were going to be consolidated during the afternoon of March 27."  Secretary Ureña was "aware that both 1-North and 2-North contained some COVID-19 positive veterans at the time the units were combined" but did not object to their consolidation.  Report at 109.

95.   On March 27, 2020, Secretary Ureña also learned that the situation at the Soldiers' Home was so bad that Mr. Walsh had requested the assistance of the National Guard.  Report at 100.  However, Secretary Ureña informed Mr. Walsh that the National Guard would not be providing assistance at the Soldiers' Home.  As Secretary Ureña stated in his sworn remarks to the Joint Oversight Committee, the decision to deny Mr. Walsh's belated request for assistance by the National Guard was not made by Secretary Ureña.  Secretary Ureña testified that, upon receiving the request from Mr. Walsh that the National Guard be deployed, he immediately communicated that request to

the leadership team at the Executive Office of Health and Human Services and that Health and Human Services ultimately denied the request.

96.  Given this backdrop, from the outset of the COVID-19 outbreak, Secretary Sudders and Secretary Ureña should have immediately taken effective steps to confirm protocols were in place and actually being implemented at the Soldiers' Home, including confirming that patients with COVID-19 or exhibiting COVID-19 symptoms were being isolated.  But no such intervention occurred.

97.  On the evening of March 28, 2020, SEIU Local 888 President Brenda Rodrigues contacted Secretary Sudders directly to report the concerns of a nursing aide about the deaths of veterans at the Soldiers' Home.  Secretary Sudders immediately contacted Secretary Ureña.  Report at 103.

98.  On March 29, 2020, "For the first time, the Department of Veterans' Services requested daily reporting of the number of pending COVID-19 cases (i.e., veterans awaiting their test results), the number of patients recovered from COVID-19, and the number of deaths associated with pending or confirmed COVID-19 cases."  Report at 126.

99.  But by that time, it was too late to avoid the crisis that would follow.

100. The Report ultimately concluded that "the Department of Veterans' Services failed in its responsibility to oversee the Soldiers' Home," Report at 16, explaining as follows:

> Secretary Ureña recommended and approved Mr. Walsh's appointment despite his lack of any healthcare administration experience. Once Mr. Walsh was in the role, Secretary Ureña and his Chief of Staff soon developed concerns about his performance. They felt his communication skills were "poor" and he was "cryptic" and "not forthright in his communications." They thought he was "in over his head" and did not spend enough time at the Home. They observed massive turnover in Mr. Walsh's staff, including clinical leadership positions. They had to hire an executive coach to work with Mr. Walsh on his anger management, and then had to extend this appointment in response to more complaints. And they were concerned that Mr. Walsh tried to control the flow of information in and out of the Home. Secretary Ureña asserts that at one point, Mr. Walsh asked the Secretary of EOHHS to bar Secretary Ureña from visiting the Home without giving Mr. Walsh prior notice. Despite all this, Secretary Ureña did not take sufficient action to address Mr. Walsh's deficits, and allowed the Deputy Superintendent role to remain open for nine months— including the period of the COVID-19 outbreak.
>
> One resource that should have been available to bring healthcare oversight experience was the Executive Director of Veterans' Homes. In 2016, the Legislature created this role within the Department of Veterans' Services with reporting and oversite responsibilities for the Soldiers' Home. The statute requires that an experienced healthcare executive hold this role. But the position—mandated by statute—was never filled, for budget reasons.
>
> A key oversight function is to make sure the right people are in important jobs. Here—for good reason—the Department of Veterans' Services leaders did not believe Mr. Walsh was the right person for the job, but they did not take action to assure that there was competent leadership in place at the Soldiers' Home.

Report at 16-17.

I.   The veterans named in this suit contracted and
     suffered from COVID-19 due to the defendants' reckless
     indifference.

101. James L. Miller was a veteran of the United States
Army and served during World War II.  Mr. Miller had been a
resident at the Soldiers' Home for approximately seven years.
Due to the conduct of the defendants, Mr. Miller contracted
COVID-19 and experienced conscious pain and suffering until he
died on March 30, 2020.

102. Robert E. Blais was a veteran of the United States
Navy and served during the Korean War.  Mr. Blais had been
admitted to the Soldiers' Home in January 2020.  Due to the
conduct of the defendants, Mr. Blais contracted COVID-19 and
experienced conscious pain and suffering until he died on March
30, 2020.

103. Albert Warren Nothe was a veteran of the United States
Army National Guard and the Air Force Reserve.  Mr. Nothe had
been a resident at the Soldiers' Home for almost six years.  Due
to the conduct of the defendants, Mr. Nothe contracted COVID-19
and experienced conscious pain and suffering until he died on
March 31, 2020.

104. Theodore Anthony Kapinos was a veteran of the United
States Army.  Mr. Kapinos had been admitted to the Soldiers'
Home in January 2020.  Due to the conduct of the defendants, Mr.
Kapinos contracted COVID-19 and experienced conscious pain and

suffering until he died on April 7, 2020.

105. Emilio J. DiPalma was a veteran of the United States Army and served during World War II.  Mr. DiPalma had been a resident at the Soldiers' Home for approximately one and a half years.  Due to the conduct of the defendants, Mr. DiPalma contracted COVID-19 and experienced conscious pain and suffering until he died on April 8, 2020.

106. James Mandeville was a veteran of the United States Navy and served during the Korean War.  Mr. Mandeville had been a resident at the Soldiers' Home for over 16 years.  Due to the conduct of the defendants, Mr. Mandeville contracted COVID-19 and experienced conscious pain and suffering until he died on April 14, 2020.

107. Stanley Chiz was a veteran of the United States Army and served during the Korean War.  Mr. Chiz had been a resident at the Soldiers' Home for approximately four years.  Due to the conduct of the defendants, Mr. Chiz contracted COVID-19 and experienced conscious pain and suffering until he died on April 17, 2020.

108. Ricardo J. Russo, Sr. was a veteran of the United States Army and served during World War II.  Mr. Russo had been a resident at the Soldiers' Home for approximately ten years. Due to the conduct of the defendants, Mr. Russo contracted COVID-19 and experienced conscious pain and suffering until he

died on April 20, 2020.

109. Harry P. Malandrinos was a veteran of the United States Navy and served during the Korean War.  Mr. Malandrinos had been a resident at the Soldiers' Home for approximately two years.  Due to the conduct of the defendants, Mr. Malandrinos contracted COVID-19 and experienced conscious pain and suffering until he died on April 20, 2020.

110. William C. Chandler was a veteran who served in the United States Navy.  Mr. Chandler had been a resident at the Soldiers' Home for more than three years.  Due to the conduct of the defendants, Mr. Chandler contracted COVID-19 and experienced conscious pain and suffering until he died on April 23, 2020.

111. Julius Green was a veteran who served in the United States Navy during World War II.  Mr. Green had been a resident at the Soldiers' Home for almost two years.  Due to the conduct of the defendants, Mr. Green contracted COVID-19 and experienced conscious pain and suffering until he died on April 27, 2020.

112. Joseph Sniadach was a veteran who served in the United States Army during the Korean War.  In January 2020, Mr. Sniadach moved into the Soldiers' Home.  Due to the conduct of the defendants, Mr. Sniadach contracted COVID-19 and experienced conscious pain and suffering until he died on April 27, 2020.

113. Joseph Correia Santos was a veteran of the United States Navy and served during World War II.  Mr. Santos had been

35

a resident at the Soldiers' Home for approximately one year. Due to the conduct of the defendants, Mr. Santos contracted COVID-19 and experienced conscious pain and suffering until he died on April 28, 2020.

114. Alan David Mundie was a veteran of the United States Army and served during the Korean War.  Mr. Mundie had been a resident at the Soldiers' Home for approximately one year.  Due to the conduct of the defendants, Mr. Mundie contracted COVID-19 and experienced conscious pain and suffering until he died on May 2, 2020.

115. Earl W. Desrochers was a veteran of the United States Army and served during World War II.  Mr. Desrochers had been a resident at the Soldiers' Home for approximately four and a half years.  Due to the conduct of the defendants, Mr. Desrochers contracted COVID-19 and experienced conscious pain and suffering until he died on May 7, 2020.

116. John J. Faszcza was a veteran of the United States Army.  Mr. Faszcza had been a resident at the Soldiers' Home for more than four years.  Due to the conduct of the defendants, Mr. Faszcza contracted COVID-19 and experienced conscious pain and suffering until he died on June 15, 2020.

117. Joseph Sanky was a veteran of the Air Force.  Mr. Sanky has been a resident at the Soldiers' Home since August 2019.  Due to the conduct of the defendants, Mr. Sanky

contracted COVID-19 and has experienced conscious pain and suffering as a result.

<u>COUNT I</u>
FOURTEENTH AMENDMENT
TO THE UNITED STATES CONSTITUTION
42 U.S.C. § 1983

118. The foregoing paragraphs are incorporated as if stated here.

119. The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property without due process of law."

120. The defendants' acts and omissions were under the color of state law.

121. The defendants violated the rights of the veterans named in this suit and other similarly situated veterans who resided at the Soldiers' Home by failing to protect them from harm, provide them with a safe environment, and/or provide them with minimally adequate medical and nursing care.

122. The defendants' actions were a substantial departure from accepted professional standards for the provision of medical and nursing care in a nursing facility.

123. The defendants' acts and omissions were done with deliberate indifference, and constituted deliberate disregard for the health, safety, and federal rights of the veterans of the Soldiers' Home.

124. The defendants' acts and omissions shock the conscience.

125. Pursuant to 42 U.S.C. § 1983, the plaintiff seeks recovery to the greatest extent available under the law for the plaintiffs and all others similarly situated who either died or were infected by COVID-19 at the Soldiers' Home.


WHEREFORE, the plaintiff requests that the Court:

1.  Certify a class of individuals who suffered as a result of contracting COVID-19 while residing at the Soldiers' Home between March 1 and June 23, 2020, including the estates of individuals who died as a result;

2.  Order adequate notice pursuant to Fed Rule. Civ. P. 23(c) and (d) to all members of the class;

3.  Appoint undersigned counsel as counsel for the class pursuant to Fed. R. Civ. P. 23(g);

4.  Award the plaintiffs and class members damages to the fullest extent available under the law;

5.  Grant any other relief to which the plaintiffs and class members might be entitled.

The plaintiffs demand a trial by jury.

Respectfully submitted,

On behalf of the Estates of Robert E.
Blais, William C. Chandler, Earl
Desrochers, Emilio J. DiPalma, John J.
Faszcza, Julius Green, Theodore A.
Kapinos, James Mandeville, James L.
Miller, Alan David Mundie, Albert
Warren Nothe, Ricardo J. Russo, Sr.,
Joseph C. Santos, and Joseph Sniadach,
and on behalf of Joseph Sanky, and all
others similarly situated,

Date: September 20, 2021 */s/ Thomas Lesser*

*/s/ Michael Aleo*

_____
Thomas Lesser (BBO No. 295000)
lesser@LNN-law.com
Michael Aleo (BBO No. 672071)
aleo@LNN-law.com
Lesser, Newman, Aleo, & Nasser LLP
39 Main Street
Northampton, MA 01060
(413) 584-7331 (tel)
(413) 586-7076 (fax)


On behalf of the Estates of Stanley Chiz
and Harry P. Malandrinos,

*/s/ Christopher F. Cava*

_____
Christopher F. Cava
Cava Law Firm
2 Mattoon Street
Springfield, MA  01105
(413) 737-3430 (tel)
(413) 737-3382 (fax)
chris@cavalawfirm.com

CERTIFICATE OF SERVICE

    I, Michael Aleo, hereby certify that this document has been
filed through the ECF system and will be sent electronically to
the registered participants as identified on the Notice of
Electronic Filing.


Date: September 20, 2021          /s/ Michael Aleo