UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
_____
                               )
ESTATE OF PAUL SNIADACH, et al. )    No. 20-CV-30115
                               )
         Plaintiffs            )
v.                             )
                               )
BENNETT WALSH, et al.          )
                               )
         Defendants            )
_____)
```

<u>MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT AGREEMENT</u>

The tragedy that occurred at the Holyoke Soldiers' Home in March 2020, which is the subject of this class action lawsuit, resulted in more than 170 veterans contracting COVID-19, many of whom died as a result.  The 170 veterans had served their country with valor, but the Commonwealth failed in its promise to care for them when they were unable to care for themselves.

No amount of money can bring those veterans, or their families, the justice and peace that they deserve.  Nonetheless, this lawsuit has secured a $57,912,500 settlement to help to bring a modicum of closure for the veterans and their families.[1]  As described below, the terms included in the Class Settlement Agreement are eminently reasonable and fair and this Court should therefore grant this motion for final approval.

---

[1] Class Counsel is filing two supplementary briefs, a Fee Petition and an Opposition to the Objection by the Estate of Joseph P. Bryant, which are incorporated here. Terms referred to herein are defined in the Class Settlement Agreement, which is attached as Exhibit 1.

I.    <u>INTRODUCTION</u>

The Class Settlement Agreement ("Agreement"), attached as Exhibit 1, requires the Commonwealth of Massachusetts ("the Commonwealth") to pay a total of $46,050,000 to the participating members of Settlement Class A and Settlement Class B.  Pursuant to the Agreement, all attorney fees are to be paid by the Commonwealth separately, not out of the $46,050,000 designated for the class members.

The Claims Administrator and his team sent out Notice to the Class Members identified in the Agreement.  Of the 84 eligible Class A members, 77 elected to participate in the settlement.  Of the 84 originally identified Class B members, all 84 elected to participate in the settlement.  In addition, pursuant to the Agreement, the Claims Administrator admitted three additional Class B members who submitted claims with the help of Class Counsel, bringing the total number of Class B Members to 87.[2]

As is described in the affidavit of Donald K. Stern, attached as Exhibit 2, pursuant to the terms of the Agreement, the Claims Administrator awarded (1) $1,680,000 to the 77 members of Settlement Class A, ranging from $10,000 to $51,578.31, and (2) $44,370,000 to the 87 members of Settlement

---

[2] Pursuant to the terms of the Agreement, for each of the three additional Class B members, the Commonwealth appropriated an additional $510,000, for a total of an additional $1,530,000.

Class B, ranging from $400,000 to $601,024.82.

The amounts awarded to members of both settlement classes is more than fair, particularly (a) when weighed against the risks inherent to this litigation, as described in § IV(c)(iv) below, and (b) when compared to the amounts awarded in a recent settlement of a similar dispute in New Jersey, described below in § IV(e).

Class Counsel therefore requests that the Court enter an Order approving the Class Settlement Agreement negotiated by the parties because the settlement is "fair, reasonable, and adequate." Robinson v. National Student Clearinghouse, 14 F.4th 56, 59 (1st Cir. 2021) (quoting Fed. R. Civ. P. 23(e)(2)).

II. OVERVIEW[3]

The plaintiffs brought this action, pursuant to the Due Process Clause of the Fourteenth Amendment and 42 U.S.C. § 1983, on behalf of the families of veterans who contracted the COVID-19 virus while living at the Soldiers' Home in Holyoke, Massachusetts ("Soldiers' Home") between the dates of March 1, 2020, and June 23, 2020.

Three in-depth investigations established the factual bases which underlie the plaintiffs' claims:

    (1)   An investigation commissioned by the Governor's Office, summarized in a 174 page report titled,

---

[3] A more detailed procedural history of this case is included in Class Counsel's Fee Petition.

"The COVID-19 Outbreak at the Soldiers' Home in Holyoke: An Independent Investigation Conducted for the Governor of Massachusetts," known as the "Pearlstein report," attached to the plaintiff's Second Amended Complaint, ECF 46-2;

(2)    An investigation by the Massachusetts legislature, summarized in a 181 page report titled, "Report of the Special Joint Oversight Committee on the Soldiers' Home in Holyoke," available at https://malegislature.gov/Commissions/Detail/518/Documents;

(3)    An investigation by the Massachusetts Office of the Inspector General, summarized in a 91 page report titled, "Holyoke Soldiers' Home, May 2016 to February 2020," available at https://www.mass.gov/doc/holyoke-soldiers-home-may-2016-to-february-2020/download.

Additionally, after an extensive investigation and the convening of a grand jury, the Commonwealth indicted two of the defendants named in this civil action, Superintendent Bennett Walsh and Medical Director David Clinton, in the Hampden County Superior Court.[4]

Further, during the course of the parties' settlement discussions, the Commonwealth voluntarily disclosed additional

---

[4] The criminal charges were later dismissed by the Superior Court and are currently pending on an appeal. Com. v. Clinton, Mass. App. Ct. Nos. 22-P-309, and Com. v. Walsh, 22-P-321. For the Court's reference, the Superior Court order dismissing the charges is attached hereto as Exhibit 3. Counsel would also note that three other civil actions involving the Soldiers' Home were separately filed with this Court after Class Counsel filed the instant action: (1) Philips-Chiz v. Walsh, et al., No. 20-cv-30194-MGM, which was consolidated with this action (ECF Nos. 12 and 45); (2) Lindsay v. Walsh et al., No. 22-cv-30061-MGM, which was dismissed following the Lindsay estate's decision to participate in the instant Class Action Settlement as a Member of Settlement Class B; and (3) Ablordeppey v. Walsh, No. 21-cv-11314-MGM, brought by a group of current and former employees of the Soldiers' Home against the same Defendants named in this action pursuant to 42 U.S.C. § 1983, which this Court dismissed on October 3, 2022.

factual information bearing on the relevant legal issues and the
identification of Class Members.[5]

The negotiations between the parties concerning the terms
of a potential settlement took place over the course of six
months.  On May 20, 2022, the parties executed a Class
Settlement Agreement, which they submitted to the Court with
their motion for preliminary approval of the proposed agreement.
ECF 47.

As described in more detail below, the Class Settlement
Agreement establishes two Settlement Classes: (1) Settlement
Class A includes any veteran, or estate of a deceased veteran,
who was living at the Holyoke Soldiers' Home at any time between
March 1 and June 23, 2020, who tested positive for COVID-19

---

[5] The fact that the parties did not engage in formal discovery is not a bar to
final approval of the settlement in light of the extensive investigations
referred to above, as well as the disclosures that the Commonwealth made as
part of these settlement negotiations.  The question before the Court is
whether the parties had sufficient information "to make an intelligent
judgment about settlement."  Hochstadt v. Boston Scientific Corp., 708 F.
Supp. 2d 95, 107 (D. Mass. 2010).

The procedural posture here is similar to the disposition in Robinson v.
National Student Clearinghouse, where the First Circuit affirmed the District
Court's approval of a class settlement agreement, noting:

> The district court considered that the settlement agreement was the
> product of arm's-length negotiation between class counsel and NSC
> in mediation before Judge Welsh. The district court stayed its
> proceedings pending the parties' attempt to resolve their dispute
> through mediation. Before the mediation, NSC provided disclosures
> to class counsel, including the number of class members and the
> total amount of the alleged overcharge. The district court thus
> properly concluded that "the parties negotiated at arm's length and
> conducted sufficient discovery."

14 F.4th 56, 59 (1st Cir. 2021).

during that same period, and survived past June 23, 2020; and
(2) Settlement Class B includes the estate of any veteran who
was living at the Holyoke Soldiers' Home at any time between
March 1 and June 23, 2020, who contracted COVID-19 during that
time, but who died prior to June 23, 2020.

As of the time the parties executed the Class Settlement
Agreement, they had identified a total of 168 known class
members: 84 members of Settlement Class A and 84 members of
Settlement Class B.

On June 6, 2022, after a hearing was held on the merits of
the motion, the Court granted preliminary approval of the
Agreement by: (1) appointing undersigned counsel as Class
Counsel, (2) appointing Attorney Donald K. Stern as Claims
Administrator, (3) directing the Claims Administrator to issue
Notice to all potential members of either of the two Settlement
Classes, and (4) scheduling a Final Approval Hearing for
November 14, 2022.

The Claims Administrator and his team subsequently sent out
Notice to potential class members by:

> a. Mailing claim forms to 168 families: 84 from Class A
>    and 84 from Class B.
>
> b. Publishing a website that contained the information
>    and claim forms included with the mail notice.
>
> c. Publishing two advertisements in the Springfield
>    Republican.

   d. Participating in a media interview to publicize the
      claims process.

   e. And following up with hundreds of telephone calls and
      emails to class members.

The results were astounding.

Seventy-seven of the 84 families for Class A elected to
participate in the settlement.  Only seven eligible Class
Members chose not to participate, and no Class A members elected
to opt out of the settlement to bring their own lawsuits.  This
means that 91% of Class A members are participating in the
settlement.[6]

For Class B, which includes the estates of veterans who
passed away prior to June 23, 2020, all 84 families that the
parties identified before sending out Notice have elected to
participate in the settlement, and three additional families,
who had not been identified as Class B members before Notice was
sent, submitted claim forms with the help of Class Counsel and
were added to Settlement Class B by the Claims Administrator,
bringing the total number of Settlement Class B members to 87.[7]
Equally significantly, no potential Class Members found the

---

[6] One Class A member has objected to the settlement, seeking to be treated as
a member of Settlement Class B instead.

[7] Per the terms of the Settlement Agreement, the Commonwealth will contribute
the additional funds needed to ensure that the added Class Members will not
negatively impact the average settlement that Class B members will receive.
For each additional Class B member, the Commonwealth will appropriate an
additional (1) $510,000 to contribute towards the award, and (2) $127,500 for
payment of attorney fees.

settlement amounts to be inadequate, as none chose to opt out and bring separate lawsuits.

In summary, the participation rate by Settlement Class members in Class A and Class B exceeds 95 percent of the potential Class Members.

III. <u>TERMS OF CLASS SETTLEMENT AGREEMENT</u>

The Class Settlement Agreement provides for: (a) the payment by the Commonwealth of $57,912,500 to settle the underlying claims; (b) certification of two Settlement Classes; (c) the appointment of and payment to a Claims Administrator; (d) payment of attorney fees to Class Counsel; and (f) a Notice Plan, which included the manner and form for potential class members to participate in, opt out of, or object to the terms of the Class Settlement Agreement.

a. *Global Settlement Amount*

The total amount that the Commonwealth is obligated to pay under the Agreement is $57,912,500.  It includes the payments to the Class Members, the Claims Administrator, and Class Counsel. Pursuant to the Agreement, the Office of the Governor sought appropriation from the Massachusetts legislature in the amount of $56 million, which the legislature passed overwhelmingly, resulting in the Commonwealth depositing $56 million into a specially designated escrow account held with the Greenfield

Savings Bank.[8]

Pursuant to Section 9.1.2 of the Agreement, the Commonwealth has agreed to appropriate an additional $1,912,500 in settlement funds on account of the admission of the three additional members to Settlement Class B ($637,500 for each additional Class B member).[9]

  b. *Settlement Classes*

As noted above, the parties agreed to resolve the claims of the following two Settlement Classes:

> Settlement Class A: Any veteran, or estate of a deceased veteran, who was living at the Holyoke Soldiers' Home at any time between March 1, 2020 and June 23, 2020, who (i) tested positive for COVID-19 during that same period and (ii) did not die prior to June 23, 2020.

> Settlement Class B: Any estate of a veteran who was living at the Holyoke Soldiers' Home at any time between March 1, 2020 and June 23, 2020, and who, at the time of the veteran's death, which death occurred at any time between March 1, 2020 and June 23, 2020, (i) had tested positive for COVID-19, (ii) had Coronavirus listed as one cause of death on his or her death certificate, (iii) tested positive for COVID-19 and also had Coronavirus or a similar cause of death listed as one cause of death on his or her death certificate, and/or (iv) is a named plaintiff in the Second Amended Complaint, in the above entitled lawsuit.

---

[8] Appropriation of the settlement funds by the Massachusetts legislature was necessary due to the limitations of the Commonwealth's indemnification statute, G.L. c. 258, § 9. The funds, held by the Greenfield Savings Bank, are earning interest at an annual rate of 1.3%.

[9] The settlement funds designated for the seven Class Members who elected not to participate in the settlement will not revert to the Commonwealth, because Class Counsel negotiated a clause providing that the first $2 million dollars of such funds would be used to further compensate members of Settlement Class A.  See Section 9.1.2 of the Agreement.

Prior to executing the Class Settlement Agreement, the parties had identified 84 members of Settlement Class A and 84 members of Settlement Class B.

Identification of the Settlement Class Members was the result of lengthy discussions between counsel for the Commonwealth and Class Counsel, based on (1) information the Commonwealth voluntarily provided regarding veterans at the Soldiers' Home, and (2) information that Class Counsel shared with the Commonwealth regarding the approximately 40 families of Soldiers' Home veterans who had contacted and retained Lesser, Newman, Aleo and Nasser, LLP as counsel.  The 84 veterans that the parties originally identified was eight more than had been identified in the Pearlstein report.

Class Counsel also negotiated a clause that (a) allowed additional claimants who were not among the 168 known potential Class Members to submit claim forms in order to participate in either Settlement Class, and (b) if approved by the Claims Administrator, then the Commonwealth would appropriate further funds to compensate each additional Class Member.  See Section 9.2.2.  As noted above, three such estates have been admitted to Settlement Class B.

c. *Appointment of Claims Administrator*

The parties agreed that a Claims Administrator should be appointed to allocate the settlement funds to participating

Class Members in accordance with the terms of the Agreement.  On the request by the parties, the Court appointed Attorney Donald K. Stern as the Claims Administrator.  Attorney Stern's curriculum vitae was attached as Exhibit B to the parties' motion for preliminary approval of the Class Settlement Agreement, ECF 47-2.  The Claims Administrator and his team have proved incredibly competent, diligent, and thoughtful throughout the claims process.  The Claims Administrator's affidavit is attached as Exhibit 2.

       d. _Payments to Class Members_

The Agreement provides for payments to participating members of each Settlement Class, including parameters that define (1) the minimum amount that each Class Member shall receive, and (2) the Claims Administrator's discretion to award additional amounts to participating members of each Settlement Class.

Class Counsel negotiated the funds designated for each Settlement Class separately from the fees that will be paid to the Claims Administrator and to Class Counsel.  That means that neither payments to the Claims Administrator nor payments to Class Counsel will reduce the amounts awarded to Class Members pursuant to the Class Settlement Agreement.

       i. Payments to Members of Settlement Class A

Settlement Class A includes veterans, or estates of such

veterans, who were living at the Soldiers' Home at any time
between March 1, 2020, and June 23, 2020, who contracted COVID-
19 during that period of time, and who survived past June 23,
2020.  The Claims Administrator served notice on the 84
potential members of Settlement Class A that were identified by
the parties, 77 of whom decided to participate in the
settlement.

The Agreement directs the Claims Administrator to award
$1,680,000 of the Global Settlement Amount to the members of
Settlement Class A, with no member of Settlement Class A
receiving less than $10,000.  The Claims Administrator therefore
allocated at least $10,000 to each qualifying member of
Settlement Class A.  The Claims Administrator then awarded the
remaining $910,000 to Settlement Class A members, using his
discretion as to how to allocate those funds, as described in
Section III(d)(iii) below.

ii. *Payments to Members of Settlement Class B*

Settlement Class B includes the estates of veterans who
were living at the Soldiers' Home between March 1, 2020, and
June 23, 2020, contracted COVID-19 during that period of time,
and died prior to June 23, 2020.

Based on participation by all 84 members, the Agreement
provided that $42,840,000 of the Global Settlement Amount would
be distributed to members of Settlement Class B, an average of

$510,000 per Class Member.  In addition, the Agreement further provided that, for each additional Class Member that the Claims Administrator admitted to Settlement Class B, the Commonwealth would provide $510,000 in additional funds to be available to Settlement Class B Members.  See §§ 9.2.2 and 10.1 (requiring the Commonwealth to appropriate a total of $637,500 for each new Class B Member: $510,000 for each Class Member plus $127,500 in attorney fees).

Therefore, the total amount to be distributed to Settlement Class B Members became $44,370,000.

Pursuant to the Agreement, the Claims Administrator therefore allocated at least $400,000 to each qualifying Member of Settlement Class B.  The Claims Administrator then awarded the remaining funds available to Settlement Class B Members based on the discretionary parameters set forth in the Agreement, as described below.

iii.  Parameters for Discretionary Payments

In deciding how to award the discretionary amounts available to Members of each Settlement Class, the Claims Administrator considered the information that participating Class Members submitted as part of the claims process, including: the respective veteran's age; the severity and duration of the veteran's suffering; any future earnings and support the veteran provided to others; the frequency of contact

the veteran had with family members and other loved ones; and such other factors that were raised by veterans, or estates of such veterans, in the questionnaires and documentation submitted to the Claims Administrator in connection with their claims.

Per the Agreement, the Claims Administrator was granted considerably more discretion with regard to how to allocate funds to Members of Settlement Class A as compared to Settlement Class B, allowing the Claims Administrator to take into account the different outcomes that Class A veterans who contracted COVID-19 and survived past June 23, 2020, experienced.[10]

e. *Attorney Fees.*[11]

The Agreement provides that Class Counsel will apply to the Court, without objection from the Commonwealth, for an award of a fee of no more than 25% of that portion of the Global Settlement Amount distributed to participating Class Members (none of the 164 Class Members participating in the settlement have objected to the amount of the requested attorney fees, which was set forth in the Notice that they each received).

Unlike many class action settlements, the attorney fees awarded to Class Counsel will have no effect on the amounts paid

---

[10] For Class A Members, 50% of the available funds were to be allocated at the discretion of the Claims Administrator.  Whereas, for Class B Members, only 21.5% of the available funds were to be allocated at the Claims Administrator's discretion.

[11] Class Counsel has separately submitted a Fee Petition that addresses the reasonableness of the fees sought, which is summarized here.

to Members of either Settlement Class A or B, as described in the previous sections above.  This is because the attorney fees are to be paid out of separately allocated funds.

Should the Court reduce the requested attorney fees award, those reduced funds (which have already been appropriated by the Commonwealth and placed into escrow), would not cause an increase in the amount available to be distributed to Settlement Class Members.  Instead, those funds would revert to the Commonwealth, in accordance with Section 10.4 of the Class Settlement Agreement, which states: "Any difference between the award of attorney fees as set forth in Paragraph 10.1 above and the amount awarded to Class Counsel by the Court shall revert to the Commonwealth of Massachusetts."  Class Members would not benefit.

f. *Notice Plan.*

The Notice Plan established in the Agreement has proved more than adequate, as evidenced by the fact that the participation rate among potential class members exceeded 95%, well above the parties' expectations.[12]

Pursuant to Rule 23(c)(2)(B), the Notice included an explanation as to:

(i) the nature of the action;
(ii) the definition of the class certified;

---

[12] The Plan was attached as Exhibit C to the parties' motion for preliminary approval of the Agreement, ECF 47-3.

(iii) the class claims, issues, or defenses;
(iv) that a class member may enter an appearance through
an attorney if the member so desires;
(v) that the court will exclude from the class any member
who requests exclusion;
(vi) the time and manner for requesting exclusion; and
(vii) the binding effect of a class judgment on members
under Rule 23(c)(3).

The Notice to Class Members also included an easy to

understand explanation of the qualifications that needed to be

met to participate in the settlement, the procedure required to

participate, the consequences of such participation, and the

procedure required to opt out of or object to the settlement.

The Claims Administrator and his team sent out Notice to

potential class members by:

a. Sending out claim forms to 168 families: 84 from Class
   A and 84 from Class B.

b. Publishing a website, which contained the information
   and claim forms included with the mail notice.

c. Publishing two advertisements in the Springfield
   Republican.

d. Participating in a media interview to publicize the
   claims process.

e. And following up with dozens, if not hundreds, of
   telephone calls and emails to class members.

g. *Opt-Out Rights.*

The Notice explained the process by which a Class Member

could opt out of the Settlement.  However, not a single

potential class member in either Class A or Class B elected to

opt of the settlement for the purpose of pursuing a separate

legal action.  This speaks loud and clear to the fairness of the settlement.[13]

h. *Objections to Settlement.*

The Notice explained the process by which a Class Member could object to the Settlement.  Only one Class Member, the estate of Joseph Bryant, through counsel, objected to the terms of the Agreement.  The Bryant estate's objection is limited to its inclusion in Settlement Class A, rather than Settlement Class B.  For the reasons described in Section IV below and in Class Counsel's supplementary Opposition to the Objection, while Class Counsel is sympathetic to the Bryant estate, that single objection is clearly insufficient to render the Agreement unfair.

IV.  APPROVAL OF THE SETTLEMENT IS APPROPRIATE UNDER RULE 23

a. *Standard of Review.*

As the First Circuit has explained, "A class action settlement must be 'fair, reasonable, and adequate.'"  Robinson v. National Student Clearinghouse, 14 F.4th 56, 59 (1st Cir. 2021) (quoting Fed. R. Civ. P. 23(e)(2)).  See also Cohen v. Brown Univ., 16 F.4th 935, 943 (1st Cir. 2021).  The District Court has considerable discretion when making this determination:

---

[13] Under Section 6.7 of the Agreement, the Commonwealth had the right not to proceed with settlement of this action if three or more potential Members of Settlement Class A or Settlement Class B elected to opt out.

> Where "the parties negotiated at arm's length and
> conducted sufficient discovery, the district court must
> presume the settlement is reasonable." In re Pharm.
> Indus. Average Wholesale Price Litig., 588 F.3d 24, 32-
> 33 (1st Cir. 2009). The district court considers a
> "laundry list[] of factors" pertaining to the
> reasonableness of a class action settlement, but "the
> ultimate decision by the judge involves balancing the
> advantages and disadvantages of the proposed settlement
> as against the consequences of going to trial or other
> possible but perhaps unattainable variations on the
> proffered settlement." Nat'l Ass'n of Chain Drug Stores
> v. New England Carpenters Health Benefits Fund, 582 F.3d
> 30, 44 (1st Cir. 2009). We have further explained that
> "the district court enjoys considerable range in
> approving or disapproving a class action settlement,
> given the generality of the standard and the need to
> balance [the settlement's] benefits and costs." Id. at
> 45.

Robinson, 14 F.4th at 59.[14]

More specifically, under Rule 23(e)(2), in determining if

the proposed class settlement is "fair, reasonable, and

adequate," this Court must consider whether:

> (A) the class representatives and class counsel have
> adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking
> into account:
>> (i) the costs, risks, and delay of trial and appeal;
>> (ii) the effectiveness of any proposed method of
>> distributing relief to the class, including the
>> method of processing class-member claims;
>> (iii) the terms of any proposed award of attorney's
>> fees, including timing of payment; and
>> (iv) any agreement required to be identified under
>> Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative
> to each other.

---

[14] As indicated in Section II above, although the parties have not engaged in
discovery, the underlying facts were probed thoroughly in several
investigations conducted by the Commonwealth. See Robinson, 14 F.4th at 59.

As described below, the proposed Settlement satisfies each of these elements.

b. *The Class Settlement Agreement offers substantial relief to members of both Settlement Class A and Settlement Class B.*

The Agreement requires the Commonwealth to pay a total of $46,050,000 to members of Settlement Class A and Settlement Class B: $1,680,000 to the 77 Members of Settlement Class A who have elected to participate in this settlement, and $44,370,000 to the 87 Members of Settlement Class B.

*Settlement Class A*

Settlement Class A Members will receive, on average, $21,818.  The Claims Administrator issued awards to Members of Settlement Class A ranging from $10,000 to $51,578.31.  Based on a standard, one-third private contingency fee agreement, the Class A Member that received the highest award, of $51,578.31, would typically have needed to secure an award of $77,367.46 to net that same amount.[15]

*Settlement Class B*

Settlement Class B Members will receive, on average, an award of $510,000.  Were counsel to settle cases individually (i.e., not pursuant to the terms of the Class Settlement Agreement), based on counsel's current contingency fee

---

[15] On an award of $77,367.46, a one third contingency fee would reduce the award by $25,789.15, leaving $51,578.31 for the client.

agreements, the individual plaintiffs would each have to secure an award of $765,000 to net the same amount.[16]

    c. *The proposed Class Settlement satisfies all of the factors established under Rule 23.*

        i. Class Certification Pursuant to Rule 23(a)-(b)

The Settlement Class meets the certification requirements of Rule 23(a)(1-4), because:

(1) "[T]he class is so numerous that joinder of all members is impracticable," since more than 170 veterans were infected with the COVID-19 virus during the relevant class period, from March 1 through June 23, 2020.

(2) "[T]here are questions of law or fact common to the class," namely, whether the defendants' conduct rose to the level of a constitutional deprivation and whether that deprivation caused the veterans' injuries. As a matter of fact, the circumstances that caused the outbreak of COVID-19 at the Soldiers' Home, as alleged in the Amended Complaint, arose from the common conduct of the defendants. As a matter of law, for plaintiffs' claims to succeed, each of the plaintiffs would have to carry the burden of proving that this common set of circumstances amounted to a constitutional deprivation that caused the respective veterans to contract COVID-19 and suffer as a result. Conversely, the primary defenses to liability that each defendant would assert would apply with equal force to each of the respective veterans.

(3) "[T]he claims or defenses of the representative parties are typical of the claims or defenses of the class," since (a) the plaintiffs allege that the veterans named in this action contracted COVID-19 as a result of the same set of circumstances that caused other residents of the Soldiers' Home to contract COVID-19, and (b) the primary defenses to liability that each defendant would assert would

---

[16] On an award of $765,000, a one third contingency fee would reduce the award by $255,000, leaving $510,000 for the client.

apply with equal force to each of the respective veterans.

(4)   "[T]he representative parties will fairly and adequately protect the interests of the class," since the proposed Class Representatives do not have any conflicts with other class members with regard to establishing the liability of the defendants, and the plaintiffs' counsel would prosecute this action vigorously on behalf of the class.

Certification of the class is appropriate under Rule 23(b)(3) because "questions of law or fact common to class members predominate over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

ii. <u>The class has been adequately represented, as required by Rule 23(e)(2)(A).</u>

Under Rule 23(e)(2)(A), "the class representatives and class counsel have adequately represented the class."

Class Counsel have worked diligently to represent and protect the claims of members of both Settlement Classes.  As noted below, the award secured in this case is much more favorable than the only comparable case that Class Counsel is aware of, which recently settled in New Jersey.

Counsel's work has included, but has not been limited to: filing the original Complaint; communicating with potential fact witnesses; diligently researching the very complicated law

underlying the plaintiffs' claims; amending the complaint twice
to add additional parties; communicating with counsel for the
defendants; initiating communications with settlement counsel
for the Commonwealth; intensively negotiating with the
Commonwealth's settlement counsel as well as counsel for several
of the defendants over the course of more than six months to
reach terms favorable to both Settlement Classes; communicating
with well over 100 of the families of veterans; preparing and
submitting the proposed Agreement to the Court; participating in
notifying and communicating with potential Settlement Class
Members about the proposed settlement; discussing the terms of
the Agreement with Class Members; locating "missing" Class
Members who did not respond to the initial Notice; assisting
Settlement Class Members with the submission of their claims
forms and questionnaires to the Claims Administrator; assisting
Class Members with probating the estates of veterans;
petitioning the Claims Administrator to admit additional Class
Members to Settlement Class B; consulting with experts regarding
various issues underlying the claims; and defending the fairness
of the Class Settlement Agreement.

Through the course of this process, no conflicts of
interest between the named plaintiffs have come to light, other
than those raised in the Objection filed by the estate of Joseph
P. Bryant, which is addressed in Section IV below and the

accompanying Opposition by Class Counsel.  See <u>Cohen v. Brown Univ.</u>, 16 F.4th 935, 945 (1st Cir. 2021) ("The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent.") (Quoting <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 625 (1997)).

> iii.  <u>The "proposal was negotiated at arm's length," as required by Rule 23(e)(2)(B).</u>

Under Rule 23(e)(2)(B), "the proposal was negotiated at arm's length," as none of the Parties or counsel for the Parties had a preexisting relationship or any other relationship that had any impact on the terms of the Settlement.

> iv.  <u>The terms of the Class Settlement Agreement are particularly fair when weighed against "the costs, risks, and delay of trial and appeal" under Rule 23(e)(2)(C)(i).</u>

Under Rule 23(e)(2)(C)(i), "the costs, risks, and delay of trial and appeal" weigh significantly in favor of settling this dispute as the "uncertainties of litigation" are particularly onerous in this matter.  See <u>Bezdek v. Vibram USA Inc.</u>, 79 F. Supp. 3d 324, 343 (D. Mass. 2015) (courts weigh reasonableness of the settlement in light of the "uncertainties of litigation."), *aff'd* 809 F.3d 78, 80 (1st Cir. 2015).[17]

---

[17] <u>Bezdek</u> listed the following factors: "(1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of

## *Difficult Legal Issues to Overcome*

The substance of the plaintiffs' legal claims involves complicated and developing legal theories.  Indeed, it was only <u>after</u> Class Counsel filed the original Complaint in this action that, for the first time, the First Circuit issued a decision where it both recognized the legal theory underlying the plaintiffs' lawsuit and also held that the plaintiff in that case had stated a claim that could survive either a dispositive motion.  See <u>Irish v. Fowler</u>, 979 F.3d 65, 67 (1st Cir. 2020) ("Under the state-created danger substantive due process doctrine, officers may be held liable for failing to protect plaintiffs from danger created or enhanced by their affirmative acts. In doing so, we for the first time join nine other circuits in holding such a theory of substantive due process liability is viable.").[18]

However, since the First Circuit's decision in <u>Irish v. Fowler</u>, the Supreme Court's decision in <u>Dobbs</u> has cast serious

---

establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation."  79 F.3d at 343-344.

[18] <u>Irish</u> involved facts that are distinct from the facts here.  There, the claim was that a police investigation caused a suspect to murder a witness. No case in the First Circuit since <u>Irish</u> has involved a class action where the allegations involved the care provided at a long term care facility by state employees.

doubt on the viability of substantive due process claims, such as the plaintiffs' state-created danger claim here.  See *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2301 (2022), *J. Thomas concurring* ("[I]n future cases, we should reconsider all of this Court's substantive due process precedents. . . .").

Absent this settlement, the defendants would file motions to dismiss the plaintiffs' claims.  This would include challenges based on qualified immunity grounds.[19]  Even if this Court denied the defendants' motions to dismiss, the defendants would seek interlocutory appeal and, in light of *Dobbs*, it is far from clear how the plaintiffs would fare on appeal.

Assuming the plaintiffs survived the defendants' motions to dismiss, discovery would be extensive, likely spanning multiple years and involving the production of hundreds of thousands of pages of documents and depositions of dozens and dozens of witnesses.  Both the plaintiffs and defendants would also be required to retain experts at considerable expense.

At the close of discovery, the defendants would likely file motions for summary judgment.  If those motions were denied, the defendants would again likely petition the Court of Appeals for

---

[19] Those motions, which would be brought by counsel for the individual defendants but funded by the Commonwealth, would take positions that would inevitably harden the attitude of the plaintiffs toward the defendants and would make settlement of these claims more difficult, if not impossible. This reality was one of the considerations that motivated both Class Counsel and settlement counsel for the Commonwealth to engage in these negotiations before dispositive motions were filed.

interlocutory review.

If the plaintiffs survived the defendants' motions for summary judgment, their claims would proceed to trial, which would span months, not weeks.  At trial, the parties would litigate a myriad of issues, including not only whether the defendants' conduct was sufficiently severe to constitute a deprivation of the veterans' constitutional rights, but also the equally difficult question of whether the plaintiffs were able to carry their burden of proving that the defendants' conduct was the cause of the veterans' suffering.

More specifically, proving causation, i.e., that the veterans contracted COVID-19 because of the defendants' conduct, would not be easy to establish conclusively given the complexities of the transmission of COVID-19 and the fact that the COVID-19 infection spread rampantly throughout Massachusetts, not just at the Soldiers' Home.  Indeed, the Superior Court judge that dismissed the Commonwealth's criminal prosecution of defendants Walsh and Clinton accepted the defendants' arguments that causation was too speculative to be established by the Commonwealth:

> The Commonwealth . . . presented testimony from two
> medical experts, Dr. Asif Merchant and Dr. Ronald Rosen.
> Dr. Merchant testified that the merger was "not good
> infection control," which presented a risk that the five
> named veterans (among others) would contract COVID-19.
> But he testified that it was *not possible* to know the
> COVID-19 status of the five named veterans at the time

of the merger, because they already had been exposed to
COVID-19 before the merger but not yet been tested.

With respect to R.C., Dr. Merchant was asked, "[G]iven
that [R.C.] was living in a room with . . . symptomatic
people, what did that tell you regarding [R.C.'s]
potential COVID status on the date of the
consolidation?" He responded, "Well, we *wouldn't know*
what his COVID status was, you know, if he wasn't tested.
But he was exposed, yes." *Id.* The Commonwealth inquired
further, "So despite being in a room with individuals
who are COVID symptomatic, can you just assume that
[R.C.] was also infected?" Dr. Merchant responded, "*No,
you can't assume anything in medicine*, you know."

Exhibit 3 at 7, 17 ("There was insufficient reasonably

trustworthy evidence presented to the grand jury that, but for

the merger of these two dementia units, the medical condition of

any of these five veterans would have been materially

different.").

Finally, assuming that the plaintiffs prevailed at trial

and on any post-trial appeals brought by the defendants,

recovery of the amounts awarded by a jury would be extremely

challenging.  The individual defendants would not have the

ability to satisfy any judgments.  Therefore, for the plaintiffs

to recover the monies awarded to them, they would be dependent

on the Commonwealth of Massachusetts to make such payments.

Not only does the Commonwealth's indemnification statute,

M.G.L. c. 258, § 9, leave such indemnification at the discretion

of the Commonwealth ("Public employers may indemnify public

employees"), but the plain language of the indemnification

statute might bar recovery altogether in a § 1983 action.  This is explicitly because indemnification is not permitted under the statute if the defendants "acted in a grossly negligent, willful or malicious manner,"[20] but a § 1983 claim requires proof that the defendants acted with "deliberate indifference" to the plaintiffs' constitutional rights.[21]

Further, it is not clear whether the $1,000,000 indemnification cap in the statute applies on a per plaintiff, per defendant, or per occurrence basis.  No court has yet addressed this distinction.

Still worse, regardless of whether the cap is on a per defendant or per occurrence basis, the statute explicitly states that any award is to be reduced by the defendants' attorney fees, which in this case would be astronomical.  Indeed, the legal costs for each defendant would easily exceed $1,000,000, which means the indemnification statute, as written, would result in the statutory cap of $1,000,000 being significantly

---

[20] Note that M.G.L. c. 258, § 9, applies to state employees generally, like the defendants in this case, but a separate section, M.G.L. c. 258, § 9A, applies to claims against police.  Section 9A does not include such a bar against recovery for "grossly negligent" conduct.  The Commonwealth's decision to include that bar to recovery in § 9 but to exclude it from § 9A suggests that indemnification for § 1983 claims is not permitted under § 9, absent the enactment of a special statute as occurred here.

[21] See Voutour v. Vitale, 761 F.2d 812, 817-823 (1st Cir. 1985) ("Like most other courts that have addressed the matter, we hold that the supervisor must demonstrate at least gross negligence amounting to deliberate indifference, and that this conduct must be causally linked to the subordinate's violation of plaintiff's civil rights....").

reduced, if not entirely exhausted, by the defendants' attorney fees.

In other words, many obstacles exist that could prevent the plaintiffs from reaching or prevailing at trial, and, even if the plaintiffs managed to secure a sizeable judgment in their favor years from now, such a judgment might be virtually uncollectible.

> v. The method of distributing relief to the class proved incredibly effective, as is required under Rule 23(e)(2)(C)(ii).

Under, Rule 23(e)(2)(C)(ii), the "method of distributing relief to the class, including the method of processing class-member claims," was appropriate.  The parties (1) selected a highly reputable attorney, Donald K. Stern, to administer the claims process, (2) sent clear and easy to understand Notices to potential Class Members with clear and easy to process forms to return to the Claims Administrator, (3) set realistic deadlines for each stage of the claims process, and (4) worked diligently to communicate with potential Class Members to assist them during the claims process with submitting their claims.  The participation rate by class members, greater than 95%, clearly affirms that the distribution of relief contemplated under the Agreement was sound.

> vi. The proposed attorney fees are reasonable, as required under Rule 23(e)(2)(C)(iii).

As explained in greater detail in Class Counsel's accompanying Fee Petition, under Rule 23(e)(2)(C)(iii), "the terms of any proposed award of attorney's fees, including timing of payment" are very fair.

Class Counsel's proposed fees of $11,512,500 are 19.8% of the $57,912,500 that the Commonwealth is obligated to pay to resolve the case, putting the requested fees on the lowest end of fees commonly awarded in common fund cases.  See Bezdek v. Vibram USA Inc., 79 F. Supp. 324, 349-350 (D. Mass. 2015) aff'd, 809 F.3d 78 (1st Cir. 2015) ("Within the First Circuit, courts generally award fees 'in the range of 20-30%, with 25% as "the benchmark."' Latorraca v. Centennial Techs., Inc., 834 F. Supp. 2d 25, 27-28 (D. Mass. 2011) (collecting cases).").[22]

It is worth noting that counsel for the named plaintiffs have contingency fee agreements that entitle them to recovery of one-third of any monies secured for each plaintiff.  However, under the terms of the Settlement Agreement, Class Counsel has agreed to waive the 33 1/3% contingency fee provisions in their respective fee agreements with individual plaintiffs and accept the 19.8% fee provided in the Class Settlement Agreement.

---

[22] "The First Circuit recognizes two methods for calculating attorneys' fees in the class action context. . . . Under the 'percentage of the fund' ('POF') method, counsel may be awarded a reasonable percentage of the common fund. . . . [T]he POF method is generally favored in the class action context. . . ." Bezdek, 79 F. Supp. 3d at 349-350.

Moreover, the fees paid to Class Counsel under the Agreement will not affect the amount paid to Class Members but will instead be paid out of separately designated funds.[23]

### vii. *The Class Settlement Agreement is the only agreement that needs to be identified under Rule 23(e)(2)(C)(iv).*

Under Rule 23(e)(2)(C)(iv), the only "agreement required to be identified under Rule 23(e)(3)" is the proposed Agreement, attached as Exhibit 1, the terms of which are described in detail Section III above.  No other agreements pertaining to this settlement exist (other than the individual representation agreements between private counsel and individual clients, referred to above, which will become void upon the Court's final approval of the Class Settlement Agreement).

### viii. *Class Members are treated equitably relative to each other, as required under Rule 23(e)(2)(D).*

In addition to satisfying each of the four criteria under Rule 23(e)(2)(C), the Agreement also satisfies Rule 23(e)(2)(D), because "the proposal treats class members equitably relative to each other," by (1) establishing threshold amounts that each member of the respective Settlement Classes will be paid at a minimum, and (2) appointing a reputable Claims Administrator who

---

[23] As noted above, under the Agreement, if the Court reduces the fee award, the reduced amount, which has already been appropriated by the Commonwealth and is now in escrow, will be returned to the Commonwealth.  Such funds cannot be used to increase the payments to Settlement Class Members.

had considerable discretion to award additional amounts beyond the minimum threshold amount to compensate class members as appropriate based on relevant information supplied to him.

    d. *The sole Objection, brought by the estate of Joseph Bryant, does not render the Class Settlement Agreement unfair.*

The estate of Joseph Bryant has decided to participate in the settlement, but has objected to being included in Settlement Class A, rather than Settlement Class B.  The Bryant estate was included in Class A because (1) Mr. Bryant contracted COVID-19 during the relevant time period, and (2) his death occurred eleven days after the cutoff date of June 23, 2020.

Knowing that it did not meet the definition of Settlement Class B set forth in the Settlement Agreement, the Bryant estate could have opted out of the settlement and brought its own lawsuit in an effort to secure a larger recovery than that available to Class A Members.  But the Bryant estate elected not to bring its own lawsuit.[24]  Instead, the estate filed a claim pursuant to the Settlement Agreement and in its Objection asks this Court to amend the Agreement to include it in Class B.

But as the Commonwealth separately and persuasively explains in its response to the Bryant estate's objection, the

---

[24] A decision likely made in recognition of the fact that accepting the settlement, even as a Member of Settlement Class A, would be superior to pursuing separate litigation, which is fraught the uncertainties described in Section IV(b)(iv) above and the causation issues set forth below.

Court does not have the authority to amend the definition of the Settlement Class but can only accept or reject the Agreement in its entirety.[25]

Class Counsel requests that the Court not disrupt the settlement.  Doing so would be fundamentally unfair to the other 76 participating members of Settlement Class A and all 87 members of Settlement Class B.  See Bacchi v. Massachusetts Mut. Life Ins. Co., No. 12-11280-DJC, 2017 U.S. Dist. LEXIS 184926, at *8 (D. Mass. Nov. 8, 2017) ("[T]o the extent that some objectors contend that the settlement amount is too small, the Court does not agree given the uncertainty that Plaintiffs faced of no recovery whatsoever if the parties had not settled and had continued to litigate," quoting In re Lupron Mktg. & Sales Practices Litig., 228 F.R.D. 75, 97-98 (D. Mass. 2005)).

As the Commonwealth further notes in its Opposition, the cutoff date for delineating between Class A and Class B members was fiercely negotiated during Class Counsel's settlement

---

[25] See Evans v. Jeff D., 475 U.S. 717, 726-27 (1986) ("Rule 23(e) wisely requires court approval of the terms of any settlement of a class action, but the power to approve or reject a settlement negotiated by the parties before trial does not authorize the court to require the parties to accept a settlement to which they have not agreed."); In re Warner Commc'n Sec. Litig., 798 F.2d 35, 37 (2d Cir.1986) ("It is not a district judge's job to dictate the terms of a class settlement; he should approve or disapprove a proposed agreement as it is placed before him and should not take it upon himself to modify its terms."); Nilsen v. York County, 382 F. Supp. 2d 206, 217-218 (D. Me. 2005) ("My role is not to dictate the terms of settlement, but only to reject the settlement if it is not fair, reasonable and adequate.").

discussions with the Commonwealth.  In its initial Complaint, Class Counsel defined the class of veterans entitled to relief as including anyone who contracted COVID-19 prior to June 23, 2020, the date that the Pearlstein report issued.  Class Counsel's rationale for the June 23, 2020, date was that the National Guard had taken control of the Soldiers' Home at the end of March 2020, which meant that any the negligent acts of the defendants ended by that date.

Counsel for the Commonwealth argued strongly that Settlement Class B should only include the estates of veterans who contracted COVID-19 and passed away shortly after March 2020 (i.e., before May 1, 2020).  From their perspective, causation was too attenuated to stretch all the way until June 23, 2020, almost three months after the National Guard entered the Soldiers' Home.  After intensive negotiations, Class Counsel nonetheless secured the cutoff date of June 23, 2020.

To mitigate the impact of the cutoff date, Class Counsel negotiated to allow the Claims Administrator considerable discretion in allocating settlement funds to members of Settlement Class A.

It is important to note that the terms of the Settlement Agreement do not require a member of Settlement Class B to prove that COVID-19 caused the veteran's death.  Instead, the Agreement merely requires members of Settlement Class B, which

34

the Bryant estate seeks to join, to prove that the veteran had been living at the Soldiers' Home, contracted COVID-19, and died before June 23, 2020.

However, if the Class Settlement Agreement is not approved and this matter were to proceed to trial, then causation would become a live issue.  In that case, the Bryant estate, like all 164 plaintiffs, would have to prove (1) that Mr. Bryant contracted COVID-19 because of the defendants' conduct, and (2) that COVID-19 was the cause of his death.  This would prove challenging, for all of the plaintiffs and particularly for the Bryant estate.

According to the Bryant estate's Objection, Mr. Bryant was a hospice patient who suffered from "dementia, diabetes, chronic kidney disease, hypertension, sacral decubitus, thoracic aortic dissection, osteoarthritis of the knees, benign prostatic hypertrophy and anemia."  Objection at 3.[26]  Throughout his time at the Soldiers' Home (including before he contracted COVID-19), "Joseph's dementia has been variously diagnosed as moderate to severe and, due to arthritic knees, he was never able to walk while a Soldiers Home resident but was confined to bed or a wheelchair."  Id.  The Objection further notes that Mr. Bryant

---

[26] The Notes of Advisory Committee on the 2003 Amendments to Rule 23(c) caution that, during the Class Certification process, "Further inquiry into the agreements identified by the parties should not become the occasion for discovery by the parties or objectors."  In this case, all parties agree that such discovery is not warranted to address the Bryant estate's Objection.

had lost a lot of weight between December 2019 and May 2020, but that he had gained some weight back by June 2020.  Objection at 4.  Mr. Bryant's records also document that he suffered cellulitis, urinary tract infections, and bed sores, and there were also "several episodes in which Bryant fell out of bed." Id.  Those medical conditions described in the Bryant estate's Objection are arguably not conditions that are related to suffering caused by a COVID-19 infection.

### e. *Comparison to a similar settlement of veteran estates' claims in New Jersey.*

Finally, Class Counsel would further underscore that the compensation secured by this Class Settlement Agreement for Class B members is 70% higher than the terms of a settlement of similar claims by the estates of veterans in New Jersey, who contracted COVID-19 and died as a result. [27]

The families who lost a veteran to COVID-19 in the New Jersey settlement received payments of $445,000.  But the amount actually received by the families was far less since the awards were then reduced by the payment of attorney fees of 33 1/3%. The families therefore netted less than $300,000 each (in

---

[27] See Families of Veterans Who Died of Covid Win $53 Million Legal Settlement, Christopher Weaver, New York Times, December 23, 2021, at https://www.nytimes.com/2022/01/07/nyregion/nj-nursing-home-covid-settlement.html. Unlike in this lawsuit, the New Jersey settlement only provided relief for the estates of veterans who contracted COVID-19 and died as a result.  Upon information and belief, no recovery was provided to veterans who contracted COVID-19 but survived.

contrast to the $510,000 that Class B members netted here).

V.    CONCLUSION

        WHEREFORE, Class Counsel asks the Court to issue FINAL

JUDGMENT,

        (1)  Approving the Class Settlement Agreement, adjudging
             the terms thereof to be fair, reasonable, and
             adequate, and directing consummation of its terms and
             provisions;

        (2)  Approving Class Counsel's application for an award of
             Attorneys' Fees and Costs;

        (3)  Certifying the Settlement Class, for Settlement
             purposes only, in accordance with applicable legal
             standards and this Agreement; and

        (4)  Dismissing this litigation between the Class
             Representatives and the Settlement Class Members, on
             the one hand, and the defendants, on the other hand,
             on the merits and with prejudice, and permanently
             barring the Class Representatives and all Settlement
             Class Members from further prosecuting any of the
             claims released in the Releases against the
             Commonwealth Released Parties.

A proposed Order is attached as Exhibit 4.


Date: November 2, 2022    The Plaintiffs,
                          By their attorneys,

                          /s/ Michael Aleo
                          _____
                          Thomas Lesser
                          lesser@lnn-law.com
                          Michael E. Aleo
                          aleo@lnn-law.com
                          Lesser, Newman, Aleo & Nasser, LLP
                          39 Main Street
                          Northampton, MA 01060
                          (413) 584-7331

<u>CERTIFICATE OF SERVICE</u>

    I, Michael Aleo, hereby certify that this document has been filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.


Date: November 2, 2022      */s/ Michael Aleo*