UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                    )
ESTATE OF PAUL SNIADACH, et al.     )     No. 20-CV-30115
                                    )
          Plaintiffs                )
                                    )
v.                                  )
                                    )
BENNETT WALSH, et al.               )
                                    )
          Defendants                )
_____     )

<u>CLASS COUNSEL'S FEE PETITION</u>

Attorneys Thomas Lesser and Michael Aleo, as Class Counsel, request that the Court enter an Order approving the award of attorney fees in the amount of $11,512,500, in accordance with Section 10.1 of the Class Settlement Agreement ("Agreement").

The requested attorney fees constitute 19.8% of the $57,912,500 that the Class Settlement Agreement requires the Commonwealth of Massachusetts ("Commonwealth") to pay to resolve this dispute. This places the requested fees on the lowest end of the range of attorney fees awarded in common fund[1] class action settlements in the First Circuit. See <u>Bezdek v. Vibram USA Inc.</u>, 79 F.3d 324, 349-350 (D. Mass. 2015) ("Within the First Circuit, courts generally award fees in the range of 20-

_____

[1] In common fund class action cases, such as this, "a litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." <u>Boeing Co. v. Van Gemert</u>, 444 U.S. 472, 478, 62 L. Ed. 2d 676, 100 S. Ct. 745 (1980); <u>In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig.</u>, 56 F.3d 295, 307 (1st Cir. 1995).

30% [of the common fund settlement], with 25% as the benchmark."
(internal quotations and citations omitted)).[2]

This attorney fee request was negotiated with the
Commonwealth and is unopposed by the Commonwealth.  In addition,
none of the 164 Settlement Class Members have objected to the
amount of the requested attorney fees, which were set forth in
the Class Settlement Notice provided to each of the Class
members.

For the reasons described below, the requested attorney
fees are reasonable and are in accordance with Fed. R. Civ. P.
23(h).

I.    INTRODUCTION

This class action suit began with the claim of a single
plaintiff, the Estate of Joseph Sniadach, brought pursuant to
the Due Process Clause of the Fourteenth Amendment and 42 U.S.C.
§ 1983. That lawsuit sought the certification of a class of
veterans who contracted the COVID-19 virus while living at the
Soldiers' Home in Holyoke, Massachusetts ("Soldiers' Home"),
between March 1 and June 23, 2020.

Six months of intensive negotiation with the Governor's

_____

[2] Any reduction by the Court in the $11,512,500 requested by Class Counsel in
their Fee Petition, which amount has already been appropriated by the
Legislature and placed into escrow with the Greenfield Savings Bank, will
revert to the Commonwealth per the Settlement Agreement.  In other words, a
reduction of the requested fees will not result in any increase in the amount
of the award(s) to Class Members.

Office of the Commonwealth eventually followed.  At the end of May 2022, the parties signed a Class Settlement Agreement, which will resolve the claims of 164 veterans: 77 members of Settlement Class A (veterans who contracted COVID-19 between March 1, 2020 and June 23, 2020 and survived past June 23, 2020), and 87 members of Settlement Class B (veterans who contracted COVID-19 and died between March 1, 2020 and June 23, 2020).[3]

Unlike most class action settlements, the parties in this case did not negotiate a single settlement amount that included both (a) monies to be awarded to the claimants and (b) monies to be awarded for attorney fees.  In those cases, where a single finite sum is negotiated (which encompasses both the amount to be received by the claimants and the amount to be received by the attorneys as fees), any reduction in attorney fees automatically results in an identical increase in the amount received by the claimants.[4]

---

[3] During negotiations, Class Counsel secured an increase in the number of deceased veterans eligible to participate as Class B members in the settlement, from 76 (the number known when the case was filed) to 87.  The addition of those eleven veterans to Class B increased the settlement fund by $5,610,000, since each veteran included in Class B was allocated $510,000.

[4] In those cases, the amount of the attorney fees award is determined post-settlement, which creates a conflict in interest for class counsel.  See Fid./MICRON Sec. Litig. v. FIDELITY MAGELLAN FUND, 167 F.3d 735, 738 (1st Cir. 1999) (highlighting the concern that, "once [such] a common fund is established, class members and class counsel wind up playing a zero sum game, in which every dollar awarded to counsel represents one dollar less that is available for distribution to class members.").

Here however, the award to the claimants and the amount of attorney fees were separately negotiated and stand as separate stand-alone awards in the Settlement Agreement, avoiding any conflict between Class Counsel and Class members.

Under Section 9 of the Settlement Agreement, Settlement Class members will receive a defined amount (in this case $46,050,000),[5] which will not be reduced by or affected in any way by the amount of the attorney fees awarded.

The amount to be awarded for attorney fees is addressed separately in Section 10 of the Settlement Agreement. First, under Section 10.1, the Commonwealth agreed not to object to an attorney fees award that does not exceed 25% of the amount received by the Class Members. In accordance with that language in Section 10.1, Class Counsel has requested an attorney fee award in the amount of 25% of the amount to be received by the Class Members, which constitutes 19.8% of the $57,972,500 the Commonwealth is obligated to pay to resolve the case).[6] Second, under Section 10.2, all pre-existing retainer agreements between Class Members and Lesser Newman Aleo & Nasser, LLP (now Class

---

[5] The original amount set forth in the Settlement Agreement was $45,858,750, but it increased by $1,912,500 after the Settlement Agreement was signed because Class Counsel filed successful claims with the Claims Administrator to admit three additional members to Class B, bringing the total number of Class B members to 87. Under the Settlement Agreement, the Commonwealth was then obligated to allocate $510,000, plus $127,500 in attorney fees, for each additional member admitted to Class B.

[6] This is more fully explained below at page 9 in Section III below.

Counsel), which were standard 33 1/3 % fee agreements, are
rendered null and void.  Class Counsel will only collect the
percentage of the recovery awarded by the Court.  Third, under
Section 10.4 of the Settlement Agreement, if this Court should
award Class Counsel less than the requested amount, that reduced
amount would revert to the Commonwealth: "Any difference between
the award of attorney fees as set forth in Section 10.1 above
and the amount awarded to Class Counsel by the Court shall
revert to the Commonwealth of Massachusetts." In other words,
any reduction in the requested attorney fees would result in a
windfall to the Commonwealth, which is not opposing the amount
requested in this petition for attorney fees.  None of the
reduction in fees would accrue to the benefit of the Class
Members.

II.  <u>PROCEDURAL HISTORY</u>

Class Counsel, on behalf of a single estate, the estate of
Joseph Sniadach, originally filed this civil rights lawsuit as a
putative class action on July 17, 2020, against five defendants,
four of whom formerly served on the executive leadership team of
the Soldiers' Home: Bennett Walsh, former Superintendent of the
Soldiers' Home; David Clinton, former Medical Director of the
Soldiers' Home; Vanessa Lauziere, former Chief Nursing Officer
of the Soldiers' Home; and Celeste Surreira, former Assistant
Director of Nursing of the Soldiers' Home; and a fifth

defendant, Francisco Ureña, the former Secretary of the
Department of Veterans' Services for the Commonwealth of
Massachusetts.  ECF No. 1.

On December 23, 2020, the estate of Stanley Chiz filed a
separate lawsuit against the same defendants based on the same
legal theory, No. 20-cv-30194-MGM.

On January 25, 2021, the parties filed a Joint Motion to
(1) consolidate the Sniadach and Chiz actions and (2) further
enlarge the time period to file an amended complaint, ECF No.
12.

After status conferences were held on February 5, March 22,
and June 21, 2021, the Court allowed the parties' motion to
consolidate, ECF Nos. 15, 21, and 27.

On September 20, 2021, Class Counsel filed an Amended
Complaint, adding several named plaintiffs and a sixth
defendant, Mary Lou Sudders, Secretary of the Executive Office
of Health and Human Services for the Commonwealth, ECF No. 31.

On October 27, 2021, the parties filed a motion to further
extend the responsive deadlines, ECF No. 35, which the Court
allowed, ECF No. 36.

Beginning in November 2021, counsel for the plaintiffs
entered into intensive negotiations with settlement counsel for
the Commonwealth.  During these negotiations, Class Counsel was
able to increase the number of veterans in Class B (the class of

6

veterans who contracted COVID-19 and died prior to June 23, 2020) from 76 (the number in the Perlstein report) to 84.[7]

On May 12, 2022, the parties filed a joint motion (1) notifying the Court that the parties had agreed to settlement terms and (2) requesting that the Court stay the proceedings pending execution of a proposed Class Settlement Agreement, ECF No. 43.  The Court held a status conference that same day and granted the motion, ECF Nos. 44-45.

On May 19, 2022, Class Counsel filed a motion to amend the Complaint again to add additional plaintiffs and to define the proposed settlement classes more particularly, ECF No. 46, which the Court allowed, ECF No. 48.

On May 20, 2022, the parties executed a Class Settlement Agreement and submitted the Agreement to the Court as part of its joint motion for preliminary approval of the Agreement, ECF No. 47.

On June 6, 2022, after holding a status conference on the merits of the proposed Agreement, the Court issued an Order, ECF No. 51, preliminarily approving the Agreement; appointing undersigned counsel, Thomas Lesser and Michael Aleo, as Class

---

[7] On May 11, 2022, a potential class member filed a separate complaint with this Court against the same defendants alleging the same facts included in the Amended Complaint in this action, Lindsay v. Walsh et al., 22-cv-30061 (2022), but the Lindsay estate then decided to participate in this action and has dismissed that suit.

Counsel; appointing Attorney Donald K. Stern as Claims
Administrator; and issuing a Notice Order directing the Claims
Administrator to send out Notice to potential settlement Class
Members.

On July 11, 2022, the Legislature passed a Special Act,
appropriating $56,000,000 to cover the sums set forth in the
Settlement Agreement for (a) the awards to the claimants, (b)
attorneys fees, and (c) payment to the Claims Administrator.[8]

Following the Court's June 6, 2022, Order, the Claims
Administrator sent out Notices to potential Class Members and
began receiving and processing the submission of claims, which
Class Counsel assisted with throughout the summer of 2022.

On August 12, 2022, the estate of Joseph Bryant, through
separate counsel, (a) submitted a claim to the Claims
Administrator to participate in the settlement and (b) also
filed an Objection to the terms of the Agreement, ECF No. 53.
The Bryant estate did not (1) opt-out of the Settlement in order
to bring its own lawsuit, or (2) take issue with the amount of
the attorney fees set forth in the Agreement.

On August 22, 2022, the Claims Administrator submitted a
letter to the Court, pursuant to Section 6.6 of the proposed
Class Settlement Agreement, stating that no Settlement Class

---

[8] That $56,000,000 is now being held in escrow in the Greenfield Savings Bank
pending further action by this Court.

Member had elected to opt out of the Class Settlement in order to bring their own lawsuit, ECF No. 54.

On September 16, 2022, the Court held a status conference, at which time the Court heard an update from the parties and a summary of the Objection by counsel for the Bryant estate.

On September 29, 2022, the Claims Administrator accepted the claims of three additional estates, who had submitted claims with the help of Class Counsel, to be admitted into Class B. This brought the number of veterans in Class B up to 87, eleven more than were known when Lesser, Newman, Aleo & Nasser, LLP filed the initial complaint.[9]

On November 2, 2022, the Claims Administrator submitted an affidavit summarizing his allocation of funds to Settlement Class Members, which included awards totaling $46,050,000 to 164 Settlement Class Members.  Motion for Final Approval, Exhibit 1.

III. <u>THE SETTLEMENT PROVISIONS IN THE CLASS SETTLEMENT AGREEMENT</u>

The Settlement Agreement provides that the Commonwealth has agreed to pay the following sums to resolve the cases:

(1)   $1,680,000 to the 77 members of Settlement Class A, pursuant to Section 9.1;

---

[9] The addition of those three Class B members will not decrease the amount to be received by the initially named 84 Class B members because the Commonwealth will contribute an additional $510,000 for each of the three added Estates into the monies available to be distributed, plus attorney fees.

    (2)   $44,370,000 to the 87 members of Settlement Class B;[10]

    (3)   $11,512,500 to Class Counsel;[11] and

    (4)   $350,000 to the Claims Administrator.[12]

Those payments total $57,912,500.

## IV.   THE FEES REQUESTED IN THIS PETITION ARE IN ACCORDANCE WITH THE SETTLEMENT AGREEMENT AND ARE REASONABLE

Under Rule 23(h) of the Federal Rules of Civil Procedure: "In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."   In this case, fees are authorized both by law, pursuant to 42 U.S.C. §§ 1983 and 1988, and by the parties' Class Settlement Agreement.

"The First Circuit recognizes two methods for calculating attorneys' fees in the class action context": (1) the "percentage of the fund" method, which is based on "a reasonable percentage of the common fund" and which is "generally favored," in common fund class action cases, such as the case before this

---

[10] This includes the initial $42,840,000 set forth in Section 9.2 of the Settlement Agreement and the additional $1,530,000 provided by the Commonwealth pursuant to Section 9.2.2, to compensate the three additional Settlement Class Members that the Claims Administrator admitted to Class B on September 29, 2022.

[11] The requested attorney fees include, but are not limited to, (a) attorney fees for co-counsel Christopher Cava, (b) attorney fees for referring counsel, (c) Class Counsel's time spent on the litigation, (d) Class Counsel's time in filing or otherwise ensuring that the estates of all Class Members had an appointed Personal Representative, a prerequisite to recovery, and (e) all costs, expert and otherwise, incurred by Lesser Newman Aleo & Nasser, LLP during the litigation.

[12] The requested fees are 19.8% of the total amount of $57,972,500 the Commonwealth is obligated to pay to settle the underlying claims.

Court, or (2) the "lodestar" method, which is based on the number of hours Class Counsel has expended based on the case. Bezdek v. Vibram USA Inc., 79 F.3d 324, 349-350 (D. Mass. 2015), aff'd 809 F.3d 78, 80 (1st Cir. 2015).

"Regardless of the calculation method employed, the touchstone of the inquiry is reasonableness."  Bezdek, 79 F.3d 324, 349-350 (citing In re Fidelity/Micron Sec. Litig., 167 F.3d 735, 738 (1st Cir. 1999)).[13]

a. *Percentage of Fund Method*

The parties used the "Percentage of Fund" (POF) method for calculating attorney fees in Section 10.1 of the Class Settlement Agreement.

This was in accordance with the recognition that in the First Circuit, the "Percentage of Fund" method of calculating attorney fees "is generally favored in the class action context," Bezdek, 79 F.3d at 350 (quoting In re Thirteen Appeals, infra).[14]

---

[13] The attorney fees requested here are reasonable.  It should be noted that (a) a full award will not reduce, or affect in any way, the money designated for Class Members and (b) the Commonwealth is not objecting to the amount of the attorney fees requested in this petition.

[14] As the District Court noted in Arkansas Teacher Retirement Sys.:

> The court's "authority to order reimbursement from a common fund has its origins in equity . . ." In re Fidelity Micron, 167 F.3d 735, 737 (1st Cir. 1999). . . . Under the Common Fund doctrine, "[a] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." Boeing Co. v.

As the First Circuit found in <u>Thirteen Appeals</u>:

[U]sing the POF method in a common fund case enhances efficiency, or, put in the reverse, using the lodestar method in such a case encourages inefficiency. Under the latter approach, attorneys not only have a monetary incentive to spend as many hours as possible (and bill for them) but also face a strong disincentive to early settlement. *See* Third Circuit Report, 108 F.R.D. at 247-48 (finding that, in common fund cases, the lodestar method "encourages lawyers to expend excessive hours" and "creates a disincentive for the early settlement of cases"); *see also* FJC Report, *supra*, at 310. If the POF method is utilized, a lawyer is still free to be inefficient or to drag her feet in pursuing settlement options -- but, rather than being rewarded for this unproductive behavior, she will likely reduce her own return on hours expended.

Another point is worth making: because the POF technique is result-oriented rather than process-oriented, it better approximates the workings of the marketplace. We think that Judge Posner captured the essence of this point when he wrote that "the market in fact pays not for the individual hours but for the ensemble of services rendered in a case of this character." *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992). In fine, the market pays for the result achieved.

56 F.3d at 307-308.

These two points are particularly applicable to what has occurred in the case before the Court.  Class Counsel was able

---

<u>Van Gemert</u>, 444 U.S. 472, 478 (1980). The Common Fund doctrine "is founded on the equitable principle that those who have profited from litigation should share its costs." <u>In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.</u>, 56 F.3d 295, 305 (1st Cir. 1995). This rule "reflect[s] the traditional practice in courts of equity" and has been applied "in a wide range of circumstances as part of [courts'] inherent authority." <u>US Airways, Inc. v. McCutchen</u>, 569 U.S. 88, 104, 133 S. Ct. 1537, 185 L. Ed. 2d 654 (2013) (internal citations and quotations omitted).

<u>Arkansas Teacher Retirement Sys. v. State St. Bank & Trust Co.</u>, 513 F. Supp. 3d 202, 208 (D. Mass. 2021).

to secure a remarkably high settlement for the plaintiffs in a remarkably short period of time.  The estates of the Class of deceased veterans will receive amounts a full 70% more than the amounts received by veterans in the only comparable case resolved to date (see Section (5) below at page 24).  And the settlement was reached within twenty two months of the filing of the lawsuit, at a time when parts of the legal system had come to a grinding halt due to COVID-19.[15]

The reasons for using the percentage of fund method for calculating attorney fees, rather than the lodestar are addressed in more detail in the Affidavit of Professor David Rosenberg of Harvard Law School, attached as Exhibit A and incorporated herein.  Professor Rosenberg's particular area of expertise is common fund class actions, including what constitutes appropriate attorney fees.  In his Affidavit, he explains the reasons why the percentage of fund method for calculating attorney fees should be used, rather than the lodestar method.  He explains that the percentage of fund method (a) is more efficient, (b) more closely approximates the market place by aligning the interests of Class Members and Class

---

[15] An early settlement, rather than a verdict after years and years of litigation, clearly was in the interest of the families of the veterans who suffered through this tragedy.  By resolving the case now, the families received the opportunity to begin to heal, which would not have been possible during years of aggressive litigation by the defendants in which they would have disclaimed any responsibility for what occurred at the Soldiers' Home.

Counsel, (c) acts as a greater deterrent to future wrongdoing, and (d) serves as a greater incentive to counsel to bring difficult cases to vindicate the public interest.[16]

Assuming that this Court follows the First Circuit's preferred method for calculating attorney fees in common fund cases (i.e., the percentage of fund method included in the Class Settlement Agreement), the question then becomes what percentage is reasonable.  In this case, the requested fee is 19.8% of the total settlement amount of $57,912,500. This places the requested attorney fees at the bottom end of the range of fees generally awarded in the First Circuit in common fund cases.

Judge Saris addressed the issue of what percentage of the common fund is generally awarded in the First Circuit in <u>Harden Mfg. v. Pfizer, Inc (In re Neurontin Mktg. & Sales Practices Litig.)</u>, 58 F.3d 167, 170, 172 (D. Mass. 2014).  There, the court noted that: "An empirical study of federal class action fee awards in 2006 and 2007 found that nearly two-thirds of class action fee awards based on the percentage method were between 25% and 35% of the common fund."  <u>Id</u>. at 172 ("In the First Circuit, the mean was 27% and the median was 25%.) (citing Brian T. Fitzpatrick, An Empirical Study of Class Action Settlements and Their Fee Awards, 7 J. Empirical L. Stud. 811, 833-34 (2010)).

---

[16] Professor Rosenberg's Affidavit also explains why the requested fee is reasonable and promotes good public policy.

Similarly, the District Court in Bezdek found: "Within the First Circuit, courts generally award fees in the range of 20-30%, with 25% as "the benchmark."  79 F.3d. at 350 (quoting Latorraca v. Centennial Techs., Inc., 834 F. Supp. 2d 25, 27-28 (D. Mass. 2011)).

Thus, Class Counsel's Fee Petition, which constitutes 19.8% of the amount the Commonwealth has agreed to pay to settle this case, is just below the low end of the range of fees awarded in First Circuit common fund cases.

Not only are the attorney fees requested in this case at the bottom of the range of fee awards in the First Circuit, but they also are strongly supported by the seven Goldberger factors that District courts will often consider when evaluating the reasonableness of the requested percentage of the fund award.

As detailed in Harden Mfg. v. Pfizer, Inc., "In weighing a common fund request, courts generally consider the following so-called *Goldberger* factors," which include:

> (1) the size of the fund and the number of persons benefitted; (2) the skill, experience, and efficiency of the attorneys involved; (3) the complexity and duration of the litigation; (4) the risks of the litigation; (5) the amount of time devoted to the case by counsel; (6) awards in similar cases; and (7) public policy considerations.

58 F. Supp. 3d 167, 170, 171 (D. Mass. 2014).[17]

---

[17] Citing Goldberger v. Integrated Res., Inc., 209 F.3d 43, 50 (2d Cir. 2000).

(1)   *"The size of the fund and the number of persons benefitted."*

The size of the common fund in this case is $57,912,500.[18] There are 164 participating Class Members, a participation rate of more than 95% of the eligible veterans.

The Settlement provides an excellent recovery for Class Members, which will not be reduced by the Court's award of attorney fees.  For example, members of Settlement Class B will receive, on average, an award of $510,000.  Were counsel to have settled the plaintiffs' cases individually (i.e., not pursuant to the terms of the Class Settlement Agreement), each individual plaintiff would have had to receive an award of $ 765,000 to net $510,000.[19]

(2)   *"The skill, experience, and efficiency of the attorneys involved."*

Class Counsel's skill and experience with complex litigation and their efficiency in resolving the dispute weigh heavily in favor of allowing their request for attorney fees.

Attorney Lesser earned his law degree from Harvard Law School in 1972 and was admitted to practice law in the

---

[18] Courts will sometimes decrease the percentage of the common fund awarded for attorney fees in "megafund" cases, which are defined as cases with a recovery in excess of $100,000,000.  Harden Mfg. v. Pfizer, Inc 58 F. Supp. 3d 167, 170, 172 (D. Mass. 2014).  The recovery here is well below $100,000,000.

[19] Each plaintiff had a standard one-third contingency agreement.  On an award of $765,000, a one third contingency fee would reduce the award by $255,000, leaving $510,000 for the client.

Commonwealth of Massachusetts in January 1973.  Since he began
the practice of law in 1973, with the firm now known as Lesser,
Newman, Aleo & Nasser, LLP, over 90 percent of his practice has
been in litigation, either civil or criminal.  Attorney Lesser
has appeared before the United States District Court and the
First Circuit Court of Appeals many times, and he has appeared
before virtually every type of state court throughout
Massachusetts.  His practice is focused on complex litigation
involving the First Amendment, civil rights issues arising under
42 U.S.C. § 1983, medical malpractice, personal injury,
employment, political disputes, and more.

Attorney Aleo earned his law degree at American
University's Washington College of Law in 2006.  He practiced
employment law in Washington, D.C. and in California in 2006-
2007.  He became licensed to practice law in Massachusetts in
2008 when he began practicing civil rights litigation at the
Lawyers Committee for Civil Rights in Boston, Massachusetts (now
the Lawyers for Civil Rights – Boston).  He joined the law firm
of Lesser, Newman & Nasser, LLP in 2011, after three years at
the Lawyers Committee.  After he was named a partner, the law
firm changed its name to Lesser, Newman, Aleo & Nasser, LLP.
His practice is focused primarily on civil litigation, with a
concentration in employment, personal injury, and complex civil
disputes.

Attorney Lesser and Attorney Aleo put their skill and experience to good use in this case, by resolving this dispute efficiently and expeditiously.  Litigation of this case could easily have lasted an additional three to five years.

Equally importantly, Counsel recognized the peril of litigation and aggressively pushed to open settlement discussions _before_ dispositive motions were ever filed.[20]  This preserved the opportunity to resolve these claims by settlement and resulted in the Class Settlement Agreement coming to fruition.

_(3)_   _"The complexity and duration of the litigation."_

The plaintiffs' legal claims involve complicated legal theories and statutory interpretations that have not been decided or brought to trial in District Courts within the First Circuit.

The issues that were raised by this litigation include:

(a)   The viability of the plaintiffs' due process claim brought pursuant to 42 U.S.C. § 1983.

It was only after Class Counsel filed the original Complaint in this action that, for the first time, the First Circuit issued a decision, _Irish v. Fowler_, where it both

---

[20] If dispositive motions had been filed, the defendants would have asserted defenses that disclaimed any responsibility for COVID-19 spreading throughout the Soldiers' Home.  Such pleadings would have strongly offended and hardened the positions of the plaintiffs (still fresh from the suffering and losses of their loved ones) and made later settlement extremely difficult.

recognized the legal theory underlying the plaintiffs' lawsuit
and also held that the plaintiff in that case had stated a claim
that could survive either a motion to dismiss or a motion for
summary judgment.  979 F.3d 65, 67 (1st Cir. 2020) ("Under the
state-created danger substantive due process doctrine, officers
may be held liable for failing to protect plaintiffs from danger
created or enhanced by their affirmative acts.").

However, Irish involved facts that are distinct from the
facts here.  There, the claim was that a police investigation
caused a suspect to murder a witness.  No case in the First
Circuit since Irish has involved a class action where the
allegations involved the allegedly deficient care provided at a
long term care facility resulting in the spread of an infectious
disease.

Moreover, since the First Circuit's decision in Irish, the
Supreme Court's decision in Dobbs has cast serious doubt on the
continued viability of substantive due process claims, such as
the plaintiffs' state-created danger claim.  See Dobbs v.
Jackson Women's Health Org., 142 S. Ct. 2228, 2301 (2022), *J.
Thomas concurring* ("[I]n future cases, we should reconsider all
of this Court's substantive due process precedents. . . .").

      (b)  Qualified immunity – Clearly Established Law.

When evaluating a defendant's qualified immunity claim, the
plaintiff must establish (1) "the deprivation of an actual

constitutional right," and (2) that "the right was clearly established at the time of the alleged action or inaction." Starlight Sugar, Inc. v. Soto, 253 F.3d 137, 141 (1st Cir. 2001).

"The test to determine whether a right is clearly established asks whether the precedent is 'clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply' and whether '[t]he rule's contours [were] so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Irish v. Fowler, 979 F.3d 65, 76 (1st Cir. 2020) (quoting District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018)). This is a heavy burden.

Proving that each of the defendants should have acted in a particular manner, in accordance with precedent, to prevent the spread of COVID-19 at the time the alleged wrongful acts occurred would have been challenging, particularly given that Irish v. Fowler (1) was decided after the alleged wrongful acts in this dispute occurred, and (2) involved an entirely different set of facts than the dispute here (i.e., the impact that the conduct of police officers had on third-parties, as compared to the transmission of COVID-19 due to the conduct of state

employees).[21]

     (c)  <u>Prevailing at trial</u>.

Assuming the plaintiffs survived the defendants' motions to dismiss, discovery would be extensive, spanning years and involving the production of hundreds of thousands of pages of documents, as well as the depositions of dozens of witnesses.

At the close of discovery, the defendants would file motions for summary judgment.  If those motions were denied, the defendants would almost certainly petition the Court of Appeals for interlocutory review.

If the plaintiffs survived the defendants' motions for summary judgment, their claims would proceed to trial, which would span months, not weeks.  At trial, the parties would litigate a myriad of issues, including not only whether the defendants' conduct was sufficiently severe to constitute a deprivation of the veterans' constitutional rights, but also the equally difficult question of whether the plaintiffs carried their burden of proving that the defendants' conduct was the cause of the veterans' suffering.

Proving causation, i.e., that the veterans contracted COVID-19 because of the defendants' conduct, would not be easy

---

[21] Although the Court's dismissal of the class action in <u>Ablordeppey v. Walsh</u>, No. 21-cv-11314-MGM, specifically distinguished the facts there from this case, that distinction would not necessarily be enough for the plaintiffs to carry the day on appeal in light of <u>Dobbs</u>.

to establish conclusively, given the complexities of the
transmission of COVID-19 and the fact that the COVID-19
infection spread rampantly throughout institutions in
Massachusetts, not just at the Soldiers' Home.  Indeed, the
Superior Court judge that dismissed the Commonwealth's criminal
prosecution of defendants Walsh and Clinton accepted the
defendants' arguments that causation was too speculative to be
established by the Commonwealth:

> The Commonwealth . . . presented testimony from two
> medical experts, Dr. Asif Merchant and Dr. Ronald Rosen.
> Dr. Merchant testified that the merger was "not good
> infection control," which presented a risk that the five
> named veterans (among others) would contract Covid 19.
> But he testified that it was *not possible* to know the
> Covid-19 status of the five named veterans at the time
> of the merger, because they already had been exposed to
> Covid-19 before the merger but not yet been tested.
>
> With respect to R.C., Dr. Merchant was asked, "[G]iven
> that [R.C.] was living in a room with . . . symptomatic
> people, what did that tell you regarding [R.C.'s]
> potential COVID status on the date of the
> consolidation?" He responded, "Well, we *wouldn't know*
> what his COVID status was, you know, if he wasn't tested.
> But he was exposed, yes." *Id.* The Commonwealth inquired
> further, "So despite being in a room with individuals
> who are COVID symptomatic, can you just assume that
> [R.C.] was also infected?" Dr. Merchant responded, "*No,
> you can't assume anything in medicine*, you know."

Motion for Final Approval, Ex. 3 at 7.

        (d)   <u>Collecting any verdict</u>.

Assuming that the plaintiffs prevailed at trial and on any
post-trial appeals brought by the defendants, the defendants
individually do not have the financial means to pay for the

judgment that could have issued in the plaintiffs' favor.
Therefore, for the plaintiffs to recover any monies that a jury
awarded to them, they would be dependent on the Commonwealth of
Massachusetts to make such payments.

However, the Commonwealth's indemnification statute, M.G.L.
c. 258, § 9, leaves such indemnification difficult, at best.[22]
In fact, the plain language of the indemnification statute may
bar recovery altogether in a § 1983 action, because
indemnification is not permitted under the statute if the
defendants "acted in a grossly negligent, willful or malicious
manner,"[23] but a § 1983 claim requires proof that the defendants
acted with "deliberate indifference" to the plaintiffs'
constitutional rights.[24]

Further, it is not clear whether the $1,000,000
indemnification cap included in the statute applies on a per

---

[22] For starters, the statute is discretionary, not mandatory.  M.G.L. c. 258,
§ 9 states: "Public employers may indemnify public employees." (Emphasis
added.)

[23] M.G.L. c. 258, § 9 applies to state employees generally, like the
defendants in this case, but a separate section, M.G.L. c. 258, § 9A, applies
to claims against police. Section 9A does not include the bar against
recovery for "grossly negligent" conduct contained in § 9.  The legislature's
decision to include that bar to recovery in § 9, but to exclude from § 9A
would weigh in favor of a determination that indemnification for § 1983
claims is not permitted under § 9.

[24] See Voutour v. Vitale, 761 F.2d 812, 817-823 (1st Cir. 1985) ("Like most
other courts that have addressed the matter, we hold that the supervisor must
demonstrate at least gross negligence amounting to deliberate indifference,
and that this conduct must be causally linked to the subordinate's violation
of plaintiff's civil rights....").

plaintiff, per defendant, or per occurrence basis.  No court has yet addressed this distinction.

Still worse, the statute explicitly states that any post-trial verdict would be reduced by the defendants' attorney fees, which in this case would be astronomical.  This means that a jury verdict at trial would be (a) first reduced to the maximum amount allowed by the statute, $1,000,000, and (b) then further reduced by the defendants' attorney fees.

In other words, many obstacles exist that could prevent the plaintiffs from reaching or prevailing at trial, and, even if the plaintiffs managed to secure a judgment in their favor, which would be many years from now, such a judgment might be virtually uncollectible.

(4)  *"The amount of time devoted to the case by counsel."*

As indicated in the affidavits attached as Exhibit B and Exhibit C, Attorney Thomas Lesser has to date spent more than 550 hours working on this case, and Attorney Aleo, to date, has spent more than 1,015 hours working on this case, with many more hours on the horizon.  The amount of time counsel spent working on this case resulted in counsel having to scale back their practice and decline many other cases.

(5)  *"Awards in similar cases."*

The only settlement that Class Counsel is aware of with

similar facts occurred in New Jersey in early 2022.[25]  There,
like here, veterans living in state run facilities contracted
COVID-19, allegedly due to actions of employees of the state,
and died as a result.

In that case, a group of New Jersey attorneys, who had
entered into fee agreements with individual families, negotiated
a global settlement with the state of New Jersey.  The New
Jersey settlements were $445,000 per estate, but each estate
netted just under $300,000, because one-third came off the top
for attorneys' fees.

The awards here were a full 70% higher than in New Jersey,
a net of $510,000 per estate, much much higher than just under
$300,000.

(6)  *"Public policy considerations."*

Finally, public policy considerations weigh heavily in
favor of granting the requested attorney fees.  First as
Professor Rosenberg explains in his affidavit, an award of
attorney fees serves as an important deterrent against further
wrongdoing by the defendant.  Deterrence is particularly
important in 42 U.S.C. § 1983 cases, where it is the state that
has committed the wrongdoing.  The higher the attorney fees in

---

[25] See Families of Veterans Who Died of Covid Win $53 Million Legal Settlement,
Christopher    Weaver,    New    York    Times,    December    23,    2021,    at
https://www.nytimes.com/2022/01/07/nyregion/nj-nursing-home-covid-
settlement.html.

such cases, the greater the deterrent.  If this Court were to award less than the parties' agreed upon fee, it would be a disincentive in the future for the Commonwealth to settle such disputes or take pro-active steps to prevent such tragedies from occurring.

Second, attorneys should be encouraged to take on difficult cases when people are harmed by state action.  In taking this case on, counsel was aware that (a) the likelihood of prevailing at trial and actually recovering a judgment was, at best, difficult, (b) numerous other attorneys had declined to represent the veterans who had died of COVID-19 at the Holyoke Soldiers' Home, and (c) if the case went to trial, the firm would end up spending several million dollars' worth of billable hours, as well as incurring a minimum of $500,000 in expert fees.[26]

The case was brought, in the spirit of the words of Barack Obama in his first Inaugural Address, as a "duty . . . not grudgingly accept[ed], but rather seize[d] gladly, firm in the knowledge that there is nothing so satisfying to the spirit, so defining of our character than giving our all to a difficult task.  This is the price and the promise of citizenship."

Bringing a lawsuit of this nature is a daunting task.  It

---

[26] Any sizable award would require a Special Act of the Legislature.

should be rewarded with a full attorney fee award, particularly in this case, where the requested fee is on the low end of the range of attorney fee awards recoveries in common fund class actions in the First Circuit and a full attorney fee award will not decrease the amounts to be received by the Class Members.

    *b. Lodestar method*

Although the Class Settlement Agreement does not contemplate compensating Class Counsel based on the amount of time that counsel spent litigating this case, Class Counsel has submitted affidavits as Exhibits B and C attesting to the time that Thomas Lesser and Michael Aleo spent working on this matter.[27]

V.    <u>CONCLUSION</u>

WHEREFORE, Class Counsel asks the Court to issue an Order awarding Class Counsel attorney fees in the amount of $11,513,500, as set forth in Section 10 of the Settlement Agreement.

---

[27] Under the "lodestar" method, attorney fees are initially calculated using "the number of hours reasonably expended multiplied by a reasonable hourly rate for attorneys of similar skill within that geographic area." <u>Bezdek</u>, 79 F.3d at 350 (quoting <u>In re Relafen Antitrust Litig.</u>, 231 F.R.D. 52, 72 (D. Mass. 2005) and citing <u>Spooner v. EEN, Inc.</u>, 644 F.3d 62, 68 (1st Cir. 2011)). "The court may then elect to adjust the lodestar amount, either upward or downward, if the specific circumstances of the case warrant such an adjustment." <u>Pérez-Sosa v. Garland</u>, 22 F.4th 312, 321 (1st Cir. 2022).

Date: November 2, 2022    /s/ Michael Aleo
                          Thomas Lesser
                          lesser@lnn-law.com
                          Michael E. Aleo
                          aleo@lnn-law.com
                          Lesser, Newman, Aleo & Nasser, LLP
                          39 Main Street
                          Northampton, MA 01060
                          (413) 584-7331


## CERTIFICATE OF SERVICE

        I, Michael Aleo, hereby certify that this document has been
filed through the ECF system and will be sent electronically to
the registered participants as identified on the Notice of
Electronic Filing.


Date: November 2, 2022    /s/ Michael Aleo