```
              UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
_____
                              )
ESTATE OF PAUL SNIADACH, et al.)   No. 20-CV-30115
                              )
         Plaintiffs           )
v.                            )
                              )
BENNETT WALSH, et al.         )
                              )
         Defendants           )
_____)
```

### AFFIDAVIT OF THOMAS LESSER, ESQ. IN SUPPORT OF CLASS COUNSEL'S FEE PETITION

I, Thomas Lesser, swear under the pains and penalties of perjury that the following is true to the best of my information and belief:

1. I serve as co-Class Counsel in the above-captioned case.

2. I met with Paul Sniadach and his family for the first time on July 11, 2020.

3. After meeting with Paul Sniadach and his family and hearing their story about what had happened to Joseph Sniadach while he was a resident at the Holyoke Soldiers' Home, I agreed to represent the family in filing a lawsuit against the negligent parties.

4. At the time that I agreed to represent the Sniadach family, I was aware that a number of attorneys in Hampden County had declined to represent veterans who contracted and died of

1

COVID-19 at the Holyoke Soldiers' Home.

5. I understood that the case would be difficult and filled with impediments to recovery. The legal hurdles were formidable.

6. The legal barriers I immediately identified included (a) the fact that the due process claim on which the case would be predicated had little First Circuit support, (b) the defendants' qualified immunity defense was a strong defense, (c) class certification would be opposed, (d) both deliberate indifference and causation would be difficult to prove at trial, and (e) the indemnification statute was fraught with language which potentially would limit, reduce or even preclude recovery.

7. I filed the case knowing that if the case went to trial, I would (a) spend several millions of dollars of legal time, and (b) incur expert and other costs in excess of $500,000, all without a likelihood of recovery.

8. I filed the case because of my agreement (paraphrasing the words of President Barack Obama in his first Inaugural Address) that there are certain things we are bound or required to do for ourselves and our community, and that we seize those duties gladly and not begrudgingly.

9. I filed the case with a commitment that, given the Commonwealth's egregious failure to provide proper care for the servicemen and women who had so voluntarily served their

country, the families of those veterans deserved to have their day in court.

10.  Throughout the process, from the filing of the lawsuit to the present, I have talked to and heard heart-rending stories from the families of the veterans who contracted COVID-19 at the Holyoke Soldiers' Home, about their loved ones, about what they experienced and how their loved ones suffered at the Holyoke Soldiers' Home beginning in March 2020.  I will never forget their stories, which are forever etched into my mind.  For example, the daughter who told me that her father would have "died with more dignity on the beaches of Normandy" than how he died at the Holyoke Soldiers' Home.

11.  My initial attempts at resolving the case short of protracted litigation met with resounding failure.  It was only after we amended the complaint to include Mary Lou Sudders, the Secretary of Health and Human Services, that settlement negotiations began, sixteen months after the original filing.

12.  Negotiations with the Commonwealth began with agreeing upon the language of a Term Sheet.  Once we agreed on that language, the negotiations then shifted to the amount that Settlement Class A and Settlement Class B members would receive.

13.  A major stumbling block to obtaining what I, and my clients, deemed a fair settlement was that there had been only one settlement of a similar case in the country (in New Jersey),

and that settlement resulted in awards of less than $300,000 to the estates of the deceased veterans after the payment of attorney fees. That amount was far too low, in our opinion, to settle the case.

14. A major portion of our work included researching and addressing the legal issues listed above in paragraph 5. Once the Secretary of Health and Human Services was added as a defendant, the scope of supervisory liability under 42 USC § 1983 came to the forefront. The Commonwealth had to be convinced before they would engage in meaningful settlement negotiations that (a) the case would survive their motions to dismiss and (b) we had the fortitude and will to proceed to trial.

15. Both before and during the negotiations, we consulted experts in every area of the law, including (a) due process claims under § 1983, (b) the Massachusetts indemnification statute, (c) class actions, and (d) COVID-19 liability.

16. Prior to settlement, we explored whether federal funds were available to supplement any state appropriations.

17. We talked to reporters regularly, particularly from the Boston Globe, in an attempt to apply pressure on the Governor to settle in a fair amount.

18. Serious negotiations took place over which veterans would be included as Class B veterans in the Settlement

Agreement. The Perlstein report had identified 76 veterans, but through the efforts of Class Counsel, that number increased to 84 prior to the filing of the Settlement Agreement. Since each veteran in Class B was entitled to $510,000, an increase of eight Class Members meant that $4,080,000 in additional funds went to families of Class B veterans.

19. After the settlement was filed, Class Counsel submitted Claims to the Claims Administrator for additional veterans to be admitted to Class B. Three were accepted, which increased the settlement award amount by another $1,530,000.

20. Our work included doing investigatory work to locate class members who did not respond to the initial mailed Notice. Eventually, every Class Member in both Class A and Class B was found.

21. My decision to accept this case with the resulting time requirements, meant that I scaled back my practice and declined many requests to represent other clients.

22. My background is as follows:

    (a)  I graduated from Harvard Law School in 1972.

    (b)  I was admitted to practice law in the Commonwealth of Massachusetts in January 1973.

    (c)  I began practicing law in Northampton in 1973 for the Western Massachusetts Migrant Worker Project.

    (d)  In 1974, I began the law firm which is now known

       as Lesser, Newman, Aleo & Nasser, LLP.

  (e)  I have practiced law with this firm since 1974.

  (f)  Since I began the practice of law in 1973, over 90 percent of my practice has been in litigation, either civil or criminal.  I practice throughout the Commonwealth of Massachusetts with major cases in Suffolk, Middlesex, Worcester, and Dukes County, as well as in western Massachusetts.

  (g)  My minimum billing rate is $600.00 per hour.

23.  I have contemporaneously documented the time that I have spent working on this dispute, in excess of 550 hours.  My time is delineated in approximately 20 pages of records, which will be provided to the Court upon request.

24.  My documentation of the time that I have spent working on this dispute omits a considerable amount of time that I failed to contemporaneously document (including communications with clients, the press, and with numerous other attorneys with whom I discussed various legal theories and strategies relating to the case, etc.).

25.  I will be spending many more hours of working on this case before the case is finally resolved.

Date: November 2, 2022        /s/ Thomas Lesser
                                         _____

CERTIFICATE OF SERVICE

    I, Michael Aleo, hereby certify that this document has been filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

Date: November 2, 2022       */s/ Michael Aleo*